## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| COIN CENTER; PATRICK O'SULLIVAN; JOHN DOE; and DAVID HOFFMAN, <br>                 Plaintiffs, <br><br>         v. <br><br> JANET YELLEN, in her official capacity as Secretary of the Treasury; DEPARTMENT OF THE TREASURY; ANDREA M. GACKI, in her official capacity as Director of the Office of Foreign Assets Control; and OFFICE OF FOREIGN ASSETS CONTROL, <br>                 Defendants. | Case No. _____ |

## COMPLAINT

Plaintiffs file this complaint for declaratory and injunctive relief against Defendants and allege as follows.

## NATURE OF THE ACTION

1.     On August 8, 2022, the Biden Administration criminalized the use of Tornado Cash, an open-source software tool that helps Americans maintain their privacy while using cryptocurrency and related assets. It justified this action based on its power to sanction foreign enemies, even though Tornado Cash is not controlled by

foreign enemies and Americans' use of the technology does not involve foreign enemies. The Administration's use of the foreign-affairs power to punish domestic cryptocurrency users was unprecedented and unlawful.

2.      Plaintiffs all use Ethereum. Ethereum is a digital marketplace that uses shared online technology to help people order their finances without needing to trust banks, governments, or other third parties. It enables transactions involving cryptocurrency and other similar crypto assets. Tens of millions of Americans, from Tom Brady to local retailers, use Ethereum.

3.      Ethereum's functionality depends on a transparent public ledger. When someone completes a transaction using Ethereum, that transaction is posted to a ledger visible to anyone. The transaction can't be erased or hidden from view. Although users transact using pseudonymous addresses, there are a variety of ways to connect a person's identity—and therefore to all his transactions and assets—to his address on the public ledger.

4.      If a user doesn't take proactive steps to protect his privacy, the ledger's transparency allows strangers to track his private associations and stalk his intimate relations. It invites publicization of and retaliation for his private contributions to unpopular causes. And it allows anyone to see whether he has a lot of assets, which would put a target on his back.

5.      To protect themselves, users of Ethereum employ privacy tools. These tools generally allow users to clear any publicly discernible connection between their

past and future transactions. They do this by making transactions by the same person appear unrelated, thereby stymying bad actors who seek to track, stalk, retaliate, and endanger.

6.      Tornado Cash is the state-of-the-art privacy tool on Ethereum. It is a software program permanently stored on the Ethereum ledger, so it can be accessed or used by anyone. To use Tornado Cash, a user moves his crypto assets to a Tornado Cash address. There are at least 20 such addresses, each for a different type of crypto asset or a different amount thereof. After moving his asset to that address, the user can then direct the asset's release to a new address, controlled either by him or by someone he wishes to receive the asset.

7.      To anyone viewing the public ledger, it is impossible to tell when the person retrieved his asset or which new address it went to. Once it arrives at the new address, it cannot be connected to the earlier address using publicly available data. If the user wishes to relink the two addresses and prove that both were his, he can do so, selectively revealing his identity, but no stranger can perform this re-identification without his consent.

8.      Nobody controls Tornado Cash. It is an immutable tool that automatically executes according to the user's wishes. The tool is software residing on the Ethereum blockchain at specified Ethereum addresses. Anyone with an internet connection can move digital assets to those addresses and the software will automatically perform the aforementioned steps to protect the user's privacy.

Throughout this entire process no human, apart from the user, is empowered or relied upon to hold or move the assets.

9.    Cryptocurrencies like Bitcoin are known, in part, for creating irreversible transactions that, once confirmed in the shared public ledger online, cannot be canceled, withdrawn, altered, or rescinded by the sender or any third party. This quality is often referred to as immutability. Ethereum takes this capability a step further and allows technologists to publish immutable software tools to the public ledger. Once published, these tools are available for anyone with an internet connection to use, and they will perform exactly as the rules in their software command. No person can alter their functionality or remove their availability, just as no person can reverse or rescind a cryptocurrency payment.

10.    The International Emergency Economic Powers Act of 1977, which is the statutory descendant of the Trading with the Enemy Act of 1917, allows the President to restrict trade with foreign enemies under emergency conditions.

11.    As relevant here, it authorizes the President to "declar[e] a national emergency with respect to" an "unusual and extraordinary" foreign threat. 50 U.S.C. §1701(a).

12.    Once the President declares that emergency, the Act allows him to criminalize certain transactions, but only if the transactions include "any property in which any foreign country or a national thereof has any interest." §1702(a)(1).

13.     Under executive delegations and regulations, Defendants exercise a subpart of the President's power under IEEPA. Specifically, under certain conditions, Defendants can criminalize transactions that fall within the scope of the statute, but only by designating "persons" with whom Americans cannot trade. 31 C.F.R. §578.201(a).

14.     Invoking this authority last August, Defendants criminalized all transactions involving 38 Ethereum addresses. Those 38 addresses include the 20 addresses that constitute the core of the Tornado Cash privacy tool—the same ones described above and that are at issue in this lawsuit.

15.     As a result of the Biden Administration's action, Americans who use Tornado Cash to protect their privacy while using their own assets are criminals. Additionally, their receipt of any asset through Tornado Cash, even one from a stranger that they did not solicit, is a federal crime. And their use of Tornado Cash to protect their expressive activities is criminal as well.

16.     Defendants' action was unlawful for four main reasons.

17.     First, Defendants' criminalization of Tornado Cash exceeded their statutory authority because Tornado Cash is used to complete functions that do not include "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. §1702(a)(1). Americans use Tornado Cash unilaterally to protect their own property. Defendants' defiance of this statutory element assumes an

authority that would give them virtually unlimited control to regulate the American economy.

