## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

COIN CENTER; PATRICK
O'SULLIVAN; JOHN DOE; and
DAVID HOFFMAN,
                    Plaintiffs,

v.

JANET YELLEN, in her official
capacity as Secretary of the Treasury;
DEPARTMENT OF THE
TREASURY; ANDREA M. GACKI,
in her official capacity as Director of
the Office of Foreign Assets Control;
and OFFICE OF FOREIGN
ASSETS CONTROL,
                    Defendants.

Case No.
3:22-cv-20375-TKW-ZCB

## FIRST AMENDED COMPLAINT

Plaintiffs file this complaint for declaratory and injunctive relief against

Defendants and allege as follows.

## NATURE OF THE ACTION

1.     On August 8, 2022, and then again on November 8, 2022, the Biden

Administration criminalized an open-source software tool that helps Americans

maintain their privacy while using cryptocurrency and related assets. It justified this

action based on its power to sanction foreign enemies, even though the tool is not

controlled by foreign enemies and Americans' use of the tool does not involve foreign enemies. The Administration's invocation of the foreign-affairs power to punish domestic cryptocurrency users was unprecedented and unlawful.

2.      Plaintiffs all use Ethereum. Ethereum is a digital marketplace that uses shared online technology to help people order their finances without needing to trust banks, governments, or other third parties. It enables transactions involving cryptocurrency and other similar crypto assets. Tens of millions of Americans use Ethereum.

3.      Ethereum's functionality depends on a transparent public ledger. When someone completes a transaction using Ethereum, that transaction is posted to a ledger visible to anyone. The transaction can't be erased or hidden from view. Although users transact using pseudonymous addresses, there are a variety of ways to connect a person's identity to his address on the public ledger—and therefore to all his transactions and assets.

4.      If a user doesn't take proactive steps to protect his privacy, the ledger's transparency allows strangers to track his private associations and stalk his intimate relations. It invites publicization of and retaliation for his private contributions to unpopular causes. And it allows anyone to see whether he has a lot of assets, which can put a target on his back.

5.      To protect themselves, users of Ethereum employ privacy tools. These tools generally allow users to clear any publicly discernible connection between their

past and future transactions. They do this by making transactions by the same person appear unrelated, thereby stymying bad actors who seek to track, stalk, retaliate, and endanger.

6.     The state-of-the-art privacy tool on Ethereum is the Tornado Cash Tool. The Tornado Cash Tool is a software program permanently stored on the Ethereum ledger, so it can be accessed or used by anyone. To use the Tornado Cash Tool, a user moves his crypto assets to a Tornado Cash Tool address. There are several such addresses, each for a different type of crypto asset or a different amount of that asset. After moving his asset to that address, the user can then direct the asset's release to a new address, controlled either by him or by his chosen recipient.

7.     To anyone viewing the public ledger, it is impossible to tell when the person retrieved his asset or which new address it went to. Once the asset arrives at the new address, it cannot be connected to the earlier address using publicly available data. If the user wishes to relink the two addresses and prove that both were his, he can do so, selectively revealing his identity, but no stranger can perform this re-identification without his consent.

8.     Nobody controls the Tornado Cash Tool. It is immutable and executes according to the user's wishes. The Tool is software residing on the Ethereum public ledger at specified Ethereum addresses. Anyone with an internet connection can move crypto assets to those addresses and make the software perform the aforementioned

steps to protect that user's privacy. Throughout this entire process no human or organization, apart from the user, can or does hold the assets.

9.     Cryptocurrencies like Bitcoin are known, in part, for creating irreversible transactions that, once confirmed in the shared public ledger online, cannot be canceled, withdrawn, altered, or rescinded by the sender or any third party. This quality is often referred to as immutability. Ethereum takes this capability a step further and allows technologists to publish immutable software tools to the public ledger. Once published, these tools are available for anyone with an internet connection to use, and they will perform exactly as the rules in their software command. No person or organization can alter their functionality or remove their availability, just as no person or organization can reverse or rescind a cryptocurrency payment.

10.     The people who wrote the Tornado Cash Tool can use the Tool just like anyone else. But because the Tool is published to the public ledger in an immutable form, those people no longer have any say in who uses the Tool or any involvement in Americans' use of the Tool. Likewise, a decentralized autonomous organization exists with regard to some similar non-immutable software, but that organization has no power over the Tornado Cash Tool.

11.     The International Emergency Economic Powers Act of 1977, which is the statutory descendant of the Trading with the Enemy Act of 1917, allows the President to restrict trade with foreign enemies under emergency conditions.

12.     As relevant here, it authorizes the President to "declar[e] a national emergency with respect to" an "unusual and extraordinary" foreign threat. 50 U.S.C. §1701(a).

13.     Once the President declares that emergency, the Act allows him to criminalize certain transactions, but only if the transactions are "in foreign exchange" or include "any property in which any foreign country or a national thereof has any interest." *Id.* §1702(a)(1).

14.     The North Korea Sanctions and Policy Enhancement Act gives the President specific authority to criminalize transactions with North Korean-related persons within the same scope. 22 U.S.C. §§9201 et seq. For instance, he can criminalize transactions involving qualifying North-Korean-related "person[s]" when those transactions are "in foreign exchange." 22 U.S.C. §9214; *see also*, *e.g.*, *id.* §§9214(c), 9214(f), §9221c.

15.     Under executive delegations and regulations, Defendants exercise a subpart of the President's power under these Acts. Specifically, under certain conditions, Defendants can criminalize transactions that fall within the scope of the Acts, but only by designating "persons" or "entities" with whom Americans cannot trade. 31 C.F.R. §578.201(a), §510.201(a).

16.     Invoking this authority last August, Defendants criminalized all transactions involving 38 Ethereum addresses. Those 38 addresses included 20 addresses at which the Tornado Cash Tool is published.

17.    In November, after this lawsuit was originally filed, Defendants withdrew that action. But on the same day, Defendants criminalized all transactions involving a batch of 90 Ethereum addresses, including 29 addresses at which the Tornado Cash Tool is published. Those 29 addresses constitute the core of the Tornado Cash Tool.

18.    The criminalization of those 29 addresses is at issue in this lawsuit.

19.    In their second attempt to criminalize the Tornado Cash Tool, Defendants altered their justification for their action. But they did not invoke any broader authority relevant to Plaintiffs' claims.

20.    Defendants also put into the daylight their confused view of what they were criminalizing. Recognizing that they can criminalize transactions only if those transactions involve qualifying foreign "person[s]" and "entit[ies]," Defendants identified the "founders and other associated developers" of the software underlying the Tool, as well as a decentralized autonomous organization that has no control over the Tool, as together constituting an entity that Defendants called "the Tornado Cash person." *See Frequently Asked Questions No. 1095*, Dep't of Treasury, perma.cc/VT4V-T7JJ ("Who is the Tornado Cash "person" that OFAC designated[?]"). They then reasoned that these people and this organization "*use*" the Tornado Cash Tool to further a broad range of goals. *Id.* (emphasis added). But, then, instead of criminalizing transactions with the people and organization themselves, as

the governing law allows, Defendants criminalized transactions with the Tornado Cash Tool that they use. *Id.*

21.     In other words, Defendants' new action identifies people and an organization whom they *could* sanction, explains that those people and that organization "use" a technology, and then proceeds to sanction the technology but not the people or the organization.

22.     As a result, an American today could send cryptocurrency directly to those sanctionable people and organizations without repercussion. But if that same American used the Tornado Cash Tool to move his own cryptocurrency to his own new address in a process entirely beyond the control of any of these people or organizations, he would commit a federal crime.

