# Exhibit A

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

COIN CENTER; PATRICK
O'SULLIVAN; JOHN DOE; and
DAVID HOFFMAN,
                    Plaintiffs,

v.

JANET YELLEN, in her official
capacity as Secretary of the Treasury;
DEPARTMENT OF THE
TREASURY; ANDREA M. GACKI,
in her official capacity as Director of
the Office of Foreign Assets Control;
and OFFICE OF FOREIGN
ASSETS CONTROL,
                    Defendants.

Case No.
3:22-cv-20375-TKW-ZCB

**EXPERT DECLARATION OF
PETER VAN VALKENBURGH**

I, Peter Van Valkenburgh, declare as follows:

## BACKGROUND AND QUALIFICATIONS

1.      I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.      I am the Director of Research at Coin Center, the leading non-profit research and advocacy center focused on the public policy issues facing cryptocurrency and decentralized computing technologies such as Bitcoin, Ethereum, and the like.

3.      I received a B.S. in economics from George Mason University.

4.      I received a J.D. from NYU School of Law.

5.      I am a full-time employee of Coin Center and am not being paid separately for my study and testimony in this case. My compensation is not contingent on the results of my analysis or the substance of my testimony.

6.      I have held that role for the past nine years. My primary duties in that role have included researching cryptocurrency technology and associated legal and regulatory topics, consulting with cryptocurrency experts, and educating policymakers and the public about cryptocurrency technology through articles, lectures, and testimony.

7.      I have been called to testify before Congress about cryptocurrency technology five times.

8.     I testified before the Congress Joint Economic Committee on "Demystifying Crypto: Digital Assets and the Role of Government" on November 17, 2021. *Demystifying Crypto: Digital Assets and the Role of Government: Hearing Before Cong. Joint Economic Committee*, 117th Cong. (Nov. 17, 2021).

9.     I testified before the House of Representatives Committee on Financial Services Subcommittee on Oversight and Investigations on "America on "FIRE": Will the Crypto Frenzy Lead to Financial Independence and Early Retirement or Financial Ruin?" on June 30, 2021. *America On "Fire": Will The Crypto Frenzy Lead To Financial Independence and Early Retirement Or Financial Ruin? Hybrid Hearing Before of House Comm. On Financial Services Subcomm. on Oversight and Investigations*, 117th Cong. (June 30, 2021).

10.     I testified before the Senate Committee on Banking, Housing, and Urban Affairs on "Exploring the Cryptocurrency and Blockchain Ecosystem" on October 11, 2018. *Exploring the Cryptocurrency and Blockchain Ecosystem: Hearing Before Senate Committee on Banking, Housing, and Urban Affairs*, 115th Cong. (Oct. 11, 2018).

11.     I testified before the House Subcommittee on Capital Markets, Securities, and Investments on "Examining Cryptocurrencies and ICO Markets" on March 16, 2018. *Examining the Cryptocurrencies and ICO Markets: Hearing Before House Subcomm. on Capital Markets, Securities, and Investments*, 115th Cong. (Mar. 16, 2018).

12.     I testified before the House Subcommittee on Digital Commerce and Consumer Protection on "Improving Consumers' Financial Options with Fintech" on June 8, 2017. *See Disrupter Series: Improving Consumers' Financial Options With Fintech:*

*Hearing Before H. Subcomm. on Digital Commerce and Consumer Protection*, 115th Cong. (June 8, 2017).

13.     My testimony to Congress has included providing an account of the specific technological concepts underlying this case—the Ethereum network and smart contracts. *See Disrupter Series: Improving Consumers' Financial Options With Fintech: Hearing Before H. Subcomm. on Digital Commerce and Consumer Protection*, 115th Cong. (June 8, 2017).

14.     I have not testified as an expert at trial or by deposition in other cases during the past 4 years.

15.     I am a member of the CFTC's Technology Advisory Committee's Subcommittee on Virtual Currencies.

16.     I have guest lectured about cryptocurrency at various law schools and engineering schools, including Yale, Harvard, NYU, Columbia, Cornell, Carnegie Mellon, U.C. Berkeley, and the University of Maryland.

17.     Defendants, in the Evidentiary Memorandum underlying the challenged designation, relied on my work. Defendants' memorandum cites my work for a wide range of propositions about how the challenged 29 addresses (hereinafter the Tornado Cash Tool) function. Defendants' Evidentiary Memorandum cited my work about fifteen times.

18.     My work has been cited or I have been interviewed as an expert in cryptocurrency technology and policy by The New York Times, The Wall Street

Journal, NPR, Bloomberg, Wired Magazine, the MIT Technology Review, C-SPAN's Washington Journal, The Economist, and The Financial Times.

19.    The Congressional Research Service has published at least four reports on various topics related to cryptocurrency that cite my research. *See* Perkins, Cong. Research Serv., R45427, *Cryptocurrency: The Economics of Money and Selected Policy Issues* (2018); Su, Cong. Research Serv., R46208, *Digital Assets and SEC Regulation* (2021); Sykes, Cong. Research Serv., R45664, *Virtual Currencies and Money Laundering: Legal Background, Enforcement Actions, and Legislative Proposals* (2019); Sykes, Cong. Research Serv., R45301, *Securities Regulation and Initial Coin Offerings: A Legal Primer* (2018).

20.    My work has been cited by SEC Commissioners, *see e.g.* Hester M. Peirce, Commissioner, Securities & Exchange Comm'n, *Remarks at Protecting the Public While Fostering Innovation and Entrepreneurship: First Principles for Optimal Regulation* (Feb. 18, 2019), and Treasury Officials, *see e.g.* Mnuchin & Phillips, *Report to President Donald J. Trump: A Financial System that Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation*, Dep't of Treasury (July 2018), perma.cc/FNN8-HEVX. I've spoken at events and on podcasts hosted by the FTC and CFTC. *See e.g.* FTC, *FinTech Forum: Artificial Intelligence and Blockchain – Peter Van Valkenburgh* (2017), perma.cc/96QS-ZQNT; CFTC, *CFTC Talks EP066: Coincenter.org Peter Van Valkenburgh* (Oct. 5, 2018), perma.cc/J5TF-BP8A; CFTC, *CFTC Talks EP024: Coincenter.org Peter Van Valkenburgh* (Dec. 28, 2017), perma.cc/M9FV-BPXT.

21.     In the past ten years, I have published many articles on cryptocurrency. My publications are too numerous to include in-text, but are listed in Appendix A to this declaration.

22.     In preparing this declaration and studying this issue, I reviewed the following materials: Nikolaenko et al., *Powers-of-Tau to the People: Decentralizing Setup Ceremonies*, Int'l Ass'n for Cryptological Research (2022), perma.cc/7MPT-9VE2; Pertsev et al., *Tornado Cash Privacy Solution Version 1.4* (Dec. 17, 2019), perma.cc/GR3V-HJFQ; Nadler & Schar, *Tornado Cash and Blockchain Privacy: A Primer for Economists and Policymakers*, Federal Reserve Bank of St. Louis Rev. (2023), perma.cc/PD3G-7NVS; Etherscan, Tornado.cash, etherscan.io/accounts/label/ tornado-cash; Garman et al., *Zerocoin: Anonymous Distributed E-Cash from Bitcoin*, 2013 IEEE Symposium on Security and Privacy, Berkeley 397 (2013); Ben-Sasson, *Zerocash: Decentralized Anonymous Payments from Bitcoin*, 2014 IEEE Symposium on Security and Privacy 459 (2014); GitHub, "tornadocash/docs," perma.cc/5NRV-3CER (the public software repository documenting the Tornado Cash software); OFAC's Evidentiary Memorandum; and many of the exhibits to OFAC's Evidentiary Memorandum. I also drew on my years of study and experience, which have made me fluent in the technology underlying this case.

23.     I arrived at my conclusions in this report by applying accepted principles of cryptography and computing to the technology underlying this case.

## ETHEREUM

24.     Ethereum is a network of computers on the internet. The computers collectively work together to create a shared public database of user data, including personal financial transactions. That database is typically referred to as Ethereum's "blockchain," a term of art referencing the specific technological methods used to encode and verify the data in the database, or "public ledger," another term of art referencing the fact that much, though not all, of that data is financial in nature.

25.     Centralized online service providers like Facebook or Paypal also maintain databases that record user data. Like those databases, Ethereum's public ledger contains social interaction data about its users, such as the messages that one user has sent to another user or the metadata concerning photos, affinities, or writings that a user has shared about herself. It also contains financial data about its users, such as the amounts and currency denominations that one user has paid to another.

26.     Unlike Facebook or PayPal's databases, however, no single company or person controls Ethereum's public ledger. Instead, users are directly and solely in control of their own data, and these same users are free to participate with the larger network in order to distribute, continually update, verify, and secure the public ledger across the entire network of computers for the benefit of all of its users.

27.     Ethereum is used by tens of millions of Americans. It facilitates transactions involving ether, the second most common cryptocurrency in America. It

also facilitates transactions involving a wide range of additional crypto assets often referred to generally as "tokens."

28.     To use Ethereum, a person need only have an internet-connected device and freely available software. That software is free as in gratis, *i.e.* it is available for users to download from a multitude of sources without any cost. It is also free as in freedom, *i.e.* it is released under open-source copyright licenses that allow anyone to use, modify, distribute, and copy it without permission and as they see fit.

29.     Using this free software on his own computer, a person can begin transacting on Ethereum. As a first step he must have his computer generate an Ethereum address and a corresponding "private key." The address is a random but unique number that will represent the user on the Ethereum network. This address is a pseudonym, meaning that it does not immediately reveal the real identity of the person who uses it. The private key allows him to digitally sign messages such that everyone else on the network can verify that the sender of the message is the person who created the address rather than an imposter.

