# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

COIN CENTER *et al.*,

     *Plaintiffs*,

v.

    No. 3:22-cv-20375

JANET YELLEN *et al.*,

     *Defendants*.

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 4

I.   Plaintiffs' Motion Is Correctly Deemed a Motion to Supplement the Administrative Record. ....................................................................................................... 4

II.  Plaintiffs' Motion Misconstrues the Standard Applicable to a Motion to Supplement the Administrative Record. ........................................................... 5

   A.   A Plaintiff May Supplement the Administrative Record Only in Highly Exceptional Circumstances—Typically Where There Is Bad Faith. ...................... 5

   B.   The Eleventh Circuit Has Held That Bad Faith Is a Necessary Prerequisite to Any Departure from the Record Rule. ...................................................... 7

   C.   Plaintiffs' Cited Authorities Largely Undermine Their Position. .................. 10

III. Even If the Purported Complex-or-Technical Exception Applied Here, Plaintiffs Do Not Meet That Standard. ........................................................................... 14

   A.   The Complex-or-Technical Exception Plainly Requires a Showing of Necessity, which Plaintiffs Cannot Meet. ............................................................... 14

   B.   Van Valkenburgh Is Not Qualified as a Rule 26 Expert, and an Article Reflecting His Views on How Tornado Cash Works Already Appears in the Record .................................................................................................................. 15

   C.   The Purported Mistakes That Plaintiffs Cite to Justify Admission of the Declaration Are Not Mistakes at All. ..................................................................... 17

   D.   It Is the Van Valkenburgh Declaration, Not OFAC's Evidentiary Memorandum, That Would Introduce Confusion. ................................................. 20

IV. The Van Valkenburgh Declaration Is Inadmissible under Federal Rules of Evidence 702 and 703. ......................................................................................................... 24

V.  There Is No Due Process Problem with Excluding the Declaration ......................... 28

VI. The Court Should Rule on the Motion Now and Give Defendants the Opportunity to Seek Further Testimony If It Is Inclined to Grant the Motion. .................................. 31

CONCLUSION ...................................................................................................... 32

## **INTRODUCTION**

Plaintiffs have filed a motion ("Pls.' Mot."), ECF No. 28, to supplement the administrative record with the declaration of Peter Van Valkenburgh, a purported cryptocurrency expert.  Van Valkenburgh is an attorney employed by Plaintiff Coin Center, Inc.  Plaintiffs argue that the Court should admit Van Valkenburgh's declaration if the testimony would be "helpful" to explain "complex or technical" information—which is not the proper standard.  The motion should be denied because there is no basis for supplementation.  This is a record review case that should move straightforwardly toward summary judgment, without expert discovery.

First, much of the case law Plaintiffs cite undermines, rather than supports, their position.  Under Supreme Court and Eleventh Circuit precedent, plaintiffs seeking to admit extra-record evidence in an Administrative Procedure Act ("APA") case must typically make a strong bad-faith showing.  Plaintiffs offer no assertion that the agency has demonstrated bad faith or improper behavior here.  At the very least, they must demonstrate that the proffered testimony is necessary for effective judicial review in light of serious record deficiencies, at which point the proper remedy would be remand to the agency for further consideration of the material or revision of the record, not supplementation with extra-record evidence.

Plaintiffs also fail to meet even the lower standard they favor for APA cases involving "technical" matters.  The cases that have recognized an exception for admission of materials explaining complex or technical subjects have near-universally required a strong showing of *necessity* to admit the information. Plaintiffs do not even attempt to meet that standard, and instead merely argue that the declaration is "admissible, helpful . . . , and important."  Pls.' Mot. at 2.  And, although Plaintiffs acknowledge that the administrative record extensively cites Van Valkenburgh's work, they fail to mention that the material he wrote—that is, material *already* in the record and considered by Defendant the Office of Foreign Assets Control ("OFAC")—mirrors the declaration's content, but in greater detail and with significantly less legal advocacy (and before Van Valkenburgh's employer sued OFAC).  Moreover, although Plaintiffs purport to have identified factual errors in the record, those turn out not to be errors at all.  Accordingly, Plaintiffs' declaration is plainly not *necessary* for the Court's review.

Even if it would suffice for Plaintiffs to show that the declaration is merely "helpful," it is not that either.  Although the declaration may appear to be a plainspoken explanation of the underlying technology, it is a piece of legal advocacy, not admissible expert testimony.  Indeed, Plaintiffs' proffered expert testimony does not meet the ordinary standards for admissibility.  Federal Rule of Evidence 702 requires Plaintiffs to show that the expert is qualified on the particularized subject

2

matter of his testimony, that his methodology and application are reliable, and that the testimony is helpful to the trier of fact.  Van Valkenburgh's declaration fails to establish any of these requirements.

Finally, there is no due process problem with excluding the declaration, particularly since there is already material in the record written by Van Valkenburgh, about how Tornado Cash works, that OFAC already considered.  Plaintiffs have not demonstrated why this material is inadequate.  Moreover, courts routinely exclude extra-record testimony in challenges to OFAC sanctions, even where there is no prior notice of the action.  And Plaintiffs have not even attempted to seek administrative relief through seeking de-listing, guidance, or other authorization that could obviate any potential due process concerns.

For all of these reasons, the Court should deny Plaintiffs' motion and allow the parties to prepare and submit summary judgment motions for the Court's resolution.  But if the Court is inclined to grant the motion, it should vacate the current summary judgment schedule and afford Defendants the opportunity to take the deposition of Van Valkenburgh and/or submit rebuttal testimony.  Admitting the declaration without such opportunity could prejudice Defendants at summary judgment, and the Court should therefore decline Plaintiffs' offer to defer ruling on the motion until after the briefing has concluded.

