# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

COIN CENTER; PATRICK O'SUL-
LIVAN; JOHN DOE; and DAVID
HOFFMAN,

          Plaintiffs,

      v.

JANET YELLEN, in her official ca-
pacity as Secretary of the Treasury;
DEPARTMENT OF THE TREAS-
URY; ANDREA M. GACKI, in her
official capacity as Director of the Of-
fice of Foreign Assets Control; and
OFFICE OF FOREIGN ASSETS
CONTROL,

          Defendants.

Case No.
3:22-cv-20375-TKW-ZCB

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities.................................................................................................iii

Introduction...............................................................................................................1

Statement of Facts ....................................................................................................2

Standard...................................................................................................................16

Argument .................................................................................................................17

   I.   OFAC exceeded its statutory authority. ........................................................17

     A.   IEEPA does not reach purely domestic transactions. .....................................18

       1.   IEEPA requires every transaction to include the sanctioned foreign person's property interest. .................................................................................19

       2.   The sanctioned foreign persons have no property interest in domestic uses of the core software tool. .........................................................................21

       3.   The government's ambitious property-interest theories fall short. .............22

     B.   Even if the statutory text weren't clear, Plaintiffs are correct under the rule of lenity and major questions doctrine. .................................................................27

   II.   OFAC acted arbitrarily and capriciously.............................................................30

   III.   OFAC violated the First Amendment. ................................................................33

Conclusion ...............................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. DHS*,
141 S. Ct. 2485 (2021) ........................................................................... 28

*American Guarantee Liab. v. Timothy S. Keiter*,
360 F.3d 13 (1st Cir. 2004) .................................................................... 26

*Americans for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021). ..................................................................... 33, 34

*Bidi Vapor v. FDA*,
47 F.4th 1191 (11th Cir. 2022) ........................................................ 32, 33

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ........................................................................... 19

*Checker Cab Operators v. Miami-Dade Cty.*,
899 F.3d 908 (11th Cir. 2018) ............................................................... 20

*Clark v. Martinez*,
543 U.S. 371 (2005) ............................................................................... 27

*College v. Woodward*,
17 U.S. 518 (1819) ................................................................................. 25

*Commerce v. New York*,
139 S. Ct. 2551 (2019) ...................................................................... 30, 31

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .......................................................................... 20, 21

*DHS v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................................... 32

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ........................................................................... 29

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) ............................................................................... 32

*Fleischhauer v. Feltner,*
   879 F.2d 1290 (6th Cir. 1989) ..................................................... 21

*Gallardo v. Barr,*
   968 F.3d 1053 (9th Cir. 2020) ..................................................... 27

*Gibson v. Fla. Legis. Investigation Comm.,*
   372 U.S. 539 (1963) ..................................................................... 33

*Gonzales v. Oregon,*
   546 U.S. 243 (2006) ..................................................................... 28

*Hewitt v. IRS,*
   21 F.4th 1336 (11th Cir. 2021) ................................................... 17

*In re Kalter,*
   292 F.3d 1350 (11th Cir. 2002) ................................................... 19

*King v. Burwell,*
   576 U.S. 473 (2015) ..................................................................... 29

*Leocal v. Ashcroft,*
   543 U.S. 1 (2004) ......................................................................... 27

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982) ..................................................................... 20

*Marsh v. Nichols, Shepard Co.,*
   128 U.S. 605 (1888) ..................................................................... 24

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ..................................................................... 30

*Meyer v. United States,*
   364 U.S. 410 (1960) ..................................................................... 19

*Michigan v. EPA,*
   576 U.S. 743 (2015) ............................................................... 29, 32

*Ministry of Defense of Iran v. Elahi,*
   556 U.S. 366 (2009) ............................................................... 20, 25

iv

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ................................................................................ 30

*NFIB v. OSHA,*
    142 S. Ct. 661 (2022). .......................................................................... 28

*Regan v. Wald,*
    468 U.S. 222 (1984) ............................................................ 1, 11, 17, 29

*Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972) .............................................................................. 26

*Robinson v. California,*
    370 U.S. 660 (1962) .............................................................................. 32

*Romero v. DHS,*
    20 F.4th 1374 (11th Cir. 2021) ............................................................ 27

*United States v. Apel,*
    571 U.S. 359 (2014) .............................................................................. 29

*United States v. Green,*
    981 F.3d 945 (11th Cir. 2020) ............................................................. 22

*Vega v. T-Mobile USA, Inc.,*
    564 F.3d 1256 (11th Cir. 2009) ........................................................... 25

*W. Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ......................................................................... 28

*Youngstown Sheet & Tube v. Sawyer,*
    343 U.S. 579 (1952) .............................................................................. 25

**Statutes**

22 U.S.C. §9214 ......................................................................................... 16

22 U.S.C. §9214(a) ............................................................................... 16, 23

22 U.S.C. §9214(c) ..................................................................................... 23

5 U.S.C. §706(2) ............................................................................. 21, 28, 34

50 U.S.C. §1702(a)(1)(B) ................................................................... *passim*

50 U.S.C. §1705(a) ................................................................................................. 17

50 U.S.C. §1705(b) ................................................................................................. 17

50 U.S.C. §1705(c). ........................................................................................... 17, 32

*Emergency Banking Relief Act*,
Pub. L. 73-1, 48 Stat. 1 (1933) ....................................................................... 15

*International Emergency Economic Powers Act*,
Pub. L. 95-223, 91 Stat. 1625 (1977) ............................................................. 16

*Trading with the Enemies Act*,
Pub. L. 65-91, 40 Stat. 411 (1917) ................................................................. 15

**Rules & Regulations**

31 C.F.R. §§501.601-02 ........................................................................................ 17

31 C.F.R. §578.701 ................................................................................................ 17

Fed. R. Civ. P. 56(a) .............................................................................................. 21

**Executive Orders**

*Blocking Property of the Government of North Korea*,
81 Fed. Reg. 14,943 (Mar. 18, 2016) ......................................... 17, 18, 20, 23

*Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities*,
80 Fed. Reg. 18,077 (Apr. 2, 2015) ........................................... 17, 18, 20, 23

*Ensuring Responsible Development of Digital Assets*,
87 Fed. Reg. 14,143 (Mar. 14, 2022) ............................................................. 15

*Executive Proclamation No. 2039* (1933) ............................................................. 15

**Legislative Documents**

77 Cong. Rec. 80 (1933) ........................................................................................ 16

H.R. Rep. No. 95-459 (1977) ................................................................................. 16

S. Rep. No. 93-549 (1973) ..................................................................................... 16

## Other Authorities

*Attacker Takes Over Tornado Cash DAO*,
  CoinDesk (May 21, 2023), perma.cc/W8QZ-KP2E ....................................................19

