# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

COIN CENTER *et al.*,

       *Plaintiffs*,

v.

JANET YELLEN *et al.*,

       *Defendants*.

No. 3:22-cv-20375

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 3

  I.   IEEPA and Relevant Executive Orders Providing for Sanctions ................. 3

  II. Factual Background ..................................................................... 6

      A.  Cryptocurrency and Blockchains ............................................6

      B.  Tornado Cash ................................................................8

      C.  OFAC's Designation of Tornado Cash ...............................11

STANDARD OF REVIEW ................................................................13

ARGUMENT....................................................................................14

  I.   OFAC Acted Within Its Statutory Authority .................................14

      A.  Tornado Cash Has a Property Interest in Its Software Service, Which Comprises All of Its Smart Contracts ...................................15

      B.  Plaintiffs Are Prohibited from Using or Transacting with the Blocked Property Regardless of the Nature of the Transaction ...........................19

      C.  The Court Should Not Grant Plaintiffs Permission to Engage in Prohibited Transactions .......................................................23

      D.  The Rule of Lenity and Major Questions Doctrine Are Inapplicable ....25

  II. The Designation of Tornado Cash Was Not Arbitrary and Capricious ........27

  III. Defendants Are Entitled to Summary Judgment on the First Amendment Claims...............................................................................30

      A.  The Designation Does Not Implicate Plaintiffs' First Amendment Rights ...............................................................................30

      B.  In Any Event, the Designation Satisfies Exacting Scrutiny...................33

CONCLUSION ................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. HHS*,
  141 S.Ct. 2485 (2021) ......................................................................................27

*Ams. for Prosperity Foundation v. Bonta*,
  141 S.Ct. 2373 (2021) .................................................................................30, 33

*Babbitt v. Sweet Home Chapter of Cmtys.*,
  515 U.S. 687 (1995) .........................................................................................26

*Camp v. Pitts*,
  411 U.S. 138 (1973) .........................................................................................14

*Consarc Corp. v. Iraqi Ministry*,
  27 F.3d 695 (D.C. Cir. 1994) ...........................................................................19

*Eldred v. Ashcroft*,
  255 F.3d 849 (D.C. Cir. 2001) .........................................................................17

*FCC v. Prometheus Radio Project*,
  141 S.Ct. 1150 (2021) ......................................................................................27

*Gibson v. Fla. Legis. Investigation Comm.*,
  372 U.S. 539 (1963) .........................................................................................31

*Global Relief Found., Inc. v. O'Neill*,
  315 F.3d 748 (7th Cir. 2002) ..............................................................16, 17, 34

*Global Relief Found., Inc. v. O'Neill*,
  207 F.Supp.2d 779 (N.D. Ill.), *aff'd*, 315 F.3d 748 (7th Cir. 2002)...................21

*Holy Land Found. For Relief & Dev. v. Ashcroft*,
  219 F.Supp.2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir 2003) . 16, 19, 33

*Laird v. Tatum*,
  408 U.S. 1 (1972)..............................................................................................32

*Moose Lodge No. 107 v. Irvis*,
  407 U.S. 163 (1972) .........................................................................................32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................28

*Muscarello v. United States*,
    524 U.S. 125 (1998) .....................................................................................26

*Nat'l Mining Ass'n v. United Steel Workers*,
    985 F.3d 1309 (11th Cir. 2021) ...................................................................28

*NFIB v. OSHA*,
    142 S.Ct. 661 (2022) ....................................................................................26

*Orvis v. Brownell*,
    345 U.S. 183 (1953) ....................................................................................... 4

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*,
    87 F.3d 1242 (11th Cir. 1996) .....................................................................14

*Propper v. Clark*,
    337 U.S. 472 (1949) ....................................................................................... 4

*Regan v. Wald*,
    468 U.S. 222 (1984) ..................................................................................4, 19

*United States v. Davis*,
    139 S.Ct. 2319 (2019) ..................................................................................25

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) .....................................................................................27

*Wash. Post v. McManus*,
    355 F. Supp. 3d 272 (D. Md. 2019) .............................................................31

*West Virginia v. EPA*,
    142 S.Ct. 2587 (2022) .............................................................................26, 27

*Wright v. United States*,
    164 F.3d 267 (5th Cir. 1999) .......................................................................14

**Statutes**

5 U.S.C. § 706 ....................................................................................................14

50 U.S.C. § 1701(a) ............................................................................................. 4

50 U.S.C. § 1702(a)(1)(B) .................................................................4, 15, 20, 22

50 U.S.C. § 1704 ...............................................................................................19

50 U.S.C. § 4305(b)(1) ..................................................................................... 4

**Administrative and Executive Materials**

31 C.F.R. pt. 510 .............................................................................................. 6

31 C.F.R. § 501, subpart E ................................................................................24

31 C.F.R. § 510.201 ....................................................................................19, 20

31 C.F.R. § 510.305 ...........................................................................................23

31 C.F.R. § 510.313 ....................................................................................16, 19

31 C.F.R. § 510.323 ...........................................................................................17

31 C.F.R. § 578 ..................................................................................................24

31 C.F.R. § 578.201 ....................................................................................19, 20

31 C.F.R. § 578.309 ....................................................................................16, 19

31 C.F.R. § 578.313 ........................................................................................... 5

31 C.F.R. § 578.314 ...........................................................................................17

31 C.F.R. § 578.404 ......................................................................................6, 34

31 C.F.R. § 578.802 ......................................................................................5, 19

Exec. Order 13,694,
     80 Fed. Reg. 18,077 (Apr. 2, 2015) ......................................................5, 19, 24

Exec. Order 13,722,
     81 Fed. Reg. 14,943 (Mar. 18, 2016).........................................................6, 24

Exec. Order 13,757,
     82 Fed. Reg. 1 (Jan. 3, 2017).................................................................. 5

**Other Authorities**

*Beneficial Interest*, Black's Law Dictionary (11th ed. 2019)................................23

Dep't of the Treasury, The Treasury 2021 Sanctions Review 1 (2021),
    https://perma.cc/9M85-7ZRN ...........................................................................29

FIOD Belastingdienst, *Arrest of Suspected Developer of Tornado Cash* (Aug. 12,
    2022),
    https://www.fiod.nl/arrest-of-suspected-developer-of-tornado-cash .................. 9

OFAC, *Frequently Asked Questions: Cyber-Related Sanctions*,
    https://perma.cc/5KQ5-25GE ........................................................ 13, 25, 30, 34