18.     Second, Defendants' criminalization of Tornado Cash also exceeded their regulatory authority because Tornado Cash is not a "person." 31 C.F.R. §578.201(a). It is a privacy tool beyond the control of anyone.

19.     Third, Defendants' criminalization of Tornado Cash was arbitrary and capricious because it failed to consider important aspects of the problem, changed its position without explanation, and defied its own rules on the books.

20.     And fourth, Defendants' criminalization of Tornado Cash violated the constitutional rights of Tornado Cash users who need it to protect their private associations.

21.     Plaintiffs all would have used or continued to use Tornado Cash to protect their privacy in the future, but are prevented from doing so as a result of the Biden Administration's criminalization of Tornado Cash.

22.     They respectfully request that this Court hold unlawful, set aside, and permanently enjoin the enforcement of the criminalization of Tornado Cash.

## THE PARTIES

23.     Plaintiff Coin Center is the leading nonprofit research and advocacy center focused on the public-policy issues facing cryptocurrency and decentralized computing technologies. It defends the rights of individuals to build and use free and

open cryptocurrency networks, including the right to write and publish code, the right to assemble into peer-to-peer networks, and the right to do all this privately. Coin Center produces and publishes research, educates policymakers and the media about cryptocurrencies, advocates for sound public policy, and defends digital civil liberties. It is based in Washington, D.C.

24.    Coin Center uses Ethereum. It routinely receives contributions from donors in the form of crypto assets.

25.    Many of Coin Center's donors want to keep their contributions private. They value privacy, both when it comes to public knowledge of their crypto assets and public knowledge of their expressive associations. Many of them engage in transactions that can be traced on Ethereum's public ledger with the assets that they intend to contribute to Coin Center.

26.    Coin Center's donors therefore used in the past, and would use in the future, Tornado Cash to protect their privacy. They would send a crypto asset to a Tornado Cash address, and then release it to an address controlled by Coin Center. It is impossible to tell whose assets are being sent to Coin Center's account when they come from a Tornado Cash address.

27.    As a result of the Biden Administration's criminalization of Tornado Cash, these donors are less likely to contribute to Coin Center. They are effectively barred from engaging in expressive advocacy because, without Tornado Cash, they cannot do so with confidence that their associations will remain private. By forcing

them to make contributions on the public ledger, the Biden Administration's criminalization of Tornado Cash chills their expressive activity. Coin Center expects to lose contributions from these donors.

28.     Coin Center is not a terrorist or a criminal and does not transact with terrorists or criminals. In the course of receiving contributions through Tornado Cash from American donors, the donors' and Coin Center's assets would never come under the control of any foreign person.

29.     Plaintiff Patrick O'Sullivan is a software developer who resides in Escambia County, Florida.

30.     Mr. O'Sullivan uses Ethereum. He is routinely paid by his employer in crypto assets, and he routinely obtains crypto assets from public exchanges.

31.     Mr. O'Sullivan's use of Ethereum can be monitored on Ethereum's public ledger. Mr. O'Sullivan shares his Ethereum addresses with other parties, transfers assets to himself from accounts with third parties who hold his personal information, and is a publicly known user and developer of Ethereum-related technology. As a result, Mr. O'Sullivan's transactions and assets can easily be tracked by the public at large.

32.     He therefore routinely uses privacy tools to protect himself and his family. He has used a number of privacy tools, each of which has its own advantages.

33.     Mr. O'Sullivan believes that the best practice for protecting his privacy is to use multiple privacy tools. Mr. O'Sullivan believes that Tornado Cash is one of the

best options for protecting his privacy. And Mr. O'Sullivan does not believe that alternatives, standing alone, would provide him with adequate privacy and security. He therefore intended to use Tornado Cash in his regular rotation of privacy tools.

34.    Mr. O'Sullivan intended to move assets from an address under his control to a Tornado Cash address and then later release them to a new address, also under his control. At no point would these assets have been controlled by anyone else.

35.    All of Mr. O'Sullivan's crypto assets come from his American employer or from public exchanges. He is not a terrorist or a criminal and does not transact with terrorists or criminals. In using Tornado Cash, his assets would never come under the control of any other person, including any foreign person.

36.    As a result of Defendants' action, Mr. O'Sullivan cannot carry out his intended uses of Tornado Cash.

37.    John Doe is a human-rights advocate who resides in the southeastern United States. Mr. Doe is proceeding anonymously because he credibly fears that, if his identity is exposed, Russian agents will learn about his pro-Ukranian activities and will harm him and his family.

38.    After Russia invaded Ukraine, Mr. Doe began providing and coordinating support for Ukrainians under attack. Since April 2022, he has been supporting Ukrainians personally and has facilitated sizable crypto donations from other donors. He and his donors call themselves the 688th Support Brigade.

39.     Mr. Doe provides and facilitates donations that go to supporting the most urgent needs of Ukrainians at war. His efforts have paid for gloves, shoes, helmets, drones, and vehicles to assist Ukrainian frontline efforts. While many say they support Ukraine, Mr. Doe and his donors are actually doing something about it.

40.     Crypto donations to Ukraine have made a substantial positive impact. As Senator Toomey recently recounted in a congressional hearing, "While there has been virtually no evidence of Russia meaningfully using cryptocurrencies to evade sanctions, Ukraine has been actively utilizing cryptocurrencies to do tremendous good. Cryptocurrency donations for Ukraine have reached approximately $100 million, which has helped Ukrainians defend their country against Russia's invasion. These funds have gone towards more than 5,500 bulletproof vests, 500 helmets, and 410,000 meals, among other things. Ukraine's Deputy Minister of Digital Transformation has said that 'each and every helmet and vest bought via crypto donations is currently saving Ukrainian soldiers' lives.'"