23.     Americans who use the Tornado Cash Tool to protect their privacy while using their own assets or while transacting with each other are now criminals. Their receipt of any asset through the Tornado Cash Tool, even one that they did not solicit, is a federal crime. And their use of the Tornado Cash Tool to protect their expressive activities is criminal as well.

24.     Defendants' action was unlawful for four main reasons.

25.     First, Defendants' criminalization of the Tornado Cash Tool exceeded their statutory authority because the Tornado Cash Tool is used to complete functions that do not involve qualifying "person[s]," are not "in foreign exchange," and do not include "any property in which any foreign country or a national thereof has any

interest." 50 U.S.C. §1702(a)(1); 22 U.S.C. §§9201 et seq. Americans use the Tornado Cash Tool unilaterally to protect their own property. Defendants' defiance of this statutory element assumes an authority that would give them virtually unlimited control to regulate the American economy.

26.    Second, Defendants' criminalization of the Tornado Cash Tool also exceeded their regulatory authority because the Tornado Cash Tool is not a "person." 31 C.F.R. §§578.201(a), §510.201(a). It is a privacy tool beyond the control of anyone.

27.    Third, Defendants' criminalization of the Tornado Cash Tool was arbitrary and capricious because it failed to consider important aspects of the problem, changed their position without explanation, was pretextual, and defied their own rules on the books.

28.    And fourth, Defendants' criminalization of the Tornado Cash Tool violated the constitutional rights of users of the Tornado Cash Tool who need it to protect their private associations.

29.    Plaintiffs all would have used or continued to use the Tornado Cash Tool to protect their privacy in the future, but are prevented from doing so as a result of the Biden Administration's criminalization of the Tornado Cash Tool.

30.    They respectfully request that this Court hold unlawful, set aside, and permanently enjoin the enforcement of the criminalization of the Tornado Cash Tool.

## THE PARTIES

31.    Plaintiff Coin Center is the leading nonprofit research and advocacy center focused on the public-policy issues facing cryptocurrency and decentralized computing technologies. It defends the rights of individuals to build and use free and open cryptocurrency networks, including the right to write and publish code, the right to assemble into peer-to-peer networks, and the right to do all this privately. Coin Center produces and publishes research, educates policymakers and the media about cryptocurrencies, advocates for sound public policy, and defends digital civil liberties. It is based in Washington, D.C.

32.    Coin Center uses Ethereum. It routinely receives contributions from donors in the form of crypto assets.

33.    Many of Coin Center's donors want to keep their contributions private. They value privacy, both when it comes to public knowledge of their crypto assets and public knowledge of their expressive associations. Many of them engage in transactions that can be traced on Ethereum's public ledger with the assets that they intend to contribute to Coin Center.

34.    Coin Center's donors therefore used in the past, and would use in the future, the Tornado Cash Tool to protect their privacy. They would send a crypto asset to a Tornado Cash Tool address, and then release it to an address controlled by Coin Center. It is impossible to tell whose assets are being sent to Coin Center's account when they come from a Tornado Cash Tool address.

35.    As a result of the Biden Administration's criminalization of the Tornado Cash Tool, these donors are less likely to contribute to Coin Center. They are effectively barred from engaging in expressive advocacy because, without the Tornado Cash Tool, they cannot do so with confidence that their associations will remain private. By forcing them to make contributions on the public ledger, the Biden Administration's criminalization of the Tornado Cash Tool chills their expressive activity. Coin Center will lose contributions from these donors.

36.    Coin Center is not a terrorist or a criminal and does not intend to transact with terrorists or criminals. In the course of receiving contributions through the Tornado Cash Tool from American donors, the donors' and Coin Center's assets would never come under the control of any foreign person or organization.

37.    Plaintiff Patrick O'Sullivan is a software developer who resides in Escambia County, Florida.

38.    Mr. O'Sullivan uses Ethereum. He is routinely paid by his employer in crypto assets, and he routinely obtains crypto assets from public exchanges.

39.    Mr. O'Sullivan's use of Ethereum can be monitored on Ethereum's public ledger. Mr. O'Sullivan shares his Ethereum addresses with other parties, transfers assets to himself from accounts with third parties who hold his personal information, and is a publicly known user and developer of Ethereum-related technology. As a result, Mr. O'Sullivan's transactions and assets can easily be tracked by the public at large.

10

40.    He therefore routinely uses privacy tools to protect himself and his family. He has used a number of privacy tools, each of which has its own advantages.

41.    Mr. O'Sullivan believes that the best practice for protecting his privacy is to use multiple privacy tools. Mr. O'Sullivan believes that the Tornado Cash Tool is one of the best options for protecting his privacy. And Mr. O'Sullivan does not believe that alternatives, standing alone, would provide him with adequate privacy and security. He therefore intended to use the Tornado Cash Tool in his regular rotation of privacy tools.

42.    Mr. O'Sullivan intended to move assets from an address under his control to a Tornado Cash Tool address and then later release them to a new address, also under his control. At no point would these assets have been controlled by anyone else, including any person or organization.

43.    All of Mr. O'Sullivan's crypto assets come from his American employer or from public exchanges. He is not a terrorist or a criminal and does not intend to transact with terrorists or criminals. In using Tornado Cash, his assets would never come under the control of any other person or organization, including any foreign person or organization.

44.    As a result of Defendants' action, Mr. O'Sullivan cannot carry out his intended uses of the Tornado Cash Tool.

45.    John Doe is a human-rights advocate who resides in the southeastern United States. Mr. Doe is proceeding anonymously because he credibly fears that, if

his identity is exposed, Russian agents will learn about his pro-Ukranian activities and will harm him and his family.

46.     After Russia invaded Ukraine, Mr. Doe began providing and coordinating support for Ukrainians under attack. Since April 2022, he has been supporting Ukrainians personally and has facilitated sizable crypto donations from other donors. He and his donors call themselves the 688th Support Brigade.

47.     Mr. Doe provides and facilitates donations that go to supporting the most urgent needs of Ukrainians at war. His efforts have paid for gloves, shoes, helmets, drones, and vehicles to assist Ukrainian frontline efforts. While many say they support Ukraine, Mr. Doe and his donors are actually doing something about it.

48.     Crypto donations to Ukraine have made a substantial positive impact. As Senator Toomey recently recounted in a congressional hearing, "While there has been virtually no evidence of Russia meaningfully using cryptocurrencies to evade sanctions, Ukraine has been actively utilizing cryptocurrencies to do tremendous good. Cryptocurrency donations for Ukraine have reached approximately $100 million, which has helped Ukrainians defend their country against Russia's invasion. These funds have gone towards more than 5,500 bulletproof vests, 500 helmets, and 410,000 meals, among other things. Ukraine's Deputy Minister of Digital Transformation has said that 'each and every helmet and vest bought via crypto donations is currently saving Ukrainian soldiers' lives.'"

49.     Mr. Doe and the donors he assists came to the mutual agreement that donating to Ukrainians could jeopardize their and their families' safety. Without privacy protections, Russian agents and Russian-funded hackers could identify and retaliate against donors for providing frontline aid. If the donors' identities were revealed, their lives could be in danger when they travel abroad and they could be targeted by hackers. Mr. Doe's donors want to support Ukraine without fear of being harmed. They also inherently value making contributions privately.

50.     Every single donor has used the Tornado Cash Tool. Under Mr. Doe's direction, a donor will move his crypto asset to a Tornado Cash Tool address, then later release it from that address to an account controlled by Mr. Doe exclusively for the provision of aid. From that latter account, Mr. Doe can send the assets to recipients who purchase the aid for Ukraine. It is impossible for an outside observer to tell whose assets are being sent to the latter account because they all come through an address with this privacy tool.