30.     The address is conceptually similar to a username created for a typical online service like a social media website or a hosted email server. The private key is conceptually similar to a password for such services. Unlike with social media or hosted email providers, however, Ethereum's users are not "customers" in the traditional sense. They are participants in a global computing system running on open-source software. Open-source software means software that is distributed with

8

its source code and permissive licensing, making it available for use, modification, and distribution. Each participant in the Ethereum network can independently verify that messages are signed correctly using publicly researched and published cryptographic functions, and no participant need rely on any company, like a Facebook or a Google, to do that verification on their behalf.

31.     By sharing an address, users are able to receive tokens from anyone, anywhere in the world. Unlike a traditional payment service, sending and receiving tokens on Ethereum does not require an intermediary. Instead, the sender broadcasts their intent to transfer tokens, digitally signs their message using the corresponding private key, and Ethereum's network collectively updates the global records of the sender and receiver addresses with the new balances. At no point in this process does a third party have control over, or take custody of, the tokens being transferred.

32.     In addition to sending and receiving tokens, users can create and interact with "smart contracts," which are software applications that extend the functionality of Ethereum. When software developers program smart contract applications, they decide what operations the smart contract will support and what rules those operations must follow. These rules and operations are written using code that is broadcast to Ethereum's network, just like the token transactions described above. Once a smart contract's code is added to Ethereum's records, it receives a unique address and can be interacted with by any user to automatically carry out the rules and operations it supports.

33.     In essence, smart contracts are open-source applications that anyone can deploy to Ethereum. Just like the rest of Ethereum, smart contract applications can be viewed and used by anyone, anywhere, and without relying on an intermediary.

34.     Both people and smart contracts can have Ethereum addresses. The difference is that when a person has an address they have the private key that controls any tokens sent to that address. That person will ultimately decide if and when any transactions are made with those tokens. When a smart contract has an address, the rules and operations written in the smart contract code control the tokens. They could be simple rules – such as "automatically return the tokens to the sender" – or more complicated rules. There could be rules that include human operations and human decisions – such as "send the tokens back if 3 out of 5 of these human-controlled addresses send a signed message saying they agree."

35.     The rules could also, however, be fully and permanently outside of any human being's control. In that case, so too are any tokens sent to that address until and unless the contract sends them to some human according to the rules.

36.     By default, smart contract applications are "immutable," which means they cannot be removed or modified (updated) by anyone once they are "deployed," a term of art for publishing the code to the Ethereum public ledger. It is possible for the smart contract's developers to include, in the contract code, the ability to update functionality in the future as a supported operation. For example, the developers could include the rule that "this human-controlled address can rewrite the contract in

the future." However, such an operation must be included in the smart contract's code prior to the smart contract's deployment. Without the inclusion of updatability prior to deployment, a smart contract's code cannot ever again be modified by anyone.

37.     If a contract is initially deployed with an update capability, it is also possible to revoke that capability, thus foreclosing the possibility of future updates. To do so, the person or group of persons who currently have the power to update the contract must transfer that update permission to a placeholder Ethereum address for which it is mathematically infeasible to derive a private key. All the computing power in the world could be dedicated exclusively to creating a corresponding private key for the next billion years and yet still no computer would likely succeed at creating that matching key. Without a corresponding private key it is impossible for any person to forge a correct digital signature updating the contract. This placeholder address is known as "the zero address." Once the ability to update a contract has been revoked, it cannot be reclaimed and the contract can no longer be changed.

38.     Unlike traditional finance, Ethereum's records are completely transparent: anyone can download and view the balances and transaction history of its user accounts. Although user addresses are pseudonymous, if a real-world identity is linked to a user address, it becomes possible to trace that user's complete financial history. Ethereum's transparency is important for auditability, or verifying that updates to records are valid. However, this transparency also makes it difficult for users to protect their personal information. By default, a record of a casual transaction today,

like paying cryptocurrency for Wi-Fi access at the airport, leads directly to records of earlier cryptocurrency transactions, which may include any intimate, revealing, or sensitive transactions made by the same user long ago.

39.    Among the many different applications smart contracts may support, they may also provide an avenue for users to regain the privacy they expect when interacting with financial systems. Central to that privacy is the use of smart contracts to break the public chain of records that would otherwise link one's transaction today to every transaction one has ever made in the past.

## OFAC ACTION

40.    In its November 2022 designation of "Tornado Cash," OFAC listed 90 Ethereum addresses.

41.    The 90 listed addresses include 29 addresses that host the technology and support functions that together constitute the core of the Tornado Cash Tool. They are identified in full in Appendix B to this Declaration. These are the addresses that allow users to move various assets and later release the same assets to a new address, thereby obtaining transactional privacy.

42.    The other 61 listed addresses are either non-functional, serve other purposes, can be controlled by someone—such as a "decentralized autonomous organization"—or share all of these characteristics.

43.    All 90 addresses appear to be Ethereum addresses. OFAC listed all 90 with the prefix "Digital Currency Address - ETH," which, in common usage, means

that they refer to addresses on only the Ethereum public ledger, and not to addresses on any other public ledger.

## WHAT THE TORNADO CASH TOOL DOES

44.    The Tornado Cash Tool is a series of smart contract applications that allow users of Ethereum to protect their privacy when transacting despite the inherent public visibility of transactions on Ethereum's public ledger. It is to Ethereum users what a set of drapes would be to someone with large picture windows in their bedrooms.

45.    The Tornado Cash Tool is an application made entirely of open-source software, just like the software that powers the Ethereum network. That software was originally developed by a group of individuals and companies, but these persons retain no control or power over that tool. They have no more control or power over the tool than, for example, Henry Phillips retains control or power over a phillips head screwdriver in an American's tool box today. Phillips drew up the blueprint for the "+" screwdriver and made the design available to the public, but that never gave him control over screwdrivers made according to the design.

46.    To obtain transactional privacy using the tool, an Ethereum user sends his tokens to a Tornado Cash Tool address on the Ethereum blockchain. The smart contract published at that address locks those tokens, but allows the sender to release them to a new, apparently unconnected Ethereum address at a later date.

47.     To anyone attempting to track the user's activities across the Ethereum blockchain, they will see that he moved tokens to a Tornado Cash Tool address, but will not know which release from that address was under his control because it will be sent to a new address with no obvious connection to the user's earlier activities. All that an outsider will see on the public ledger is something like the following:

Time 1: [1 Ether] Known User Address → Tornado Cash Tool Address

Time 2: [1 Ether] Tornado Cash Tool Address → New Address

That same user himself provides, at Time 2, for the release of the asset to an address under his own control or under a chosen recipient's control. The user also controls how long to wait between Time 1 and Time 2. In between those two times, other users may also move and release funds from the Tornado Cash Tool, so any given user's two transactions will be difficult to disambiguate from the transactions of other users.

48.     It is helpful to think of Tornado Cash as an extension of the Ethereum protocol: Ethereum allows users to send tokens from address to address, and Tornado Cash allows users to do that with privacy. Neither Ethereum nor Tornado Cash requires users to put their trust in anyone while transacting, and neither allows any third party to control the user's assets while transacting.

49.     There are at least 29 addresses that make up the core of the Tornado Cash Tool. Many of these addresses correspond to a certain fixed amount of a certain token (*e.g.* 100 Ether). This provides a user with a variety of different sized privacy

tools for his toolbox. To move small amounts of ether, he can use the 0.1 ether core address (at Ethereum address 0x12D66f87A04A9E220743712cE6d9bB1B5616B8Fc); to move larger amounts of dai (another token) he can use the 1000 dai core address (at Ethereum address 0xD4B88Df4D29F5CedD6857912842cff3b20C8Cfa3).

50.     The software at these addresses is designed in this manner such that each user using any given core address will always lock the same amount of the same token, and then release the same amount of the same token later on. This makes each interaction with any given core address look indistinguishable from other interactions and other users, thereby protecting the user's privacy from public view.

51.     A user of the Tornado Cash Tool retains complete control of his assets at all times. When he moves assets to a core address, he – and he alone – retains the ability to release them at any time.

52.     Because no person besides the user ever has control over the assets, the Tornado Cash Tool is not like a bank that lends and invests assets once it receives them; nor does it actively mix or commingle different people's assets together. Rather, the Tornado Cash Tool is like a safe deposit box room with a specific box for each user that only he can unlock.

53.     No other person or organization can use or control a user's assets when that user uses this privacy tool. The rules programmed into the core address smart contracts are enforced by the Ethereum network itself and no third party could alter

the functioning of those rules any more than they could alter the functioning of those rules with respect to the entirety of the Ethereum network itself.

54.    While it is true that software can conceivably have bugs that can unexpectedly give a third party control over the systems or assets it secures, the Tornado Cash Tool and the Ethereum network broadly have been used for years without any such bug coming to light. Similarly, the fact that Microsoft's word processing software could have a bug that some third party could discover and use to alter its functionality does not mean that this hypothetical third party has any control over the words I'm typing into this declaration today.

55.    All of this means that nobody controls the Tornado Cash Tool. It consists of computer code that executes on a user's command. Nobody can rewrite the Tornado Cash Tool software as it exists at the 29 core addresses in order to change how it works. And nobody can remove the Tornado Cash Tool software from the Ethereum network. It is as permanent and immutable as is the entire Ethereum public ledger within which it is published.

56.    Many Ethereum users use the Tornado Cash Tool routinely to keep their assets private and secure. Its use is widely regarded as a good practice for anyone who wishes to participate in Ethereum responsibly.