**ARGUMENT**

I.   **Plaintiffs' Motion Is Correctly Deemed a Motion to Supplement the Administrative Record.**

At the outset, the Court should treat Plaintiffs' filing as a motion to supplement the administrative record.  *Motions to complete* an administrative record and *motions to supplement* an administrative record (sometimes referred to as motions to "go beyond" the record) are not the same.  A motion to complete the record seeks to include information that was considered by the decisionmaker but was missing from the administrative record, whereas a motion to supplement the record seeks to include evidence that was not before the decisionmaker at the time of decision.  *See*, *e.g.*, *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1274 (D. Colo. 2010).  Some courts have confusingly referred to both types of requests as motions to "supplement" the record.  *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 113 (D.D.C. 2009) ("confusion is caused by the use of the word 'supplement' in both types of cases").

This distinction matters: motions to supplement place a heavy burden on the movant, *see id.* at 115 (they may be granted only in "limited, and highly exceptional, circumstances"), whereas motions to complete the record require the movant to show only "that the materials sought to be included . . . were indeed before the agency" when it made its decision, *id.* at 114; *see infra* Part II.  Because the Van Valkenburgh

4

Declaration was not before OFAC at the time of its decision, Plaintiffs' motion is properly deemed a motion to supplement the record.

Plaintiffs purport to chart a third course, however.  Relying on Federal Rule of Civil Procedure 26, they suggest, in a late footnote, that the "ordinary rules of civil discovery" should apply to the submission of expert testimony in APA cases. Pls.' Mot. at 14 n.3.  For all of the reasons discussed below, however, case law is to the contrary—expert testimony at summary judgment in an APA case is the rare exception.  *See infra* Part II.  A motion to supplement may be granted only in extraordinary circumstances.  This is not one of them.

## II.    <u>Plaintiffs' Motion Misconstrues the Standard Applicable to a Motion to Supplement the Administrative Record.</u>

Plaintiffs give the mistaken impression that courts are free to supplement an administrative record with material not considered by the agency whenever the record's subject matter is "complex and technical" and the material sought to be admitted purports to be "explanatory."  *See, e.g.*, Pls.' Mot. at 5–9.  This significantly misstates the law of administrative record supplementation.

### A.  <u>A Plaintiff May Supplement the Administrative Record Only in Highly Exceptional Circumstances—Typically Where There Is Bad Faith.</u>

Under what is known as the "record review rule," "it is black letter law that, except in the rare case, review in federal court must be based on the record before the agency and, hence, a reviewing court may not go outside the administrative

5

record." 33 Charles Allan Wright et al., Federal Practice and Procedure § 8306 (1st ed. rev. Apr. 2017). The source of this rule is the APA itself, which provides that, in cases challenging agency action, the reviewing court "shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

The Supreme Court has made clear that the scope of this review is exceedingly narrow. District courts must review agency action "based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). It follows that "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Thus, extra-record inquiry is "usually to be avoided," and "there must be a strong showing of bad faith or improper behavior before such inquiry may be made." *Overton Park*, 401 U.S. at 420. Testimony beyond the record may be appropriate only where "there was such failure to explain administrative action as to frustrate effective judicial review." *Camp*, 411 U.S. at 142–43. And if "the reviewing court *simply cannot* evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added).

There is no general authority to supplement the record simply because an opposing party characterizes the subject matter as complex.  Moreover, Plaintiffs have not even attempted to meet these standards.  *See* Pls.' Mot. at 5–9.

B. <u>The Eleventh Circuit Has Held That Bad Faith Is a Necessary Prerequisite to Any Departure from the Record Rule.</u>

Plaintiffs rely on several cases that have seemingly failed to adhere to the Supreme Court's clear framework in *Overton Park*, *Camp*, and *Florida Power*.  One prominent example—which appears in one of Plaintiffs' footnotes, *see* Pls.' Mot. at 6 n.2—is *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989).  There, the court recognized no fewer than eight broad exceptions to the record review rule.

*Esch* has since rightly fallen out of favor.  Several courts, including the D.C. Circuit itself, have either explicitly rejected *Esch* or recognized its limited vitality.  *See, e.g.*, *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (rejecting *Esch* and recognizing that it is "heavily in tension" with existing precedent); *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013) (*Esch* "has been given a limited interpretation since it was decided"); *Miccosukee Tribe of Indians v. United States*, 396 F. Supp. 2d 1327, 1330 (S.D. Fla. 2005) (the *Esch* exceptions are "not recognized by the Eleventh Circuit").

Case law from this circuit has followed a similar trajectory.  In 1996, in *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers* ("*Cobb's History*"), the Eleventh Circuit referred to, but did not expressly adopt,

7

four exceptions set forth by the Ninth Circuit in *Animal Defense Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988).  *See* 87 F.3d 1242, 1246 n.1 (11th Cir. 1996) (listing the four *Animal Defense* exceptions but stating that the court "need not consider" them because none applied in that case).  Plaintiffs here purport to rely on one of those four exceptions, for information deemed "necessary to explain technical terms or complex subject matter."  *Id.* at 1436.  Although courts in other circuits have occasionally referred to this exception, the Ninth Circuit appears to be the only one to have explicitly adopted it; at least one commentator has noted that this is "an exception unique to the Ninth Circuit and with little basis in the *Overton Park* bad faith standard."  Conley K. Hurst, *The Scope of Evidentiary Review in Constitutional Challenges to Agency Action*, 88 U. Chi. L. Rev. 1511, 1525 (2021).[1]

Like these other circuits, the Eleventh Circuit has since hewn more closely to the strict principles reflected in the Supreme Court's decisions.  In *Alabama-*

---

[1] The Ninth Circuit itself has pulled back from an expansive understanding of the complex-or-technical exception.  In *San Luis & Delta-Mendota Water Authority v. Jewell*, for example, the Ninth Circuit found that a district court had abused its discretion by relying on extra-record scientific declarations when it struck down portions of an "extremely complicated and technical" Biological Opinion of the National Marine Fisheries Service.  747 F.3d 581, 604–05 (9th Cir. 2014).  The Biological Opinion at issue was a "jumble of disjointed facts and analyses" that amounted to a "big bit of a mess," *id.*; it is hard to imagine a case that might have been more amenable to an exception for extra-record explanation.  Nonetheless, the Ninth Circuit held that consideration of the parties' extra-record materials on the merits was improper, and it expressed "serious concerns that the district court failed to observe" the record review rule.  *Id.* at 603.