Black's Law Dictionary (10th ed. 2014)..............................................................................26

Black's Law Dictionary (11th ed. 2019)..............................................................................24

Comm'r Pierce, *Rendering Innovation Kaput*,
  SEC (Apr. 14, 2023), perma.cc/9MTH-GZZL ............................................................15

*FAQ: What is prohibited as a result of OFAC's designation of Tornado Cash?*,
  OFAC (Nov. 8, 2022), perma.cc/F94U-WHPH ................................................... 19, 35

*FAQ: Who is the Tornado Cash "person" that OFAC designated?*,
  OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW ...........................................19, 26, 35

GitHub, tornadocash/tornado-core,
  perma.cc/5CLY-77WT ......................................................................................................9

GitHub, tornadocash/tornado-relayer,
  perma.cc/C9HM-C6T9 ...................................................................................................13

*Gov. DeSantis Seeks 'Crypto Friendly' Florida*,
  CBS Miami (Dec. 10, 2021) ...........................................................................................15

*OFAC Specially Designated Nationals and Blocked Persons List*,
  perma.cc/PC4B-M7MQ ...................................................................................................17

*Protocols*, ISDA,
  perma.cc/CBU8-BXF8 ......................................................................................................30

*Restatement (Third) of Restitution and Unjust Enrichment* §2 (2011) ........................29

Thompson, *Operation Choke Point 2.0: The Federal Bank Regulators Come for Crypto*
  (Mar. 2023), perma.cc/54DC-LF7T ..............................................................................15

*Treasury Designates DPRK Weapons Representatives*,
  OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8.............................................20, 35, 36

*Treasury Sanctions Individual, Banks and Trading Company*,
  Treasury (May 27, 2022), perma.cc/J6PZ-UNW4.......................................................18

*Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*,
   OFAC (Aug. 8, 2022), perma.cc/8GFV-3VMB ....................................................... 34, 36

*Tucked Inside Biden Infrastructure Bill: Unconstitutional Crypto Surveillance*,
   CoinDesk (Jan. 25, 2022), perma.cc/3XPB-2PKW ....................................................... 35

## INTRODUCTION

Congress enacted the International Emergency Economic Powers Act to remove the executive branch's emergency power over "purely domestic transactions." *See Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984). IEEPA limits the executive to regulating transactions involving "property in which any *foreign[er]*... has any interest." 50 U.S.C. §1702(a)(1)(B) (emphasis added). When it comes to Americans dealing with their *own* property interests, IEEPA promises they will be left alone. But the Biden administration refuses. Through the Office of Foreign Assets Control, it has used IEEPA to make it a federal felony for Americans to deposit and then withdraw their *own* cryptocurrency assets from a freely-available software tool, even though no foreigner is involved. The government defends its overreach by drawing hypothetical connections to foreigners, but those connections do not exist and would not satisfy IEEPA if they did. If an American's exercise of dominion over his own assets is not a "purely domestic transaction," then little is. Because OFAC exceeded its statutory authority, Plaintiffs are entitled to summary judgment.

Plaintiffs are also entitled to summary judgment because OFAC acted arbitrarily and capriciously and violated the First Amendment. OFAC's overreach does not match the proffered rationale, departs from a longstanding policy by sanctioning a technology, and fails to consider crucial aspects of the problem. And OFAC deprived Americans

of software that they use to privately associate and donate, needlessly chilling their constitutional rights.

Though the government's overreach is severe, the remedy is fairly modest. Plaintiffs challenge the criminalization of only 29 of 91 addresses. Those are the addresses that don't generate any payment to foreigners and over which foreigners have no control. Accordingly, this Court should set aside the criminalization of transactions involving the 29 challenged addresses.

## STATEMENT OF FACTS

**Ethereum.** Ethereum is a popular online marketplace. A.R.730, 817. People use Ethereum to buy, hold, and sell cryptocurrency assets. A.R.26-27. Anyone with the Internet can download freely-available software to use Ethereum. A.R.546. Once someone does that, he generates a pseudonymous address, which is a long alphanumeric string. A.R.1933. He can then receive and send crypto assets with that address. A.R.546.

When a user makes a transaction using Ethereum, the transaction is posted to a public ledger visible to anyone. A.R.17. The public ledger displays the sender's address, the recipient's address, and the crypto asset that they exchanged. A.R.23. Anyone can view every Ethereum transaction ever made. A.R.549.

People can also write new software and publish it to the Ethereum public ledger to allow users to participate in more advanced transactions according to rules defined in the code. A.R.43, 547. For example, someone can publish software that allows any

2

user to send 1 crypto unit and then automatically receive it back 10 days later. A.R.547. Software is published by assigning it to a new Ethereum address, which then allows anyone to use the software at that address. A.R.547.

Once someone publishes software to the Ethereum public ledger, it resides at its address permanently and, unless specific steps are taken before publication to void that condition, cannot be changed. A.R.548. It is immutable. *Id.*

**Privacy tools.** Although Ethereum user addresses are pseudonymous, if a real-world identity is linked to a user address, "it becomes possible to trace that user's complete financial history." A.R.549. For example, if an employee asks an employer to pay him in crypto assets, he must share his address with the employer. Ex.A¶4. Once a person's address is known to others, he and his family can be put at risk. For example, if others see that someone holds a large portfolio of crypto assets, they may use threats or violence to extort him. A.R.144.

To respond to this problem, users have published software tools to protect their privacy while using Ethereum. These tools generally allow users to clear a visible connection between their past and future transactions, so others cannot stalk their transactions. A.R.549.

**The "Tornado Cash" core software tool.** This case is about one of those privacy software tools. First published in 2019, the tool was popularly referred to as "Tornado Cash." A.R.952. The government now uses the name "Tornado Cash" to refer to

3

the people who wrote the software and another related group of people, rather than the software itself. A.R.32. To avoid confusion, Plaintiffs will refer to the software as it resides at the challenged Ethereum addresses as the "core software tool."

The core software tool allows users to deposit a crypto asset from their more public address and then withdraw that asset to a new, more private address. A.R.550. The core software tool operates simply: It "accepts ETH"—Ethereum's native crypto asset, A.R.818—"and other toke[n] deposits from one address and enables their withdrawal from a different address." A.R.51. The software "simply execute[s] 'deposit' and 'withdrawal' operations." A.R.53. It consists of under 500 lines of code. GitHub, tornadocash/tornado-core, perma.cc/5CLY-77WT; A.R.2218-26. When a user withdraws his assets from the tool, others viewing the public ledger can no longer tell that the assets are his, so his privacy is restored. A.R.54.