U.S. Dep't of the Treasury, Treasury Designates DPRK Weapons Representatives:
    Tornado Cash Redesignated with Additional DPRK Authorities (Nov. 8, 2022),
    https://perma.cc/TGD5-8MXH .........................................................................12

U.S. Dep't of the Treasury, U.S. Treasury Sanctions Notorious Virtual Currency
    Mixer Tornado Cash (Aug. 8, 2022),
    https://perma.cc/AY3X-Z8JG .........................................................................11

**INTRODUCTION**

Tornado Cash is an organization that assisted the North Korean Government and others in laundering hundreds of millions of dollars' worth of stolen cryptocurrency. It did so by providing a publicly available software service that mixes the deposited currency of many users to obscure the link between sender and recipient. Each deposit and withdrawal occurs through a cascading series of transactions executed by its computer programs, known as "smart contracts." Because Tornado Cash provided a service often used by criminal enterprises and foreign adversaries, the Department of the Treasury's Office of Foreign Assets Control (OFAC) determined that Tornado Cash engaged in sanctionable activity that poses a significant threat to U.S. national and economic security. OFAC therefore designated Tornado Cash under the International Emergency Economic Powers Act (IEEPA) and relevant executive orders, adding it to the List of Specially Designated Nationals and Blocked Persons and prohibiting those subject to U.S. jurisdiction from transacting with Tornado Cash's property or interests in property.

Although their amended complaint asks this Court to set aside the designation as a whole, in their motion for summary judgment Plaintiffs do not challenge OFAC's designation of Tornado Cash under IEEPA and the relevant regulations. Instead, they contend that OFAC acted unlawfully by prohibiting U.S. persons such as Plaintiffs from engaging in certain transactions using a subset of the Tornado Cash

smart contracts. Rather than seeking a license to engage in their desired transactions, Plaintiffs filed this suit, constructing a novel theory of sanctions law that would insulate a portion of Tornado Cash's software service from U.S. sanctions.

Plaintiffs' piecemeal challenge to the blocking of property that results from OFAC's designation has no basis in law. First, Tornado Cash has a property interest in all of its smart contracts, which together constitute the money-laundering service it provides, and its smart contracts are therefore blocked property pursuant to the designation. Under IEEPA and relevant regulations, U.S. persons are prohibited from engaging in *any* transactions with that blocked property, absent a license. While the sanctioned entity must have an interest in the blocked *property* pursuant to IEEPA, that interest need not extend to every individual *transaction* involving that property. Even if only U.S. persons were using Tornado Cash smart contracts, the contracts are still property in which the sanctioned entity has an interest. IEEPA authorizes blocking property within the jurisdiction of the United States, which, by its very nature, could involve transactions between only U.S. persons. Should they wish to engage in transactions with Tornado Cash smart contracts, Plaintiffs are free to apply for an OFAC license, which they have not done.

Second, the designation easily satisfies the narrow and highly deferential standard of review for determining whether an agency action is arbitrary and capricious. That standard requires that an action be reasonable and reasonably

explained. OFAC's designation is not only reasonable but indeed critical to national and global economic security, as explained in great detail in its evidentiary memorandum. *See* Admin. Record (A.R.) 13–100.

Finally, the designation does not impinge on Plaintiffs' (or anyone else's) First Amendment associational rights. There is no right to use a particular platform or method to engage in private association, and Plaintiffs remain free to anonymously associate with and donate money to their preferred causes using any other method or platform.

Make no mistake: Plaintiffs' request to set aside the designation of Tornado Cash, or carve out some of the smart contracts that make up its software service, would undermine the government's ability to deter malicious cyber-enabled activities and to protect U.S. national and economic security. The Court should reject Plaintiffs' meritless request.

## BACKGROUND

## I.     IEEPA and Relevant Executive Orders Providing for Sanctions

For nearly its entire history, the United States has used economic sanctions as a critical tool to protect national security and achieve foreign policy goals. Pursuant to statutory authority granted in IEEPA, the President has long wielded broad authority to "investigate, regulate … prevent or prohibit … transactions" in times of war or declared national emergencies, 50 U.S.C. §4305(b)(1). Courts have

consistently interpreted that presidential authority to encompass the power to block or freeze an entity's property. *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187–88 (1953); *Propper v. Clark*, 337 U.S. 472, 483–84 (1949).

IEEPA also allows the President to use that authority in response to peacetime crises. *See Regan v. Wald*, 468 U.S. 222, 227–28 (1984). The President may declare national emergencies "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a). Once an emergency is declared, IEEPA authorizes the President to

> regulate, … prevent or prohibit, any … use, transfer … of, or dealing in, … or transactions involving, any property in which any foreign country or a national thereof has any interest[,] by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* §1702(a)(1)(B).

Pursuant to this authority, the President issued Executive Order (E.O.) 13694 based on his determination that "the increasing prevalence and severity of malicious cyber-enabled activities originating from … outside the United States constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 80 Fed. Reg. 18,077 (Apr. 2, 2015). The President declared a national emergency to counter that threat, blocking the property and

property interests of designated persons engaged in such malicious cyber-enabled activities. *Id.*

Later, the President amended E.O. 13694 to address "the increasing use of [significant malicious cyber-enabled activities] to undermine democratic processes or institutions." E.O. 13757, 82 Fed. Reg. 1 (Jan. 3, 2017). In relevant part, the order provides for blocking the property and interests in property of "any person," *id.*—i.e., "individual or entity," 31 C.F.R. §578.313—that the Secretary of the Treasury determines is "responsible for or complicit in" or has "engaged in, directly or indirectly, [certain] cyber-enabled activities originating from, or directed by persons located … outside the United States." E.O. 13694, §1. The order also provides for blocking the property and interests in property of "any person" that the Secretary determines "materially assisted, sponsored, or provided financial, material, or technological support for" any such cyber-enabled activity. *Id.*

Authorized to "employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order," *id.* §8, the Secretary delegated to the Director of OFAC the authority to block persons under E.O. 13694, as amended. *See* 31 C.F.R. §578.802. OFAC's implementing regulations also allow for general and specific licenses that would authorize transactions otherwise prohibited by the sanctions. *See id.* §578.404.

Also in accordance with IEEPA, in 2016 the President issued E.O. 13722, which addressed a national emergency with respect to North Korea. 81 Fed. Reg. 14,943 (Mar. 18, 2016). The President explained that "the Government of North Korea's continuing pursuit of its nuclear and missile programs … increasingly imperils the United States and its allies." *Id.* Accordingly, the President blocked the property and property interests of the Government of North Korea and the Workers' Party of Korea, *id.* §1(a), and blocked persons determined "to have materially assisted, sponsored, or provided financial, material, or technological support for" them, *id.* §2(a)(vii); *see also* 31 C.F.R. pt. 510 (OFAC implementing regulations).