41.     Mr. Doe and the donors he assists came to the mutual agreement that donating to Ukrainians could jeopardize their and their families' safety. Without privacy protections, Russian agents and Russian-funded hackers could identify and retaliate against donors for providing frontline aid. If the donors' identities were revealed, their lives could be in danger when they travel abroad and they could be targeted by hackers. Mr. Doe's donors want to support Ukraine without fear of being harmed. They also inherently value making contributions privately.

42.     Every single donor has used Tornado Cash. Under Mr. Doe's direction, a donor will move his crypto asset to a Tornado Cash address, then later release it from that address to an account controlled by Mr. Doe exclusively for the provision of aid. From that latter account, Mr. Doe can send the assets to recipients who purchase the aid for Ukraine. It is impossible for an outside observer to tell whose assets are being sent to the latter account because they all come through a Tornado Cash address.

43.     Mr. Doe himself has contributed to these efforts using Tornado Cash. He has moved assets from a personal address to a Tornado Cash address, and then released those assets from the Tornado Cash address to his address that he uses exclusively for the provision of aid. He intended to continue doing so.

44.     Mr. Doe is not a terrorist or a criminal and does not transact with terrorists or criminals. In the course of using Tornado Cash for his own contributions, his assets would never come under the control of any other person, including any foreign person. In the course of using Tornado Cash for contributions by other American donors, their assets would never come under the control of any foreign person.

45.     As a result of the Biden Administration's criminalization of Tornado Cash, donations have stopped. Mr. Doe is not comfortable facilitating donations without the protection of Tornado Cash. He is not confident that any alternative tools, standing alone, will provide a sufficient level of privacy or security.

46.     Plaintiff David Hoffman is a crypto asset investor and entrepreneur who resides in New York.

47.     Mr. Hoffman uses Ethereum publicly. Like many users, Mr. Hoffman makes one of his Ethereum addresses public, so that anyone can access it online and transact with him.

48.     After the Biden Administration criminalized Tornado Cash, an unknown person sent crypto assets to Mr. Hoffman's public address through Tornado Cash. And Ethereum users like Mr. Hoffman have no ability to reject incoming transfers. So the criminalization of Tornado Cash empowered someone else to implicate Mr. Hoffman and force reporting obligations on him by causing him to receive an asset from a sanctioned entity. And it has licensed anyone else who wishes to harass or inconvenience Mr. Hoffman to continue to send crypto assets through Tornado Cash to Mr. Hoffman's publicly known addresses, each time triggering potential liability and reporting obligations.

49.     Mr. Hoffman intended to continue to use Tornado Cash in the future. He routinely uses privacy tools to protect himself while using crypto assets. Mr. Hoffman believes that Tornado Cash is a uniquely effective tool for protecting his privacy.

50.     Mr. Hoffman intended to move assets from an address under his control to a Tornado Cash address and then later withdraw them to a new address, also under his control. At no point would these assets have been controlled by anyone else.

51.     Mr. Hoffman is not a terrorist or a criminal and does not transact with terrorists or criminals. And in using Tornado Cash, his assets would never come under the control of any other person, including any foreign person.

52.     As a result of Defendants' criminalization, Mr. Hoffman is burdened with potential civil and criminal liability through no fault of his own, saddled with reporting obligations, and impeded from carrying out his intended use of Tornado Cash.

53.     Defendants—Janet Yellen, in her official capacity as Secretary of the Treasury; U.S. Department of the Treasury; Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, and the Office of Foreign Assets Control—are responsible for the enforcement and administration of the criminalization of Tornado Cash. Treasury is a federal administrative agency, and OFAC is an agency within Treasury. Both Treasury and OFAC are headquartered in Washington, D.C. Defendants acted under color of law at all relevant times.

54.     The criminalization of Tornado Cash constituted final agency action.

## JURISDICTION AND VENUE

55.     This action arises under the Administrative Procedure Act, 5 U.S.C. §500 et seq., and the United States Constitution.

56.     This Court has jurisdiction under 28 U.S.C. §1331.

57.     Venue is proper in this District under 28 U.S.C. §1391(e)(1) because Plaintiff O'Sullivan resides here and Defendants are federal agencies and officers acting in their official capacities.

## BACKGROUND

58.     Ethereum is a digital marketplace. It uses shared online technology to help people transact and order their finances. It hosts transactions involving cryptocurrency and other assets that use cryptographic technology.

59.     Ethereum allows people to transact across long distances without middlemen. It allows people to protect against inflation by using a store of value whose supply cannot be increased by any central bank. It allows people to structure advanced financial transactions and enforce the terms of their agreements with certainty. And it allows anyone with an internet connection to participate, regardless of their race, religion, or social status.

60.     "Ethereum is arguably the most crucial platform in the crypto industry." Yaffe-Bellany, *Crypto's Long-Awaited 'Merge' Reaches the Finish Line*, N.Y. Times (Sept. 15, 2022), nyti.ms/3fbOnGm. It is used by tens of millions of Americans. It facilitates transactions involving Ether, the second most common cryptocurrency in America. The present value of Ether is around $200 billion, or about the value of McDonald's. It also facilitates transactions involving a wide range of additional crypto assets.

61.     To use Ethereum, a person creates an address, which is a personal account that only they can access and use. The address uses a pseudonym so that it can't be immediately traced to the person who uses it.