51.     Mr. Doe himself has contributed to these efforts using the Tornado Cash Tool. He has moved assets from a personal address to a Tornado Cash Tool address, and then released those assets from the Tornado Cash Tool address to his address that he uses exclusively for the provision of aid. He intended to continue doing so.

52.     Mr. Doe is not a terrorist or a criminal and does not intend to transact with terrorists or criminals. In the course of using the Tornado Cash Tool for his own

contributions, his assets would never come under the control of any other person or organization, including any foreign person or organization. In the course of using the Tornado Cash Tool for contributions by other American donors, their assets would never come under the control of any foreign person or organization.

53.     As a result of the Biden Administration's criminalization of the Tornado Cash Tool, donations have stopped. Mr. Doe is not comfortable facilitating donations without the protection of the Tornado Cash Tool. He is not confident that any alternative tools, standing alone, will provide a sufficient level of privacy or security.

54.     Plaintiff David Hoffman is a crypto asset investor and entrepreneur who resides in New York.

55.     Mr. Hoffman uses Ethereum publicly. Like many users, Mr. Hoffman makes one of his Ethereum addresses public, so that anyone can access it online and transact with him.

56.     After the Biden Administration criminalized the Tornado Cash Tool, an unknown person sent crypto assets to Mr. Hoffman's public address through the Tornado Cash Tool. Ethereum users like Mr. Hoffman have no ability to reject incoming transfers. So the criminalization of the Tornado Cash Tool empowered someone else to implicate Mr. Hoffman and force reporting obligations on him by causing him to receive an asset from a sanctioned entity. And it has licensed anyone else who wishes to harass or inconvenience Mr. Hoffman to continue to send crypto

assets through the Tornado Cash Tool to Mr. Hoffman's publicly known addresses, each time triggering potential liability and reporting obligations.

57.     Mr. Hoffman intended to continue to use the Tornado Cash Tool in the future. He routinely uses privacy tools to protect himself while using crypto assets. Mr. Hoffman believes that the Tornado Cash Tool is a uniquely effective tool for protecting his privacy.

58.     Mr. Hoffman intended to move assets from an address under his control to a Tornado Cash Tool address and then later withdraw them to a new address, also under his control. At no point would these assets have been controlled by anyone else, including any person or organization.

59.     Mr. Hoffman is not a terrorist or a criminal and does not intend to transact with terrorists or criminals. And in using the Tornado Cash Tool, his assets would never come under the control of any other person or organization, including any foreign person or organization.

60.     As a result of Defendants' criminalization, Mr. Hoffman is burdened with potential civil and criminal liability through no fault of his own, saddled with reporting obligations, and impeded from carrying out his intended use of the Tornado Cash Tool.

61.     Defendants—Janet Yellen, in her official capacity as Secretary of the Treasury; U.S. Department of the Treasury; Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, and the Office of Foreign Assets

Control—are responsible for the enforcement and administration of the criminalization of the Tornado Cash Tool. Treasury is a federal administrative agency, and OFAC is an agency within Treasury. Both Treasury and OFAC are headquartered in Washington, D.C. Defendants acted under color of law at all relevant times.

62.     The criminalization of the Tornado Cash Tool constituted final agency action.

## JURISDICTION AND VENUE

63.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§500 et seq., and the United States Constitution.

64.     This Court has jurisdiction under 28 U.S.C. §1331.

65.     Venue is proper in this District under 28 U.S.C. §1391(e)(1) because Plaintiff O'Sullivan resides here and Defendants are federal agencies and officers acting in their official capacities.

## BACKGROUND

66.     Ethereum is a digital marketplace. It uses shared online technology to help people transact and order their finances. It hosts transactions involving cryptocurrency and other assets that use cryptographic technology.

67.     Ethereum allows people to transact across long distances without middlemen. It allows people to protect against inflation by using a store of value whose supply cannot be increased by any central bank. It allows people to structure

advanced financial transactions and enforce the terms of their agreements with certainty. And it allows anyone with an internet connection to participate, regardless of their race, religion, or social status.

68.    "Ethereum is arguably the most crucial platform in the crypto industry." Yaffe-Bellany, *Crypto's Long-Awaited 'Merge' Reaches the Finish Line*, N.Y. Times (Sept. 15, 2022), perma.cc/485T-2X6X. It is used by tens of millions of Americans. It facilitates transactions involving Ether, the second most common cryptocurrency in America. The present value of Ether is around $200 billion, or about the value of McDonald's. It also facilitates transactions involving a wide range of additional crypto assets.

69.    To use Ethereum, a person creates an address, which is a personal account that only they can access and use. The address uses a pseudonym so that it can't be immediately traced to the person who uses it.

70.    Ethereum's functionality depends on a transparent public ledger. When someone completes an Ethereum transaction, that transaction is posted to a public ledger visible to anyone, alongside his address. That transaction can't be erased or hidden from view.

71.    Although a person transacts using a pseudonymous address, there are a variety of ways to connect a person's identity to his address. In fact, users are sometimes required by law to disclose their identity when using cryptocurrency. Once outsiders connect a person's identity to the address that he uses, they can inspect *all* of the user's transactions and assets.

72.    Users who don't use privacy tools can therefore face risks. The transparent nature of the public ledger has allowed violent burglars to identify people holding particularly valuable crypto assets, and even torture them in front of their families until they hand over access to their crypto assets. *E.g.*, Higgins, *Man Stole $1.8 Million in Ether After Armed Robbery, Prosecutors Say*, CoinDesk (Dec. 13, 2017), perma.cc/X8FY-NDN8; Kramer, *Dutch Bitcoin Trader Suffers Brutal Torture with a 'Heavy Drill' in Violent Robbery*, Yahoo! (Feb. 25, 2019), perma.cc/5V2C-EHBR. It can also allow unwanted snooping on private relationships and intimate transactions.

73.    That's where the Tornado Cash Tool comes in. The Tornado Cash Tool allows users of cryptocurrency to protect themselves from being followed in everything that they do. It allows them to clear any discernible connection between their past transactions and their future transactions. They route an asset through a Tornado Cash Tool address and then can release it to a new, apparently unconnected address at a later date.

74.    To anyone attempting to track the user, they will see that he moved some asset to a Tornado Cash Tool address, but will not know which release from that address was under his control because it will be released to a new address with no connection to the user's earlier activities. All that an outsider will see on the public ledger is something like the following:

Time 1: [1 Ether] Known User Address → Tornado Cash Tool Address

Time 2: [1 Ether] Tornado Cash Tool Address → New Address

The user himself provides, at Time 2, for the release of the asset to an address under his control or a chosen recipient's control. The user also controls how long to wait between Time 1 and Time 2. In between those two times, other users will also move and release funds from the Tornado Cash Tool, so any given user's two transactions will appear unrelated.

75.    There are at least 29 addresses that make up the core of the Tornado Cash Tool. Addresses correspond to a certain fixed amount of a certain crypto asset, so each user using any given Tornado Cash Tool address will move the same amount, such as 1 unit, and then release the same amount later on. This makes each interaction with any given address look indistinguishable.

76.    Throughout the duration of his use of the Tornado Cash Tool, the original user retains complete control of his assets. When he moves assets to an Tornado Cash Tool address, he retains the ability to release them at any time.

77.    The Tornado Cash Tool is not like a bank that lends and invests assets once it receives them; nor does it ever mix or commingle different people's assets together. From the user's perspective, it's like a safe that keeps his asset secure and that only he can unlock.