### HOW THE TORNADO CASH TOOL WORKS

57.    Several technological points warrant more detailed description.

58.    First, users can withdraw only the specific tokens they originally deposed.

59.    Tornado Cash's core addresses contain smart contract applications that enable users to transact privately on Ethereum. When prompted by a user, core address smart contracts will automatically carry out one of two supported operations: "deposit" or "withdraw." Together, these operations allow a user to deposit tokens from one address and later withdraw those same tokens to a different address. Crucially, even though these deposit and withdrawal events occur transparently on Ethereum's public ledger, any public link between the deposit and withdrawal addresses is severed. The user is able to withdraw and use their funds without fear of exposing their entire financial history to third parties.

60.    In support of the deposit and withdrawal operations, the smart contracts at the core addresses encode strict rules that further define their functionality. These rules are automatically applied to the deposit and withdrawal operations to maintain a very important property shared by all Tornado Cash core addresses: users can withdraw only the specific tokens they originally deposited.

61.    This property is enforced automatically for all core address smart contract operations, and ensures that the Tornado Cash Tool is entirely non-custodial. That is, a user who deposits and later withdraws tokens maintains total ownership and control over their tokens, even as they pass through a core address. At no point does the user relinquish control of their tokens to anyone.

62.     A key principle of the Tornado Cash Tool is that a user's privacy is derived in part from the simultaneous usage of the core addresses by many other users. If the core address had only a single user, it wouldn't matter that the link between the user's deposit and withdrawal addresses was severed: simple inference would make it obvious where the withdrawn tokens came from. Instead, core addresses are used by many users simultaneously. Think of it like a bank's safe deposit box room. Anyone can go and store valuables in a locked box in that room, and, assuming the locks are good, only the person with the key can ever get those valuables back. Security aside, however, this may or may not be privacy enhancing. If only one person is ever seen going into and out of the room, then we know any valuables in that room are theirs. If, on the other hand, many people frequently go into and out of the room, then we have no way of knowing who controls which valuables in which boxes. By guaranteeing the property that users can only withdraw tokens they originally deposited, many users can simultaneously use these core addresses with the assurance that no-one else will receive their tokens.

63.     Traditionally, these assurances would be provided by a custodial service: a bank in the safe deposit box example, or a group of people running a "mixing service" in other common cryptocurrency arrangements. Mixing services like Blender.io directly accept tokens from their clients, aggregate and mix them, and then return the same quantity of funds to their clients (often taking some fee in the process). During the intermediate aggregation and mixing stage, the funds in question

are completely in the control of the operators of the mixing service and are commingled. At the final stage of the mixing process, a user would receive funds sourced from the myriad other users that also used the service.

64.   In contrast, Tornado Cash Tool core addresses have no custodial operator. In other words, no one has a private key that can control tokens sent to those core addresses. And users can only ever withdraw the tokens that they can prove they originally deposited – rather than a mixture of tokens from the other users of the service.

65.   Advanced mathematics makes this possible. Specifically, a user's ability to prove his entitlement to previously deposited tokens is ensured by important properties of the software's deposit and withdrawal operations, which are made possible through the use of a privacy-preserving branch of mathematics called "zero-knowledge cryptography." Principles from zero-knowledge cryptography are included in Tornado Cash's smart contract code, much like principles of internal combustion are included in the design of automobiles.

66.   A "zero-knowledge proof" is a cryptographic method by which one party (the "prover") can prove to another party (the "verifier") that a given statement is true without the prover conveying any additional information apart from the fact that the statement is indeed true.

67.   In the case of Tornado Cash, the "prover" is the user withdrawing tokens from the core address, while the "verifier" is the smart contract software at

that core address. When a user prompts the core address in order to withdraw his tokens, the user must supply the address with a zero-knowledge proof. The smart contract software automatically checks the input proof, only processing a withdrawal if the proof is found to be valid.

68.     Exactly what statement is being proven by the user and how they create that proof is slightly more complicated, and requires a bit more detail on the deposit process.

69.     When a user wants to deposit tokens, they first generate a "deposit note," which is a long sequence of digits known only to the user. This is done privately on the user's own computer, and is never shared publicly. Next, the user prompts a Tornado Cash core address to process the deposit. Along with this prompt, the user supplies the tokens for deposit along with a hash, or encoded form, of their deposit note. The core smart contract automatically records the encoded note as a new entry in a public list of other users' encoded notes. At this point, the depositing user has completed the first part of the process, and retains the deposit note, which acts as a receipt to withdraw the tokens later.

70.     When a user is ready to withdraw their tokens, they first split their deposit note in half. One side acts like a "secret," and the other acts like a "lock." After that, the user prompts the core address to withdraw. Along with the prompt, the user supplies:

a.   A hash (or encoded form) of the "lock," and

b. A zero-knowledge proof, generated using the "secret" and the "lock"

71.    The smart contract software uses these inputs to automatically verify – that is, prove – the following:

a. That the zero-knowledge proof was generated using the "secret." It is the exact same "secret" that corresponds to one of the existing encoded notes in the core address's public list of encoded notes. This proves that the tokens being withdrawn were previously deposited by someone.

b. That the same proof also corresponds to the encoded form of the "lock" supplied with the proof. This proves that the person who is withdrawing the tokens must be the same person who deposited them.

c. That the submitted "lock" has not been submitted previously. This proves that the deposit in question has not already been withdrawn.

72.    Assuming the proof is verified, the core address automatically:

a. Sends the user their tokens.

b. Records the encoded "lock" in a public list of other users' encoded locks, ensuring the same tokens cannot be withdrawn again.

73.    Crucially, the above operations are carried out without the user ever needing to reveal additional information about himself or his transactions to the public. Specifically the user does not need to reveal which of many encoded notes the proof corresponds to (*i.e.* who, among all Tornado Cash depositors, is now withdrawing).

74.     Therefore, even though Ethereum is transparent – anyone can view the transaction history and balance of any user account and anyone can view the interaction history, balance, and code of a smart contract application – a user can deposit into a Tornado Cash Tool address and later withdraw to a different address without creating an obvious link to anyone observing Ethereum's public records.

75.     JP Morgan Chase previously built and tested a computer system, called "Quorum," for privately settling accounts between banks using the very same zero-knowledge proof cryptography as Tornado Cash. Recently it has been reported that they are testing a similar zero-knowledge system that, like Tornado Cash, runs on the Ethereum network, called "Aztec." These tools are widely regarded by top researchers in cryptography and finance as state-of-the-art and essential for providing privacy safeguards when using public ledgers to transact.

76.     Second, it is still possible for users to show the path and source of their funds after using the Tornado Cash Tool.

77.     Tornado Cash was built to enable Ethereum's users to reclaim their privacy. Rather than exposing their complete financial history, Tornado Cash gives users control over their personal information: both what is shared and with whom it is shared. However, maintaining privacy and preserving control over one's personal information does not need to come at the expense of compliance with legal obligations.

78.     To this end, the developers of Tornado Cash created the Tornado Cash Compliance Tool. Users supply the tool with the original "deposit note" generated during the core address deposit process to create a PDF report that provides proof of the original source of the tokens. Although the public link between a user's deposit and withdrawal addresses was severed by the Tornado Cash Tool, the Compliance Tool allows users to selectively "undo" this severance to provide traceability to third parties.

79.     The Compliance Tool is not a smart contract. However, just like the other software described in this declaration, the Compliance Tool is also not a service provided by Tornado Cash developers; it is an open-source software tool that is available for free and can be used by anyone. Just as anyone could obtain a breathalyzer tool in order to prove that he has not consumed alcohol, anyone can obtain a copy of the Compliance Tool software in order to prove that the tokens he controls in an otherwise anonymous address came from a non-criminal and non-anonymous source, like another address that is publicly known to belong to him, or an address that is known to belong to his employer or spouse.

80.     One reason that a user may choose to use the Compliance Tool is that he intends to send his tokens to a regulated cryptocurrency exchange who will exchange them for dollars, such as Coinbase. Coinbase is a corporation that owns a cryptocurrency trading platform. It is subject to the Bank Secrecy Act (BSA) and therefore needs to perform customer due diligence with regard to incoming funds.

Our hypothetical Tornado Cash user wishes to maintain his privacy as against the general public, but is happy to restore the verifiable link between his past transactions and his current transaction so that Coinbase can be sure he is not engaged in criminal activity and can comply with its obligations under the BSA. Importantly, if the customer only provides the PDF proof to Coinbase, then his privacy will be maintained against malicious third parties and the public at large, even though he has achieved a desirable level of auditable transparency with regard to Coinbase and Coinbase's financial integrity regulators.

81.    Third, the nature of the Tool means that it cannot be taken down, can be used unilaterally to implicate others, and can continue to be used by foreign terrorists.

82.    Because the Tornado Cash Tool consists merely of software published to the Ethereum public ledger and distributed automatically to every computer connected to the Ethereum network, it is still available for use. The fact that no intermediary is necessary for the Tornado Cash Tool to operate means that anyone can send unsolicited crypto assets through the Tornado Cash Tool to Americans with known Ethereum addresses. That means that the OFAC action has empowered any bad actor to easily subject a law-abiding American to potential civil and criminal liability and reporting obligations, through no fault of the American's own.

83.    This has happened. Soon after the criminalization of the Tornado Cash Tool, an unknown person or persons sent small amounts of crypto assets through the

Tornado Cash Tool to a wide range of celebrities and publicly known users of Ethereum, including Jimmy Kimmel and Shaquile O'Neal.

84.     The criminalization of the Tornado Cash Tool also does not prevent foreign terrorists from using it. It remains online and available for any user. This past January and February, for example, total user withdrawals from the various Ethereum denominated core addresses ranged from $3 million to $8 million dollars per week while user deposits ranged from $4 million to $16 million dollars per week.