*Tombigbee Rivers Coalition v. Kempthorne*, the Eleventh Circuit rejected the argument that a district court should have allowed extra-record discovery into the facts underlying a scientific study of the cytochrome *b* genes of two types of sturgeon.   477 F.3d 1250, 1262 (11th Cir. 2007).   Citing to *Cobb's History*'s[2] discussion of the narrow exceptions to the record review rule, the *Alabama-Tombigbee* court concluded that a court may consider extra-record evidence "*only* where there is *initially* 'a strong showing of bad faith or improper behavior' by the agency." *Id.* (emphasis added) (quoting *Overton Park*, 401 U.S. at 420).

Plaintiffs contend that this Court should ignore *Alabama-Tombigbee*, because "the litigants in th[at] case[] didn't raise the complex-or-technical exception" and the challengers' briefs in that case "never mentioned" it.   Pls.' Mot. at 6 n.1.   In fact, the *Alabama-Tombigbee* court was fully aware of *Cobb's History* and its discussion of the Ninth Circuit's exceptions to extra-record review—indeed, it cited to the very sentence of *Cobb's History* that discussed those exceptions.   *Alabama-Tombigbee*, 477 F.3d at 1262.   *Alabama-Tombigbee*'s holding that the exceptions to record review apply "only where there is initially" a bad-faith showing means that *bad faith is now a prerequisite* to the invocation of any such exceptions in the Eleventh

---

[2] The *Alabama-Tombigbee* court referred to *Cobb's History* by the acronym *PEACH*.  *See* 477 F.3d at 1254.

Circuit.  *Id.*  Because Plaintiffs do not and cannot argue bad faith, they cannot take advantage of that narrow exception.

C. Plaintiffs' Cited Authorities Largely Undermine Their Position.

Plaintiffs present a pair of footnotes purporting to bolster their argument that the complex-or-technical exception to the record review rule is widely accepted.  *See* Pls.' Mot. at 6 n.1 & n.2.  A closer look, however, reveals how disfavored such exceptions really are.

Not a single one of the cases cited in Plaintiffs' first footnote, Pls.' Mot. at 6 n.1 (listing in-circuit cases), admitted extra-record evidence *at all*, let alone on the basis of a complex-or-technical exception.  *Compare id. with SOSS2, Inc. v. U.S. Army Corps of Eng'rs*, 403 F. Supp. 3d 1233, 1237 (M.D. Fla. 2019) ("SOSS2 fails to demonstrate that the transcripts and exhibits fall within an exception"); *see also Sierra Club v. U.S. Fish & Wildlife Serv.*, No. 2:20-cv-13-SPC-NPM, 2021 WL 5634131, at *4 (M.D. Fla. Dec. 1, 2021) (similar); *Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. CV 206-186, 2007 WL 1830864, at *2 (S.D. Ga. June 21, 2007) (similar); *Kirkpatrick v. White*, 351 F. Supp. 2d 1261, 1272 (N.D. Ala. 2004) (similar); *Miccosukee Tribe*, 396 F. Supp. 2d at 1330 (similar); *Hakki v. Sec'y, Dep't of Veterans Affs.*, No. 8:18-cv-1269-T-35JSS, 2018 WL 6447305, at *2 (M.D. Fla. Oct. 19, 2018) (similar); *Arriva Med. LLC v. Sec'y of U.S. Dep't of HHS*,

No. 19-80685-CIV-SMITH, 2020 WL 5757084, at *3 (S.D. Fla. Sept. 28, 2020) (similar).

The sole in-circuit case that Plaintiffs elsewhere offer as an example—a Georgia district court case from over 30 years ago—allowed depositions of *agency* officials to better understand the administrative record, but *disallowed* a request to submit extra-record "depositions, affidavits, and other materials." *See United States v. Amtreco, Inc.*, 806 F. Supp. 1004, 1007 (M.D. Ga. 1992).  In fact, at least one other district court in this circuit relied on that case for the *opposite* conclusion that Plaintiffs do, *i.e.*, that this circuit does *not* recognize the complex-or-technical exception.  *See Wise v. Heddel*, No. 5:09-CV-127, 2011 WL 1379867, at *1 (M.D. Ga. Apr. 12, 2011).  After *Alabama-Tombigbee*, and in light of *Florida Power*, *see supra* Part II.A-B, it is at best questionable that the portion of the decision allowing for agency depositions is even good law.  *See Alabama-Tombigbee*, 477 F.3d at 1262.