The core software tool is published to 20 addresses and available for anyone to read and use. A.R.563-67. The 20 versions are identical except that each is designed for a different crypto asset. For example, the first version, published to address 0x12D66f87A04A9E220743712cE6d9bB1B5616B8Fc, allows deposits and withdrawals of 0.1 ETH.[1]

---

[1] The addresses, which are all on the Ethereum public ledger, are enumerated in the administrative record at A.R.43-49 (in two lists) and the Amended Complaint (Doc. 9) at 41-44. For ease of reference, Plaintiffs will identify each address by its number in these two sources. The 0.1 ETH address is AR-I, AC-1.

Another version, published to a different address with a different alphanumeric code, allows deposits and withdrawals of 1 ETH.[2] Another does 10 ETH.[3] And another does 100 ETH.[4] Sixteen other versions allow deposits and withdrawals of different amounts of three other crypto assets—"DAI,"[5] "USDC,"[6] and "WBTC."[7] All 20 of these addresses were criminalized by the government and are challenged in this case. Am.Compl.41-44.

For all 20 addresses, the software is published permanently and cannot be changed. A.R.61. Neither the software writers, anyone affiliated with the software in any way, or anyone else in the world can change the software. A.R.563-67, 951. Some of the 20 addresses initially included an option to be changed, but that option was removed and can never be restored. A.R.557.

Using the core software tool takes two steps. First, the user deposits his crypto asset from his more public address to the appropriate software tool address. Second, at a later date, he withdraws the crypto asset from that address to his more private address. For example, when someone uses the 0.1 ETH address, the public ledger will show:

---

[2] AR-II, AC-2.
[3] AR-III, AC-3.
[4] AR-IV, AC-4.
[5] AR-V-XII (list one) & VII (list two), AC-5-13.
[6] AR-XIII-XVI, AC-14-17.
[7] AR-XVII-XIX, AC-18-20.

Time 1: [0.1 ETH] [more public address] → 0x12D66f87…

Time 2: [0.1 ETH] 0x12D66f87… → [more private address]

In the course of using the core software tool, a user does not have to make a payment to anyone else, except the standard Ethereum fee that applies to all transactions. A.R.554-56. The user does not have to pay the people who wrote the original software or anyone affiliated with the software in any way. *Id.* The core software tool is free and its use is unilateral, like putting money in and out of a piggy bank. *Id.*

**Registered relayers.** Although the core software tool is self-sufficient, over time, software writers have created ancillary support tools. The ancillary tools allow people to do things related to their use of the core software tool, like more easily find and use the core software tool,[8] or make optional donations to software writers.[9]

Based on the government's theory of this case, the most important ancillary tool for present purposes is the "registered relayer" tool. Registered relayers help users complete the second step: Instead of withdrawing the asset himself, the user pays another person, a "registered relayer," to withdraw it and transfer it to his more private address. A.R.559.

---

[8] AR-LXI, AC-30.
[9] AC-47; *see* A.R.48 (unnumbered).

Using a registered relayer itself involves two relevant steps. First, a user must send a request to the "relayer registry." A.R.57. The relayer registry lists people registered to perform relayer services and resides at Ethereum address 0x58E8dCC13BE9780-fC42E8723D8EaD4CF46943dF2.[10] A.R.59. Once a user requests a registered relayer from that address, his transaction is assigned to a relayer. A.R.57-58.

The relayer registry is maintained by an informal group called a decentralized autonomous organization, or "DAO." A.R.56-57. The DAO includes anyone who owns a crypto token called a Torn token, which then grants them the ability to vote on certain actions of the DAO. A.R.18. The DAO can update the registry and other ancillary tools. A.R.59.

Second, by requesting a registered relayer, the user sometimes generates a payment to the DAO in an amount equivalent to 0.3% of his withdrawal. A.R.59. The payment goes to Ethereum address 0x2FC93484614a34f26F7970CBB94615bA-109BB4bf.[11] A.R.18 Only some uses of registered relayers—depending on the underlying crypto asset involved—generate a payment to the DAO. A.R.59-60.

---

[10] AR-LXIV, AC-31.
[11] AR-LXVI, AC-63.

Using a registered relayer is optional. A.R.57. A user can use the core software tool without using a relayer at all. A.R.187. Relayers just provide an ancillary convenience. A.R.559-61. And even a user who wants that optional convenience can have a *non*-registered relayer do the same thing. In fact, although the core software tool has been running since 2019, "the launch of the relayers" was on "March 2, 2022." A.R.39. For over two years, the core software tool functioned and was widely used without any registered relayers to generate any payment to the DAO. Although the registration process came to help relayers attract users, anyone can perform the relayer service by running the relayer's open-source software himself and advertising any other way. GitHub, tornadocash/tornado-relayer, perma.cc/C9HM-C6T9. Using a non-registered relayer would not generate any payment to the DAO. *See* A.R.58.

**Plaintiffs.** All four Plaintiffs use Ethereum and would use or benefit from the core software tool. None would use registered relayers.

Patrick O'Sullivan lives in Santa Rosa County, Florida. Ex.A.¶2. His employer pays him in crypto assets, so he uses privacy tools to protect himself. *Id.*¶4. He would use the core software tool in his regular rotation of privacy tools. *Id.*¶9. He would deposit his own asset from his publicly known address to one of the core software tool addresses, such as the 0.1 ETH address,[12] then withdraw that same asset to a new, more

---

[12] AR-I, AC-1.

private address also under his control. *Id.*¶¶9-13. He would not use a registered relayer. *Id.*¶11. But as a result of OFAC's criminalization, O'Sullivan cannot do these things.

John Doe is a human rights advocate. Ex.B.¶2. He has used the core software tool to organize donations to provide frontline aid to Ukraine. *Id.*¶¶5-6. He and the donors whom he advised all used the core software tool before making any donations to protect their identities from Russians who could retaliate against them. *Id.*¶9.  He and his donors would continue providing aid using the core software tool, but cannot because of OFAC's action. *Id.*¶11. Given their lack of alternatives to securely fund those who furnish the aid, they have stopped all donations. *Id.*¶12. Doe would not use registered relayers. *Id.*¶13.

David Hoffman routinely uses crypto assets and is well-known in the crypto economy. Ex.C..¶¶4-5. In his regular rotation of privacy tools, he would use the core software tool. *Id.*¶¶10-13. He would deposit his own asset from his publicly known address to one of the core software tool addresses, then withdraw that same asset to a new, more private address also under his control. *Id.*¶13. He would not use a registered relayer. *Id.*¶12. He cannot take these planned actions due to OFAC's criminalization. After that criminalization, Hoffman was sent an unsolicited crypto asset through the core software tool. *Id.*¶5. So he has already incurred burdensome reporting obligations and potential liability because of OFAC's action. *Id.*¶6.