## II.    Factual Background

### A. Cryptocurrency and Blockchains

**1.** Cryptocurrency is a virtual currency that can be traded and exchanged on blockchains and used for payment or investment purposes. A.R.21, 1766–67. A blockchain is a decentralized ledger—i.e., record of transactions—that relies on an online network of individuals who maintain the ledger's accuracy through cryptographic algorithms. A.R.21, 875. Users typically store assets in—and transmit funds between—digital "wallets," which are like virtual bank accounts, each identified by its "address." A.R.23, 1767.

Cryptocurrency can take the form of virtual coins or tokens. A.R.22, 729–31. Coins—such as Bitcoin, traded on the Bitcoin blockchain—are like dollars and

cents: they are the fundamental (or "native") medium of exchange on a blockchain, and they imitate traditional fiat currencies. A.R.22, 731. Tokens, meanwhile, are akin to vouchers or coupons: they are assets created through software developed on a blockchain, which can be used for a particular purpose but also have value and therefore can be bought, sold, and traded. *Id.*

A governance token can represent a share of ownership or voting rights in a decentralized autonomous organization (DAO). *Id.* A DAO is a management structure composed of the holders of governance tokens, who may vote on organizational decisions and thereby manage the service. A.R.24, 515. Typically, a core developer group creates the DAO and distributes governance tokens to stakeholders. A.R.515.

**2.** Ethereum is a prominent virtual currency blockchain, and its native cryptocurrency is Ether (ETH). A.R.26, 818, 857–58. An Ethereum account is a wallet that can hold cryptocurrency and send crypto assets on the Ethereum blockchain. A.R.506. Some Ethereum accounts are "smart contracts," which are software programs consisting of computer code deployed directly onto the Ethereum network. A.R.507, 1767. Smart contracts automatically execute all or parts of their code when a transaction is initiated by an authorized user or by another smart contract, A.R.2141. All Ethereum transactions require a fee, known as "gas," paid in Ether. *Id.*

**3.** Cryptocurrency mixing services, or mixers, are designed to obscure the source or owner of particular cryptocurrency units, thereby allowing users to remain anonymous. A.R.28, 1805. Criminals often employ mixers to launder stolen cryptocurrency. *See* A.R.1808. To initiate a transaction on a smart-contract mixer, a user sends a certain amount of cryptocurrency to the mixer and, in return, receives a cryptographic "note," or password, proving that they are the depositor. A.R.580. The deposited cryptocurrency is pooled, or "mixed," with cryptocurrency units of other users. *Id.* At a time of the user's choosing, the user sends the note back to the mixer and withdraws the designated amount to a specified recipient address. *Id.* The withdrawal transaction is often initiated by the withdrawal wallet address alone, to ensure that no connection can be drawn between sender and recipient. A.R.951. For an extra layer of anonymity, transactions are often executed with the aid of service providers called "relayers," who typically provide a fee to the mixer and collect a fee from the depositor, in exchange for initiating the withdrawal transaction. A.R.32, 951.

**B. Tornado Cash**

Tornado Cash is an organization that runs a cryptocurrency mixing service. A.R.32. Its organizational structure is composed of (1) its founders Alexey Pertsev,[1]

---

[1] After OFAC's designation, Pertsev was arrested by Dutch authorities on charges of facilitating money laundering. *See* FIOD Belastingdienst, *Arrest of*

Roman Semenov, and Roman Storm, and other associated developers, who together launched the Tornado Cash service, developed new features, created the DAO, and actively promoted the platform's popularity; and (2) its DAO, which votes on implementing new features created by the developers. *Id.* The DAO is made up of users who hold "TORN," Tornado Cash's governance token. A.R.35–41. TORN gives the holder the right to vote on changes to the Tornado Cash software service. *Id.* Although TORN plays an important governance function, it is also a virtual asset that may be bought and sold on secondary markets, the value of which increases as Tornado Cash increases its user base and popularity. A.R.43–50.

Tornado Cash uses smart contracts—created by its developers and approved and deployed by the DAO—to provide mixing services on multiple blockchains. A.R.51. On Ethereum, Tornado Cash smart contracts accept Ether (and other coins and tokens) into their smart contract wallets, or "pools," and allow users to withdraw the currency to a different address. *Id.* When a user transmits cryptocurrency using Tornado Cash's public interface, the requested transmission occurs through a cascading series of transactions automatically executed by multiple smart contracts. A.R.43.

---

*Suspected Developer of Tornado Cash* (Aug. 12, 2022), https://www.fiod.nl/arrest-of-suspected-developer-of-tornado-cash.

Tornado Cash collects fees through its relayers—third parties who have agreed to provide an extra layer of anonymity by withdrawing funds from the Tornado Cash pool and paying the Ethereum gas on a user's behalf, to further obscure the source of the funds. A.R.56–60 & n.113, 951. Nearly 84% of Tornado Cash transactions use relayers. A.R.57 n.113; *see* Quinby Decl., ECF No. 31-1. Tornado Cash maintains a registry of relayers, which exists in the form of a smart contract. *Id.* For a relayer to be listed on that registry, the relayer must "stake" (i.e., deposit) TORN into Tornado Cash's governance smart contract. *Id.* Tornado Cash collects a fee from the relayer for each transaction processed, and it distributes that fee to members of the DAO by reallocating a portion of the relayer's staked TORN. *Id.* The relayer, in turn, collects a fee from the user for every transaction they facilitate. *Id.*

When a user initiates a transaction on Tornado Cash's public interface, they can select their desired parameters, such as amount, coin type, and whether to use a relayer—and if they opt to use a relayer, that transaction will be aided by one of Tornado Cash's registered relayers. A.R.57. A user does not ordinarily select which individual smart contracts they would like to use. Rather, their requested transaction will execute automatically through a cascading series of interconnected instructions often contained in multiple smart contracts, which operate in concert to satisfy the selected parameters. For example, if a user deposits 101 ETH, the 100 ETH and 1

10

ETH smart contracts will be an integral part of that series, but that series may also include the "router" contract, certain governance contracts, and so on. *See generally* A.R.43–49. The deposited funds will go to the 100 ETH and 1 ETH pools, where they are indistinguishable from the cryptocurrency units deposited by other users in both relayer and non-relayer transactions. A.R.17–18, 54 n.109. Each such transaction increases Tornado Cash's appeal, and thus the value of TORN, by adding to the anonymity-enhancing crowd of active users. A.R.16–17.