62.     Ethereum's functionality depends on a transparent public ledger. When someone completes an Ethereum transaction, that transaction is posted to a public ledger visible to anyone, alongside his address. That transaction can't be erased or hidden from view.

63.     Although a person transacts using a pseudonymous address, there are a variety of ways to connect a person's identity to his address. In fact, users are sometimes required by law to disclose their identity when using cryptocurrency. Once outsiders connect a person's identity to the address that he uses, they can inspect all of the user's transactions and assets.

64.     Users who don't use privacy tools can therefore face risks. The transparent nature of the public ledger has allowed violent burglars to identify people holding valuable crypto assets, and even torture them in front of their families until they hand over access to their crypto assets. *E.g.*, Higgins, *Man Stole $1.8 Million in Ether After Armed Robbery, Prosecutors Say*, CoinDesk (Dec. 13, 2017), bit.ly/3farJhI; Kramer, *Dutch Bitcoin Trader Suffers Brutal Torture with a 'Heavy Drill' in Violent Robbery*, Yahoo! (Feb. 25, 2019), yhoo.it/3SsIK5k. It can also allow unwanted snooping on private relationships and intimate transactions.

65.     That's where Tornado Cash comes in. Tornado Cash is a tool that allows users of cryptocurrency to protect themselves from being followed in everything that they do. It allows them to clear any discernible connection between their past transactions and their future transactions. They route an asset through a Tornado Cash address and then can release it to a new, apparently unconnected address at a later date.

66.     To anyone attempting to track the user, they will see that he moved some asset to a Tornado Cash address, but will not know which release from that address was under his control because it will be released to a new address with no connection to the user's earlier activities. All that an outsider will see on the public ledger is something like the following:

Time 1: [1 Ether] Known User Address → Tornado Cash Address

Time 2: [1 Ether] Tornado Cash Address → New Address

The user also provides, at Time 2, for the release of the asset to an address under his control or someone else's control. The user also controls how long to wait between Time 1 and Time 2. In between those two times, other users will also move and release funds from Tornado Cash, so any given user's two transactions will appear unrelated.

67.     There are at least 20 addresses that make up the core of Tornado Cash. Each address corresponds to a certain fixed amount of a certain crypto asset, so each user using any given Tornado Cash address will move the same amount, such as 1

unit, and then release the same amount later on. This makes each interaction with any given address look indistinguishable.

68.     Throughout the duration of his use of Tornado Cash, the original user retains complete control of his assets. When he moves assets to a Tornado Cash address, he retains the ability to release them at any time. Tornado Cash is not like a bank that lends and invests assets once it receives them; nor does it ever mix or commingle different people's assets together. So from the user's perspective, it's like a safe that keeps his asset secure and that only he can unlock.

69.     Nobody controls Tornado Cash. It consists of computer code that self-executes on the user's command. Nobody can rewrite the Tornado Cash software to change how it works. And nobody can remove the Tornado Cash software. It is permanent, immutable, and automatic.

70.     Thanks to Tornado Cash, people can use Ethereum without worrying about the safety of themselves and their families. They can keep their personal contributions and associations private. And they can rest assured that their activities will not be tracked by bad actors who might do them harm.

71.     Many Ethereum users use Tornado Cash routinely to keep their assets private and secure. It is widely regarded as a good practice for anyone who wishes to participate in Ethereum responsibly.

72.     Like every good technology in human history, Tornado Cash is used by some people to do bad things. Tornado Cash makes it harder to follow what all users

are doing, so it makes it harder to follow what criminals are doing. But like other good technologies, it provides innumerable benefits to law-abiding Americans, and their use is understandable and appropriate.

73.     For some time, it was widely believed that the United States would lead the way in embracing Ethereum and other crypto assets. Many American governors, legislators, mayors, and public figures have celebrated America's pioneering role in the use of cryptocurrency. *See, e.g., Gov. DeSantis Seeks 'Crypto Friendly' Florida*, CBS Miami (Dec. 10, 2021), cbsloc.al/3riBn52; Stewart, *Cryptocurrency Gets Warm Texas Welcome from Gov. Abbott*, Houston Chronicle (Jun. 22, 2021), bit.ly/3O0vtzk; Yaffe-Bellany, *The Rise of the Crypto Mayors*, N.Y. Times (Jan. 25, 2022), nyti.ms/3O4MUyB.

74.     But America's leading role has been thrown into reverse by the Biden Administration's recent efforts to punish crypto users. For a variety of political reasons, the Administration has sought to hyper-regulate and criminalize common uses of cryptocurrency. Klein, *How Biden's Executive Order on Cryptocurrency May Impact the Fate of Digital Currency and Assets*, Brookings (Mar. 17, 2022), brook.gs/3vaMxKl; Hall, *Biden Administration Targets Bitcoin Mining In New Report*, Nasdaq (Sept. 21, 2022), bit.ly/3S31DvE. Warmbrodt, *Elizabeth Warren's Anti-crypto Crusade Splits the Left*, Politico (Mar. 15, 2022), politi.co/3xlCPaF.

75.     Perhaps no attack on the crypto world has been as severe as the August 8, 2022 criminalization of Tornado Cash.

76.     Under the International Emergency Economic Powers Act, the President can take certain actions after "declar[ing] a national emergency with respect to" an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a).

77.     After declaring an emergency, the President can take certain actions. §1702(a)(1). As relevant here, the President can prohibit transactions subject to American jurisdiction, but only if those transactions include "any property in which any foreign country or a national thereof has any interest." *Id.* The President cannot prohibit transactions that include no foreign property, such as transactions among Americans or activities by a single American with respect to his own property.