78.    No other person or organization can use or control a user's assets when that user uses this privacy tool.

79.    Nobody controls the Tornado Cash Tool. It consists of computer code that executes on the user's command. Nobody can rewrite the Tornado Cash Tool

software to change how it works. And nobody can remove the Tornado Cash Tool software. It is permanent and immutable.

80.     Thanks to the Tornado Cash Tool, people can use Ethereum without worrying about the safety of themselves and their families. They can keep their personal contributions and associations private. And they can rest assured that their activities will not be tracked by bad actors who might do them harm.

81.     Many Ethereum users use the Tornado Cash Tool routinely to keep their assets private and secure. It is widely regarded as a good practice for anyone who wishes to participate in Ethereum responsibly.

82.     Like every good technology in human history, the Tornado Cash Tool is used by some people to do bad things. The Tornado Cash Tool makes it harder to follow what all users are doing, so it makes it harder to follow what criminals are doing. But like other good technologies, it provides innumerable benefits to law-abiding Americans, and their use of the tool is understandable and appropriate.

83.     For some time, it was widely believed that the United States would lead the way in embracing Ethereum and other crypto assets. Many American governors, legislators, mayors, and public figures have celebrated America's pioneering role in the use of cryptocurrency. *See, e.g., Gov. DeSantis Seeks 'Crypto Friendly' Florida*, CBS Miami (Dec. 10, 2021), perma.cc/U8TN-K2HD; Stewart, *Cryptocurrency Gets Warm Texas Welcome from Gov. Abbott*, Houston Chronicle (Jun. 22, 2021), perma.cc/LMG6-54XF;

Yaffe-Bellany, *The Rise of the Crypto Mayors*, N.Y. Times (Jan. 25, 2022), perma.cc/8ULT-GFLS.

84.     But America's leading role has been thrown into reverse by the Biden Administration's recent efforts to punish crypto users. For a variety of political reasons, the Administration has sought to hyper-regulate and criminalize common uses of cryptocurrency. Klein, *How Biden's Executive Order on Cryptocurrency May Impact the Fate of Digital Currency and Assets*, Brookings (Mar. 17, 2022), perma.cc/2EZS-HYE8; Hall, *Biden Administration Targets Bitcoin Mining In New Report*, Nasdaq (Sept. 21, 2022), perma.cc/HAL6-222Z; Warmbrodt, *Elizabeth Warren's Anti-crypto Crusade Splits the Left*, Politico (Mar. 15, 2022), perma.cc/ST7F-7GBJ.

85.     Perhaps no attack on the crypto world has been as severe as the August 2022 criminalization and November 2022 re-criminalization of the Tornado Cash Tool.

86.     Under the International Emergency Economic Powers Act, the President can take certain actions after "declar[ing] a national emergency with respect to" an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a).

87.     After declaring an emergency, the President can take certain actions. §1702(a)(1). As relevant here, the President can prohibit transactions subject to American jurisdiction, but only if those transactions occur "in foreign exchange" or

include "any property in which any foreign country or a national thereof has any interest." *Id.* The President cannot prohibit transactions that include no foreign property, such as transactions among Americans or activities by a single American with respect to his own property.

88.     In full, and broken down by element, the statute authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit
>
> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> any **property** in which **any foreign country** or a **national thereof** has any interest
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States.

§1702(a)(1)(B) (emphasis added).

89.     It also authorizes the President to "investigate, regulate, or prohibit … any transactions in foreign exchange." *Id.* §1702(a)(1)(A).

90.     Under the North Korea Sanctions and Policy Enhancement Act, the President can criminalize transactions with North Korean-related persons within the same scope. 22 U.S.C. §§9201 et seq. For instance, he can criminalize transactions involving qualifying North-Korean-related "person[s]" when those transactions are "in foreign exchange." 22 U.S.C. §9214; *see also*, *e.g.*, *id.* §9214(c), §9214(f), §9221c.

91.     President Obama delegated some of his power under these statutes to the Secretary of the Treasury. Exec. Order 13694, 80 Fed. Reg. 18,077, 18,077-18,078 (Apr. 2, 2015); Exec. Order 13722, 81 Fed. Reg. 14,943, 14,495 (Mar. 18, 2016). In his Executive Orders, President Obama authorized the Secretary of the Treasury to identify "person[s]" involved in qualifying cyber-enabled activities. He then authorized the Secretary to "bloc[k]" the "property and interests in property" of any of those identified persons.

92.     The Secretary of Treasury in turn delegated that authority to the Director of OFAC and enacted regulations to govern the exercise of that authority. *See* 31 C.F.R. §§578.802, 578.201 et seq.

93.     As relevant here, those regulations provide that, under certain conditions, Defendants can criminalize transactions that fall within the scope of the statute. But they can do so only by designating "persons" with whom Americans cannot trade. This was the rule when the Tornado Cash Tool was criminalized, *see* 80 Fed. Reg. 81,752, 81,754 (Dec. 31, 2015), and was reaffirmed in updated regulations issued subsequent to the initial criminalization but before the withdrawal and re-criminalization, *see* 31 C.F.R. §578.201(a) (effective Sept. 6, 2022); *see also id.* §510.201.

94.     The term "person" means only an "individual or entity." *Id.* §578.313. It does not cover an idea, a tool, or a technology.

95.     The Director of OFAC maintains a Specially Designated Nationals and Blocked Persons List, which in turn designates persons pursuant to these statutes.

96.     Adding a person to the List criminalizes transactions with that person. If an American transacts with a person on the List, he commits a federal felony punishable by up to 20 years in prison and a $1,000,000 fine. Americans are also required to block any property or interests in property of that designated person, and are required to report any such blocked property in their possession or control to OFAC. *See* 31 C.F.R. §578.201; *id.* §578.701; *id.* §§501.101 et seq.; *id.* §§510.201 et seq.; 87 Fed. Reg. 54,373 (Sept. 6, 2022).

97.     Some earlier designations on the List include Vladimir Putin, Bashar al Assad, and the late Saddam Hussein, Qasem Soleimani, and Muammar Gaddafi. *See OFAC Specially Designated Nationals and Blocked Persons List*, perma.cc/PC4B-M7MQ.

98.     As a result of these designations, it would be a felony for an American to, for example, sell a house to Vladimir Putin.

99.     But on August 8, 2022, OFAC made a new and unprecedented kind of designation. It added "Tornado Cash" to the List. *See U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), perma.cc/8W7V-MCBP. Its designation originally included 38 Ethereum addresses.

100.    In its press release, OFAC did not appear to understand what it was designating. It referred to "Tornado Cash" as a "blocked … perso[n]," *id.*, and described its "willingness to remove" "Tornado Cash" if it demonstrated "a positive

change in behavior," *id.*, even though it was referring to a widely available software tool, lacking agency and not controlled by anyone.

101.   On October 12, 2022, Plaintiffs brought this lawsuit, alleging that the criminalization of this privacy tool exceeded Defendants' statutory authority, was contrary to law, was arbitrary and capricious, and violated the First Amendment.

102.   On November 8, 2022, Defendants withdrew their initial criminalization of the Tornado Cash Tool. They then re-criminalized it with different justification and specifications. They emphasized the Tool's use by North-Korea-related persons. *Treasury Designates DPRK Weapons Representatives: Tornado Cash Redesignated with Additional DPRK Authorities, New OFAC Guidance*, OFAC (Nov. 8, 2022), perma.cc/V387-KEPG.