**WHO CONTROLS THE TOOL AND THE ASSETS IT MOVES**

85.     Finally, it's necessary to clarify and reemphasize who does and does not have possession or control over assets when users use the Tool.

86.     First, Americans can and do use the 29 challenged Tornado Cash Tool addresses without any assets being controlled or possessed by anyone else, including foreigners.

87.     An American who sends his tokens to a core address must provide a deposit note that is mathematically generated from a secret string of random digits that only exist on his computer, unless he foolishly or negligently shares it. Barring some discovery that long-established mathematical and scientific cryptographic research is flawed – an upset that would likely invalidate all manner of secret-keeping and security across all computer systems – no one except the user who retains that secret code can control or move those tokens once deposited. If the American then withdrawals his tokens to another address he controls, or to the address of an

American company (*e.g.* Coinbase) or another American (*e.g.* his spouse), then at no point in the transaction will any foreign person have had any control or financial interest in the transaction.

88.    A Tornado Cash transaction where the user withdraws to himself is accurately analogized to an American moving his valuables and jewelry from one safe within his home to another safe in his home. Either safe may have been manufactured by foreigners, but they do not control or own those valuables today; the only person with control and ownership is the American who knows the combination to the safe. The safe, meanwhile, is not a party to the transaction; it is not a party at all. It is merely technology used by an American to secure his own property.

89.    Second, the Tornado Cash Tool *does not* mix or commingle user tokens.

90.    There are two types of addresses on the Ethereum network, addresses that are controlled by users, known as Externally Owned Accounts or EOAs, and addresses that are controlled by the rules of a smart contract, known as contract addresses.

91.    Ethereum uses an account-based model for transactions between EOAs. That means that each EOA has an account balance describing the number of tokens in that account. When a transaction is made, the sender's balance is reduced and the recipient's balance is increased appropriately. Therefore, all tokens sent to an EOA are, effectively, commingled or mixed. They are part of a fungible balance of units and anyone with the private key to that account has the ability to spend those tokens.

92.     The Tornado Cash core addresses, however, are not EOAs; they are contract addresses. Ethereum's rules allow a contract to add additional rules and limitations to the otherwise simple transfer of funds between two addresses. The rules of the Tornado Cash software ensure that *only* the specific person who deposited certain tokens into that address is allowed to withdraw them. It is therefore important to distinguish between the default qualities of an ordinary Ethereum EOA, in which all assets are indeed commingled and mixed, and the specific rules of the Tornado Cash Tool core addresses which prevent commingling amongst users.

93.     In addition to ensuring that users only withdraw their own deposits, these anti-mixing rules also allow for the proper functioning of the Compliance Tool. If all deposited tokens were mixed and commingled, there would not be a way to reliably reidentify whose deposits belonged to which depositor. Because the smart contract limits the withdrawal of tokens to the person who can provide a valid proof made from a secret code that only he has retained, a user's subsequent revelation of that code can prove, with mathematical certainty, which deposits were his own and which were not. This is critical for a law-abiding American to prove to a regulated financial institution that the source of his funds is legitimate and not a sanctioned person or otherwise suspect from an anti-money-laundering or counter terrorism standpoint.

94.     Third, the founders and developers behind Tornado Cash have no control over the 29 challenged Tornado Cash Tool addresses.

95.     Ethereum smart contracts are, by default, unalterable once they are published to the Ethereum public ledger. A software developer can, should he wish, publish a smart contract that allows for future modifications and can also remove or destroy that future modification power if he wishes. Once that power is removed it cannot be restored.

96.     All of the 29 challenged Tornado Cash Tool addresses were either deployed as unalterable or subsequently made unalterable. Therefore, the original developers of the smart contracts retain no ability to alter the functioning of those tools or otherwise control the assets of people who use those tools.

97.     All of these limitations on modifications are mathematical and technical limitations rather than limitations based on laws or human decision making. In other words, the reason why these software authors cannot alter their published code is not that an employer would fire them or a court would hold them liable, it's that they are unable to create a message altering the code on the Ethereum network that would be mathematically valid.

98.     Fourth, any "trusted setup ceremony" for the Tornado Cash Tool could not have conferred power to alter the software at the 29 challenged Tornado Cash Tool addresses to any participants in the ceremony.

99.     A "trusted setup ceremony" is a customary procedure that helps ensure the integrity of an important cryptocurrency operation called a "zero knowledge proof."

100.   A zero knowledge proof is a short mathematical statement that proves some fact about a larger calculation without revealing the details of that calculation.

101.   A simple example would be a proof that two numbers sum to 5 without revealing whether those numbers are 2 and 3, or 1 and 4, or 0 and 5, or -1 and 6, etc.

102.   A proof has "integrity" if there is no way for a malicious actor to generate a proof that appears valid even if the underlying calculation is not valid.

103.   A simple example of failed integrity would be if a person was able to provide a proof that the two numbers they have chosen sum to 5 even though the numbers they have chosen are 4 and 2.

104.   There are various ways to create zero knowledge proof systems, just as there are many different cryptographic algorithms used by security professionals for sending secret messages, or validating digital signatures.

105.   Some zero knowledge proof systems require a "trusted setup ceremony" in order to have integrity.

106.   In a simplified sense, a trusted setup ceremony involves the creation of a random number. This random number is referred to as "public parameters" in academic computer science literature. The process of generating those public parameters also results in the creation of a so-called "trapdoor number." The setup process assumes that the trapdoor number will be destroyed (*i.e.* forgotten or deleted by the person or persons conducting the ceremony). If the trapdoor is retained, or if

some person knows how to recreate the number, then it may be possible for that person to generate proofs without integrity.

107.   To ensure that the trapdoor number is discarded, proof systems can be generated in public wherein the calculation of the public parameters is cumulative and many persons freely contribute to that ongoing calculation, deleting their part of the resultant trapdoor number as they go. The trapdoor number is a danger to proof integrity only if it is retained in its entirety, but each participant only generates a portion of that number. So long as at least one participant deletes his part of the trapdoor number, the integrity of the proof system will be guaranteed. This is true even if every other participant cheats and retains their incomplete portions of the trapdoor number. The cumulative generation of these public parameters is sometimes referred to as a "multi-party compute ceremony" or, in the specific case of certain zero knowledge proof systems, a "trusted setup ceremony."

108.   If only *one* of the many parties contributing to the public parameters calculation does so genuinely – *i.e.* does not collude with all the other participants in order to retain and reconstruct the complete trapdoor number – then the resultant proof system will have integrity. That is, the proof system will only allow users to prove mathematically correct statements.

109.   The Tornado Cash Tool uses a zero knowledge proof system that required a trusted setup ceremony to ensure that proofs of deposits would have integrity.

110.   Tornado Cash developers organized a trusted setup ceremony that was open to the general public for free participation and 1,114 persons contributed to the ceremony over a 10 day period. At the completion of the ceremony the results of the calculation, the public parameters, were incorporated into the software found at the Tornado Cash Tool core addresses.

111.   Some of the contributors to the ceremony were well-respected developers and researchers in the cryptocurrency ecosystem and made their participation public so as to stake their personal reputation on the validity of their part of the computation, and others did so anonymously so as to make it more difficult for some third party to attempt to find and compromise all participants. An attacker who wanted to compromise the integrity of the proof system used by Tornado Cash would, therefore, have needed to hack or collude with all 1,114 persons who chose to participate. Participation involves running software on one's computer that automatically deletes one's fragment of the trapdoor, so a successful attacker would have needed to hack or collude with all 1,114 participants in advance of their participation, maliciously altering the functioning of their computers to record and retain the trapdoor number fragments rather than deleting them. There was no prearranged list of participants and anyone interested and online was free to join the ceremony as it was taking place. As such, after already hacking thousands of computers around the world, a hypothetical hacker would still not know exactly whose

31

computer he still needed to hack until the very last moment when the very last volunteer contributor added his work to the cumulative ceremony.

112.   The likelihood that Tornado Cash's trusted setup ceremony was corrupted is therefore infinitesimal. Nonetheless, even if someone had corrupted the ceremony that person would still not be able to alter the core Tornado Cash smart contracts, because their immutability is guaranteed by the underlying Ethereum network and has nothing to do with the trusted setup ceremony. The one thing an attacker would be able to do is siphon all of the deposited tokens out of the core addresses by creating bogus proofs of deposit. Given the fact that the core addresses continue to have tokens left unwithdrawn to this day and given that people continue to deposit to the core addresses, it is reasonable to infer that this has not happened.

113.   Participants in the trusted setup ceremony therefore have no control over the use of the 29 challenged Tornado Cash Tool core addresses.

114.   Fifth, the Torn "DAO," or "Decentralized Autonomous Organization," has no control over the use of the 29 challenged Tornado Cash Tool addresses.

115.   In some Ethereum smart contract projects, decision-making power over whether and how to update the software in the smart contract is retained by a group of persons who vote on updates using tokens. In the voting process, an Ethereum address that holds *n* number of tokens gets *n* number of votes. This mode of governance by token voting is often referred to as a "Decentralized Autonomous Organization" or "DAO."

116.    One of the 90 sanctioned addresses was used to create and distribute a token, called the Torn token, and some of the 90 sanctioned addresses – mainly addresses that collect donations for funding future software development related to privacy – allow for future modifications of their code or dispersions of the funds they control, by a vote of Torn token holders.

117.    None of the 29 challenged Tornado Cash Tool core addresses allow for future modifications by this DAO voting process or, as discussed earlier, by any other process. These specific addresses cannot be changed and will continue to operate as originally programmed irrespective of the actions of any of the Torn token holders or the original software developers.