As for the out-of-circuit cases, *see* Pls.' Mot. at 6 n.2, aside from *Esch* (discussed *supra* at 7), only four of the ten other cases cited in Plaintiffs' second footnote actually admitted any extra-record evidence, and three of those did so on bases irrelevant here: one did so because the government had waived any objection to admitting the material, *see Ruskai v. Pistole*, 775 F.3d 61, 66 (1st Cir. 2014); one did so based on an exception not recognized in this circuit, *compare Spiller v.*

*Walker*, No. A-98-CA-255-SS, 2002 WL 1609722, at *8 (W.D. Tex. July 19, 2002) (admitting extra-record declarations on "relevant factor" exception), *with St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:17-CV-398-J-34MCR, 2018 WL 11346477, at *4 (M.D. Fla. Nov. 27, 2018) ("relevant factor" exception is not recognized in this circuit); and one found no error because the district court had not actually relied on the material, *Norwich Eaton Pharmaceuticals, Inc. v. Bowen*, 808 F.2d 486, 489 (6th Cir. 1987).

The *only* other case Plaintiffs cite in their lengthy second footnote that allowed the introduction of extra-record evidence on relevant grounds is *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, which allowed "supplementary evidence only to explain the record and to determine the adequacy of the procedures followed and the facts considered." 734 F.2d 347, 357 (8th Cir. 1984). But that case is from 1984— a year before the Supreme Court's landmark *Florida Power* holding that a court should remand to the agency in such circumstances. *See* 470 U.S. at 744. It does not reflect current law and should not be followed.

Plaintiffs also rely on another, even earlier case, *Association of Pacific Fisheries v. EPA*, which represents the Ninth Circuit's now-disfavored, more lenient approach to the complex-or-technical exception. *See* 615 F.2d 794, 811–12 (9th Cir. 1980); Pls.' Mot. at 7; *see also supra* n.1. But even there, for submission of post-decision expert testimony to be considered on the merits, the court required a

showing that the agency's underlying assumptions were "entirely fictional or utterly without scientific support," *Pacific Fisheries*, 615 F.2d at 812, a standard that Plaintiffs have not—and could not—meet here.  *See infra* Part III.

Moreover, some of Plaintiffs' citations *undermine* their position.    For example, in *Minto v. U.S. Office of Personnel Management*, the plaintiff had sought to admit an expert declaration regarding her pseudoarthrosis diagnosis, to "explain technical terms of complex subject matter involved in the agency action."  765 F. App'x 779, 782 (3d Cir. 2019) (citation omitted); *see* Pls.' Mot. at 6 n.2.  The Third Circuit rejected this argument and upheld the district court's finding that the record was "exceedingly complete" on its own.  *Minto*, 765 F. App'x at 782.  As Plaintiffs do here, the *Minto* plaintiff argued that the material she sought to admit merely "clarified" relevant technical terminology, but "in actuality it set[] forth additional legal arguments . . . in support of her case."  *Id.* at 783–84; *see also infra* Part III.D. Accordingly, no exception to the record review rule applied, and supplementation was not proper.  *Minto*, 765 F. App'x at 783–84.

In short, Plaintiffs provide near-zero support for the novel two-part test they have invented.  *See* Pls.' Mot at 7.  Because they have not even attempted to show bad faith under *Overton Park* and *Alabama-Tombigbee*, their attempt to supplement the record with the Van Valkenburgh Declaration should be denied on this basis alone.

**III.**   **Even If the Purported Complex-or-Technical Exception Applied Here, Plaintiffs Do Not Meet That Standard.**

Even if the Ninth Circuit's purported complex-or-technical exception did apply in the Eleventh Circuit, which it does not, Plaintiffs' motion should still be denied.  Although Plaintiffs say the Van Valkenburgh Declaration is "admissible, helpful to the Court, and important" to their claims,  Pls.' Mot at 2, they fail to argue that inclusion of the declaration is *necessary* to resolve those claims, or that the Court "simply cannot evaluate the challenged agency action" without it (and if so, remand would be the proper remedy, not supplementation).  *See Florida Power*, 470 U.S. at 744.  Accordingly, even if the complex-or-technical exception were applicable, Plaintiffs have failed to meet this threshold prerequisite.

A. The Complex-or-Technical Exception Plainly Requires a Showing of Necessity, which Plaintiffs Cannot Meet.

Nearly every case to have mentioned the complex-or-technical exception—in this circuit and elsewhere—has made clear that a showing of necessity is an unavoidable requirement.  *See, e.g.*, *Cobb's History*, 87 F.3d at 1246 n.1 (describing exception where "technical terms or complex subjects *need* to be explained" (citing *Animal Defense*, 840 F.2d at 1436 ("discovery may be permitted if supplementation of the record is *necessary* to explain technical terms or complex subject matter" (emphasis added))); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996) (supplementation is improper where the information "can

either be extracted from the record or is not *necessary* to this court's review"
(emphasis added)).  Absent any  "necessity" requirement, the complex-or-technical
exception would squarely conflict with the Supreme Court's reasoning that record
supplementation may be allowed only in the rare instances where there is "*such
failure* to explain [the record] *as to frustrate* effective judicial review."  *Camp*, 411
U.S. at 142–43 (emphasis added).

Plaintiffs' motion falls far short of showing necessity.  Plaintiffs state that,
because the case "concerns cryptocurrency and related technologies," it is "the
poster child for the exception."  Pls.' Mot. at 8, 4.  But they fail to provide any
explanation *why* that might be so, except by further incanting the words "technical"
and "complex."  For example, they proffer that Van Valkenburgh's declaration
should be admitted because the case "implicates technical fields and complex
subjects in mathematics and computer science."  Pls.' Mot. at. 8.  Yet they provide
no reason to believe that mathematical or computer science expertise is necessary to
resolve this case.

B.  Van Valkenburgh Is Not Qualified as a Rule 26 Expert, and an Article
    Reflecting His Views on How Tornado Cash Works Already Appears in
    the Record.