Coin Center is a leading cryptocurrency nonprofit. Ex.D.¶3. Coin Center receives contributions from donors who use the core software tool to preserve their privacy. *Id.*¶§6-8. Coin Center is not aware of any that used registered relayers. *Id.*¶9. Coin Center and its donors would have continued to use and benefit from the core software tool, but cannot do so because of OFAC's action. *Id.*¶10.

**Biden Administration and Crypto.** It was once widely believed that America would lead the way in embracing crypto assets. *E.g.*, *Gov. DeSantis Seeks 'Crypto Friendly' Florida*, CBS Miami (Dec. 10, 2021), perma.cc/U8TN-K2HD; Am.Compl.¶83. But the Biden administration now strives to make crypto "extinc[t]." Comm'r Pierce, *Rendering Innovation Kaput*, SEC (Apr. 14, 2023), perma.cc/9MTH-GZZL. The administration has waged an all-fronts war on Americans who invest and transact in crypto, and has asked agencies to suppress this new technology. *Ensuring Responsible Development of Digital Assets*, 87 Fed. Reg. 14,143 (Mar. 14, 2022); *see* Thompson, *Operation Choke Point 2.0: The Federal Bank Regulators Come for Crypto* (Mar. 2023), perma.cc/54DC-LF7T; Am.Compl.¶84. Instead of a free market for crypto, the Biden administration "places the highest urgency" on developing a "central bank digital currency," whereby everyone's personal finances are controlled and surveilled by the federal government. 87 Fed. Reg. 14,145.

**Statutory Background.** Congress enacted the Trading with the Enemies Act in 1917. Pub. L. 65-91, 40 Stat. 411 (1917). That Act authorized the President to prohibit

10

certain transactions in wartime, but only transactions "between the United States and any foreign country." *Id.* §5(b), 40 Stat. 415. The Act didn't apply to any "transactions to be executed wholly within the United States." *Id.* In 1933, President Roosevelt imposed an emergency bank holiday under the Act. *See* Executive Proclamation No. 2039 (1933). Congress rushed to amend the Act to authorize Roosevelt's domestic regulation. *Emergency Banking Relief Act*, Pub. L. 73-1, 48 Stat. 1 (1933). In giving the President the power to restrict some domestic transactions during emergencies, supporters recognized that they were creating a temporary "dictatorship," which they justified only by the recent bank panic. S. Rep. No. 93-549, at 186 (1973) (quoting 77 Cong. Rec. 80 (1933) (Rep. McFadden)).

America came to regret this brief experiment. S. Rep. No. 93-549, at 5-10. In 1977, Congress amended the Trading with the Enemies Act to apply "solely to times of war." *Wald*, 468 U.S. at 227. For peacetime, it enacted the International Emergency Economic Powers Act to give the President the power to regulate transactions during emergencies. Pub. L. 95-223, 91 Stat. 1625 (1977). But those emergency powers are confined to transactions involving *foreigners*. IEEPA authorized the President to, upon a declared emergency, restrict transactions involving "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. §1702(a)(1)(B), thereby removing the President's emergency "power to regulate purely domestic transactions," H.R. Rep. No. 95-459, at 15 (1977).

11

Congress enacted the North Korea Sanctions and Policy Enhancement Act in 2016 to force the President to use his IEEPA power in certain cases, but did not add to the power. Pub. L. 114-122, 130 Stat. 93 (2016). The Act compels the President to designate anyone who aids the government of North Korea and prohibit "all transactions in property and interests in property of a person designated," but only if he stays within the "powers granted to the President under [IEEPA]." 22 U.S.C. §9214(a), (c).

Earlier designations under these Acts include Vladimir Putin, Bashar al Assad, and the late Saddam Hussein. *See OFAC Specially Designated Nationals and Blocked Persons List*, perma.cc/PC4B-M7MQ. As a result, Americans cannot transact with the property interests of those people. For example, Americans cannot send money to Vladimir Putin.

**Criminalization.** If someone willfully engages in a transaction prohibited pursuant to these Acts, he commits a federal felony punishable by up to a $1,000,000 fine and 20 years in prison. 50 U.S.C. §1705(a), (c). Other violations result in large civil fines. *Id.* §1705(b); 31 C.F.R. §578.701. If someone receives blocked property, they must report it. 31 C.F.R. §§501.601-02.

**Challenged action.** The President has delegated some of his authority under IEEPA to the Secretary of the Treasury. As relevant here, the President has declared foreign emergencies and authorized the Secretary to block "property and interests in

property … of the following persons": those who assist malicious foreign cyber activities, *Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities*, 80 Fed. Reg. 18,077, 18,077-18,078 (Apr. 2, 2015); and those responsible for aiding the government of North Korea, *Blocking Property of the Government of North Korea*, 81 Fed. Reg. 14,943, 14,495 (Mar. 18, 2016). The Secretary exercises her delegated powers through OFAC.

Therefore, OFAC can prohibit transactions involving "property and interests in property … of … persons" responsible for assisting malicious foreign cyber activities or aiding North Korea. 80 Fed. Reg. 18,077-18,078, 81 Fed. Reg. 14,945. For example, last year OFAC designated the Air Koryo Trading Corporation, an aviation company, as providing support for North Korea's weapons program. So it prohibited transactions involving the Corporation's property interests, such as buying flights from them or selling them supplies. *Treasury Sanctions Individual, Banks and Trading Company*, Treasury (May 27, 2022), perma.cc/J6PZ-UNW4.

In 2022, OFAC determined that two new "persons" were responsible for assisting malicious foreign cyber activities and aiding North Korea: (1) the software writers who wrote the original lines of code constituting the core software tool and (2) the decentralized autonomous organization, or "DAO" that is affiliated with ancillary tools such as a relayer registry. A.R.32. The software writers were responsible, according to

OFAC, because they wrote software that helped malicious cyber actors and North Korea. A.R.67-76. And the DAO was responsible because it improved ancillary tools related to this software and benefitted from these actions. *Id.* Both the software writers and the DAO, according to OFAC, are foreigners. A.R.66-67.

OFAC *could* have then prohibited transactions involving the "interests in property … of" the software writers and the DAO members. *See* 80 Fed. Reg. 18,077-18,078, 81 Fed. Reg. 14,945. But OFAC did not do that. It did "not designat[e] Tornado Cash's individual founders, developers, [or] members of the DAO." *FAQ: Who is the Tornado Cash "person" that OFAC designated?*, OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW. Transactions with all of them remain legal.