### C. OFAC's Designation of Tornado Cash

On August 8, 2022, OFAC designated Tornado Cash pursuant to E.O. 13694, as amended. *See* U.S. Dep't of the Treasury, U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash, https://perma.cc/AY3X-Z8JG. In its accompanying public statement, OFAC explained that Tornado Cash "indiscriminately facilitates anonymous transactions by obfuscating their origin, destination, and counterparties, with no attempt to determine their origin." *Id.* OFAC noted that illicit actors have laundered hundreds of millions of dollars' worth of virtual currency since Tornado Cash's creation in 2019, including the Lazarus Group, a North Korean state-sponsored hacking group. *Id.* On November 8, 2022, OFAC rescinded the original designation and simultaneously re-designated Tornado Cash, to include an additional basis for the designation regarding Tornado Cash's activities involving the Democratic People's Republic of Korea (DPRK) and to

consider additional information. A.R.13–100; *see* U.S. Dep't of the Treasury, Treasury Designates DPRK Weapons Representatives: Tornado Cash Redesignated with Additional DPRK Authorities, https://perma.cc/TGD5-8MXH.

OFAC determined that Tornado Cash materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, an activity described in section 1(a)(ii) of E.O. 13694, as amended. A.R.67–73. Specifically, Tornado Cash enabled the Lazarus Group to launder more than $600 million in Ether in a criminal cryptocurrency operation known as the Sky Mavis–Ronin Bridge Heist, generating revenue for the DPRK's weapons of mass destruction and ballistic missile programs. A.R.70. OFAC determined that such cyber-enabled activities threaten the United States and pose a significant threat to the international financial system.

OFAC designated Tornado Cash also for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, the Government of North Korea, pursuant to section 2(a)(vii) of E.O. 13722. A.R.73–76. OFAC determined that (1) the Lazarus Group constituted an agency, instrumentality, or controlled entity of the Government of North Korea; (2) Tornado Cash facilitated the laundering of the $600 million proceeds from the Lazarus Group's Sky Mavis–Ronin Bridge Heist; and (3) Tornado Cash facilitated the laundering of monies from another cryptocurrency theft of $100

million, known as the Harmony Heist, in which the Lazarus Group is also suspected. A.R.73–76.[2]

Along with its designation, OFAC issued several FAQs, available on its website, to inform the public regarding the scope of the designation. For example, FAQ 1079 explained that individuals who had funds held in Tornado Cash at the time of designation may request a specific license for retrieval of the funds and that "OFAC would have a favorable licensing policy towards such applications, provided that the transaction did not involve other sanctionable conduct." OFAC, *Frequently Asked Questions: Cyber-Related Sanctions*, https://perma.cc/5KQ5-25GE ("OFAC *FAQ*"). In addition, FAQ 1078 explained that although unsolicited receipt of crypto assets from Tornado Cash (i.e., "dusting") would technically be subject to OFAC's regulations, "OFAC will not prioritize enforcement against" persons who receive such funds. *Id.* OFAC also noted that such persons "can also apply to OFAC for a specific license." *Id.*

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), an agency action may not be set aside unless it is "arbitrary," "capricious," "not in accordance with law," or

---

[2] Further material facts supporting the designation are properly classified and included in the classified addendum to the administrative record, which will be lodged with the Department of Justice's Litigation Security Group for the Court's review at its convenience.

"unsupported by substantial evidence." 5 U.S.C. §706. In making these determinations, a "court shall review the whole record or those parts of it cited by a party," *id.*, and it "shall not substitute its judgment for that of the agency," *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). In such cases, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "The agency's decision does not have to be ideal so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Wright v. United States*, 164 F.3d 267, 268–69 (5th Cir. 1999).

## ARGUMENT

### I.   OFAC Acted Within Its Statutory Authority

In support of its designation, OFAC established that Tornado Cash (1) is an entity that provided material support for malicious cyber-enabled activities and to the Government of North Korea, A.R.32–60, 67–78; and (2) has a property interest in the smart contracts that together constitute the Tornado Cash mixing service, A.R.60–64. Under U.S. sanctions law, U.S. persons, including Plaintiffs, are therefore prohibited from transacting with the Tornado Cash smart contracts.

Plaintiffs nonetheless believe that they should remain free to engage in prohibited transactions involving some subset of the blocked Tornado Cash smart

contracts. *See* Pls.' Mot. 19, ECF No. 36. And they create a novel standard, unsupported by IEEPA or the relevant regulations, in arguing that the Court should grant them (and other U.S. persons) permission to do so: they contend that the sanctioned entity—Tornado Cash—must have an interest in every *transaction* involving its software in order for those transactions to be prohibited. *Id.* But that is not what the statute or regulations require. To the contrary, under IEEPA, when property is blocked, U.S. persons are prohibited from *any* "use … of, or dealing in, … or transactions involving" that property—not just *some* uses of or transactions with that property. 50 U.S.C. §1702(a)(1)(B). Tornado Cash has a property interest in its software service, which is composed of all of its smart contracts. Thus, all U.S. persons, including Plaintiffs, are prohibited from *any* transactions involving any of the Tornado Cash smart contracts, absent a specific license from OFAC.

## A. Tornado Cash Has a Property Interest in Its Software Service, Which Comprises All of Its Smart Contracts

IEEPA broadly authorizes the President to prohibit "any" transactions with property and interests in property of persons designated under the relevant executive orders and regulations. *See supra* at 4. And OFAC's regulations provide that "the term *interest*, when used with respect to property (*e.g.*, 'an interest in property'), means an interest of *any nature whatsoever*, direct or indirect." 31 C.F.R. §§578.309, 510.313 (emphasis added). Thus, for property to be blocked under IEEPA, a sanctioned entity's interest in the property need not be a legally enforceable interest;

it can simply be a beneficial interest. *See Global Relief Found., Inc. v. O'Neill* ("*Global Relief II*"), 315 F.3d 748, 753 (7th Cir. 2002) ("The function of the IEEPA strongly suggests that beneficial rather than legal interests matter."); *Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F.Supp.2d 57, 68 (D.D.C. 2002) ("IEEPA does not limit the President's blocking authority to the existence of a legally enforceable interest."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

The purpose of this statutory breadth is readily apparent: "[IEEPA] is designed to give the President means to control assets that could be used by enemy aliens." *Global Relief II*, 315 F.3d at 753. If "enemy aliens" could merely transform their property interests into creative new forms to avoid sanctions, it would subvert the entire purpose of the sanctions. As the Seventh Circuit put it in the context of assessing whether domestic property could be blocked:

> What sense could it make to treat al Qaeda's funds as open to seizure if administered by a German bank but not if administered by a Delaware corporation under terrorist control? Nothing in the text of the IEEPA suggests that the United States' ability to respond to an external threat can be defeated so easily. Thus the focus must be on how assets could be controlled and used, not on bare legal ownership.