78.     In full, and broken down by element, the statute authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit
>
> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> any ***property*** in which ***any foreign country*** or a ***national thereof*** has any interest
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States.

§1702(a)(1)(B) (emphasis added).

79.    In 2015, President Obama declared a national emergency with regard to "cyber-enabled" activities originating from abroad. See Exec. Order 13694, 80 Fed. Reg. 18,077 (Apr. 2, 2015).

80.    President Obama also delegated some of his power under §1702(a)(1) to the Secretary of the Treasury. *Id.* at 18,077-18,078. In his Executive Order, President Obama authorized the Secretary of the Treasury to identify "person[s]" involved in qualifying cyber-enabled activities. *Id.* He then authorized the Secretary to "bloc[k]" the "property and interests in property" of any of those identified persons. *Id.*

81.    The Secretary of Treasury in turn delegated that authority to the Director of OFAC and enacted regulations to govern the exercise of that authority. *See* 31 C.F.R. §§578.802, 578.201 et seq.

82.    As relevant here, those regulations provide that, under certain conditions, Defendants can criminalize transactions that fall within the scope of the statute. But they can do so only by designating "persons" with whom Americans cannot trade. This was the law when Tornado Cash was criminalized (see 80 Fed. Reg. 81,752, 81,754 (Dec. 31, 2015)) and was confirmed as the law in updated regulations issued subsequent to that criminalization. 31 C.F.R. §578.201(a) (effective Sept. 6, 2022). The term "person" means only an "individual or entity." §578.313. It does not cover an idea, a tool, or a technology.

83.    The Director of OFAC maintains a Specially Designated Nationals and Blocked Persons List, which in turn designates persons pursuant to IEEPA (and other statutes).

84.    Adding a person to the List criminalizes transactions with that person. If an American transacts with a person on the List, he commits a federal felony punishable by up to 20 years in prison and a $1,000,000 fine. Americans are also required to block any property or interests in property of that designated person, and are required to report any such blocked property in their possession or control to OFAC. *See* 31 C.F.R. §578.201; *id.* §578.701; *id.* §501.101 et seq.; 87 Fed. Reg. 54,373 (Sept. 6, 2022).

85.    Some earlier designations on the List include Vladimir Putin, Saddam Hussein, Bashar al Assad, Qasem Soleimani, and Muammar Gaddafi. *See OFAC Specially Designated Nationals and Blocked Persons List*, bit.ly/3QNEZGe.

86.    As a result of these designations, it would be a felony for an American to, for example, sell a house to Vladimir Putin.

87.    But on August 8, 2022, OFAC made a new and unprecedented kind of designation. It added "Tornado Cash" to the List. *See U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), bit.ly/3eP6T7r. Its designation included 38 Ethereum addresses.

88.    In its press release, OFAC did not appear to understand what it was designating. It referred to Tornado Cash as a "blocked perso[n]," *id.*, and described its

"willingness to remove" Tornado Cash if it demonstrated "a positive change in behavior," *id.*, even though Tornado Cash is merely a widely available software tool, lacking agency and not controlled by anyone.

89.     The 38 designated addresses include 20 addresses at issue in this lawsuit. Those 20 addresses constitute the core of Tornado Cash. They are identified in full in the appendix to this complaint. Each allows users to move assets and later release assets to a new address using the same basic tool known as Tornado Cash.

90.     The other 18 addresses are either non-functional, serve other purposes, can be controlled by someone, or share all of these characteristics. For purposes of this lawsuit, Plaintiffs do not challenge Defendants' claim that transactions with those 18 addresses involve qualifying foreign property and involve persons within Defendants' authority.

91.     But each of the 20 Tornado Cash addresses at issue here are immutable and operate automatically. They are used to complete functions that do not involve any property in which any foreign country or national thereof has any interest. The addresses are not themselves property. None is a person, none identifies a person, and none is controlled by any person. They are therefore beyond the scope of Defendants' statutory and regulatory authority to criminalize.

92.     But as a result of the Biden Administration's action, using these addresses is now criminal. No Ethereum user subject to American jurisdiction can lawfully use Tornado Cash for any purpose. Plaintiffs and other law-abiding citizens

are prohibited from depositing, withdrawing, sending, or receiving funds through Tornado Cash, even when the funds are lawfully obtained and being used for lawful purposes.

93.    For users who had moved an asset to Tornado Cash but not yet released it, they now cannot release their own property. *See Frequently Asked Questions No. 1079*, Dep't of Treasury, bit.ly/3dEKSrE; Fries, *OFAC Breaks Its Silence on Funds Locked with Tornado Cash*, Tokenist (Sept. 13, 2022), bit.ly/3dJZTss.

94.    And for all Americans, it is now a crime to use a helpful privacy tool, even though they will never transact with any foreigner or any property in which any foreigner had any interest by virtue of using that tool. *See Frequently Asked Questions No. 1077*, Dep't of Treasury (Sept. 13, 2022), bit.ly/3dEKSrE.

95.    For all Americans, it is now impossible to use the best tool for protecting their privacy when they engage in expressive associations with crypto assets. They are chilled from contributing to causes that they support because those contributions will now be subject to public exposure. By criminalizing this privacy tool, the Biden Administration has chilled—and in some cases altogether prevented—Americans from engaging in protected advocacy.

96.    To justify its action, the Biden Administration explained that the Lazarus Group, a North Korean criminal organization, used Tornado Cash to cover up its theft of crypto assets. But neither the Lazarus Group nor any other foreign

organization has control over Tornado Cash, let alone an interest in transactions that Americans make with themselves and each other using Tornado Cash.