103.   They continued to refer to "Tornado Cash" as a "blocked … perso[n]," and described their "willingness to remove" "Tornado Cash" if it demonstrated "a positive change in behavior." *Id.*

104.   In a new FAQ response, Defendants acknowledged the mismatch between the requirement that they sanction "person[s]" and the designation of the Tornado Cash Tool. They attempted to overcome that mismatch by identifying persons and an organization—"founders," "developers," and a "decentralized autonomous organization"—who "use" the tool to advance their goals. *See Frequently Asked Questions No. 1095*, Dep't of Treasury, perma.cc/R7RS-JBF4. But then they criminalized transactions with the Tool—not with those persons and organizations. *Id.*

105.   Specifically, Defendants listed 90 Ethereum addresses, thereby criminalizing transactions involving any of those 90 addresses.

106.   The 90 listed addresses include 29 addresses at issue in this lawsuit. Those 29 addresses host the technology and support functions that together constitute the core of the Tornado Cash Tool. They are identified in full in the appendix to this complaint. They allow users to move various assets and later release the same assets to a new address.

107.   The other 61 listed addresses are either non-functional, serve other purposes, can be controlled by someone—such as the decentralized autonomous organization identified by Defendants—or share all of these characteristics.

108.   For purposes of this lawsuit, Plaintiffs do not challenge Defendants' claim that transactions with those 61 addresses involve qualifying foreign property and involve persons within Defendants' authority. Plaintiffs also do not challenge Defendants' power to criminalize transactions with any identified persons, including the founders, developers, and decentralized autonomous organization who Defendants now call "Tornado Cash." Plaintiffs challenge only the criminalization of transactions with the 29 addresses that host the immutable Tornado Cash Tool.

109.   All 90 addresses are Ethereum addresses. Defendants listed all 90 with the prefix "Digital Currency Address - ETH," which means that they refer to addresses on only the Ethereum public ledger, and not to addresses on any other public ledger. *See* Dep't of Treasury, *Burma-Related Designations; North Korea Designations;*

*Cyber-Related Designation; Cyber-Related Designation Removal; Publication of Cyber-Related Frequently Asked Questions* (Nov. 8,. 2022), perma.cc/5D55-JN5Q (listing addresses); *see also* OFAC, *Sanctions List Search* (last accessed Dec. 6, 2022), perma.cc/R4LH-HWE9 (listing addresses). To the extent that Defendants meant to and later do list any identical alphanumerical addresses on other public ledgers, and those addresses also host the immutable Tornado Cash Tool, Plaintiffs challenge the criminalization of those addresses as well.

110.   Each of the challenged Tornado Cash Tool addresses is immutable and operates at the user's command. They are used to complete functions that do not involve any property in which any foreign country or national thereof has any interest. The addresses are not themselves property. None is a person, none identifies a person, and none is controlled by any person. They are therefore beyond the scope of Defendants' statutory and regulatory authority to criminalize.

111.   But as a result of the Biden Administration's action, using these addresses is now criminal. No Ethereum user subject to American jurisdiction can lawfully use the Tornado Cash Tool for any purpose. Plaintiffs and other law-abiding citizens are prohibited from depositing, withdrawing, sending, or receiving funds through the Tornado Cash Tool, even when the funds are lawfully obtained and being used for lawful purposes.

112.   For users who had moved an asset to a Tornado Cash Tool address but not yet released it, they now cannot release their own property. *See Frequently Asked*

*Questions No. 1079*, Dep't of Treasury, perma.cc/5Z68-RU5X; Fries, *OFAC Breaks Its Silence on Funds Locked with Tornado Cash*, Tokenist (Sept. 13, 2022), perma.cc/4K2K-LSLV.

113.   And for all Americans, it is now a crime to use a helpful privacy tool, even though they will never transact with any foreigner or any property in which any foreigner had any interest by virtue of using that tool. *See Frequently Asked Questions No. 1077*, Dep't of Treasury, perma.cc/77F8-VDB2.

114.   For all Americans, it is now impossible to use the best tool for protecting their privacy when they engage in expressive associations with crypto assets. They are chilled from contributing to causes that they support because those contributions will now be subject to public exposure. By criminalizing this privacy tool, the Biden Administration has chilled—and in some cases altogether prevented—Americans from engaging in protected advocacy.

115.   To justify its action, the Biden Administration initially explained that the Lazarus Group, a North Korean criminal organization, used the Tornado Cash Tool to cover up its theft of crypto assets.

116.   It then subsequently explained that the developers and founders of the Tool, along with a decentralized autonomous organization, also "use" the Tool to advance a variety of goals.

117.   But nobody—not the Lazarus Group, not the developers and founders, not the decentralized autonomous organization, and not any other foreign

organization—has control over the Tornado Cash Tool, let alone an interest in transactions that Americans make with themselves and each other using the Tornado Cash Tool.

118.   Making it a crime for Americans to use the Tornado Cash Tool because the Lazarus Group or other foreign persons used the Tool to further their illicit activities is like making it a crime for Americans to use email because the Lazarus Group used email to further its illicit activities. Sometimes good tools are used by bad people. That inevitability does not justify criminalizing every American's use of those tools, and the law gives Defendants no such power.

119.   The criminalization of the Tornado Cash Tool, perversely, means that foreign terrorists or developers can take down parts of the American economy by using our best technologies and ideas—a kind of cyber-age heckler's veto.

120.   Worse, the criminalization of the Tornado Cash Tool does not even prevent foreign terrorists or any of the identified persons or organizations from using it. It remains online and operable, precisely because nobody can control it.

121.   The criminalization of the Tornado Cash Tool has created far-reaching and embarrassing consequences. Because the Tornado Cash Tool consists of already-published, self-executing code, it is still operational. The fact that no intermediary is necessary for the Tornado Cash Tool to operate means that anyone can send unsolicited crypto assets through the Tornado Cash Tool to Americans with known Ethereum addresses. In other words, the Biden Administration has

empowered any bad actor to easily subject a law-abiding American to potential civil and criminal liability and burdensome reporting obligations, through no fault of the American's own—a phenomenon known as "dusting."

122.   And that has happened. Soon after the Biden Administration's criminalization of the Tornado Cash Tool, an unknown person or persons sent small amounts of crypto assets ("dust") through the Tornado Cash Tool to a wide range of celebrities and publicly known users of Ethereum. Mack, *US Treasury Sanctioning Tornado Cash Unleashes 'Max Chaos' in the Crypto Universe*, Forbes (Aug. 9, 2022), perma.cc/X6PC-V7CH.

123.   For example, unknown actors sent assets through the Tornado Cash Tool to Shaquille O'Neal and Jimmy Fallon. And many Americans who lack the teams of lawyers that are available to Shaquille O'Neal and Jimmy Fallon were subject to similar acts. Tan, *Someone Is Trolling Celebs by Sending ETH from Tornado Cash*, CoinDesk (Aug. 9, 2022), perma.cc/TM9H-8MJ3; Chow, *A New U.S. Crackdown Has Crypto Users Worried About Their Privacy*, Time (Aug. 10, 2022), perma.cc/6GVT-HA3R.

124.   Because the law imposes strict liability, users who are "dusted" in this manner still face criminal liability and still have reporting obligations. Treasury confirmed as much in the FAQs it released on September 13, 2022 and reissued on November 8, 2022. In response to a question about dusting, the FAQs confirm that "[t]echnically, OFAC's regulations would apply to these transactions." All that

Treasury could say is that, in its unilateral discretion, OFAC would not "prioritize enforcement" against dusted individuals whose reports were merely "delayed."