118.    The "Tornado Cash DAO" therefore has no control over the 29 challenged Tornado Cash Tool addresses.

119.    Sixth, the DAO cannot implement changes to these addresses through the trusted setup ceremony.

120.    The Torn token DAO governance process and the trusted setup ceremony are not related to one another in any property sense (as in shared ownership and control) or mechanistic sense (as in ability to control or alter their respective smart contracts on the Ethereum blockchain). Neither are the various Ethereum smart contracts that facilitate the DAO governance process related, in any of these senses, to the Tornado Cash core addresses that incorporated the trusted setup ceremony's calculation into their software.

121.   The Tornado Cash trusted setup ceremony was performed in May of 2020, almost a year before the Torn token and associated DAO was created in December of 2020. The resultant calculation from the ceremony was incorporated into the software at the core addresses, over which no party, including the DAO, has any control over or ability to upgrade.

122.   The trusted setup ceremony was merely the collaborative creation of a random number input to a cryptographic calculation that was used to create the software for the Tornado Cash Tool. The Tool was then made immutable and incapable of future alteration via publication to the Ethereum blockchain at the core addresses.

123.   The DAO, by contrast, was a subsequent scheme to create a governance process related to *other* smart contracts at other addresses. These DAO smart contracts were deployed to the Ethereum blockchain with future modification enabled. (Defendant's sanctioning of these DAO-controlled addresses, to reiterate, is not challenged by Plaintiffs.)

124.   Seventh, the use of the 29 challenged Tornado Cash Tool addresses does not profit the Tornado Cash developers or the DAO.

125.   As with any Ethereum transaction, a Tornado Cash user pays a fee to have their transactions included in the Ethereum public ledger. That fee goes to third parties who are validating transaction messages, bundling them into batches called blocks, and incorporating those blocks into the Ethereum blockchain or public ledger.

126. These block creators cannot alter the transaction messages they place into blocks because digital signatures are tamper proof. They therefore cannot redirect or misdirect tokens that are being transferred in those transaction messages.

127. Anyone can be a block creator on the Ethereum network by installing the Ethereum software on their internet-connected computer and staking (*i.e.* proving that they have possession of) a certain amount of ether. The reason for this staking mechanism is to ensure that a non-zero cost is associated with performing the role of block creation such that malicious actors will need to suffer a cost that they will be unable to recoup should they attempt to spam the network with bogus or invalid blocks. Many block creators are Americans.

128. The only fee that a user of the 29 challenged Tornado Cash Tool addresses must pay in order to use those tools to obtain privacy is the fee to the block creator. At no point must they pay any fee or otherwise enrich any other party including the original software developers or the Torn token holders.

129. The use of the 29 challenged Tornado Cash Tool addresses therefore does not profit founders or the DAO.

130. Eighth, the use of the 29 challenged Tornado Cash Tool addresses need not include any third-party "relayers."

131. A "relayer" is an independent operator who provides an optional service for Tornado Cash users.

132.    By default, when users prompt the Tornado Cash core addresses for withdrawal, the address to which the user is withdrawing needs to already have ether in it so that it can pay the Ethereum network to process the smart contract's operations. However, sending ether to the withdrawal address prior to withdrawal might create a link between the user's deposit and withdrawal address on the Ethereum public ledger.

133.    Relayers, identified by their own Ethereum addresses, allow users to process withdrawals without needing to pre-fund their withdrawal addresses, which helps users maintain privacy when withdrawing.

134.    Users may select a relayer from a public Relayer Registry, another sanctioned – but unchallenged – Tornado Cash smart contract. The user then uses their withdrawal address to sign a transaction authorizing the relayer-assisted withdrawal. The user sends this transaction to their selected relayer, who processes the withdrawal on their behalf, earning a fee in the process. Note that even though they process withdrawals on behalf of users, relayers never have custody over users' tokens; the smart contract ensures that withdrawn tokens are only ever sent to the user's withdrawal address and never to the address of the relayer.

135.    OFAC has not added any relayer addresses to the SDN List, but it has added the smart contract that contains a registry of relayers to the list.

136.   The use of relayers is entirely optional and users of the 29 challenged Tornado Cash Tool addresses can and do obtain transactional privacy without paying any fee to the registered relayers.

137.   At no point does a user of the 29 challenged addresses need to use any of these registered relayers, nor pay any fee to these relayers, nor hold or purchase any Torn tokens, nor pay any fee to anyone other than the Ethereum block creator who incorporates his transaction into a block. Therefore, in no way does a user of the 29 core addresses need to enrich or otherwise profit any of these other parties.

138.   In summary, each of the core Tornado Cash Tool addresses is immutable and operates at a user's command. When a law-abiding American uses one of these tools, at no point does that user or the tool he is using necessarily touch, control, alter, or otherwise affect any property in which any foreign country or national thereof has any interest. No foreigner has control over the 29 challenged Tornado Cash Tool addresses, let alone an interest in transactions that Americans make with themselves and each through those addresses.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 14, 2023, in Washington, D.C.

Peter Van Valkenburgh

## Appendix A: Van Valkenburgh Publications

Van Valkenburgh, A Snapshot of the Current Questions and Unsettled Policy Related to Cryptocurrency Taxation (Feb. 23, 2023), perma.cc/T84J-HCXM

Van Valkenburgh, The Digital Asset Anti-Money Laundering Act is an opportunistic, unconstitutional assault on cryptocurrency self custody, developers, and node operators (Dec. 14, 2022), perma.cc/W72Y-73S4

Van Valkenburgh, Tornado Cash is no "golem." It's a tool for privacy and free speech. (Oct. 26, 2022), perma.cc/ULD3-4FWU

Van Valkenburgh & Brito, Coin Center is suing OFAC over its Tornado Cash sanction (Oct. 12, 2022), perma.cc/4DZJ-ERXH

Van Valkenburgh, Does the Merge change how Ethereum is regulated? (No.) (Sep. 15, 2022), perma.cc/VX8Z-KHLW

Van Valkenburgh, Lewellen, & Wade, How does Tornado Cash work? (Aug. 25, 2022), perma.cc/345H-4NDB

Van Valkenburgh, How does Tornado Cash actually work? (Aug. 25, 2022), perma.cc/65EY-5G9P

Van Valkenburgh & Brito, Analysis: What is and what is not a sanctionable entity in the Tornado Cash case (Aug. 15, 2022), perma.cc/4DUH-K8FY

Van Valkenburgh & Brito, U.S. Treasury sanction of privacy tools places sweeping restrictions on all Americans (Aug. 8, 2022), perma.cc/T69E-7EZK

Van Valkenburgh, Comments to the Department of Treasury Regarding Ensuring Responsible Development of Digital Assets (Aug. 3, 2022), perma.cc/C4MG-CXF5

Van Valkenburgh, A new Senate bill focuses on cryptocurrency exchanges. Here's what developers and users should keep an eye on. (Aug 3, 2022), perma.cc/R4PU-YENZ

Van Valkenburgh & Brito, Coin Center has filed a court challenge against the Treasury Dept. over unconstitutional financial surveillance (Jun. 11, 2022), perma.cc/NM8H-U6YL

Van Valkenburgh, A new SEC proposal has a serious change hidden within its complex language. (Apr. 14, 2022), perma.cc/BD66-C2NF

Van Valkenburgh, Comments to the Securities Exchange Commission on Amendments Regarding the Definition of 'Exchange' and Alternative Trading Systems (Apr. 14, 2022), perma.cc/MF5M-GARF

Van Valkenburgh & Brito, New crypto sanctions bill targets publishing code, facilitating transactions (Mar. 17, 2022), perma.cc/36K8-HT86

Van Valkenburgh, Coin Center amicus brief in Jarrett v U.S. (Mar. 15, 2022), perma.cc/SV5E-KTC5

Van Valkenburgh, Comments to the Thirty-First Legislature (2022) of the State of Hawaii on S.B. No. 3076 relating to special purpose digital currency licensure and S.B. 3025 relating to digital currency licensing program (Feb. 10, 2022), perma.cc/H52L-49Z6

Van Valkenburgh, IRS signals retreat in court battle that could reshape block reward taxation (Feb. 3, 2022), perma.cc/9J5Q-4HXH

Van Valkenburgh & Brito, New bill would hand Treasury blank check to ban crypto at exchanges (Jan. 26, 2022), perma.cc/JPR7-4E3F

Van Valkenburgh, How policymakers should think about "staking" (Jan. 24, 2022), perma.cc/59EH-FSCR

Van Valkenburgh, What is "staking"? (Jan. 24, 2022), perma.cc/9ULB-UV68

Van Valkenburgh, The long-awaited FATF crypto guidance is not as bad as it could have been, but still flawed (Oct. 28, 2021), perma.cc/JMB2-EARQ

Van Valkenburgh, Open Blockchains and Decentralized Identity Standards (Sep. 28, 2021), perma.cc/X3L7-JAPP

Van Valkenburgh, Proposals for Clarifying Laws Around Cryptocurrency and Blockchain Technologies in Response to Requests for Feedback from Senator Pat Toomey (Sep. 28, 2021), perma.cc/3FZU-Q5GT

Van Valkenburgh, An unworkable and arguably unconstitutional tax change tucked away in the infrastructure bill (Sep. 17, 2021), perma.cc/6ZQ5-3328

Van Valkenburgh, Understanding Bitcoin's energy use (Jun. 9, 2021), perma.cc/W8MZ-A67A

Van Valkenburgh, "Expansive" standards for surveillance threaten human autonomy—our message to FATF (Apr. 20, 2021), perma.cc/9ELA-NLFG