In any event, Van Valkenburgh's testimony is inadmissible because he is
neither a mathematics nor a computer science expert.  *See* Pls.' Ex. A, Van
Valkenburgh Decl. ("Decl.") ¶ 4, ECF No. 28-1.  He is a lawyer and cryptocurrency

advocate who works at Coin Center, an organization that is a plaintiff in this lawsuit. *See id*. His declaration does not actually explain any math or science concepts, let alone any that might be necessary to resolve the case, and on several purportedly complex topics, the declaration descends into inapposite metaphors. *See*, *e.g.*, *id*. ¶ 44 (Tornado Cash smart contracts "are to Ethereum users what a set of drapes would be to someone with large picture windows in their bedrooms"); *id*. ¶ 65 (cryptography is included in Tornado Cash "much like principles of internal combustion are included in the design of automobiles"); *id*. ¶¶ 71–73 (zero-knowledge proofs are generated using "secret[s]" and "lock[s]").

At best, Van Valkenburgh's declaration can be understood to provide an informed layperson's opinion regarding how users interact with the Tornado Cash software and how he understands the software to function. *See generally* Decl. ¶¶ 57–84. But the administrative record provides that information, and in great detail. *See* Defs.' Ex. A, OFAC Evidentiary Memo. at 20–52 (explaining Tornado Cash's internal structure, function, mixing service, smart contracts, governance tokens, relayer transactions, and so forth). Indeed, as Plaintiffs admit, the administrative record repeatedly cites to an article written by Van Valkenburgh. *See* Pls.' Mot. at 4.

Van Valkenburgh's article, which appears in the record, is entitled "How Does Tornado Cash Work?" *See* Defs.' Ex. B, Exhibit 62 to Admin. Record, at CYBER2-

29777-00545–76.  The article echoes many of the points he makes in his declaration and has the benefit of not having been written purely for this litigation.  *Compare id.*[3] (discussing how the Ethereum network functions, *see id.* at 545–49; how Tornado Cash's application operates, *id.* at 549–52; its use of zero-knowledge proofs, *id.* at 552–54; how deposits and withdrawals function, *id.* at 554–56; how certain contracts cannot be changed, *id.* at 556–57; how Tornado Cash's governance operates, *id.* at 557–59; how relayer transactions work, *id.* at 559–60; and the functions of the various smart contract addresses, *id.* at 563–76), *with* Decl. ¶¶ 24–138.  These points, as conveyed in Van Valkenburgh's pre-lawsuit article, were thus considered by OFAC. Where material is "apparently already in the Administrative Record," a motion to supplement is properly denied.  *Wise*, 2011 WL 1379867, at *2.

C.  The Purported Mistakes That Plaintiffs Cite to Justify Admission of the Declaration Are Not Mistakes at All.

At most, Plaintiffs' motion attempts to argue that the declaration "provides a *better* explanation than the record" does in light of purported errors in OFAC's evidentiary memorandum.  Pls.' Mot. at 10.  They claim to have "several examples" of this phenomenon, but notably only elect to provide "one" of them.  *Id.*  In actuality, the purported flaw is of Plaintiffs' invention.  Specifically, Plaintiffs assert

___

[3] Citations to Administrative Record Exhibit 62 cite to the final three digits of the respective Bates numbers.

that OFAC's evidentiary memorandum in the record incorrectly states that "the challenged cryptocurrency addresses are 'controlled by a DAO' (shorthand for a 'decentralized autonomous organization') that 'implements . . . new features in a process called Trusted Setup Ceremony.'"  *Id.*  (quoting Pls.' Ex. B at 3, CYBER2-29777-00035, ECF No. 28-2).

OFAC's memorandum does not state that "the challenged cryptocurrency addresses" are controlled by a DAO.  It states that *the entity* Tornado Cash is controlled by a DAO.  *See* Pls.' Ex. B at 3 ("**TORNADO CASH** is controlled by a DAO").[4]  Tornado Cash *itself* has stated as much.  *Id.* ("If the community agrees on adding or changing a given feature, the update will only be implemented if the on-chain [i.e., DAO] governance rules are complied with.").

Nor is there a problem with the statement that the DAO "implements . . . new features in a process called Trusted Setup Ceremony."  *See* Pls.' Mot. at 10.  Plaintiffs claim that the purpose of such a ceremony is not to "implement new features" but rather "just [to] create[] a large random number."  *Id.*  This argument ignores *why* Tornado Cash uses such ceremonies to create large random numbers—

---

[4] OFAC's evidentiary memorandum refers to the entity that has been designated in bold and capital letters to differentiate the entity that has been designated from other references to the term "Tornado Cash," including references to the smart contracts.  *See* Evidentiary Memo. at 9 ("OFAC will refer to the entity proposed for designation with the bold and capitalized '**TORNADO CASH.**' OFAC will use 'Tornado Cash' without bolding or capitalization when that term serves as a descriptor, such as in 'the Tornado Cash smart contracts.'").

it does so to implement the desired security features of Tornado Cash smart contracts, through cryptographic means.  *See* Evidentiary Memo. at 38 (explaining trusted setup ceremonies); *id.* at 49 (quoting Tornado Cash's statement that "[a]fter completion [of the trusted setup ceremony], our team will . . . set the operator address to zero.  At this point Tornado Cash smart contracts will become completely immutable and unstoppable."); *see also* Decl. ¶ 109 (stating that "[t]he Tornado Cash Tool . . . required a trusted setup ceremony to ensure that proofs of deposits would have integrity").