Instead, OFAC prohibited Americans from using the technology that the software writers published—the core software tool. It announced that it was illegal for Americans to use the core software tool with their own property. *FAQ: What is prohibited as a result of OFAC's designation of Tornado Cash?*, OFAC (Nov. 8, 2022), perma.cc/F94U-WHPH. It prohibited all Americans from "engag[ing] in transactions involving identified Tornado Cash virtual currency wallet addresses," including all 20 addresses hosting the core software tool, which cannot be controlled or changed by the DAO. *Id.*

In addition to the 20 core software tool addresses, it also prohibited all Americans from engaging in transactions involving nine addresses that host ancillary tools

that cannot be controlled or changed by anybody, including the DAO.[13] Those com-

bined 29 addresses are the only ones at issue in this lawsuit. Am.Compl.41-44.

OFAC also prohibited Americans from engaging in transactions involving 62

other addresses not at issue in this lawsuit. Those addresses host software that either

can be changed by the DAO or generate a payment to the DAO. Of those addresses,

28 host nothing—they appear to have been listed in a failed attempt to list addresses

hosting similar tools on public ledgers other than Ethereum. The remaining 34 ad-

dresses host a range of ancillary or unused software, including the registered relayer

software, but the software at those addresses can be changed by the DAO or results in

a payment to the DAO.[14]

It is now a federal felony for an American to deposit and withdraw his own

property from one of the 20 core software tool addresses because transactions with

each address, according to the government, involve "interests in property … of" the

sanctioned "persons"—the software writers and the DAO. 80 Fed. Reg. 18,077-18,078,

81 Fed. Reg. 14,495.

**Regulatory History.** OFAC first attempted to criminalize the core software tool

in August, and Plaintiffs sued. Doc. 1. In November, OFAC withdrew that action and

---

[13] AR-LIV, LXXV, XLIX-LI, LXXIX, LXXI-LXXIII; AC-21-29.

[14] The DAO's powerlessness over the core software was recently confirmed when con-
trol transferred to an entity that sought to extract all available funds. These ancillary
tools were affected, but the core software tool remained completely untouched. *Attacker
Takes Over Tornado Cash DAO*, CoinDesk (May 21, 2023), perma.cc/W8QZ-KP2E.

replaced it with the current action, which again criminalized the core software tool but altered other addresses and changed their justification. *Treasury Designates DPRK Weapons Representatives*, OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8. Plaintiffs amended their complaint. Doc. 9.

Plaintiffs challenge only the criminalization of the use of 29 addresses. Those consist of the 20 addresses that host the core software tool, plus 9 addresses that host ancillary tools that also do not generate payment to foreigners and cannot be controlled by foreigners. *Id.*40-44. Plaintiffs do not challenge the criminalization of any address that contains software that generates a payment to the software writers or DAO or can be changed by the software writers or DAO (or anybody else). If Plaintiffs win this lawsuit, it will remain illegal to use the 62 addresses that they do not challenge. *Id.*

Plaintiffs allege that the criminalization of the core software tool exceeds OFAC's statutory authority, is contrary to law, is arbitrary and capricious, and violates the First Amendment. *Id.*¶¶128-57.

## STANDARD

Plaintiffs are entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, courts must "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, or limitations," "arbitrary [or] capricious," or "contrary to constitutional right." 5 U.S.C. §706(2)(A)-(C). Courts "may not supply

a reasoned basis for the agency's action that the agency itself has not given." *Hewitt v. IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021).

## ARGUMENT

IEEPA authorizes OFAC to criminalize only transactions involving the property interests of two sets of foreign persons, the software writers and the DAO. But here, OFAC has criminalized transactions involving Americans' own property. It has criminalized transactions that do not generate any payment to either set of persons, over which neither set of persons has any control. The government theorizes that these persons *could* receive an optional separate payment, but that is both false and insufficient. Meanwhile, for the government to win, it would have to overcome both the rule of lenity and the major questions doctrine, which it cannot do.

The criminalization was also arbitrary and capricious because it did not match the government's foreign-affairs rationale, departed from OFAC's longstanding position of sanctioning persons who can change their behavior rather than technology that cannot, and failed to consider important aspects of the problem. And it chilled protected First Amendment association by eliminating an essential privacy tool.

## I.    OFAC exceeded its statutory authority.

"The grant of authorities in IEEPA does not include the power … to regulate purely domestic transactions." *Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984). It covers only transactions involving "any property in which any foreign country or a national

thereof has any interest." 50 U.S.C. §1702(a)(1)(B). Here, the property interests must belong to the two designated "foreign[ers]," the software writers and the DAO. But instead, OFAC has prohibited Americans from moving their own property in and out of a tool that neither the software writers nor the DAO (nor anyone else) has any control over or receives any payment from. Under the plain text and binding precedent, OFAC therefore has no authority to criminalize all uses of the core software tool.

### A. IEEPA does not reach purely domestic transactions.

IEEPA authorizes the President to prohibit, upon certain conditions, a range of activities involving property in which any foreigner has any interest. The statute allows the President to regulate or prohibit:

> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> ***any property in which any foreign country or a national thereof has any interest***
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States

50 U.S.C. §1702(a)(1)(B) (breaks and emphasis added).

The North Korea Sanctions and Policy Enhancement Act of 2016 makes the exercise of this IEEPA power mandatory to block aid to North Korean weapons activities. 22 U.S.C. §9214(a), (c). Two executive orders authorize OFAC to exercise this IEEPA power insofar as it blocks activities involving the "interests in property …of"

any "persons" who assist malicious foreign cyber activities and aid North Korea. 80 Fed. Reg. 18,077; 81 Fed. Reg. 14,943.

### 1. IEEPA requires every transaction to include the sanctioned foreign person's property interest.

IEEPA does not authorize OFAC's criminalization because Americans' uses of the core software tool are not transactions involving foreigners' property interests.  A "property interest" is a subset of the category of "legal interests," which refer to "all or part of a legal or equitable claim to or right in property." *Interest*, Black's Law Dictionary (11th ed. 2019). The concept of a "property interest" references positive law and asks whether the person has "[a]n interest … held by an owner, beneficiary, or remainder-man in land, real estate, business, or other tangible items." *Property Interest*, Black's Law Dictionary (11th ed. 2019); *In re Kalter*, 292 F.3d 1350, 1353 (11th Cir. 2002). To be a property interest, the interest must be in "objects or rights which are susceptible of ownership," such as money or goods. *Meyer v. United States*, 364 U.S. 410, 412 n.3 (1960). The term is synonymous with "ownership interest." *Property Interest*, Black's Law Dictionary (11th ed. 2019) ("also termed … ownership interest"); *Ownership Interest*, Black's Law Dictionary (11th ed. 2019) ("see property interest"). When someone has a property interest in something, that typically means that he has "rights of possession and control," *Property Interest*, Black's Law Dictionary (11th ed. 2019), the "right to exclude," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and the right of disposition,

*Checker Cab Operators v. Miami-Dade Cty.*, 899 F.3d 908, 918 (11th Cir. 2018); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).