*Id.* There is substantial evidence in the administrative record that Tornado Cash has, at minimum, a beneficial interest in its software service, composed of its smart contracts, because Tornado Cash created and governs the service, which makes money for Tornado Cash. And those smart contracts are unquestionably "property"

16

under OFAC's regulations, which define the term broadly to include "services of any nature whatsoever, [and] contracts of any nature whatsoever." 31 C.F.R. §§510.323, 578.314.[3]

The Tornado Cash software is essentially a blockchain-enabled money-laundering tool, available for hire, that Tornado Cash developed, tested, deployed, and profits from. Tornado Cash actively promotes its service to increase its user base, because the more people who use them, the more concealed the transactions become and the more money Tornado Cash makes. A.R.62. Specifically, an increase in Tornado Cash users means an increase in the overall number of relayer transactions remitting fees to the Tornado Cash DAO and an increase in the value of TORN, Tornado Cash's governance token. A.R.60–64, 550–51. Even if Plaintiffs never intend to use relayers themselves, Pls.' Mot. 8, the 29 smart contracts that they purport to challenge are executed in both relayer and non-relayer transactions alike, A.R.17.

---

[3] Some amici argue that the smart contracts do not constitute property because they "cannot be owned." Br. of Blockchain Ass'n 14–16, ECF No. 42-1; Br. of Paradigm 11, ECF No. 45-1. Plaintiffs do not raise this argument, and the Court should disregard amici's efforts to interject new issues and claims into this case. *See, e.g.*, *Eldred v. Ashcroft*, 255 F.3d 849, 851 (D.C. Cir. 2001) (collecting cases). In any event, amici ignore the existence of qualified property interests and fail to address the broad definition of "property" in OFAC's regulations, which plainly encompasses Tornado Cash's smart contracts.

Plaintiffs assert that "relayers are optional" and only "add convenience." Pls.'
Mot. 23; *see id.* at 8. But the use of relayers is all but essential to ensuring users'
anonymity, because without a relayer, the user must pre-fund the recipient account
with Ether to pay the Ethereum gas, thus establishing an electronic footprint that
Tornado Cash users go to great lengths to avoid. A.R.62–63. Given this critical
function, the pervasiveness of relayer-facilitated transactions cannot be overstated:
83.67% of Tornado Cash transactions use relayers. A.R.57 n.113, 63; Quinby Decl.[4]

Tornado Cash's interest in all of the smart contracts that make up its software
service is further revealed by its extensive efforts to develop its smart contracts and
advertise the service; undertake a complex "trusted setup ceremony" to enhance the
contracts' cryptography; create the TORN token, which allowed it to reward users
who staked TORN in its smart contracts to enhance the service's anonymity and
increase the price of that asset; and offer "bug bounties," which are rewards for users
who find errors in the software. A.R.60–62. This is all highly probative evidence
that the smart contracts provide Tornado Cash with a beneficial interest.[5]

---

[4] Moreover, for the same reasons that Tornado Cash has an interest in all of
its smart contracts, the possibility that some users who want to transact with blocked
smart contracts may choose to use a "nonregistered" relayer is irrelevant—in
addition to finding no support in the administrative record. *Contra* Pls.' Mot. 23.

[5] Plaintiffs contend that "a person does not have a property interest in
something merely because he expended his labor or incurred costs to create the
technology." Pls.' Mot. 24. Defendants, however, simply make a logical
observation—Tornado Cash engaged in these activities because a successful

18

Plaintiffs posit various alternative definitions for property "interest," while ignoring the actual definition found in OFAC's regulations. *See* Pls.' Mot. 19–20; *see also* 31 C.F.R. §§510.201, 578.201. But IEEPA expressly authorizes the President to "issue such regulations, *including regulations prescribing definitions*, as may be necessary for the exercise of the [statutory] authorities." 50 U.S.C. §1704 (emphasis added). Pursuant to express delegations of that authority, *see* E.O. 13694; 31 C.F.R. §578.802, OFAC adopted a broad definition of property "interest" to include "an interest of *any nature whatsoever*, direct or indirect," 31 C.F.R. §§578.309, 510.313 (emphasis added), which includes interests that are not legally enforceable, *see Holy Land*, 219 F.Supp.2d at 67–68; *Regan*, 468 U.S. at 224, 225–26, 233–34 (repeatedly recognizing that "any interest" should be construed broadly); *see also Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994) ("OFAC may choose and apply its own definition of property interests, subject to deferential judicial review."). That is the definition that the Court should look to here.

### B. Plaintiffs Are Prohibited from Using or Transacting with the Blocked Property Regardless of the Nature of the Transaction

Plaintiffs do not contest that Tornado Cash benefits from its software, primarily in the form of fees to the DAO; instead, they assert that specific *transactions* that they wish to engage in "would [not] result in any property going to

---

deployment of their smart contracts would allow them to reap a positive financial result, indicative of a beneficial interest.

the DAO." Pls.' Mot. 23. Plaintiffs theorize that each transaction with blocked property must "include the sanctioned foreign person's property interest." *Id.* at 19–20. But IEEPA imposes no such requirement. Once property has been blocked, U.S. persons are prohibited from *any* use of or dealing in the blocked property, regardless of the nature of the desired transaction. *See* 50 U.S.C. §1702(a)(1)(B); 31 C.F.R. §§510.201(a)(3), 578.201(a). As explained, Tornado Cash has a property interest in its software service, composed of all of its smart contracts, which operate together to effectuate both relayer and non-relayer transactions. Plaintiffs are therefore prohibited from using or dealing in Tornado Cash smart contracts absent an OFAC license. Plaintiffs have not cited any authority that requires OFAC to demonstrate that a blocked person has an interest in *all proposed transactions* using blocked property for such activity to be prohibited—indeed, no such authority exists, and any such piecemeal standard would be all but impossible to satisfy.