97.     Making it a crime for Americans to use Tornado Cash because the Lazarus Group used Tornado Cash to further its illicit activities is like making it a crime for Americans to use email because the Lazarus Group used email to further its illicit activities. Sometimes good tools are used by bad people. That inevitability does not justify criminalizing every American's use of those tools, and the law gives Defendants no such power.

98.     The criminalization of Tornado Cash, perversely, means that foreign terrorists can take down parts of the American economy by using our best technologies and ideas—a kind of new-age heckler's veto.

99.     Worse, the criminalization of Tornado Cash does not even prevent foreign terrorists from using it. It remains online and operable, precisely because nobody can control it.

100.   The criminalization of Tornado Cash has created far-reaching and embarrassing consequences. Because Tornado Cash consists of already-published, self-executing code, it is still operational. The fact that no intermediary is necessary for Tornado Cash to operate means that anyone can send unsolicited crypto assets through Tornado Cash to Americans with known Ethereum addresses. In other words, the Biden Administration has empowered any bad actor to easily subject a law-abiding American to potential civil and criminal liability and burdensome

reporting obligations, through no fault of the American's own—a phenomenon known as "dusting."

101. And that has happened. Soon after the Biden Administration's criminalization of Tornado Cash, an unknown person or persons sent small amounts of crypto assets ("dust") through Tornado Cash to a wide range of celebrities and publicly known users of Ethereum. Mack, *US Treasury Sanctioning Tornado Cash Unleashes 'Max Chaos' In The Crypto Universe*, Forbes (Aug. 9, 2022), bit.ly/3R0dCc8.

102. For example, unknown actors sent assets through Tornado Cash to Shaquille O'Neal and Jimmy Fallon. And many Americans who lack the teams of lawyers that are available to Shaquille O'Neal and Jimmy Fallon were subject to similar acts. Tan, *Someone Is Trolling Celebs by Sending ETH From Tornado Cash*, CoinDesk (Aug. 9, 2022), bit.ly/3ffm0XZ; Chow, *A New U.S. Crackdown Has Crypto Users Worried About Their Privacy*, Time (Aug. 10, 2022), bit.ly/3LEJxOa.

103. Because the law imposes strict liability, users who are "dusted" in this manner still face criminal liability and still have reporting obligations. Treasury confirmed as much in the FAQs it released on September 13, 2022. In response to a question about dusting, the FAQs confirm that "[t]echnically, OFAC's regulations would apply to these transactions." All that Treasury could say is that, in its unilateral discretion, OFAC would not "prioritize enforcement" against dusted individuals whose reports were merely "delayed."

104.    Without judicial relief, the Biden Administration's action will prevent Plaintiffs and others who are similarly situated from using Tornado Cash. Ethereum users will be forced to choose between transacting without the privacy benefits of Tornado Cash and forgoing the opportunity to engage in valuable and important uses of Ethereum. They will be chilled in their expressive activities. And they will be subject to civil and criminal liability and burdensome reporting obligations through no fault of their own.

105.    The ongoing harms are immediately redressable. An order effectively requiring Defendants to decriminalize use of the 20 Tornado Cash addresses would allow Plaintiffs to conduct their legitimate activities with some measure of anonymity, use their preferred software tool without fear of penalties, and engage in important expressive associations.

106.    Judicial relief would also serve the public interest by averting harm to Tornado Cash users who are United States persons, to Ethereum as a freedom and privacy enhancing technology, and to the important sector of the economy that depends on Ethereum.

## CLAIMS FOR RELIEF

### Count One
### Statutory Authority
### 5 U.S.C. §706(2)(C)

107.    Plaintiffs incorporate and restate all their prior allegations.

108.    Under 50 U.S.C. §1702(a)(1)(B), the President can "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit," "any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving," "any property in which *any foreign country* or a *national thereof* has any interest," "by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. §1702(a)(1)(B) (emphases added).

109.    Americans' use of Tornado Cash addresses does not involve "any property in which any foreign country or a national thereof has any interest."

110.    Many uses of Tornado Cash involve only a single American. Many involve transactions among Americans. They are not made with foreign property or in foreign exchange.

111.    Especially given the economic and political significance of this action and its application to a technology beyond Defendants' area of expertise, Defendants could not justify this action without a "clear congressional authorization." *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022); *King v. Burwell*, 576 U.S. 473, 486

(2015). Yet Congress has provided no authorization at all for this regulation of purely domestic uses of Tornado Cash.

112.  The designation of Tornado Cash was therefore "in excess of statutory … authority" and must be set aside. 5 U.S.C. §706(2)(C).

## Count Two
## Contrary to Law
## 5 U.S.C. §706(2)(A)

113.  Plaintiffs incorporate and restate all their prior allegations

114.  Under President Obama's Executive Order and their own regulations, Defendants can exercise power under the Act only by designating "persons," for whom certain consequences follow. *See* Exec. Order 13694, 80 Fed. Reg. 18,077 (Apr. 2, 2015); 31 C.F.R. §578.201(a).

115.  The term "person" means only an "individual or entity." §578.313. It does not mean an idea, a tool, or a technology.

116.  OFAC thinks that Tornado Cash is a "blocked person[]" that can "change [its] behavior." *See U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), bit.ly/3eP6T7r. It is not.

117.  None of the 20 Tornado Cash addresses listed by Defendants is a person. They are not an individual or entity, but rather an immutable tool beyond the control of any person or entity.

118.  The designation of Tornado Cash was therefore "not in accordance with law" and must be set aside. 5 U.S.C. §706(2)(A).