125.   Without judicial relief, the Biden Administration's action will prevent Plaintiffs and others who are similarly situated from using the Tornado Cash Tool. Ethereum users will be forced to choose between transacting without the privacy benefits of the Tornado Cash Tool and forgoing the opportunity to engage in valuable and important uses of Ethereum. They will be chilled in their expressive activities. And they will be subject to civil and criminal liability and burdensome reporting obligations through no fault of their own.

126.   The ongoing harms are immediately redressable. An order effectively requiring Defendants to decriminalize use of the Tornado Cash Tool addresses would allow Plaintiffs to conduct their legitimate activities with some measure of anonymity, use their preferred software tool without fear of penalties, and engage in important expressive associations.

127.   Judicial relief would also serve the public interest by averting harm to users of the Tornado Cash Tool who are United States persons, to Ethereum as a freedom and privacy enhancing technology, and to the important sector of the economy that depends on Ethereum.

# CLAIMS FOR RELIEF

## Count One
### Statutory Authority
### 5 U.S.C. §706(2)(C)

128.   Plaintiffs incorporate and restate all their prior allegations.

129.   Under 50 U.S.C. §1702(a), the President can prohibit "transactions in foreign exchange." *Id.* §1702(a)(1)(A). He can also "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit," "any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving," "any property in which *any foreign country* or a *national thereof* has any interest," "by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* §1702(a)(1)(B) (emphases added).

130.   Under 22 U.S.C. §§9201 et seq., the President can apply this power to North Korean "persons" to restrict transactions that fall within the same scope. 22 U.S.C. §9214(c). In other words, all criminalized transactions must be in "foreign exchange" or involve "any property in which any foreign country or a national thereof," including a North-Korea-related person, "has any interest."

131.   Americans' use of Tornado Cash Tool addresses is not a "transaction in foreign exchange" and does not involve "any property in which any foreign country

or a national thereof has any interest." The Tornado Cash Tool is not a North Korean "person" or any other person, organization, or entity.

132.   Many uses of the Tornado Cash Tool involve only a *single* American, moving his own asset between his own addresses. Many involve transactions between two Americans. These transactions are not made in foreign exchange or with foreign property.

133.   Especially given the economic and political significance of this action and its application to a technology beyond Defendants' area of expertise, Defendants could not justify this action without a "clear congressional authorization." *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022); *King v. Burwell*, 576 U.S. 473, 486 (2015). Yet Congress has provided no authorization at all for this regulation of purely domestic uses of the Tornado Cash Tool.

134.   The criminalization of the Tornado Cash Tool was therefore "in excess of statutory … authority" and must be set aside. 5 U.S.C. §706(2)(C).

**Count Two**
**Contrary to Law**
**5 U.S.C. §706(2)(A)**

135.   Plaintiffs incorporate and restate all their prior allegations

136.   Under President Obama's Executive Orders and their own regulations, Defendants can exercise power under the Act only by designating "persons," for whom certain consequences follow. *See* Exec. Order 13694, 80 Fed. Reg. 18,077 (Apr.

2, 2015); 31 C.F.R. §578.201(a); Exec. Order 13722, 81 Fed. Reg. 14,943, 14,495 (Mar. 18, 2016); 31 C.F.R. §510.201.

137.   The term "person" means only an "individual or entity." *Id.* §§578.313, 510.322. It does not mean an idea, a tool, or a technology.

138.   OFAC thinks that the privacy tool is a "blocked person[]" that can "change [its] behavior." *See U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), perma.cc/FA7D-WSRG; *Treasury Designates DPRK Weapons Representatives: Tornado Cash Redesignated with Additional DPRK Authorities, New OFAC Guidance*, OFAC (Nov. 8, 2022), perma.cc/PY2P-DQDH. It is not.

139.   None of the Tornado Cash Tool addresses listed by Defendants are a person. They are not individuals or entities, but rather addresses of an immutable tool beyond the control of any person or entity.

140.   The criminalization of the Tornado Cash Tool was therefore "not in accordance with law" and must be set aside. 5 U.S.C. §706(2)(A).

**Count Three**
**Arbitrary or Capricious**
**5 U.S.C. §706(2)(A)**

141.   Plaintiffs incorporate and restate all their prior allegations.

142.   When an agency "entirely fail[s] to consider an important aspect of the problem," it acts arbitrarily and capriciously. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983). Defendants failed to consider three important aspects of the problem when criminalizing the Tornado Cash Tool.

143.   First, Defendants failed to consider how their criminalization of the receipt of assets through the Tornado Cash Tool would subject people—including Plaintiff Hoffman and a wave of public figures—to criminal liability without any voluntary action on their own part, in violation of the Constitution and half a millennium of Anglo-Saxon common-law norms. *Robinson v. California*, 370 U.S. 660, 666 (1962).

144.   Second, Defendants failed to consider how their criminalization of the Tornado Cash Tool would result in a deprivation or seizure of the assets of Americans who had moved funds to a Tornado Cash Tool address but not yet released them, without any constitutionally required process.

145.   Third, Defendants failed to consider how their criminalization of a privacy tool would chill expressive associations and how their criminalization of the use of the same underlying software at different addresses would chill the right of Americans to write and publish code freely.

146.   Defendants also changed their position as to whether they could sanction a technology, not controlled by any persons. When an agency changes its position, it acts arbitrarily and capriciously if it does not "display awareness that it *is* changing position" and then "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

147.   Until now, it had been Defendants' policy to not sanction technologies. 31 C.F.R. §§578.201(a), 578.313. They made this policy clear in their regulations and public statements. *See, e.g., Specially Designated Nationals and Blocked Persons List (SDN) Human Readable Lists*, OFAC, perma.cc/Q3X7-GD6X ("OFAC publishes a list of *individuals and companies* owned or controlled by, or acting for or on behalf of, targeted countries. It also lists *individuals, groups, and entities*, such as terrorists and narcotics traffickers.") (emphases added).

148.   Defendants did not "display awareness" that they were changing their position, *Fox*, 556 U.S. at 515, in sanctioning the Tornado Cash Tool. Defendants in fact appear to continue to believe that the Tornado Cash Tool is a "perso[n]," *see U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), perma.cc/S5R3-XW4X, or is identical to the "person[s]" who "use" it but have no control over it, *Treasury Designates DPRK Weapons Representatives: Tornado Cash Redesignated with Additional DPRK Authorities, New OFAC Guidance*, OFAC (Nov. 8, 2022), perma.cc/RY6Z-P5YR

149.   Nor did Defendants "show that there are good reasons for the new policy." They provided no reasons at all for the change in course.

150.   Next, Defendants acted pretextually in sanctioning the Tornado Cash Tool. When there is a "significant mismatch between the decision [an agency] made and the rationale [it] provided," the agency acts arbitrarily and capriciously. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019). Defendants were "determined" to

sanction the Tornado Cash Tool to advance their domestic policy agenda. *Id.* at 2574. Although their rationale for sanctioning the Tornado Cash Tool was that certain developers, founders, and a decentralized autonomous organization qualified as "person[s]" subject to sanction, they did not sanction transactions with any of those persons or that organization. Instead, they sanctioned only transactions with the Tool itself, even though those persons and that organization have no control over Ameicans' use of the Tool. Likewise, although foreign terrorist groups have used the Tool, they can continue to do so after the designation. Defendants' shifting rationales for the same outcome—making it illegal for Americans to protect their privacy—underscores the pretext here.

151.    Finally, Defendants simply disregarded their own rules requiring that they exercise their sanction power only by designating "persons." 31 C.F.R. §578.201(a) ("persons"); *id.* §578.313 ("individual or entity"); *id.* §§510.201 et seq. (same). When an agency "simply disregard[s] rules that are still on the books," it acts arbitrarily and capriciously. *Fox*, 556 U.S. at 515.