Van Valkenburgh, Comments to the Financial Action Task Force on the March 2021 Draft updated Guidance for a risk-based approach to virtual assets and VASPs (Apr. 20, 2021), perma.cc/VH25-FXTL

Van Valkenburgh, A quick analysis of FATF's 2021 draft cryptocurrency guidance (Mar. 22, 2021), perma.cc/6VHV-LVBL

Van Valkenburgh, Coin Center uses additional time provided by FinCEN to file another comment in ongoing surveillance rulemaking (Mar. 15, 2021), perma.cc/5BC8-QL2Y

Van Valkenburgh, Additional Comments to the Financial Crimes Enforcement Network on Requirements for Certain Transactions Involving Convertible Virtual Currency or Digital Assets (Mar. 15, 2021), perma.cc/B9X6-TNGY

Van Valkenburgh, Coin Center files second comment in FinCEN rulemaking challenging its authority to make the surveillance rule (Jan. 7, 2021), perma.cc/YUZ4-E4HT

Van Valkenburgh & Brito, Join us in responding to an unfair and discriminatory midnight rulemaking (Dec. 22, 2020), perma.cc/WG52-94K8

Van Valkenburgh & Brito, Comments to the Financial Crimes Enforcement Network on Requirements for Certain Transactions Involving Convertible Virtual Currency or Digital Assets (Dec. 22, 2020), perma.cc/9TDU-7VZ5

Van Valkenburgh, A Midnight Rule for Cryptocurrency Transaction Reports (Dec. 18, 2020), perma.cc/G4B4-QSPV

Van Valkenburgh, The Unintended(?) Consequences of the STABLE Act (Dec. 3, 2020), perma.cc/WB48-CEBG

Van Valkenburgh & Brito, Comments to the Board of Governors of the Federal Reserve System and the Financial Crimes Enforcement Network on Changes to Threshold for "Travel Rule" Obligations (Oct. 29, 2020), perma.cc/YBZ7-7G3R

Van Valkenburgh, There's no such thing as a decentralized exchange (Oct. 3, 2020), perma.cc/CS8W-MEEQ

Van Valkenburgh, Two new bills in Congress would clarify agency jurisdiction over cryptocurrency (Sep. 24, 2020), perma.cc/JF28-W4ZZ

Van Valkenburgh & Brito, Are regulators poised to demand cryptocurrency address whitelisting? Probably not. (Aug. 31, 2020), perma.cc/VP99-HXMT

Van Valkenburgh & Brito, The ideal regulatory environment for Bitcoin (Aug. 25, 2020), perma.cc/3XGR-EG8H

Van Valkenburgh, Congress to IRS: Proof-Of-Stake block rewards should not be taxed as income (Aug. 4, 2020), perma.cc/HB3V-ZZUS

Van Valkenburgh, Comments to the Office of the Comptroller of the Currency on National Bank and Federal Savings Association Digital Activities (Aug. 3, 2020), perma.cc/V9Y5-6EQH

Van Valkenburgh, Federal regulator: National banks can hold cryptocurrency (Jul. 22, 2020), perma.cc/5PUZ-9CQV

Van Valkenburgh, Do anti-encryption bills in Congress pose a risk to cryptocurrency? (Jul. 15, 2020), perma.cc/DF4U-FWGE

Van Valkenburgh, What's in the Bitlicense's 5-year update? (Jun. 24, 2020), perma.cc/9WT2-KYMN

Van Valkenburgh & Green, Without privacy, do we really want a digital dollar? (Apr. 30, 2020), perma.cc/3RHL-JXG8

Van Valkenburgh, How to trace a virus without surrendering our privacy (Apr. 8, 2020), perma.cc/JLE2-BX3M

Van Valkenburgh, On SEC vs. Telegram (Mar. 25, 2020), perma.cc/KEY2-PCMH

Van Valkenburgh & Brito, A bill focused on stablecoins has been introduced in Congress (Dec. 2, 2019), perma.cc/GM8V-3H2P

Van Valkenburgh, Coin Center has published a new plain English explainer on forks and airdrops to highlight ambiguities in recent IRS guidance. (Oct. 17, 2019), perma.cc/YJ5E-ZS9L

Van Valkenburgh, IRS Cryptocurrency guidance answers some questions while raising messy new ones (Oct. 9, 2019), perma.cc/6FQV-ZLFS

Van Valkenburgh, Hard Fork (Oct. 9, 2019), perma.cc/RR23-6N22

Van Valkenburgh, This week's EOS and Sia settlements with the SEC reinforce Coin Center's 2016 policy recommendations. (Oct. 1, 2019), perma.cc/VCF9-VNV8

Van Valkenburgh, A national alternative to onerous state-by-state regulation of cryptocurrency intermediaries (Aug. 30, 2019), perma.cc/9T4Z-WQGE

Van Valkenburgh, Don't make these five common mistakes about blockchains and cryptocurrency. (Aug. 26, 2019), perma.cc/78G2-WUXK

Van Valkenburgh, The differences between Bitcoin and Libra should matter to policymakers (Jul. 8, 2019), perma.cc/T7PS-WUEM

Van Valkenburgh, The upcoming FATF interpretive note is not doomsday for cryptocurrency (Jun. 20, 2019), perma.cc/3A8E-DNCP

Van Valkenburgh, Comment to Her Majesty's Treasury on Transposition of the Fifth Money Laundering Directive (Jun. 10, 2019), perma.cc/S5NC-VFE7

Van Valkenburgh, FinCEN's new cryptocurrency guidance matches Coin Center recommendations (May 9, 2019), perma.cc/R8CG-6RGP

Van Valkenburgh, Coin Center analysis of SEC cryptocurrency guidance (Apr. 3, 2019), perma.cc/2AAR-2FTN

Van Valkenburgh & Brito, New regulation would effectively ban crypto exchanges in Mexico (Mar. 21, 2019), perma.cc/25PY-KRE2

Van Valkenburgh, Brookings has published a report by former CFTC Chairman Timothy Massad on cryptocurrency regulation. (Mar. 19, 2019), perma.cc/LNC7-BBGH

Van Valkenburgh, Texas cryptocurrency bill threatens financial privacy (Mar. 13, 2019), perma.cc/Q9GX-3JBR

Van Valkenburgh, The Constitution Protects Software Developers and Users from Surveillance Overreach (Mar. 7, 2019), perma.cc/288P-MA37

Van Valkenburgh, Electronic Cash, Decentralized Exchange, and the Constitution (Mar. 7, 2019), perma.cc/6YB2-VHYQ

Van Valkenburgh, Comments to the Commodity Futures Trading Commission in Response to the Request for Input on Crypto-asset Mechanics and Markets (Feb. 11, 2019), perma.cc/MW9M-5LL4

Van Valkenburgh, What can the EtherDelta settlement tell us about how decentralized exchanges are regulated? (Nov. 8, 2018), perma.cc/H2WA-8V9G

Van Valkenburgh & Brito, Writing and publishing code alone cannot be a crime (Oct. 29, 2018), perma.cc/89WN-2JS4

Van Valkenburgh, The public internet needs public payments infrastructure (Oct. 11, 2018), perma.cc/A436-JDKN

Van Valkenburgh, The Comptroller of the Currency is making the case for a Federal Fintech Charter, a welcome alternative to state-by-state licensing for cryptocurrency and other payments companies. (Sep. 18, 2018), perma.cc/HB6S-444T

Van Valkenburgh, The Federal Reserve of St. Louis has published an excellent paper on payment systems and privacy. (Aug. 30, 2018), perma.cc/6HNR-W8BN

Van Valkenburgh, 51% Attack (Aug. 22, 2018), perma.cc/57ET-4HGQ

Van Valkenburgh, An updated Framework for Securities Regulation of Cryptocurrencies (Aug. 10, 2018), perma.cc/G7KU-DXZK

Van Valkenburgh, Framework for Securities Regulation of Cryptocurrencies (Aug. 10, 2018), perma.cc/X4AF-HJ2Q

Van Valkenburgh & Benger, Understanding Bitcoin's role in the Russia investigation (Jul. 17, 2018), perma.cc/4YFQ-VP6H

Van Valkenburgh, What could "decentralization" mean in the context of the law? (Jun. 15, 2018), perma.cc/S3WU-QSXB

Van Valkenburgh, Principles for Clarifying SEC Jurisdiction over Cryptocurrencies and ICOs (May 24, 2018), perma.cc/LX9Y-4X8A

Van Valkenburgh, Why treating all tokens as securities would harm innovation (May 23, 2018), perma.cc/698J-5L9G

Van Valkenburgh, SEC Commissioner doesn't want to pick cryptocurrency winners and losers. (May 7, 2018), perma.cc/LP7J-DA2W

Van Valkenburgh, Congressman Emmer stands up for cryptocurrency innovation and gets important regulatory clarification from the SEC. (Apr. 26, 2018), perma.cc/EQ8P-NKQN

Van Valkenburgh, No, ether is not a security. (Apr. 23, 2018), perma.cc/SGW9-Y66Q

Van Valkenburgh, SEC's Clayton: Use of a token can evolve toward or away from being a security (Apr. 12, 2018), perma.cc/3Z24-QP3N

Van Valkenburgh, Comments to the Commodity Futures Trading Commission on the Proposed Interpretation on Virtual Currency "Actual Delivery" in Retail Transactions (Mar. 20, 2018), perma.cc/R7UQ-C4DV

Van Valkenburgh, FinCEN raises major licensing problem for ICOs in new letter to Congress. (Mar. 6, 2018), perma.cc/P2XL-FVKG