Moreover, the fact that the Tornado Cash DAO was created after the first trusted setup ceremony, *see* Pls.' Mot. at 10, is irrelevant to the fact that any future trusted setup ceremonies for new Tornado Cash features *would* be arranged through DAO governance.  Indeed, the administrative record is clear about when the DAO came into being.  *See, e.g.*, Evidentiary Memo. at 29 (Tornado Cash "launch[ed its] governance token [*i.e.*, the DAO] in December" of 2020).  And Plaintiffs are simply incorrect that "new features cannot possibly be implemented by anyone, including any DAO."  Pls.' Mot. at 10; *see* Decl. ¶ 123.  As Tornado Cash itself has stated, the DAO is responsible for implementing new features in new smart contracts,.  *See* Pls.' Ex. B at 3 (quoting Tornado Cash blog post stating that "update[s] will only be implemented" through DAO governance).

Accordingly, the only purported deficiency that Plaintiffs identify in the record—in a single paragraph of an exhaustive and well-organized 88-page evidentiary memorandum, no less—is not actually a deficiency at all, let alone one that would frustrate this Court's review.

D. <u>It Is the Van Valkenburgh Declaration, Not OFAC's Evidentiary Memorandum, That Would Introduce Confusion.</u>

It is Plaintiffs' proffered declaration, not the agency's memorandum, that contains "misstatements." Pls.' Mot. at 10. Critically, Plaintiffs' motion and declaration—indeed, their entire case—are premised on the fundamental misunderstanding that OFAC designated for sanctions a set of 29 immutable smart contracts. *See, e.g.*, Decl. ¶ 135 (OFAC "has added the smart contract that contains a registry of relayers to the [Specially Designated Nationals and Blocked Persons (SDN)] list"); Pls.' Mot. at 3 (claiming that Defendants "sanctioned an open-source technology"); Am. Compl. ¶ 18, ECF No. 9 ("[t]he criminalization of those 29 addresses is at issue in this lawsuit").

That is not at all what OFAC did. It designated the "person or entity" called Tornado Cash, made up of its founders, its developers, and its DAO. *See* Evidentiary Memo. at 4 (defining the Tornado Cash entity); *id.* at 3 ("OFAC has []designated **TORNADO CASH** [*i.e.*, the defined entity, *see supra* n.4] on the basis of the information cited herein."). Plaintiffs concede that this designation was proper. *See* Am. Compl. ¶ 108 ("Plaintiffs . . . do not challenge Defendants' power to [sanction]

any identified persons, including the founders, developers, and decentralized autonomous organization who Defendants now call 'Tornado Cash.'").

Accordingly, contrary to what Van Valkenburgh advocates, the smart contracts have *not* been designated. Instead, they are listed as *identifiers* for the designated entity and its property and property interests. *See* Evidentiary Memo. at 6 ("OFAC is providing the following [smart contract] *identifiers* to assist the public in identifying **TORNADO CASH** to assist in their sanctions compliance obligations, to include blocking property and interests in property of blocked persons." (emphasis added)); *see also id.* at 6–9 (listing smart contract addresses). In other words, just as a street address might identify a house that is the blocked property or interest in property of a designated person, OFAC has included Tornado Cash's smart contracts as identifiers for the blocked property or interest in property of the Tornado Cash entity. *See id.* at 48 n.121 (the terms "property" and "property interest" under OFAC regulations interest include "services of any nature whatsoever, *contracts of any nature whatsoever*, and any other property, real, personal, or mixed, *tangible or intangible, or interest or interests therein*, present, future, or contingent" (emphases added) (quoting 31 C.F.R. §§ 510.323, 578.314)).

Thus, the Van Valkenburgh Declaration is not only unnecessary, it is unhelpful legal advocacy masquerading as expert testimony, in service of Plaintiffs' strawman theory of this case. This is readily apparent from the declaration's

hyperfocus on demonstrating that the DAO does not have control over assets sent through the 29 "challenged" smart contracts.  *See, e.g.*, Decl. ¶ 31 (no third party has "control over, or take[s] custody of, the tokens"); *id.* ¶ 35 (the smart contracts are "outside of any human being's control.");  *id.* ¶ 45 (developers have no "control or power over the tool"); *id.* ¶ 48 (no third party "control[s] the user's assets"); *id.* ¶ 51 (a user "retains complete control of his assets at all times");  *id.* ¶¶ 52, 53, 54, 61, 64, 86, 87, 88, 94, 96, 113, 114, 118, 121, 138 (all similar).

This mantra is irrelevant at best.  The relevant question in this suit is not who *controls* the smart contracts—it is whether Tornado Cash has a *property interest* in them.  If so, then they are blocked property under the International Emergency Economic Powers Act (IEEPA).  *See* 50 U.S.C. § 1702(a)(1)(B).

On this property-interest question, the declaration is nearly silent.  On the rare occasion when it does speak to the topic, however, it does so misleadingly.  For example, the declaration states that "the use of the 29 challenged Tornado Cash Tool addresses does not profit the Tornado Cash developers or the DAO."  Decl. ¶¶ 124, 129.  After this apparently unequivocal denial, the real picture slowly emerges: although users of the contracts "[a]t no point *must* . . . pay any fee" to Tornado Cash, *id.* ¶ 128 (emphasis added), they often *do* pay such a fee through "relayer" transactions that "allow users to process withdrawals without needing to pre-fund their withdrawal addresses, which helps users maintain privacy," *id.* ¶ 133.

Moreover, although transactions through the addresses "*need not* include" relayers, *id.* at 130 (emphasis added), transactions that do not do so "might create a link between the user's deposit and withdrawal address," *id.* ¶ 132, thereby defeating the entire purpose of Tornado Cash.