Supreme Court precedent interpreting IEEPA's property-interest element adheres to this understanding. It asks whether the regulated transaction, standing by itself, involves some "particular property" belonging to the foreigner. *Dames & Moore v. Regan*, 453 U.S. 654, 675 (1981). In *Dames & Moore*, the Supreme Court held that IEEPA's property-interest element did *not* allow the President to prohibit lawsuits with a sanctioned foreigner. It held that lawsuits against the Iranian government "are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property." *Id.* Even though Iran was a party to the lawsuit and the sole purpose of the lawsuit was to obtain Iran's property, the lawsuit in isolation did not involve foreign property. "An in personam lawsuit, although it might eventually be reduced to judgment and that judgment might be executed upon, is an effort to establish liability and fix damages and does not focus on any particular property within the jurisdiction." *Id.* So although restrictions on such lawsuits could be upheld based on other sources of law, "[t]he terms of the IEEPA therefore do not authorize the President to suspend claims [against sanctioned foreigners] in American courts." *Id.*; *see also Ministry of Defense of Iran v. Elahi*, 556 U.S. 366, 376-77 (2009) (holding that Iran's "property interest" in judgment in its favor did not arise until "the district court confirmed the [arbitration] award").

## 2. The sanctioned foreign persons have no property interest in domestic uses of the core software tool.

When Americans like Plaintiffs use the core software tool, that use does not involve the property interests of the software writers or the DAO. 50 U.S.C. §1702(a)(1)(B). The software writers and the DAO have no rights at all with respect to that transaction because no positive law remotely supplies such rights. They are not the owner, beneficiary, or remainderman with respect to the property involved in the transaction because the property belongs exclusively to the American user. A.R.51-53, 550-61. The user's only payment is the standard Ethereum transaction fee, none of which goes to the software writers or the DAO. *Id.* They do not have rights of possession, control, exclusion, or disposition over any involved property because they could not change the transaction, prevent it, or give rights over it to anyone else. A.R.61, 563-67, 951. And even if the transaction were designed to involve their property at a later step—which it isn't—they would not have a property right in the transaction itself. *Dames & Moore*, 453 U.S. at 675.

Even if the government could clear all these hurdles, it faces two more. First, existing law suggests that unincorporated organizations like the DAO are not even *capable* of holding interests in property. *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989). Their members are, but OFAC has made clear that it's not relying on their members' property interests. *See FAQ*, OFAC (Nov. 8, 2022), perma.cc/7G88-DMGW

21

("OFAC has not designated Tornado Cash's individual founders, developers, members of the DAO, or users, or other persons involved").

And second, if the software writers or DAO somehow ever had a property interest in these transactions, they abandoned it long before the criminalization. They "relinquish[ed] of or depart[ed] from" whatever interest they had "with the present, definite, and permanent intention of never returning or regaining possession," *Abandonment*, Black's Law Dictionary (10th ed. 2014); *United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020), because they intentionally made the tool inalterable and irrevocable, A.R.141 (Software writer: "The protocol was specifically designed this way to be unstoppable, because it wouldn't make much sense if some third-party [like developers] would have control over it."); *see also* A.R.61, 138-41, 563-67, 951.

### 3.  The government's ambitious property-interest theories fall short.

Forced to defend a poor fit with the statutory text, the government throws out several new theories of property rights and hopes one of them sticks. But none do.

**1.** The government's primary theory is that the DAO has a property interest in *all* uses of the core software tool because *some* uses of the core software tool involve registered relayers, and *some* uses of registered relayers generate a payment to the DAO. A.R.62-64. But OFAC has criminalized many transactions that result in not a penny's worth of property going to the DAO. And this lawsuit will not make the transactions that *do* generate a payment to the DAO any more legal than they were before.

22

OFAC has criminalized at least three types of transactions that generate no payment to the DAO. First, many prohibited transactions involve no relayers because relayers are optional. A.R.187, 559-61. Although relayers add convenience, anyone can deposit a crypto asset from a more public address and withdraw it to a more private address without using one. Even before there was a legal problem with using them, over 16% of transactions did not use registered relayers. A.R.57. *No* Plaintiff would use relayers.[15] Second, many prohibited transactions use relayers, but not *registered* relayers. Relayer code is open-source and can be used by non-registered relayers. Before 2022, the only available relayers were non-registered relayers who generated no payment to the DAO. A.R.32, 39. And third, many prohibited transactions use registered relayers but still do not generate payment to the DAO—such as all transactions with the government's first listed address, the 0.1 ETH tool. A.R.59-60, 1145. Criminalizing large categories of transactions in which no property goes to the DAO is the definition of "exc[eeding] statutory … authority." 5 U.S.C. §706(2)(C).

In fact, not a *single* transaction that would become lawful as a result of this lawsuit would result in any property going to the DAO. Plaintiffs challenge the criminalization of transactions with the core software tool, but not the criminalization of transactions

---

[15] Ex.A¶12 ("My use would therefore consist of my public address sending my crypto asset, such as 0.1 ETH, then my private address withdrawing that same 0.1 ETH, without any payment to any registered relayer."); Ex.B¶13 ("We do not need to use registered relayers and would not use them."); Ex.C¶12 ("I would not use a registered relayer."); Ex.D¶9 ("We are … not aware of any donations that used registered relayers.").

with the relayer registry address[16] or the DAO address.[17] Am.Compl.41-43. But absent those two addresses, the government's causal chain to the DAO—and thus to the IEEPA "foreign" person—is severed. *See* A.R.57-59. Legalizing the core software tool cannot generate payments to the DAO if those payments require additional steps that remain illegal. The only effect of criminalizing the core software tool is to prohibit transactions that do *not* involve registered relayers or payments to the DAO.

**2.** The government appears to suggest three backup theories. Its first theory is that the software writers and DAO have a property interest in uses of the core software tool because they spent "efforts" creating and promoting it, A.R.62, it had a "cost" to them, A.R.60, and it effectively performs a service for future users, A.R.18. But a person does not have a property interest in something merely because he expended his labor or incurred costs to create the technology that it uses, or because it serves people in the future. *E.g.*, *Marsh v. Nichols, Shepard Co.*, 128 U.S. 605, 612 (1888) (absent a patent, an inventor has no property right in his technology); *Restatement (Third) of Restitution and Unjust Enrichment* §2 (2011) (ordinarily no right to payment for voluntarily conveying benefit). Anglo-Saxon property law has not yet adopted Marx's labor theory of value. If it did, then the executive could use IEEPA to prohibit Americans from using anything invented by foreigners, from paper to computer code to Ethereum itself.

---

[16] AR-LXIV, AC-31.
[17] AR-LXVI, AC-63.