Plaintiffs suggest that the Court should unblock some subset of the Tornado Cash software (i.e., 29 of the smart contracts) because Tornado Cash has an interest in only part of the software. *See* Pls.' Mot. 23–24. But Plaintiffs provide no support for their dubious proposition that Tornado Cash's interest can be severed.[6] The smart contracts that make up the Tornado Cash service are not severable because they

---

[6] Plaintiffs cite pages 57–59 of the record, but those pages explain the relayer network and do not support Plaintiffs' proposition.

operate in concert: when a user initiates a deposit on Tornado Cash's public interface, multiple smart contracts are automatically executed in a series of interconnected transactions to effectuate the user's request. *See supra* at 10–11. Again, Tornado Cash benefits from increased use of all of its smart contract pools and therefore has an interest in the smart contracts that together make up the money-laundering tool.

Plaintiffs wrongly assert that Defendants' "primary theory is that the DAO has a property interest in all *uses* of the core software tool." Pls.' Mot. 22. But IEEPA requires only that Defendants demonstrate that Tornado Cash has a property interest in its software service as a whole (not each individual *use* of its service), *see* A.R.60–62—and Defendants have made that showing.

Plaintiffs further contend that "IEEPA does not reach purely domestic transactions." Pls.' Mot. 18; *see id.* at 11. This is incorrect. *See, e.g.*, *Global Relief Found., Inc. v. O'Neill*, 207 F.Supp.2d 779, 793 (N.D. Ill.) (holding "the powers granted to the President under IEEPA include the ability to block purely domestic assets of a U.S. person"), *aff'd*, 315 F.3d 748 (7th Cir. 2002). The government can block only property over which it has jurisdiction. *See* 50 U.S.C. §1702(a)(1)(B). While a foreign government or national must have an interest in the *property*, it does not follow that domestic *transactions* cannot be blocked. To the contrary, blocking such transactions is essential to effective sanctions. Moreover, because foreign

nationals, including Tornado Cash, have an interest in the smart contracts themselves, there can be no "purely domestic" transaction where the Tornado Cash contracts are used. *See* A.R.64–67 (detailing foreign nexus, including usage by North Korea, foreign founders, and foreign TORN holders).

Plaintiffs raise a series of additional conclusory and inaccurate arguments. First, Plaintiffs claim that Tornado Cash has "abandoned" any property interest in its software service because it "made the tool inalterable and irrevocable." Pls.' Mot. 22. Tornado Cash has plainly not abandoned its interest. Since at least March 2022, Tornado Cash has been receiving a continual stream of crypto revenue from its smart contracts in the form of TORN tokens transferred to the DAO for relayer-enabled transactions. *See* A.R.32, 39, 56, 62. Second, Plaintiffs allege that the only financial benefit Tornado Cash receives from relayer-enabled transactions is "positive externalities" from the use of the Tornado Cash tool. Pls.' Mot. 25. But the receipt of relayer fees is not some pleasant byproduct from the creation of a money-laundering tool—Tornado Cash developed, deployed, and promoted their smart contracts so that they would receive a financial benefit. Third, Plaintiffs contend that a beneficial interest in property requires a "right or expectancy in something."[7] *Id.*

---

[7] Plaintiffs also attempt to draw an inapt comparison between the concept of "property" in constitutional law and the definition of "property interest" in the regulations. *See* Pls.' Mot. 26. But what constitutes property under the Fifth Amendment's Due Process Clause is distinct from the regulatory definition of

at 26 (quoting Black's Law Dictionary (11th ed. 2019)). But the applicable definition of "property interest" is the one contained within the regulations that OFAC had express statutory authorization to promulgate. *See supra* at 19. And, in any event, Tornado Cash "expect[s]" to receive monetary compensation in the form of relayer-enabled transaction fees from its smart contracts.[8]

### C. The Court Should Not Grant Plaintiffs Permission to Engage in Prohibited Transactions

Plaintiffs' reading of IEEPA would undercut OFAC's ability to protect this country's national security and undermine the foreign policy of the United States. On their baseless transaction-focused theory, they ask this Court to enjoin U.S. sanctions on an entity that provides a money-laundering service that has been used by Lazarus Group and other cyber criminals. And even unblocking only Plaintiffs'

---

"property interest" at issue in this case—and Plaintiffs raise no argument that the regulatory definition is unconstitutional.

[8] Plaintiffs no longer dispute that Tornado Cash is an "entity" properly subject to sanctions under relevant regulations and executive orders. *See* Pls.' Mot. 26. They are right to abandon that argument—and amici are wrong to pursue it, *see* Br. of Blockchain Ass'n 16–17; Br. of Paradigm 7; Br. of Andreessen Horowitz 12–16, even if the Court could properly consider it, *supra* n.3. Tornado Cash is fundamentally a group of individuals organized to function collectively for a common purpose, and is thus an "entity" that OFAC may properly designate under IEEPA. *See* 31 C.F.R. §510.305 (defining "entity" broadly to include "a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization"); *supra* at 9 (describing Tornado Cash's organizational structure).

selected 29 smart contracts would have far-reaching ramifications.[9] Unblocking those smart contracts would not be limited to Plaintiffs, so otherwise-deterred bad actors could resume laundering money through Tornado Cash for nefarious purposes. *See* A.R.29–31, 67–76. Such a result would severely impair the government's ability to combat the national emergencies declared in the executive orders. *See generally* E.O. 13722 (explaining that "the Government of North Korea's continuing pursuit of its nuclear and missile programs … increasingly imperils the United States and its allies"); E.O. 13694 (declaring that "the increasing prevalence and severity of malicious cyber-enabled activities … constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States").

If Plaintiffs want permission to use the Tornado Cash smart contracts for their own personal transactions, they have a mechanism, aside from judicial intervention, to do so: they can request a specific license from OFAC. *See* 31 C.F.R. §501, subpart E; *id.* §578, subpart E. In fact, FAQ 1079 explains that individuals may request a specific license that would allow the retrieval of the funds and that "OFAC would have a favorable licensing policy towards such applications, provided that the

---

[9] It is unclear what relief Plaintiffs actually seek. They appear to ask the Court to set aside the designation, but at times they suggest that they wish the Court to unblock only their 29 preferred smart contracts. *Compare, e.g.*, Am. Compl. at 39 (Prayer for Relief), *with* Pls.' Mot. 2, 27.

transaction did not involve other sanctionable conduct." OFAC *FAQ*. At the outset of this litigation, government counsel also informed Plaintiffs' counsel of the opportunity to seek such a license. *See* Letter from Christopher R. Healy, Trial Attorney, U.S. Dep't of Justice, to Plaintiffs' Counsel (Oct. 26, 2022) (Exhibit A).