**Count Three**
**Arbitrary or Capricious**
**5 U.S.C. §706(2)(A)**

119.   Plaintiffs incorporate and restate all their prior allegations.

120.   When an agency "entirely fail[s] to consider an important aspect of the problem," it acts arbitrarily and capriciously. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983). Defendants failed to consider three important aspects of the problem when criminalizing Tornado Cash.

121.   First, Defendants failed to consider how their criminalization of the receipt of assets through Tornado Cash would subject people—including Plaintiff Hoffman and a wave of public figures—to criminal liability without any voluntary action on their own part, in violation of the Constitution and half a millennium of Anglo-Saxon common-law norms. *Robinson v. California*, 370 U.S. 660, 666 (1962).

122.   Second, Defendants failed to consider how their criminalization of Tornado Cash would result in a deprivation or seizure of the assets of Americans who had moved funds to a Tornado Cash address but not yet released them, without any constitutionally required process.

123.   Third, Defendants failed to consider how their criminalization of a privacy tool would chill expressive associations and how their criminalization of the use of the same underlying software at different addresses would chill the right of Americans to write and publish code freely.

124.   Defendants also changed their position as to whether they could sanction a technology, not controlled by any persons. When an agency changes its position, it acts arbitrarily and capriciously if it does not "display awareness that it *is* changing position" and then "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

125.   Until now, it had been Defendants' policy to not sanction technologies. 31 C.F.R. §§578.201(a), 578.313. They made this policy clear in their regulations and public statements. *See, e.g.*, *Specially Designated Nationals and Blocked Persons List (SDN) Human Readable Lists*, OFAC, bit.ly/3xRXpz3 ("OFAC publishes a list of *individuals and companies* owned or controlled by, or acting for or on behalf of, targeted countries. It also lists *individuals, groups, and entities*, such as terrorists and narcotics traffickers.") (emphases added).

126.   Defendants did not "display awareness" that they were changing their position, *Fox*, 556 U.S. at 515, in sanctioning Tornado Cash. Defendants in fact appear to continue to believe that Tornado Cash is a "perso[n]." *See U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), bit.ly/3eP6T7r.

127.   Nor did Defendants "show that there are good reasons for the new policy." They provided no reasons at all for the change in course.

128.   Finally, Defendants simply disregarded their own rules requiring that they exercise their sanction power only by designating "persons." 31 C.F.R.

§578.201(a) ("persons"); *id.* §578.313 ("individual or entity"). When an agency "simply disregard[s] rules that are still on the books," it acts arbitrarily and capriciously. *Fox*, 556 U.S. at 515.

129.    For all these reasons and more, the criminalization of Tornado Cash was "arbitrary" or "capricious" and must be set aside. 5 U.S.C. §706(2)(A).

**Count Four**
**First Amendment**
**5 U.S.C. §706(2)(A), (B); U.S. Const., amend. I**

130.    Plaintiffs incorporate and restate all their prior allegations.

131.    The First Amendment protects Americans' freedom to associate for "a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). And freedom of association includes a right to associational privacy. There is a "vital relationship between freedom to associate and privacy in one's associations." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021).

132.    Infringements on associational privacy "chil[l] speech by exposing anonymous donors to harassment and threats of reprisal." *Del. Strong Fams. v. Denn*, 136 S. Ct. 2376, 2376 (2016) (Thomas, J., dissental). Individuals have a "strong associational interest in maintaining the privacy of" their associational activities. *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 555-56 (1963). "Inviolability of privacy in group association" is "indispensable to preservation of freedom of association." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

133.    The criminalization of Tornado Cash infringes on associational privacy by outlawing the use of an essential privacy tool and forcing users of that tool to disclose their activities to the federal government and the public. It thereby chills the associational activities of Mr. Doe, Coin Center, and their donors.

134.    Defendants' action was therefore "not in accordance with law" and "contrary to constitutional right" and must be set aside. 5 U.S.C. §706(2)(A), (B).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.    A declaration that the criminalization of Tornado Cash is null, void, and with no force or effect;

B.    A declaration that the criminalization of Tornado Cash is not in accordance with law under 5 U.S.C. §706(2)(A); is contrary to constitutional right under §706(2)(B); is arbitrary and capricious under §706(2)(A); and is in excess of statutory jurisdiction, authority, or limitations under §706(2)(C);

C.    An order vacating and setting aside the criminalization of Tornado Cash.

D.    An injunction preventing Defendants and their officers, employees, or agents from enforcing, implementing, applying, or taking any action whatsoever under, or in reliance on, the criminalization of Tornado Cash.

E.    An order awarding Plaintiffs their costs in this action, including attorneys' fees;

F.    Any other relief that the Court deems just and proper.

Respectfully submitted,

 s/Michael A. Sasso

<table>
<tr><td>

Jeffrey M. Harris*
Cameron T. Norris*
Jeffrey S. Hetzel*
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423

J. Abraham Sutherland*
106 Connally Street
Black Mountain, NC 28711
Telephone: 805.689.4577

</td><td>

Michael A. Sasso
Florida Bar No. 93814
masasso@sasso-law.com
Christian Bonta
Florida Bar No. 1010347
cbonta@sasso-law.com
SASSO & SASSO, P.A.
1031 West Morse Blvd, Suite 120
Winter Park, Florida 32789
Tel.: (407) 644-7161

Dated:   October 12, 2022

</td></tr>
</table>

*Attorneys for Plaintiffs*

* *Pro hac vice* applications forthcoming.