152.    For all these reasons and more, the criminalization of the Tornado Cash Tool was "arbitrary" or "capricious" and must be set aside. 5 U.S.C. §706(2)(A).

**Count Four**
**First Amendment**
**5 U.S.C. §706(2)(A), (B); U.S. Const., amend. I**
153.    Plaintiffs incorporate and restate all their prior allegations.

154.   The First Amendment protects Americans' freedom to associate for "a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). And freedom of association includes a right to associational privacy. There is a "vital relationship between freedom to associate and privacy in one's associations." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021).

155.   Infringements on associational privacy "chil[l] speech by exposing anonymous donors to harassment and threats of reprisal." *Del. Strong Fams. v. Denn*, 136 S. Ct. 2376, 2376 (2016) (Thomas, J., dissental). Individuals have a "strong associational interest in maintaining the privacy of" their associational activities. *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 555-56 (1963). "Inviolability of privacy in group association" is "indispensable to preservation of freedom of association." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

156.   The criminalization of the Tornado Cash Tool infringes on associational privacy by outlawing the use of an essential privacy tool and forcing users of that tool to disclose their activities to the federal government and the public. It thereby chills the associational activities of Mr. Doe, Coin Center, and their donors.

157.   Defendants' criminalization of the Tornado Cash Tool was therefore "not in accordance with law" and "contrary to constitutional right" and must be set aside. 5 U.S.C. §706(2)(A), (B).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court grant the following relief:

A.   A declaration that the criminalization of the Tornado Cash Tool is null, void, and with no force or effect;

B.   A declaration that the criminalization of the Tornado Cash Tool is not in accordance with law under 5 U.S.C. §706(2)(A); is contrary to constitutional right under §706(2)(B); is arbitrary and capricious under §706(2)(A); and is in excess of statutory jurisdiction, authority, or limitations under §706(2)(C);

C.   An order vacating and setting aside the criminalization of the Tornado Cash Tool.

D.   An injunction preventing Defendants and their officers, employees, or agents from enforcing, implementing, applying, or taking any action whatsoever under, or in reliance on, the criminalization of the Tornado Cash Tool.

E.   An order awarding Plaintiffs their costs in this action, including attorneys' fees;

F.   Any other relief that the Court deems just and proper, including relief as to any other public ledger addresses that host the Tornado Cash Tool that Defendants criminalize.

Respectfully submitted,

_s/Cameron T. Norris_

|                                | |
| ------------------------------ | -------------------------------- |
| Michael A. Sasso               | Jeffrey M. Harris*               |
| Florida Bar No. 93814          | Cameron T. Norris*               |
| masasso@sasso-law.com          | Jeffrey S. Hetzel*               |
| Christian Bonta                | CONSOVOY MCCARTHY PLLC           |
| Florida Bar No. 1010347        | 1600 Wilson Boulevard, Suite 700 |
| cbonta@sasso-law.com           | Arlington, VA 22209              |
| SASSO & SASSO, P.A.            | Telephone: 703.243.9423          |
| 1031 West Morse Blvd, Suite 120|                                  |
| Winter Park, Florida 32789     | J. Abraham Sutherland*           |
| Tel.: (407) 644-7161           | 106 Connally Street              |
|                                | Black Mountain, NC 28711         |
|                                | Telephone: 805.689.4577          |

Dated:   December 8, 2022

*Attorneys for Plaintiffs*

* *Pro hac vice.*

## Appendix: Sanctioned Addresses

*Immutable and Challenged in this Lawsuit*

| | Sanctioned Address |
|---|---|
| 1 | Digital Currency Address - ETH 0x12D66f87A04A9E220743712cE6d9bB1B5616B8Fc |
| 2 | Digital Currency Address - ETH 0x47CE0C6eD5B0Ce3d3A51fdb1C52DC66a7c3c2936 |
| 3 | Digital Currency Address - ETH 0x910Cbd523D972eb0a6f4cAe4618aD62622b39DbF |
| 4 | Digital Currency Address - ETH 0xA160cdAB225685dA1d56aa342Ad8841c3b53f291 |
| 5 | Digital Currency Address - ETH 0xD4B88Df4D29F5CedD6857912842cff3b20C8Cfa3 |
| 6 | Digital Currency Address - ETH 0xFD8610d20aA15b7B2E3Be39B396a1bC3516c7144 |
| 7 | Digital Currency Address - ETH 0x07687e702b410Fa43f4cB4Af7FA097918ffD2730 |
| 8 | Digital Currency Address - ETH 0x23773E65ed146A459791799d01336DB287f25334 |
| 9 | Digital Currency Address - ETH 0x22aaA7720ddd5388A3c0A3333430953C68f1849b |
| 10 | Digital Currency Address - ETH 0xBA214C1c1928a32Bffe790263E38B4Af9bFCD659 |
| 11 | Digital Currency Address - ETH 0x03893a7c7463AE47D46bc7f091665f1893656003 |
| 12 | Digital Currency Address - ETH 0x2717c5e28cf931547B621a5dddb772Ab6A35B701 |
| 13 | Digital Currency Address - ETH 0xD21be7248e0197Ee08E0c20D4a96DEBdaC3D20Af |
| 14 | Digital Currency Address - ETH 0x4736dCf1b7A3d580672CcE6E7c65cd5cc9cFBa9D |
| 15 | Digital Currency Address - ETH 0xd96f2B1c14Db8458374d9Aca76E26c3D18364307 |
| 16 | Digital Currency Address - ETH 0x169AD27A470D064DEDE56a2D3ff727986b15D52B |
| 17 | Digital Currency Address - ETH 0x0836222F2B2B24A3F36f98668Ed8F0B38D1a872f |
| 18 | Digital Currency Address - ETH 0x178169B423a011fff22B9e3F3abeA13414dDD0F1 |
| 19 | Digital Currency Address - ETH 0x610B717796ad172B316836AC95a2ffad065CeaB4 |
| 20 | Digital Currency Address - ETH 0xbB93e510BbCD0B7beb5A853875f9eC60275CF498 |
| 21 | Digital Currency Address - ETH 0xCEe71753C9820f063b38FDbE4cFDAf1d3D928A80 |
| 22 | Digital Currency Address - ETH 0x756C4628E57F7e7f8a459EC2752968360Cf4D1AA |

| 23 | Digital Currency Address - ETH 0x94C92F096437ab9958fC0A37F09348f30389Ae79 |
|----|------------------------------------------------------------------------|
| 24 | Digital Currency Address - ETH 0xD82ed8786D7c69DC7e052F7A542AB047971E73d2 |
| 25 | Digital Currency Address - ETH 0x88fd245fEdeC4A936e700f9173454D1931B4C307 |
| 26 | Digital Currency Address - ETH 0x653477c392c16b0765603074f157314Cc4f40c32 |
| 27 | Digital Currency Address - ETH 0x743494b60097A2230018079c02fe21a7B687EAA5 |
| 28 | Digital Currency Address - ETH 0xDF3A408c53E5078af6e8fb2A85088D46Ee09A61b |
| 29 | Digital Currency Address - ETH 0x09193888b3f38C82dEdfda55259A82C0E7De875E |