Van Valkenburgh, Money Transmission Licensing is broken. Here's how to fix it. (Feb. 6, 2018), perma.cc/Q4AT-GC6C

Van Valkenburgh, Cryptocurrencies are far from unregulated (Feb. 5, 2018), perma.cc/RT83-HVR8

Van Valkenburgh, The Need for a Federal Alternative to State Money Transmission Licensing (Jan. 30, 2018), perma.cc/F9MV-SSBS

Van Valkenburgh, Coin Center statement on Long Island money laundering arrest. (Dec. 14, 2017), perma.cc/33JF-SWPD

Van Valkenburgh, How Bitcoin could drive the clean energy revolution. (Dec. 14, 2017), perma.cc/AH97-XG5J

Van Valkenburgh, Munchee Settlement Puts the Utility Token Argument to the Test (Dec. 12, 2017), perma.cc/RW4C-DVNV

Van Valkenburgh, Good news: Ethereum's CryptoKitties are probably not securities. (Dec. 5, 2017), perma.cc/7335-K37G

Van Valkenburgh, Coin Center statement on IRS Coinbase order. (Nov. 29, 2017), perma.cc/4ZZD-3Z7E

Van Valkenburgh, How do token sales fit with securities regulations? (Nov. 14, 2017), perma.cc/ER4D-DHXN

Van Valkenburgh, What is "open source" and why is it important? (Oct. 17, 2017), perma.cc/5X59-E6U6

Van Valkenburgh & Brito, The SAFT is a reasonable approach to securities law when preselling useful network tokens (Oct. 2, 2017), perma.cc/CE3VAXHQ

Van Valkenburgh, A token airdrop may not spare you from securities regulation. (Sep. 20, 2017), perma.cc/57Y4-8U7N

Van Valkenburgh, Visualizing Digital Currency Regulation State-by-state (Aug. 24, 2017), perma.cc/U684-XCVQ

Van Valkenburgh & Brito, Coin Center amicus brief in U.S. v. Coinbase (Aug. 3, 2017), perma.cc/K7DT-3AMQ

Van Valkenburgh, SEC hasn't quashed blockchain innovation. Let's keep it that way (Aug. 1, 2017), perma.cc/8C27-JU3S

Van Valkenburgh, The Uniform Law Commission Has Given States a Clear Path to Approach Bitcoin (Jul. 27, 2017), perma.cc/9YEM-GYFX

Van Valkenburgh, The SEC today has said that some tokens can be securities. (Jul. 25, 2017), perma.cc/XN6R-39KA

Van Valkenburgh, The ULC's model act for digital currency businesses has passed. Here's why it's good for Bitcoin. (Jul. 19, 2017), perma.cc/K7NP4LVQ

Van Valkenburgh, *The Bank Secrecy Act, Cryptocurrencies, and New Tokens: What is Known and What Remains Ambiguous* (May 20, 2017), perma.cc/JUE7-MMPG

Van Valkenburgh, Securities Laws Aren't the Only Rules Token Sales Have to Consider (May 20, 2017), perma.cc/42WR-LB22

Van Valkenburgh, What does it mean to issue a token "on top of" Ethereum? (May 10, 2017), perma.cc/VKE7-WG6K

Van Valkenburgh, Sixth Letter to the Uniform Law Commission (May 4, 2017), perma.cc/W8SG-UHKM

Van Valkenburgh, The CSBS is suing the OCC to stop the new special purpose national bank charter for fintech firms. (Apr. 26, 2017), perma.cc/T5QGAAF8

Van Valkenburgh, What's a blockchain, anyway? (Apr. 25, 2017), perma.cc/PSL6-QC62

Van Valkenburgh, Amazon, Apple, Google, Intuit, and Paypal just asked Congress for a unified federal alternative to state money transmission licensing. (Apr. 18, 2017), perma.cc/ZN8S-74QM

Van Valkenburgh, Comments to the Office of the Comptroller of the Currency on Exploring Special Purpose National Bank Charters for Fintech Companies (Apr. 14, 2017), perma.cc/V5AS-SJJP

Van Valkenburgh, Comments to the Office of the Comptroller of the Currency on Exploring Special Purpose National Bank Charters for Fintech Companies (Apr. 13, 2017), perma.cc/FUP8-U3L6

Van Valkenburgh, California is back at it a new (old) virtual currency licensing bill is pending in the Assembly. (Apr. 12, 2017), perma.cc/38EG-328S

Van Valkenburgh, Congress should create a blockchain technology safe harbor. Luckily they already figured it out in the '90s. (Apr. 6, 2017), perma.cc/LU4N-FMCY

Van Valkenburgh, The OCC has just taken another step toward a national fintech charter. (Mar. 15, 2017), perma.cc/7JAY-BN7Q

Van Valkenburgh, New Coin Center report: How lawmakers can protect consumers without harming digital currency innovation. (Mar. 9, 2017), perma.cc/VD7S-ZJAR

Van Valkenburgh, Fifth Letter to the Uniform Law Commission (Mar. 8, 2017), perma.cc/J9JH-RVCV

Van Valkenburgh & Brito, State Digital Currency Principles and Framework (Mar. 8, 2017), perma.cc/NSG7-MNCA

Van Valkenburgh, One of bitcoin's best bets for sound regulation is about to wrap up. (Mar. 3, 2017), perma.cc/62C7-8MG5

Van Valkenburgh, Fourth Letter on the Uniform Law Commission's Uniform Regulation of Virtual Currency Businesses Act (Mar. 1, 2017), perma.cc/JL6U-CE8K

Van Valkenburgh, The hedge fund Numerai is going to issue its own cryptotoken, and this article nails the policy issues. (Feb. 21, 2017), perma.cc/W4PW-BHMZ

Van Valkenburgh, North Dakota's new money transmission bill fails to define "control" of bitcoins. (Feb. 14, 2017), perma.cc/Q4QY-UJEK

Van Valkenburgh, ESMA issued their final DLT report but continues to underestimate open networks. (Feb. 9, 2017), perma.cc/2273-HQM5

Van Valkenburgh, Great news for bitcoin and other blockchain startups from Switzerland today. (Feb. 1, 2017), perma.cc/TBZ8-9LRX

Van Valkenburgh, What does "permissionless" mean? (Jan. 31, 2017), perma.cc/5YTE-M4QK

Van Valkenburgh, Bitcoin innovators need legal safe harbors (Jan. 24, 2017), perma.cc/G94N-S3WN

Van Valkenburgh, Things are looking up for Bitcoin's biggest regulatory hurdle (Jan. 18, 2017), perma.cc/GWR7-J65H

Van Valkenburgh, Comments to the Illinois Department of Financial and Professional Regulation in Support of the Proposed Digital Currency Regulatory Guidance (Jan. 18, 2017), perma.cc/8XF6-HAT9

Van Valkenburgh, Does it matter that different government agencies define Bitcoin differently? (Jan. 11, 2017), perma.cc/3Y9G-YKS4

Van Valkenburgh, "Blockchain technology" is a buzzword with little meaning. Here's what matters. (Dec. 14, 2016), perma.cc/2SV9-X4ZP

Van Valkenburgh, Open Matters: Why Permissionless Blockchains are Essential to the Future of the Internet (Dec. 14, 2016), perma.cc/8UM6-NU77

Van Valkenburgh & Wilcox, Zcash (Dec. 8, 2016), perma.cc/9UTB-ZK87

Van Valkenburgh, Is your cryptotoken a security? This new tool will help you find out. (Dec. 7, 2016), perma.cc/EP8B-KQWK

Van Valkenburgh, The OCC has decided to pursue the federal fintech charter for which we have been advocating. (Dec. 2, 2016), perma.cc/CCE7-AF86

Van Valkenburgh, Comments to the Office of the Comptroller of the Currency on Receiverships for Uninsured National Banks (Nov. 14, 2016), perma.cc/T6R3-H7HN

Van Valkenburgh, This OCC rulemaking could a make a big difference for digital currency exchanges. (Nov. 14, 2016), perma.cc/PF8A-FYG7

Van Valkenburgh, An update from the recent Uniform Law Commission drafting meeting (Nov. 1, 2016), perma.cc/AA9P-NZ8P

Van Valkenburgh, Third Letter on the Uniform Law Commission's Uniform Regulation of Virtual Currency Businesses Act (Oct. 27, 2016), perma.cc/TVX7-HFSC

Van Valkenburgh, Appcoins (Oct. 18, 2016), perma.cc/YQ8X-SBLB

Van Valkenburgh, New CFPB prepaid rules leave out Bitcoin, and that's mostly a good thing. (Oct. 5, 2016), perma.cc/J9GC-2KVD

Van Valkenburgh, Could your decentralized token project run afoul of securities laws? (Sep. 19, 2016), perma.cc/L5UN-JSE9

Van Valkenburgh, Food for Thought: A Federal Safe Harbor for non-custodial cryptocurrency users (Sep. 7, 2016), perma.cc/J9JA-WQB6

Van Valkenburgh, Law enforcement is learning about the benefits of open networks. (Sep. 6, 2016), perma.cc/PKK3-T9HK

Van Valkenburgh, Comments to the European Securities and Markets Authority on its Consultation on Distributed Ledger Technology Applied to Securities Markets (Sep. 2, 2016), perma.cc/F5G9-FCFR

Van Valkenburgh & Brito, New California digital currency bill is a step backwards (Aug. 9, 2016), perma.cc/BP5F-6SFL

Van Valkenburgh, Neither the CFTC nor multi-sig are to blame for the Bitfinex hack (Aug. 3, 2016), perma.cc/CHZ3-ZQK5