The unspoken subtext here is that Tornado Cash—the designated entity—makes money via relayer transactions that occur using the 29 smart contracts, as the OFAC memorandum describes. *See* Evidentiary Memo. at 48–52. Van Valkenburgh's statement that use of these addresses "does not profit" Tornado Cash, *id.* ¶¶ 124, 129, is false. For all the reasons explained clearly in the evidentiary memorandum, the smart contract transactions *do* profit Tornado Cash whenever the transactions occur through relayers—indeed, this is a primary way that Tornado Cash makes money and incentivizes users to keep using its services. *See* Evidentiary Memo. at 48–52. The record material reflects this fact, while the Van Valkenburgh Declaration attempts to obscure it.[5]

Accordingly, it is *Plaintiffs' declaration* that would cause "needless confusion," Pls.' Mot. at 11, not the agency's memorandum. Just as the Third Circuit in *Minto* rejected a purportedly explanatory expert declaration that turned out to be

_____

[5] The declaration also incorrectly asserts that "users can only withdraw tokens they originally deposited," and that assets are not "mix[ed] or commingle[d]." Decl. ¶¶ 52, 62. This is wrong, as Ethereum merely tracks and updates aggregate balances, not individual tokens. *See* Evidentiary Memo. at 42 n.109.

legal advocacy in disguise, *see supra* at 13, this Court should do the same for the Van Valkenburgh Declaration. *See Minto*, 765 F. App'x at 782.

## IV.   **The Van Valkenburgh Declaration Is Inadmissible under Federal Rules of Evidence 702 and 703.**

Even if Plaintiffs surmounted all of these deficiencies, Plaintiffs' proffered declaration fails to meet the ordinary standards for admission of expert testimony. Under Federal Rule of Evidence 702, the party seeking admission of expert testimony must show that "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (cleaned up); *see* Fed. R. Evid. 702. *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (describing the "gatekeeping" role "assign[ed] to the trial judge" to ensure that an expert is qualified and his "testimony both rests on a reliable foundation and is relevant to the task at hand"). The Court should find the Van Valkenburgh Declaration inadmissible because Plaintiffs have not carried their burden on any of these three requirements.

*First*, an expert may be qualified to testify based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Although extensive

experience may suffice to qualify an expert witness, it must be "obtained in a practical context" and must be "in the relevant subject." 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6264.1 (2d ed. 2022); *see Frazier*, 387 F.3d at 1261 (noting that although "an expert may be qualified by experience," that "does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express").

Van Valkenburgh's claimed expert qualifications are nine years as an employee of Coin Center, a public policy nonprofit focused on "cryptocurrency and decentralized computing technologies"—and membership on the Commodity Futures Trading Commission's Technology Advisory Committee's Subcommittee on Virtual Currencies. Decl. ¶¶ 2, 15; *see id.* ¶¶ 3–4 (stating that his degrees are in economics and law); *see also id.* ¶¶ 8–13 (listing congressional testimonies, none of which establish the *basis* for his qualification). He does not assert that he received any education or training in cryptocurrency, and, although he talks and writes about it often, he does not purport to have any practical experience in the field. *Compare, e.g.*, *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1377–78 (M.D. Ga. 2006), *aff'd*, 201 F. App'x 681 (11th Cir.) (finding proffered expert in handwriting analysis and document examination unqualified with "ten years of training and supervision in the field of handwriting analysis and document examination" and 22

years of experience "in the field of document examination" but no official certification or trade organization membership), *with United States v. Paul*, 175 F.3d 906, 911 (11th Cir. 1999) (finding qualified handwriting analysis expert based on 30 years as full-time handwriting examiner, membership in four professional organizations, and role training law enforcement document examiners).  Nor does he specify the nature of any "research" he engages in as part of that role.  Van Valkenburgh's barebones assertion that he is qualified based on one job, held for less than a decade, fails to establish that he is qualified as an expert witness on the issues addressed in his declaration.

*Second*, determining the reliability of expert testimony "inherently require[s] the trial court to conduct an exacting analysis of the proffered expert's methodology."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002); *see also* Fed. R. Evid. 702 advisory comm. note (2000 amends.) ("An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist."). This exacting analysis is even more important where, as here, the witness purports to rely "solely or primarily on experience": the expert "must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory comm. note (2000 amends.));

*see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[A]n expert might draw a conclusion from a set of observations based on *extensive and specialized* experience." (emphasis added)).

Van Valkenburgh has explained none of this.  He offers only the conclusory statement that "I arrived at my conclusions in this report by applying accepted principles of cryptography and computing to the technology underlying this case." Decl. ¶ 23.  He does not state what those principles are or by whom they are "accepted," much less explain how his experience relates to those principles and how those unspecified principles apply to the facts he lays out.  *See Frazier*, 387 F.3d at 1261.  He refers to no methodology at all.  He does provide a list of materials he apparently "reviewed" in preparing the declaration—including, revealingly, materials *in the administrative record*—but "[n]oticeably absent . . . is any detailed explanation as to exactly *how* [he] evaluated the documents and drew his conclusions." *Dracz*, 426 F. Supp. 2d at 1380.  These paltry statements fall far short of Plaintiffs' heightened burden to show that the proffered testimony is reliable.

*Third*, as to the final factor, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  As explained in detail above, *supra* Part III.C-D, the Van Valkenburgh Declaration is not only unhelpful to the Court but is in fact misleading on issues central to this case.

27

Thus, even if the Court were to find extra-record material necessary and appropriate in this case, it should not admit the proffered declaration because Plaintiffs fail to show that Van Valkenburgh satisfies any of the three requirements for admissibility of expert testimony.

## V.   **There Is No Due Process Problem with Excluding the Declaration.**

Lastly, Plaintiffs argue that excluding the declaration in litigation would deprive them of due process, because they purport to have "had no opportunity to present their views for inclusion in the administrative record." Pls.' Mot. at 11.  They contend that this concern is "especially problematic in this case" because they believe the underlying authority to be a "felony criminal law." *Id.* at 12.