The government's second theory is that the software writers and DAO have an interest in uses of the core software tool because they enjoy positive externalities from its use. *See* A.R.60-61. But a person does not have a property interest in something because it can benefit him, or result in his enrichment. *Elahi*, 556 U.S. at 376-77; *see also College v. Woodward*, 17 U.S. 518, 639-40 (1819). If that sufficed, President Truman could have won the steel seizure case by simply invoking IEEPA's (broader) precursor and observing that greater production benefits foreign buyers of steel. *See Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 585 (1952).

Finally, the government suggests that the software writers and DAO have a "property interest" in uses of the core software tool because cryptocurrency users call it a "smart contract," and someone might have a property interest in an ordinary contract. A.R.60 n.121. But "smart contract" is a metaphor for the code's ability to execute rules, not an accurate description of American contract law. A.R.1095. The core software tool is not a contract in the property-interest sense because nobody besides the user gives consideration, agrees to terms, or performs. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). And if the core software tool were property, it would not be the property of the software writers and DAO, who are not parties to its use. When a trade group publishes an actual contract template for anybody to use, the group does not have a property interest in any future arrangements made by other parties who

25

download and use the contract template. *Protocols*, ISDA, perma.cc/CBU8-BXF8 (providing contract templates for free use).

The same outcome follows from any plausible definition of "property interest." For example, even a due-process constitutional "property interest" requires "a legitimate claim of entitlement," based on "existing rules or understandings that stem from an independent source such as state law." *Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). But neither the software writers nor the DAO have any state-law legal right to domestic uses of the core software tool. Likewise, the concept of "beneficial interests" in property requires a "right or expectancy in something (such as a trust or estate), as opposed to legal title to that thing." *Beneficial Interest*, Black's Law Dictionary (11th ed. 2019). The concept comes from "trusts and estates law," *American Guarantee Liab. v. Timothy S. Keiter*, 360 F.3d 13, 19-20 (1st Cir. 2004), and has no application to ordinary financial activity that affects a third party.

\* \* \*

Plaintiffs' position is restrained. They do not challenge the executive's power to invoke perpetual emergencies to justify IEEPA prohibitions. They do not challenge OFAC's decision to define an amorphous group that holds a certain crypto token as a sanctionable "person," or its view that this group is "foreign" even though many purported members are American. They do not challenge its power to prohibit the use of registered relayers simply because they sometimes generate small payments to the

DAO. And they do not challenge its power to punish anyone who uses the core software tool to send any crypto assets to North Korea or any other sanctioned party. All Plaintiffs contend is that IEEPA does not authorize OFAC to make it a felony for Plaintiffs to deposit and withdraw their own assets from a public tool, when no foreigner receives a payment from or has control over any aspect of that transaction.

### B. Even if the statutory text weren't clear, Plaintiffs are correct under the rule of lenity and major questions doctrine.

To the extent that IEEPA's text does not resolve this question, two rules of interpretation favor Plaintiffs. First, the rule of lenity means that Plaintiffs are correct unless IEEPA's application to domestic uses of the core software tool is "clear and definite." *Romero v. DHS*, 20 F.4th 1374, 1383 (11th Cir. 2021). *cert denied* 142 S. Ct. 2869 (2022). "[W]hen [courts] are faced with a statute that has both criminal and noncriminal applications, '[they] must interpret the statute consistently' in both contexts." *Id.* Any other approach would render "every statute a chameleon, its meaning subject to change depending on the [case]." *Clark v. Martinez*, 543 U.S. 371, 380 (2005). Therefore, "the Supreme Court has leaned decidedly against deferring to agencies' interpretations of dual application statutes." *Gallardo v. Barr*, 968 F.3d 1053, 1060-61 (9th Cir. 2020) (citing *Leocal v. Ashcroft*, 543 U.S. 1, 3-4 (2004)). IEEPA is a dual-application statute because it forms the basis for felony criminal punishments, including up to 20 years imprisonment. 50 U.S.C. §1705(c). The rule of lenity thus applies here.

Second, the major questions doctrine also means that Plaintiffs win unless IEEPA "plainly authorizes" OFAC's action. *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022). When the "logic" of an agency's statutory interpretation of a statute would empower it to take actions of "vast economic and political significance," the major questions doctrine applies. *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006); *OSHA*, 142 S. Ct. at 665; *see also Alabama Ass'n of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021) ("the Government's read of §361(a) would give the CDC a breathtaking amount of authority" to regulate other matters, like grocery delivery).

The government interprets 50 U.S.C §1702 to authorize it to criminalize purely domestic transactions if those transactions *could* (but do not) include foreigners, use technology invented by foreigners, or produce positive externalities for foreigners. *Infra*, I.A.3 Its interpretation would give it the power to regulate every financial transaction in America (because anyone can add an optional payment to a foreigner); any technologies that foreigners contribute their labor to; and every minutia of domestic industries that produce beneficial externalities to foreigners. The agency therefore cannot rely on "modest words," "vague terms," or "subtle device[s]," like a novel theory of property interests. *W. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Instead, it loses unless all uses of the core software tool "*clearly*" involve foreigners' property interests. *Id.* (emphasis added).

*Chevron* deference, or what's left of it, doesn't apply here. It yields to the major questions doctrine and the rule of lenity. *King v. Burwell*, 576 U.S. 473, 485 (2015) (major questions doctrine displaces *Chevron*); *United States v. Apel*, 571 U.S. 359, 369 (2014) ("we have never held that the Government's reading of a criminal statute is entitled to any deference"); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) ("Where, as here, the canons supply an answer, '*Chevron* leaves the stage.'"). And it does not apply in the first place because the statutory text is clear. Plaintiffs also reserve the right to argue that *Chevron* should be overruled. *Michigan v. EPA*, 576 U.S. 743, 762 (2015) (Thomas, J., concurring).

Because IEEPA does not authorize regulation of "purely domestic transactions," *Wald*, 468 U.S. at 228 n.8, OFAC's criminalization of the core software tool exceeded its authority and should be set aside, 5 U.S.C. §706(2).[18]

---

[18] The government initially suggested that the software tool itself was the sanctioned foreign person. It described "Tornado" as a "virtual currency mixer" and then sanctioned it—rather than any group of people—"for having materially assisted" malicious activities. *Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), perma.cc/8GFV-3VMB. Plaintiffs' Count II pleaded in the alternative that the tool could not be a sanctioned person. Am.Compl.33-34. The administrative record no longer relies on that rationale, so Plaintiffs will not address it here unless the government tries to resurrect it.

## II.     OFAC acted arbitrarily and capriciously.

Courts must set aside agency actions that are arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). Arbitrary and capricious review is "searching and careful." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). The criminalization of the core software tool was arbitrary and capricious in three ways.