Instead of proceeding in the normal fashion and requesting a license, Plaintiffs ask the Court for declaratory and injunctive relief that would allow them—and others—to engage in prohibited activities. *See* Am. Compl. at 39 (Prayer for Relief), ECF No. 9. The Court should reject Plaintiffs' request to use blocked smart contracts that are notorious for facilitating money laundering in circumvention of this country's economic sanctions.

### D. The Rule of Lenity and Major Questions Doctrine Are Inapplicable

Plaintiffs next contend that the rule of lenity requires the Court to adopt their misreading of IEEPA. Pls.' Mot. 27. The rule of lenity is entirely irrelevant. It is a principle of statutory construction providing that ambiguities within "a criminal statute should be resolved in the defendant's favor." *U.S. v. Davis*, 139 S.Ct. 2319, 2333 (2019). "To invoke the rule, [a court] must conclude that there is a *grievous ambiguity* or uncertainty in the statute," and it "applies only if, after seizing everything from which aid can be derived, [the court] can make no more than a guess as to what Congress intended." *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998) (emphasis added) (quotation marks and ellipsis omitted). Here, the statute

has no "grievous ambiguity." *Id.* Moreover, because lenity is properly invoked only as a fail-safe when a criminal defendant might otherwise be convicted under a grievously ambiguous statute, it has no application here as a first line of attack against an agency action—notwithstanding Plaintiffs' repeated incorrect reference to sanctions as "criminalization." *Cf. Babbitt v. Sweet Home Chapter of Cmtys.*, 515 U.S. 687, 704 n.18 (1995) (lenity not applicable to "facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement").

Finally, Plaintiffs resort to the major questions doctrine—but that doctrine is likewise inapplicable. Its application is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S.Ct. 2587, 2609 (2022) (quotation marks omitted). This is no such case. OFAC's designation of a single crypto mixer, demonstrably involved in illicit activities on behalf of foreign adversaries, is unlike the assertions of sweeping regulatory authority to which the Supreme Court has applied the doctrine. *See NFIB v. OSHA*, 142 S.Ct. 661, 666 (2022) (OSHA "broad public health regulation" applying to employers with more than 100 employees); *Ala. Ass'n of Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021) (CDC regulating "the landlord-tenant relationship" through a nationwide eviction moratorium). Nor does

the designation represent a novel exercise of agency authority or rely on an "ancillary" statutory provision. *West Virginia*, 142 S.Ct. at 2602; *see Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("discover[y] in a long-extant statute [of] an unheralded power to regulate a significant portion of the American economy").

The designation of an entity that provides a money-laundering service, at the risk of U.S. national security and foreign policy, lies at the heart of OFAC's statutory authority and expertise. And, for reasons explained, *supra* section I.B, Plaintiffs' suggestion that OFAC should exempt individual transactions (outside of its licensing authorities) from the designation misunderstands the nature and objectives of its sanctions programs. This is not a case where an agency is attempting to use vague statutory language to justify novel and expansive regulatory action, and the major questions doctrine does not apply.

## II.    The Designation of Tornado Cash Was Not Arbitrary and Capricious

Plaintiffs next challenge the designation of Tornado Cash as arbitrary and capricious, but they fail to show that OFAC's action was anything other than "reasonable and reasonably explained"—which is all that is required under the APA's highly "deferential arbitrary-and-capricious standard." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1155, 1158 (2021). Pursuant to this "narrow" scope of review, "a court is not to substitute its judgment for that of the agency" but merely

ensures that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021). OFAC's designation of Tornado Cash is reasonable—and, indeed, necessary to national security—and amply explained in the evidentiary memorandum. It easily survives the APA's deferential standard of review.

Plaintiffs raise three arguments to the contrary, all of which fall short. First, they contend that there exists a "mismatch" between OFAC's designation and its explanation because OFAC designated the entity Tornado Cash and not associated individuals. Pls.' Mot. 30. As an initial matter, Plaintiffs do not point to anything in the administrative record in support of this asserted mismatch. Moreover, there is nothing uncommon about OFAC's decision to designate the entity and not the individuals who operate it. If OFAC designates a corporation, for example, it need not separately designate each of its officers, directors, shareholders, or employees. Plaintiffs do not actually contend that OFAC failed to reasonably explain its decision to designate the entity; whether OFAC could also have designated individuals is a matter committed to OFAC's discretion and in no way undermines the designation it *did* make.

Second, Plaintiffs argue that the designation represents an unexplained change in policy regarding the "ultimate goal of sanctions," which is to "bring about a positive change in behavior," because Plaintiffs believe that software developers cannot "change the core software tool." Pls.' Mot. 32 (quotation marks omitted). But Plaintiffs' description of the objectives of U.S. sanctions programs is unduly narrow. The designation of Tornado Cash is fully consistent with the overarching goals of U.S. sanctions programs. *See, e.g.*, Dep't of the Treasury, The Treasury 2021 Sanctions Review 1 (2021), https://perma.cc/9M85-7ZRN (sanctions programs are designed "to impose a material cost on adversaries *to deter or disrupt behavior that undermines U.S. national security*" (emphasis added)). As explained in the evidentiary memorandum, "OFAC will use sanctions in the fight against criminal and other malicious actors abusing digital currencies and emerging payment systems as a complement to existing tools … [used] to combat the illicit use of digital currency transactions." A.R.31. The designation of Tornado Cash is aimed at both deterring and disrupting the use of the Tornado Cash tool for nefarious purposes. *See id.* And the Tornado Cash DAO is not powerless to change the core software, *contra* Pls.' Mot. 32: they can, and do, deploy new smart contracts rendering existing ones defunct. *E.g.*, A.R.70.

Third, Plaintiffs wrongly accuse OFAC of failing to consider purported reliance and due process interests of those who receive unsolicited funds; a "loss of

property" by those who had assets held in Tornado Cash software at the time of designation; and a purported "chilling effect of sanctioning software writers." Pls.' Mot. 32–33. Defendants took these factors into consideration: (1) OFAC publicly stated that it "will not prioritize enforcement" against "dusting" transactions, OFAC *FAQ* 1078, https://perma.cc/5KQ5-25GE; and (2) Plaintiffs may seek a license to complete the transactions necessary to recover assets held within Tornado Cash, and OFAC has a favorable licensing posture with regard to such requests, *id.* 1079. And, as Plaintiffs acknowledge, Pls.' Mot. 30–31, OFAC did not "sanction[]" any software writers; it sanctioned the *entity* providing a money-laundering service.