## Appendix: Sanctioned Addresses

*challenged in this lawsuit*

|  | Sanctioned Address | Description | Immutable? |
|---|---|---|---|
| 1* | 0x12D66f87A04A9E220743712c E6d9bB1B5616B8Fc | Tornado.Cash: 0.1 ETH | Yes |
| 2* | 0x47CE0C6eD5B0Ce3d3A51fdb 1C52DC66a7c3c2936 | Tornado.Cash: 1 ETH | Yes |
| 3* | 0x910Cbd523D972eb0a6f4cAe46 18aD62622b39DbF | Tornado.Cash: 10 ETH | Yes |
| 4* | 0xA160cdAB225685dA1d56aa34 2Ad8841c3b53f291 | Tornado.Cash: 100 ETH | Yes |
| 5* | 0xD4B88Df4D29F5CedD685791 2842cff3b20C8Cfa3 | Tornado.Cash: 100 DAI | Yes |
| 6* | 0xFD8610d20aA15b7B2E3Be39 B396a1bC3516c7144 | Tornado.Cash: 1000 DAI | Yes |
| 7* | 0x07687e702b410Fa43f4cB4Af7F A097918ffD2730 | Tornado.Cash: 10000 DAI 2 | Yes |
| 8* | 0x23773E65ed146A459791799d0 1336DB287f25334 | Tornado.Cash: 100000 DAI | Yes |
| 9* | 0x22aaA7720ddd5388A3c0A3333 430953C68f1849b | Tornado.Cash: 5000 cDAI | Yes |
| 10* | 0xBA214C1c1928a32Bffe790263 E38B4Af9bFCD659 | Tornado.Cash: 50000 cDAI | Yes |
| 11* | 0x03893a7c7463AE47D46bc7f09 1665f1893656003 | Tornado.Cash: 50000 cDAI 2 | Yes |
| 12* | 0x2717c5e28cf931547B621a5ddd b772Ab6A35B701 | Tornado.Cash: 500000 cDAI 2 | Yes |
| 13* | 0xD21be7248e0197Ee08E0c20D 4a96DEBdaC3D20Af | Tornado.Cash: 5000000 cDAI | Yes |
| 14* | 0x4736dCf1b7A3d580672CcE6E 7c65cd5cc9cFBa9D | Tornado.Cash: 100 USDC | Yes |
| 15* | 0xd96f2B1c14Db8458374d9Aca7 | Tornado.Cash: 1000 USDC | Yes |

| | 6E26c3D18364307 | | |
|---|---|---|---|
| 16* | 0x169AD27A470D064DEDE56a2D3ff727986b15D52B | Tornado.Cash: 100 USDT | Yes |
| 17* | 0x0836222F2B2B24A3F36f98668Ed8F0B38D1a872f | Tornado.Cash: 1000 USDT | Yes |
| 18* | 0x178169B423a011fff22B9e3F3abeA13414dDD0F1 | Tornado.Cash: 0.1 WBTC | Yes |
| 19* | 0x610B717796ad172B316836AC95a2ffad065CeaB4 | Tornado.Cash: 1 WBTC | Yes |
| 20* | 0xbB93e510BbCD0B7beb5A853875f9eC60275CF498 | Tornado.Cash: 10 WBTC | Yes |
| 21 | 0xd90e2f925DA726b50C4Ed8D0Fb90Ad053324F31b | Tornado.Cash: Router | No |
| 22 | 0x58E8dCC13BE9780fC42E8723D8EaD4CF46943dF2 | Tornado.Cash: Relayer Registry | No |
| 23 | 0x527653eA119F3E6a1F5BD18fbF4714081D7B31ce | Tornado.Cash: Trees | No |
| 24 | 0xCa0840578f57fE71599D29375e16783424023357 | Tornado.Cash: L1 Helper | No |
| 25 | 0x722122dF12D4e14e13Ac3b6895a86e84145b6967 | Tornado.Cash: Proxy | No |
| 26 | 0x905b63Fff465B9fFBF41DeA908CEb12478ec7601 | Tornado.Cash: Old Proxy | No |
| 27 | 0x94A1B5CdB22c43faab4AbEb5c74999895464Ddaf | Tornado.Cash: Mixer 1 | No |
| 28 | 0xb541fc07bC7619fD4062A54d96268525cBC6FfEF | Tornado.Cash: Mixer 2 | No |
| 29 | 0xF60dD140cFf0706bAE9Cd734Ac3ae76AD9eBC32A | Tornado.Cash: 10000 DAI | No |
| 30 | 0xb1C8094B234DcE6e03f10a5b673c1d8C69739A00 | Tornado.Cash: 500000 cDAI | No |

| 31 | 0xD691F27f38B395864Ea86CfC7253969B409c362d | Tornado.Cash: 10000 USDC | No |
|----|--------------------------------------------|--------------------------|-----|
| 32 | 0xaEaaC358560e11f52454D997AAFF2c5731B6f8a6 | Tornado.Cash: 5000 cUSDC | No |
| 33 | 0x1356c899D8C9467C7f71C195612F8A395aBf2f0a | Tornado.Cash: 50000 cUSDC | No |
| 34 | 0xA60C772958a3eD56c1F15dD055bA37AC8e523a0D | Tornado.Cash: 500000 cUSDC | No |
| 35 | 0xF67721A2D8F736E75a49FdD7FAd2e31D8676542a | Tornado.Cash: 10000 USDT | No |
| 36 | 0x9AD122c22B14202B4490eDAf288FDb3C7cb3ff5E | Tornado.Cash: 100000 USDT | No |
| 37 | 0xDD4c48C0B24039969fC16D1cdF626eaB821d3384 | Gitcoin Grants: Tornado.cash | No |
| 38 | 0x8589427373D6D84E98730D7795D8f6f8731FDA16 | Tornado.Cash: Donate | No |