*Not Challenged in this Lawsuit*

| | **Sanctioned Address** |
|----|------------------------------------------------------------------------|
| 30 | Digital Currency Address - ETH 0xd90e2f925DA726b50C4Ed8D0Fb90Ad053324F31b |
| 31 | Digital Currency Address - ETH 0x58E8dCC13BE9780fC42E8723D8EaD4CF46943dF2 |
| 32 | Digital Currency Address - ETH 0x527653eA119F3E6a1F5BD18fbF4714081D7B31ce |
| 33 | Digital Currency Address - ETH 0xCa0840578f57fE71599D29375e16783424023357 |
| 34 | Digital Currency Address - ETH 0x722122dF12D4e14e13Ac3b6895a86e84145b6967 |
| 35 | Digital Currency Address - ETH 0x905b63Fff465B9fFBF41DeA908CEb12478ec7601 |
| 36 | Digital Currency Address - ETH 0x94A1B5CdB22c43faab4AbEb5c74999895464Ddaf |
| 37 | Digital Currency Address - ETH 0xb541fc07bC7619fD4062A54d96268525cBC6FfEF |
| 38 | Digital Currency Address - ETH 0xF60dD140cFff0706bAE9Cd734Ac3ae76AD9eBC32A |
| 39 | Digital Currency Address - ETH 0xb1C8094B234DcEe6e03f10a5b673c1d8C69739A00 |
| 40 | Digital Currency Address - ETH 0xD691F27f38B395864Ea86CfC7253969B409c362d |
| 41 | Digital Currency Address - ETH 0xaEaaC358560e11f52454D997AAFF2c5731B6f8a6 |
| 42 | Digital Currency Address - ETH 0x1356c899D8C9467C7f71C195612F8A395aBf2f0a |
| 43 | Digital Currency Address - ETH 0xA60C772958a3eD56c1F15dD055bA37AC8e523a0D |
| 44 | Digital Currency Address - ETH 0xF67721A2D8F736E75a49FdD7FAd2e31D8676542a |
| 45 | Digital Currency Address - ETH 0x9AD122c22B14202B4490eDAf288FDb3C7cb3ff5E |

| 46 | Digital Currency Address - ETH 0xDD4c48C0B24039969fC16D1cdF626eaB821d3384 |
| 47 | Digital Currency Address - ETH 0x8589427373D6D84E98730D7795D8f6f8731FDA16 |
| 48 | Digital Currency Address - ETH 0x84443CFd09A48AF6eF360C6976C5392aC5023a1F |
| 49 | Digital Currency Address - ETH 0x330bdFADE01eE9bF63C209Ee33102DD334618e0a |
| 50 | Digital Currency Address - ETH 0xaf4c0B70B2Ea9FB7487C7CbB37aDa259579fe040 |
| 51 | Digital Currency Address - ETH 0x1E34A77868E19A6647b1f2F47B51ed72dEDE95DD |
| 52 | Digital Currency Address - ETH 0xa5C2254e4253490C54cef0a4347fddb8f75A4998 |
| 53 | Digital Currency Address - ETH 0xdf231d99Ff8b6c6CBF4E9B9a945CBAcEF9339178 |
| 54 | Digital Currency Address - ETH 0xaf8d1839c3c67cf571aa74B5c12398d4901147B3 |
| 55 | Digital Currency Address - ETH 0xffbac21a641dcfe4552920138d90f3638b3c9fba |
| 56 | Digital Currency Address - ETH 0x3efa30704d2b8bbac821307230376556cf8cc39e |
| 57 | Digital Currency Address - ETH 0x179f48c78f57a3a78f0608cc9197b8972921d1d2 |
| 58 | Digital Currency Address - ETH 0xd47438c816c9e7f2e2888e060936a499af9582b3 |
| 59 | Digital Currency Address - ETH 0xb04E030140b30C27bcdfaafFFA98C57d80eDa7B4 |
| 60 | Digital Currency Address - ETH 0x5f6c97C6AD7bdd0AE7E0Dd4ca33A4ED3fDabD4D7 |
| 61 | Digital Currency Address - ETH 0xf4B067dD14e95Bab89Be928c07Cb22E3c94E0DAA |
| 62 | Digital Currency Address - ETH 0xB20c66C4DE72433F3cE747b58B86830c459CA911 |
| 63 | Digital Currency Address - ETH 0x2FC93484614a34f26F7970CBB94615bA109BB4bf |
| 64 | Digital Currency Address - ETH 0x5efda50f22d34F262c29268506C5Fa42cB56A1Ce |
| 65 | Digital Currency Address - ETH 0xD692Fd2D0b2Fbd2e52CFa5B5b9424bC981C30696 |
| 66 | Digital Currency Address - ETH 0x2f50508a8a3d323b91336fa3ea6ae50e55f32185 |
| 67 | Digital Currency Address - ETH 0x2573BAc39EBe2901B4389CD468F2872cF7767FAF |
| 68 | Digital Currency Address - ETH 0x746aebc06d2ae31b71ac51429a19d54e797878e9 |
| 69 | Digital Currency Address - ETH 0x01e2919679362dFBC9ee1644Ba9C6da6D6245BB1 |
| 70 | Digital Currency Address - ETH 0x5cab7692D4E94096462119ab7bF57319726Eed2A |
| 71 | Digital Currency Address - ETH 0x77777fedddffc19ff86db637967013e6c6a116c |

| 72 | Digital Currency Address - ETH 0x26903a5a198D571422b2b4EA08b56a37cbD68c89 |
| 73 | Digital Currency Address - ETH 0x6Bf694a291DF3FeC1f7e69701E3ab6c592435Ae7 |
| 74 | Digital Currency Address - ETH 0x242654336ca2205714071898f67E254EB49ACdCe |
| 75 | Digital Currency Address - ETH 0x3aac1cC67c2ec5Db4eA850957b967Ba153aD6279 |
| 76 | Digital Currency Address - ETH 0x776198CCF446DFa168347089d7338879273172cF |
| 77 | Digital Currency Address - ETH 0xCC84179FFD19A1627E79F8648d09e095252Bc418 |
| 78 | Digital Currency Address - ETH 0x723B78e67497E85279CB204544566F4dC5d2acA0 |
| 79 | Digital Currency Address - ETH 0xeDC5d01286f99A066559F60a585406f3878a033e |
| 80 | Digital Currency Address - ETH 0xD5d6f8D9e784d0e26222ad3834500801a68D027D |
| 81 | Digital Currency Address - ETH 0x76D85B4C0Fc497EeCc38902397aC608000A06607 |
| 82 | Digital Currency Address - ETH 0x0E3A09dDA6B20aFbB34aC7cD4A6881493f3E7bf7 |
| 83 | Digital Currency Address - ETH 0x05E0b5B40B7b66098C2161A5EE11C5740A3A7C45 |
| 84 | Digital Currency Address - ETH 0x538Ab61E8A9fc1b2f93b3dd9011d662d89bE6FE6 |
| 85 | Digital Currency Address - ETH 0x407CcEeaA7c95d2FE2250Bf9F2c105aA7AAFB512 |
| 86 | Digital Currency Address - ETH 0x23173fE8b96A4Ad8d2E17fB83EA5dcccdCa1Ae52 |
| 87 | Digital Currency Address - ETH 0x94Be88213a387E992Dd87DE56950a9aef34b9448 |
| 88 | Digital Currency Address - ETH 0x57b2B8c82F065de8Ef5573f9730fC1449B403C9f |
| 89 | Digital Currency Address - ETH 0x8281Aa6795aDE17C8973e1aedcA380258Bc124F9 |
| 90 | Digital Currency Address - ETH 0x833481186f16Cece3f1Eeea1a694c42034c3a0dB |
| 91 | Digital Currency Address - ETH 0xd8D7DE3349ccaA0Fde6298fe6D7b7d0d34586193 |