Van Valkenburgh, A Florida court just dismissed a money laundering case and said that bitcoin isn't "money." (Jul. 25, 2016), perma.cc/CVB9-HUTP

Van Valkenburgh, Patents for an open source project sound scary, but it makes sense. (Jul. 22, 2016), perma.cc/LR8M-6GK9

Van Valkenburgh, The UK's new blockchain welfare benefits trial has privacy advocates freaking out. (Jul. 14, 2016), perma.cc/ZG2G-A7ZL

Van Valkenburgh, DAOs: the internet is weird again, and these are the regulatory issues (Jun. 2, 2016), perma.cc/H3XX-X6LL

Van Valkenburgh, Why we need a federal fintech charter (Jun. 1, 2016), perma.cc/7KKJ-VGZF

Van Valkenburgh, Slides from Consensus Workshop: Regulating the Blockchain (May 18, 2016), perma.cc/SZ4F-D7GC

Van Valkenburgh, Second Letter to the Uniform Law Commission (Mar. 29, 2016), perma.cc/4EG2-Z3VK

Van Valkenburgh, When does a company actually control customer bitcoins? (Mar. 24, 2016), perma.cc/28B8-ZA8F

Van Valkenburgh, Why Bitcoin is not the root cause of ransomware (Mar. 3, 2016), perma.cc/9RM6-MDP7

Van Valkenburgh, Letter to the Uniform Law Commission (Feb. 26, 2016), perma.cc/B678-BYVK

Van Valkenburgh, No, FinCEN Policy is not Relevant to the Bitcoin Forking Debate (Feb. 15, 2016), perma.cc/6NRE-WKMA

Van Valkenburgh, Is Bitcoin a Security (Jan. 25, 2016), perma.cc/78M2-F5Y9

Van Valkenburgh, What are Forks, Alt-coins, Meta-coins, and Sidechains? (Dec. 8, 2015), perma.cc/4KBA-B6BD

Van Valkenburgh, What last week's European VAT ruling means for bitcoin fungibility (Oct. 29, 2015), perma.cc/7DZG-PALB

Van Valkenburgh, Letter to Conference of State Bank Supervisors (Oct. 14, 2015), perma.cc/6W2W-RC4Y

Van Valkenburgh, Released Today: Updated State Digital Currency Principles and Framework (Oct. 7, 2015), perma.cc/RF7G-78ZM

Van Valkenburgh, Freshly Unveiled CSBS Model Regs: Good Goals, Poor Execution (Sep. 15, 2015), perma.cc/D5QW-ZGZA

Van Valkenburgh, Sponsor of California's Bitcoin bill responds to critics, here's our take (Aug. 13, 2015), perma.cc/FL8B-TSRU

Van Valkenburgh, BitLicense: It's not just for New Yorkers (Jul. 13, 2015), perma.cc/K9N9-ST8N

Van Valkenburgh, Connecticut and Bitcoin: A legislative question mark (Jun. 29, 2015), perma.cc/U75Q-YKZR

Van Valkenburgh & Brito, Bitcoin: Risk Factors for Insurance (Jun, 16, 2015), perma.cc/7GQ9-S822

Van Valkenburgh, The 325-year-old Company that's Learning about Bitcoin (Jun. 16, 2015), perma.cc/XC7E-MVNH

Van Valkenburgh, Our thoughts on the BitLicense: California is Winning (Jun. 3, 2015), perma.cc/8RAG-QFK9

Van Valkenburgh, Tracking Bitcoin Regulation State by State (Jun. 2, 2015), perma.cc/U68K-QZ39

Van Valkenburgh, Wall Street is using Bitcoin, not just the blockchain. (May 12, 2015), perma.cc/7JDQ-F8ME

Van Valkenburgh, Coin Center files comment on NY DFS revised BitLicense proposal (Mar. 27, 2015), perma.cc/R9YG-WPU2

Van Valkenburgh, CFPB Proposed Rules Relating to Prepaid Accounts Comment (Mar. 25, 2015), perma.cc/G4CM-QKZV

Van Valkenburgh, Coin Center comments on CFPB proposal to regulate digital currencies (Mar. 23, 2015), perma.cc/QW5E-FNVU

Van Valkenburgh, Bitcoin: Our Best Tool for Privacy and Identity on the Internet (Mar. 15, 2015), perma.cc/3RFG-XMFW

Van Valkenburgh, Bitcoin May Be What Gets Us Real Net Neutrality (Mar. 9, 2015), perma.cc/XP2B-SJZJ

Van Valkenburgh, Apple Pay isn't enough to fix a broken payment system (Mar. 4, 2015), perma.cc/BT4S-WNVF

Van Valkenburgh, Report: Bitcoin enables unprecedented financial privacy and security (Mar. 3, 2015), perma.cc/7DDF-QGES

Van Valkenburgh, Steady Sentiment and the Problem of Scams (Feb. 24, 2015), perma.cc/H4D2-77DT

Van Valkenburgh, CSBS Virtual Currency Framework Comment (Feb. 16, 2015), perma.cc/JGQ8-7CEK

Van Valkenburgh, Should You Trust This Secretive Chinese Bitcoin Mine? (Feb. 9, 2015), perma.cc/ZF2W-KSYV

Van Valkenburgh, Reporting from the EU Parliament: Building an Open Bitcoin Coalition (Jan. 29, 2015), perma.cc/8P4R-U9AZ

Van Valkenburgh, Coin Center's new Bitcoin Public Sentiment Survey (Jan. 27, 2015), perma.cc/UU2U-KP79

Van Valkenburgh, Reporting back from the Blockchain Workshops at MIT and Harvard (Jan. 21, 2015), perma.cc/Z98C-MCRJ

Van Valkenburgh, Boston and the Blockchain this weekend we'll be there. (Jan. 15, 2015), perma.cc/D8N3-9WNM

Van Valkenburgh, Some perspective on Bitstamp (Jan. 8, 2015), perma.cc/B33V-FWH3

Van Valkenburgh, What is Bitcoin mining, and why is it necessary? (Dec. 15, 2014), perma.cc/F5PT-Z8LE

## Appendix B: Challenged Addresses

| | Challenged Address |
|---|---|
| 1 | Digital Currency Address - ETH 0x12D66f87A04A9E220743712cE6d9bB1B5616B8Fc |
| 2 | Digital Currency Address - ETH 0x47CE0C6eD5B0Ce3d3A51fdb1C52DC66a7c3c2936 |
| 3 | Digital Currency Address - ETH 0x910Cbd523D972eb0a6f4cAe4618aD62622b39DbF |
| 4 | Digital Currency Address - ETH 0xA160cdAB225685dA1d56aa342Ad8841c3b53f291 |
| 5 | Digital Currency Address - ETH 0xD4B88Df4D29F5CedD6857912842cff3b20C8Cfa3 |
| 6 | Digital Currency Address - ETH 0xFD8610d20aA15b7B2E3Be39B396a1bC3516c7144 |
| 7 | Digital Currency Address - ETH 0x07687e702b410Fa43f4cB4Af7FA097918ffD2730 |
| 8 | Digital Currency Address - ETH 0x23773E65ed146A459791799d01336DB287f25334 |
| 9 | Digital Currency Address - ETH 0x22aaA7720ddd5388A3c0A3333430953C68f1849b |
| 10 | Digital Currency Address - ETH 0xBA214C1c1928a32Bffe790263E38B4Af9bFCD659 |
| 11 | Digital Currency Address - ETH 0x03893a7c7463AE47D46bc7f091665f1893656003 |
| 12 | Digital Currency Address - ETH 0x2717c5e28cf931547B621a5dddb772Ab6A35B701 |
| 13 | Digital Currency Address - ETH 0xD21be7248e0197Ee08E0c20D4a96DEBdaC3D20Af |
| 14 | Digital Currency Address - ETH 0x4736dCf1b7A3d580672CcE6E7c65cd5cc9cFBa9D |
| 15 | Digital Currency Address - ETH 0xd96f2B1c14Db8458374d9Aca76E26c3D18364307 |
| 16 | Digital Currency Address - ETH 0x169AD27A470D064DEDE56a2D3ff727986b15D52B |
| 17 | Digital Currency Address - ETH 0x0836222F2B2B24A3F36f98668Ed8F0B38D1a872f |
| 18 | Digital Currency Address - ETH 0x178169B423a011fff22B9e3F3abeA13414dDD0F1 |
| 19 | Digital Currency Address - ETH 0x610B717796ad172B316836AC95a2ffad065CeaB4 |
| 20 | Digital Currency Address - ETH 0xbB93e510BbCD0B7beb5A853875f9eC60275CF498 |
| 21 | Digital Currency Address - ETH 0xCEe71753C9820f063b38FDbE4cFDAf1d3D928A80 |
| 22 | Digital Currency Address - ETH 0x756C4628E57F7e7f8a459EC2752968360Cf4D1AA |
| 23 | Digital Currency Address - ETH 0x94C92F096437ab9958fC0A37F09348f30389Ae79 |

| 24 | Digital Currency Address - ETH 0xD82ed8786D7c69DC7e052F7A542AB047971E73d2 |
| 25 | Digital Currency Address - ETH 0x88fd245fEdeC4A936e700f9173454D1931B4C307 |
| 26 | Digital Currency Address - ETH 0x653477c392c16b0765603074f157314Cc4f40c32 |
| 27 | Digital Currency Address - ETH 0x743494b60097A2230018079c02fe21a7B687EAA5 |
| 28 | Digital Currency Address - ETH 0xDF3A408c53E5078af6e8fb2A85088D46Ee09A61b |
| 29 | Digital Currency Address - ETH 0x09193888b3f38C82dEdfda55259A82C0E7De875E |