At the outset, Plaintiffs' reference to "felony criminal law," and their repeated characterization of OFAC's action as "criminalization," is overblown.  OFAC has not "criminalized" anything.  It has designated for economic sanctions an entity that has assisted North Korea in laundering stolen money for its weapons program. *See generally* Evidentiary Memo. at 52.  To be sure, there are potential penalties for U.S. persons who violate those sanctions, including criminal penalties for "willful[]" violations.  *See* 50 U.S.C. § 1705.  But there is no indication that any Plaintiff has willfully violated the sanctions, or will do so, such that they might be subject to any such criminal penalties.  This is no more a "criminalization" than any other sanctions designation is.

Moreover, as previously discussed, Van Valkenburgh's views—on each of the topics in his declaration, and then some—are already contained in the administrative record, so Plaintiffs' claim to be deprived of an opportunity to provide his views is spurious. *See supra* at 16–17. In fact, one of Plaintiffs' cited circuit court cases rejected exactly this type of argument, in a materially similar circumstance. In *Franklin Savings Association v. Director, Office of Thrift Supervision*, the court explained that, in arguing that "the agency record [was] one-sided" and lacking the requested extra-record material, the plaintiff "ignore[d] the substance of the agency record," which was "extensive" and "clearly show[ed]" that the substance of the extra-record material was before the agency when it made its decision. 934 F.2d 1127, 1138–40 (10th Cir. 1991) (rejecting due process argument). Here too, the administrative record is not at all one-sided: it is highly comprehensive and clear and cites extensively to an article by Van Valkenburgh that tracks the subject matter of the declaration that Plaintiffs wish to admit.

Moreover, the availability of post-deprivation procedures obviates any due process concerns with the lack of pre-deprivation notice. OFAC's procedures—which typically do not provide for pre-deprivation notice in light of asset flight concerns—have been repeatedly upheld against due process challenge. *See, e.g.*, *Al Haramain Islamic Found. Inc. v. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003);

*Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002).  In addition,

courts have regularly rejected motions to supplement OFAC administrative records

with extra-record materials in circumstances like these.  *See, e.g.*, *Holy Land Found.*

*for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65 (D.D.C. 2002) (where "OFAC

did include in the record a significant portion of [plaintiff's] [requested

supplementary] evidence challenging OFAC's factual determinations" the requested

extra-record material was properly excluded), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003);

*Bazzi v. Gacki*, No. 19-CV-484, 2020 WL 5653599, at *6 (D.D.C. Sept. 23, 2020)

(excluding extra-record submission where plaintiff had not made "a colorable

argument that OFAC committed a 'gross procedural' error, 'acted in bad faith,' or

'engaged in improper behavior,'" nor demonstrated that he "need[ed] the [material]

to make out [his] claims, which rise and fall on the sufficiency of the existing

record"); *Deripaska v. Mnuchin*, No. 19-CV-00727, 2020 WL 7828783, at *3

(D.D.C. Dec. 29, 2020) (where plaintiff's motion did not "come close to establishing

that OFAC acted in bad faith," and where purported explanatory materials would

"bear on the propriety of OFAC's decision," extra-record submissions should be

excluded).

    Here, Plaintiffs cannot reasonably contend that they have had insufficient

opportunity to present Van Valkenburgh's views, where those very same views

appear in the record.  *See* Defs.' Ex. B.  Furthermore, Plaintiffs have not even

attempted to seek administrative relief through de-listing, guidance, or other authorization, even though a license would, if granted, obviate any purported property-interest deprivation that might give rise to some due process concern. As the Tenth Circuit has noted, "[t]he availability of [a] post-deprivation hearing precludes any due process violations." *Franklin*, 934 F.2d at 1140 (citing *Haralson v. Fed. Home Loan Bank Bd.*, 837 F.2d 1123, 1126 (D.C. Cir. 1988)). Accordingly, exclusion of extra-record materials is "no basis to claim a constitutional deprivation." *Id.*

## VI. The Court Should Rule on the Motion Now and Give Defendants the Opportunity to Seek Further Testimony If It Is Inclined to Grant the Motion.

Plaintiffs' motion fails to show that the declaration is admissible, so the motion should be denied. However, to the extent that the Court is inclined to grant the motion, Defendants respectfully request that the summary judgment schedule be vacated and that they be afforded 60 days thereafter within which to depose Van Valkenburgh or submit any rebuttal testimony. Without such opportunity, Defendants may be prejudiced at summary judgment. Accordingly, they respectfully request that the Court decline Plaintiffs' invitation to defer ruling on this motion until after summary judgment. *See* Pls.' Mot. at 13. Ruling now is also consistent with the Court's previous assessment that "it needs to be determined

sooner rather than later whether the administrative record will be supplemented."

*See* Order, ECF No. 27.

## **CONCLUSION**

Plaintiffs' motion to supplement the record should be denied.

Dated: March 28, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

ALEXANDER K. HAAS
Director

DIANE KELLEHER
Assistant Director

*/s/ Christopher R. Healy*
CHRISTOPHER R. HEALY
CHRISTINE L. COOGLE
Trial Attorneys
STEPHEN M. ELLIOTT
Senior Trial Counsel
Federal Programs Branch, Civil
Division
United States Department of Justice
1100 L St. NW
Washington, DC 20005
Tel: 202-514-8095
Fax 202-616-8470
E-mail: Christopher.Healy@usdoj.gov
*Counsel for Defendants*

**WORD LIMIT CERTIFICATION**

Pursuant to Local Rule 7.1(F), I hereby certify that this brief is 7,559 words in length, including headings, footnotes, and quotations, but excluding the case caption, signature block, title, table of contents, and this certification.

/s/ Christopher R. Healy

Trial Attorney, Civil Division