**1.** There was a "significant mismatch" between the proffered rationale and OFAC's decision. *Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). When there is a "disconnect between the decision made and the explanation given," the agency acts arbitrarily and capriciously. *Id.* "[A]gencies [must] offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* When the agency's "explanation for [its] decision" does not match the decision itself, it's arbitrary and capricious—especially if the agency revises its action to produce the same result with new justification for litigation purposes. *Id.* at 2570, 2574-75. Here, "[s]everal points, considered together, reveal a significant mismatch between [OFAC's] decision … and the rationale [it] provided." *Id.*

OFAC's action was head-scratching on its face. It said that the software writers and DAO "materially assisted" North Korea and malicious foreign cyber activities because they helped provide technology that those bad actors used. *Treasury Designates DPRK Weapons Representatives*, OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8. But instead of prohibiting transactions with the software writers and DAO members—like it

does for other sanctioned entities—it left them with all the rights of full participants in the American economy. *FAQ: Who is the Tornado Cash "person" that OFAC designated?*, OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW. Then, OFAC prohibited transactions by Americans with their *own* assets. *FAQ: What is prohibited as a result of OFAC's designation of Tornado Cash?*, OFAC (Nov. 8, 2022), perma.cc/F94U-WHPH.

Context demonstrates that OFAC was "determined" to obtain that result and found its reasoning later. *Commerce*, 139 S. Ct. at 2574. OFAC acted in the context of the Biden administration's targeting of domestic cryptocurrency users, which has focused on eliminating crypto privacy. Am.Compl.¶84; *Tucked Inside Biden Infrastructure Bill: Unconstitutional Crypto Surveillance*, CoinDesk (Jan. 25, 2022), perma.cc/3XPB-2PKW. And OFAC first tried to criminalize the core software tool in August based on the theory that the tool itself was a sanctionable foreign person, *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), perma.cc/8GFV-3VMB, withdrew its criminalization after legal challenge, then re-criminalized the same software tool with new reasons, *Treasury Designates DPRK Weapons Representatives*, OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8. Its administrative record oddly does not explain what changed in the interim, but one thing stayed the same: OFAC criminalized all 20 addresses that host the core software tool that protects the privacy of Americans. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Commerce*, 139 S. Ct. at 2574.

31

**2.** OFAC did not show "awareness" and provide a "reasoned explanation" for "changing [its] position" from using sanctions law to reform individuals' behavior to using it to ban a technology that cannot be reformed. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). "The ultimate goal of sanctions," OFAC always says, is "to bring about a positive change in behavior." *Treasury Designates DPRK Weapons Representatives*, OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8. But it is impossible for the software writers or the DAO to change the core software tool. If they wanted to please the government by revising the core software tool to reject all transactions involving North Koreans or by removing the tool from the Internet altogether, they couldn't. No "change in behavior" can revise or take back the core software tool, and OFAC did not even recognize—much less provide a "reasoned explanation" for—its drastic policy change.

**3.** OFAC failed to consider "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. at 752; *Bidi Vapor v. FDA*, 47 F.4th 1191, 1202-04 (11th Cir. 2022). It failed to consider:

- The reliance interests, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020), and due-process interests, *Robinson v. California*, 370 U.S. 660, 666 (1962), of Americans like Plaintiff David Hoffman who can be subject to lifetime reporting and potential liability because someone sends them unsolicited funds through the core software tool. Ex.C¶6.

- The permanent loss of property for innocent Americans who deposited their assets into the core software tool before the criminalization and were banned from withdrawing those assets, even simply to return them to themselves.

- The chilling effect of sanctioning software writers and sanctioning privacy technology on the future publishing of code and associating politically. IEEPA warns OFAC to be cautious about its effects on these protected activities because it explicitly exempts even foreigners in their publishing of "communication[s]" and "informational materials." 50 U.S.C. §1702(b). But OFAC did not consider its assault on these statutorily-privileged concerns. *See Bidi Vapor*, 47 F.4th at 1202-04.

For these reasons, the criminalization was arbitrary and capricious.

## III.    OFAC violated the First Amendment.

When government action chills protected First Amendment association, it triggers exacting scrutiny. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021). Plaintiffs have a "strong" First Amendment interest in "maintaining the privacy of" their associational activities, including their charitable donations. *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 555-56 (1963). OFAC's criminalization not only chilled Plaintiffs' protected First Amendment association, but destroyed it. It deprived John Doe and his donors of the privacy tool that they relied on and needed. They have no other options and are left to stop making donations entirely. Ex.B¶11 ("As a result of Defendants' criminalization, our donations have stopped."); *see also* Ex.D.¶10.

OFAC's criminalization fails exacting scrutiny. "[E]xacting scrutiny requires "narrowly tailor[ing]" to the government's interest. *Bonta*, 141 S. Ct. at 2384 (controlling op. of Roberts, C.J.). "Narrow tailoring" requires that OFAC "demonstrate its *need* for [its action] in light of *any* less intrusive alternatives." *Id.* at 2386 (emphases added). Here,

OFAC could have exempted Americans' uses of the core software tool that didn't involve the software writers or DAO, exempted domestic transactions that advance protected associations, or required that those transactions be reported privately to the government rather than banning them outright. Because it failed to take, and appears to have "not even considered," these alternatives, it "fails exacting scrutiny." *Bonta*, 141 S. Ct. at 2386, 2389.

## CONCLUSION

This Court should grant summary judgment for Plaintiffs and set aside the criminalization of transactions involving the 29 challenged addresses.

Dated: May 26, 2023

                                        Respectfully submitted,

                                        *s/ Cameron T. Norris*
Michael A. Sasso                        Jeffrey M. Harris*
Florida Bar No. 93814                   Cameron T. Norris*
masasso@sasso-law.com                   Jeffrey S. Hetzel*
Christian Bonta                         CONSOVOY MCCARTHY PLLC
Florida Bar No. 1010347                 1600 Wilson Boulevard, Suite 700
cbonta@sasso-law.com                    Arlington, VA 22209
SASSO & SASSO, P.A.                     Telephone: 703.243.9423
1031 West Morse Blvd, Suite 120
Winter Park, Florida 32789              J. Abraham Sutherland*
Tel.: (407) 644-7161                    106 Connally Street
                                        Black Mountain, NC 28711
                                        Telephone: 805.689.4577.

                                        *pro hac vice

                                        *Counsel for Plaintiffs*

34

## CERTIFICATE OF SERVICE

I e-filed this motion with the Court on May 26, 2023, which emailed everyone requiring notice.

*/s/Cameron T. Norris*
Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum complies with Local Rule 7.1(F) because it contains 7,994 words, excluding the parts that may be excluded.

*/s/Cameron T. Norris*
Counsel for Plaintiffs