## III. Defendants Are Entitled to Summary Judgment on the First Amendment Claims

### A. The Designation Does Not Implicate Plaintiffs' First Amendment Rights

Plaintiffs assert in conclusory fashion that the Tornado Cash designation "destroyed" their "protected First Amendment association," Pls.' Mot. 33, but they misconstrue the law and rely on cases that offer no support for their novel theory. Plaintiffs' argument rests on the vague assertion that they have an interest in "maintaining the privacy of their associational activities, including their charitable donations." *Id.* (quotation marks omitted). They rely on two inapposite cases, both of which addressed *compelled disclosure*, which is not at issue here. *See Ams. for Prosperity Foundation v. Bonta*, 141 S.Ct. 2373, 2379 (2021) (Roberts, C.J.)

(finding unconstitutional a state law requiring charitable organizations to disclose identities of major donors); *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 557 (1963) (holding that a state legislative committee could not compel the NAACP Miami branch to produce its membership list). The government is not requiring disclosure of any information, nor is it regulating charitable organizations or their members. Instead, the government has sanctioned a single entity whose service is used to exchange cryptocurrency. That individuals might otherwise choose to use that service to engage in a variety of types of transactions, including charitable donations, is of no moment.

Furthermore, Plaintiffs point to no precedent suggesting there is any First Amendment right—much less *associational* right—to use a single preferred service to send money; the Constitution does not, for example, protect Plaintiffs' choice of Western Union instead of another money-transfer service. Nor is there any First Amendment right to send cryptocurrency instead of fiat currency, or to send North Korean won instead of U.S. dollars. *Cf. Wash. Post v. McManus*, 355 F.Supp.3d 272, 282 & n.7 (D. Md. 2019) (rejecting First Amendment claim challenging state law provision "bar[ring] political ad buyers from using foreign currency").

Because no protected associational right is limited by OFAC's designation, Plaintiffs' declarations unsurprisingly do not—and could not—demonstrate any such limitation. Two Plaintiffs state merely that they wish to use Tornado Cash for

personal reasons. *See* O'Sullivan Decl. ¶¶9–15, ECF No. 36-2; Hoffman Decl. ¶¶10–15, ECF No. 36-4. The executive director of Plaintiff Coin Center alleges that some of its donors—strangers to this litigation—have previously used Tornado Cash to donate money to Coin Center. Brito Decl. ¶¶7–10, ECF No. 36-5. But Coin Center does not hint at any chilling of its own First Amendment rights, and it cannot rely on allegations regarding its donors because plaintiffs "may not seek redress for injuries done to others." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972). And, in any event, Coin Center makes no allegations as to its donors' *associational* rights. *See* Brito Decl. ¶10 (referring to donors' engagement in "expressive advocacy," not association).

Finally, Plaintiff Doe alleges that he has used Tornado Cash in the past to "facilitat[e] donations" and is "not comfortable" doing so using "alternative methods." Doe Decl. ¶11, ECF No. 36-3. But he provides no reason to believe that alternative methods for private donations would be insufficiently protective, let alone that his right to associate has been constrained. Such expressions of subjective fears cannot support a First Amendment claim. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Plaintiffs summarily contend that Doe and others "have no other options" for engaging in their desired private association, Pls.' Mot. 33—but there are myriad lawful alternatives, and Plaintiffs may continue to use any other available service to send and receive money lawfully, including the many traditional channels (like bank

transfers) that allow them to do so privately. The right to engage in private association simply does not encompass a constitutional right to *use a particular designated service* to that end.

### B. In Any Event, the Designation Satisfies Exacting Scrutiny

Based on inapposite cases applying "exacting scrutiny" to "compelled disclosure requirements," *Ams. for Prosperity Found.*, 141 S.Ct. at 2383, Plaintiffs argue that the Court should apply exacting scrutiny here, Pls.' Mot. 34. Under exacting scrutiny, the challenged "disclosure requirement" must "be narrowly tailored to the government's asserted interest … even if it is not the least restrictive means of achieving that end." *Ams. for Prosperity Found.*, 141 S.Ct. at 2383–84 (quotation marks omitted). Again, there is no "disclosure requirement" at issue here; even if there were, OFAC's designation of Tornado Cash easily satisfies this scrutiny.

OFAC has an "important and substantial government interest," *Holy Land*, 219 F.Supp.2d at 82, in preventing malicious cyber activities that imperil U.S. national security, including such activities by the Government of North Korea. Plaintiffs argue that Tornado Cash's designation is not narrowly tailored to this governmental interest because they believe "less intrusive alternatives" exist—i.e., OFAC "could have" exempted certain kind of transactions from the designation. Pls.' Mot. 33–34.

Even if the least-restrictive-means test were applicable—which, under exacting scrutiny, it is not—Plaintiffs ignore both the reality of how sanctions operate and the principal challenges to regulatory enforcement that Tornado Cash presents. As explained, *supra* section I.B, it would be neither practical nor effective for OFAC to block only *some* transactions with blocked property—even if IEEPA allowed for such a piecemeal approach. Sanctions are effective only to the extent that a designated entity is fully deprived of access to the assets that benefit it. *See Global Relief II*, 315 F.3d at 753. In countering the established national security threat, OFAC could not have reasonably taken narrower action than sanctioning Tornado Cash, the platform facilitating anonymous illicit transactions, and blocking the software in which Tornado Cash has a demonstrated interest. And the fact that individuals can apply for licenses to engage in the otherwise prohibited transactions further demonstrates that the sanction is narrowly tailored. *See* 31 C.F.R. §578.404; OFAC *FAQ*.

## CONCLUSION

Summary judgment should be issued in Defendants' favor on all counts, and Plaintiffs' motion for summary judgment should be denied.

Dated: June 30, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

ALEXANDER K. HAAS
Director

DIANE KELLEHER
Assistant Director

*/s/ Christine L. Coogle*
CHRISTINE L. COOGLE
 (D.C. Bar No. 1738913)
Trial Attorney
STEPHEN M. ELLIOTT
Senior Counsel
Federal Programs Branch
Civil Division
United States Department of Justice
1100 L St. NW
Washington, D.C. 20005
202-880-0282
christine.l.coogle@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F), I hereby certify that this brief is 7,978 words in length, including headings, footnotes, and quotations but excluding the case caption, signature block, title, table of contents, and this certification.

*/s/ Christine L. Coogle*
Counsel for Defendants