## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

COIN CENTER; PATRICK
O'SULLIVAN; JOHN DOE; and
DAVID HOFFMAN,

               Plaintiffs,

v.

JANET YELLEN, in her official
capacity as Secretary of the Treasury;
DEPARTMENT OF THE
TREASURY; ANDREA M. GACKI,
in her official capacity as Director of
the Office of Foreign Assets Control;
and OFFICE OF FOREIGN
ASSETS CONTROL,

               Defendants.

Case No.
3:22-cv-20375-TKW-ZCB

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

Introduction ............................................................................................................... 1

Statement of Facts .................................................................................................... 2

Standard ...................................................................................................................... 5

Argument .................................................................................................................... 5

    I.    OFAC exceeded its statutory authority ........................................................ 6

      A.    Under any interpretation of IEEPA, Plaintiffs win. ........................... 8

          1. Plain Meaning ............................................................................ 8

          2. Regulatory Interpretations ........................................................ 15

          3. Out-Of-Circuit Cases ................................................................ 17

      B.    The canons all favor plaintiffs. ......................................................... 19

      C.    The government's remaining arguments fail. .................................... 23

          1. "Every Transaction" .................................................................. 24

          2. Licenses ..................................................................................... 24

          3. Policy ......................................................................................... 25

    II.    OFAC's action was arbitrary and capricious. ........................................... 26

    III.    OFAC violated the First Amendment ...................................................... 28

Conclusion ................................................................................................................ 31

# TABLE OF AUTHORITIES

## Cases

*AIG v. Islamic Republic of Iran,*
  657 F.2d 430 (D.C. Cir. 1981) ........................................................................9

*Alabama Ass'n of Realtors v. DHS,*
  141 S.Ct. 2485 (2021) ...................................................................................22

*Am.'s Cmty. Bankers v. FDIC,*
  200 F.3d 822 (D.C. Cir. 2000) ......................................................................27

*Americans for Prosperity Found. v. Bonta,*
  141 S.Ct. 2373 (2021) ......................................................... 28, 29, 30, 31

*Babbitt v. Sweet Home Chapter of Cmtys.,*
  515 U.S. 687 (1995). .....................................................................................20

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972) ...........................................................................8, 12, 13

*Bochese v. Town of Ponce Inlet,*
  405 F.3d 964 (11th Cir. 2005); ................................................................ 8, 12

*Broussard v. Meineke Discount Muffler Shops,*
  155 F.3d 331 (4th Cir. 1998) ........................................................................15

*Buchanan v. Little Rock Sch. Dist.,*
  84 F.3d 1035 (8th Cir. 1996) ........................................................................17

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) (en banc) ........................................................20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ......................................................................................30

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ......................................................................................28

*Commerce v. New York*,
  139 S.Ct. 2551 (2019) ........................................................................... 26, 27

*Conrad v. Winnebago Industries, Inc.*,
  2008 WL 1696950 (S.D. Ohio Apr. 9) ........................................................13

*Consarc Corp. v. Iraqi Ministry*,
  27 F.3d 695 (D.C. Cir. 1994) ................................................................ 17, 18

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ...................................................................... 9, 12, 24, 25

*Domino's Pizza, Inc. v. McDonald*,
  546 U.S. 470 (2006) ........................................................................12, 14, 16

*Epic Sys. Corp. v. Lewis*,
  138 S.Ct. 1612 (2018) ...............................................................................23

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................................28

*FEC v. Co. RFC Comm.*,
  533 U.S. 431 (2001) ..................................................................................28

*FEC v. Massachusetts Citizens For Life*,
  479 U.S. 238 (1986) ..................................................................................29

*Field v. Mans*,
  516 U.S. 59 (1995) ......................................................................................9

*Gen. Elec. v. N.Y. DOL.*,
  936 F.2d 1448 (2d Cir. 1991) ....................................................................17

*Glob. Relief Found. v. O'Neill*,
  315 F.3d 748 (7th Cir. 2002). ............................................................... 18, 19

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ..................................................................................21

*Havana Club Holding, S.A. v. Galleon,*
  961 F. Supp. 498 (S.D.N.Y. 1997) .......................................................................24

*Hollyfrontier Cheyenne Ref. v. Renewable Fuels Ass'n,*
  141 S.Ct. 2172 (2021) ...........................................................................................23

*Jemison v. IRS,*
  45 F.2d 4 (5th Cir. 1930) ........................................................................................15

*King v. Burwell,*
  576 U.S. 473 (2015) ...............................................................................................21

*Kisor v. Wilkie,*
  139 S.Ct. 2400 (2019) ............................................................................................23

*Laredo Ridge Wind, LLC v. Nebraska Pub. Power Dist.,*
  11 F.4th 645 (8th Cir. 2021) ...................................................................................15

*Leocal v. Ashcroft,*
  543 U.S. 1 (2004) ....................................................................................................20

*Lonchar v. Thomas,*
  517 U.S. 314 (1996) ...............................................................................................19

*Merritt v. Dillard Paper Co.,*
  120 F.3d 1181 (11th Cir. 1997) ..............................................................................26

*Meyer v. Grant,*
  486 U.S. 414 (1988) .......................................................................................... 6, 29

*Ministry of Defense of Iran v. Elahi,*
  556 U.S. 366 (2009). ................................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
  463 U.S. 29 (1983) ..................................................................................................27

*N.C. Dep't of Rev. v. Kimberley Rice Kaestner 1992 Family Trust,*
  139 S.Ct. 2213 (2019) ............................................................................................19

*Ocheesee Creamery LLC v. Putnam,*
    851 F.3d 1228 (11th Cir. 2017) ........................................................30

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) .........................................................................22

*Regan v. Wald,*
    468 U.S. 222 (1984) ...............................................................1, 12, 19

*Rivadeneira v. Univ. of S. Fla.,*
    2022 WL 445661 (M.D. Fla. Feb. 14) .............................................17

*Romero v. DHS,*
    20 F.4th 1374 (11th Cir. 2021), *cert denied* 142 S.Ct. 2869 (2022)........................20, 21

*Salazar v. Buono,*
    559 U.S. 700 (2010) .........................................................................9

*Shalala v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995) .........................................................................23

*Shirras v. Caig,*
    11 U.S. 34 (1812) .......................................................................6, 8

*Simon Schuster v. Crime Victims Bd.,*
    502 U.S. 105 (1991). ......................................................................30

*Spence v. Zimmerman,*
    873 F.2d 256 (11th Cir. 1989) .....................................................8, 14

*Stand Strong USA v. Harwich Enters., LLC,*
    570 F. Supp. 3d 1207 (S.D. Fla. 2021) ............................................16

*Szabo Food Serv., Inc. v. Canteen Corp.,*
    823 F.2d 1073 (7th Cir. 1987) .......................................................17

*Underwriters Nat. Assur. v. N.C. Life,*
    455 U.S. 691 (1982) .........................................................................8

*United States v. Apel*,
571 U.S. 359 (2014) ...................................................................................23

*United States v. Coleman*,
590 F.2d 228 (7th Cir. 1978) .......................................................................17

*United States v. Garcon*,
54 F.4th 1274 (11th Cir. 2022) (en banc) ....................................................21

*United States v. Mitchell*,
463 U.S. 206 (1983) .....................................................................................19

*United States v. Parr*,
509 F.2d 1381 (5th Cir. 1975) .....................................................................18

*United States v. Singer*,
963 F.3d 1144 (11th Cir. 2020) ...................................................................21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 320 (2014) .....................................................................................22

*West Virginia v. EPA*,
142 S.Ct. 2587 (2022) ...........................................................................21, 22

*Whitman v. United States*,
574 U.S. 1003 (2014) ...................................................................................20

*Wright v. United States*,
164 F.3d 267 (5th Cir. 1999) (per curiam) ...................................................5

**Statutes**

50 U.S.C. §1702(a)(1)(B)........................................................................passim

50 U.S.C. §1705(a) .......................................................................................20

50 U.S.C. §1705(c) .......................................................................................20

**Legislative Documents**

H.R. Rep. No. 95-459 (1977) .................................................................26

**Rules & Regulations**

31 C.F.R. §510.313 .................................................................. 15, 22

31 C.F.R. §510.323 ......................................................................15

31 C.F.R. §578.309 ......................................................................15

31 C.F.R. §578.314 ......................................................................15

**Other Authorities**

17A Am.Jur.2d Contracts §1 ..............................................................16

17A Am.Jur.2d Contracts §415. ...........................................................14

Anderson, *Present and Future Interests*,
 19 Seattle L. Rev. 101 (1995) ..........................................................9

*FAQ: Can U.S. persons engage in transactions involving identified Tornado Cash virtual currency
 wallet addresses absent a specific license from OFAC?*,
 OFAC (Nov. 8, 2022), perma.cc/YX9Y-FRCM ...............................................27

*FAQ: Who is the Tornado Cash "person" that OFAC designated?*,
 OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW ............................................ 27, 30

*Smart Contracts and Distributed Ledger: A Legal Perspective*,
 ISDA (2017), perma.cc/XJ2D-C4NY ........................................................16

*Treasury Designates DPRK Weapons Representatives*,
 OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8 .................................................3

*U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*,
 OFAC (Aug. 8, 2022), perma.cc/8GFV-3VMB ...............................................26

## INTRODUCTION

Plaintiffs are Americans who wish to use a software tool to move their own crypto assets back and forth. In the course of this activity, they will not give anything to any foreigners. They will not take anything from any foreigners. And their assets will not be controlled by any foreigners. Their planned activity is not only "purely domestic," *Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984), but solitary. Yet as it stands today, if these American Plaintiffs go forward, OFAC believes that they will commit serious federal felonies for engaging in "transactions involving any property in which any *foreign* country or a national thereof has any interest." 50 U.S.C. §1702(a)(1)(B) (emphasis added).

Nearly a year after it first tried to ban Plaintiffs' activity, the government cannot explain how it meets that statutory phrase. It posits that the foreigners' "property … interest" in the transactions is a 0.3% incidental fee that they sometimes received for similar transactions. Doc. 57 (Gov't Mot.) 16-17; A.R.38. But they can't possibly receive that fee anymore, and it wouldn't give them a property interest if they could. The government posits that the foreigners' property interest is to be *inferred* from the "efforts" they put into setting up the software. Gov't Mot. 18. But the law does not recognize property interests based on past efforts like theirs. And the government posits that their ability to control adjacent activities creates a property interest in Plaintiffs' activity. *Id.* at 9. But Plaintiffs don't want to do those adjacent activities and don't seek

1

relief that would allow them to. The government is left asking the Court to ignore undisputed facts about the technology and to reimagine American property law.

The Court should enter summary judgment for Plaintiffs on their request for limited relief. That limited relief will allow Americans like Plaintiffs to resume their domestic activities, but it will not implicate any sanctioned foreigner's property interest.

## STATEMENT OF FACTS

Plaintiffs incorporate their statement of facts from their motion for summary judgment. *See* Doc. 36-1 (Mot.) 2-16. They briefly recount the basic mechanics, clarify a few points of terminology, and update the procedural background.

**Mechanics.** Plaintiffs seek to use a software tool that's published to certain addresses on the Ethereum public ledger. A.R.43-53. It allows someone to send their own crypto asset to the address, and then withdraw it at a later date. Mot. 5-6. Because of the way the public ledger works, this process gives users more privacy than they had before. A.R.17, 549. To use the tool, Plaintiffs need only send the asset from their own account to one of the addresses where the software tool is published, then withdraw it at a later date. Docs. 36-2¶¶10-14, 36-3¶¶13-14, 36-4¶13-14; A.R.552-56. In the course of using the tool, nobody else has control over the asset. A.R.51-54, 554-56.

Ancillary software exists to support users of the tool. A.R.557-62. One ancillary software tool, the registered-relayer tool, can (sometimes) generate a 0.3% payment to a group of token holders called a "decentralized autonomous organization," or DAO. A.R.59. But users don't need to use registered relayers or other ancillary tools, and

Plaintiffs don't wish to. In the government's words, a user must "opt" to "use a relayer." Gov't Mot. 10; *see also* A.R.57, 559-60.

OFAC criminalized the use of 91 addresses on the theory that the software writers and the DAO were foreigners with "property interests" in anyone's use of any of them. A.R.1-4; *Treasury Designates DPRK Weapons Representatives*, OFAC (Nov. 8, 2022), perma.cc/TF34-EXM8. Plaintiffs challenge 29 of those 91 addresses. Doc. 9 (Am.Compl.) 41-44. The 29 challenged addresses do not include any address that generates any payment to the sanctioned entities or over which the sanctioned entities have any control. *See* Mot. 5, 14-15.

**Terminology.** *Tornado Cash*. Amici use the term "Tornado Cash" to refer to the software published to the OFAC-listed addresses. *E.g.*, Doc. 45-1 (Paradigm-Amicus-Br.) 7 ("Tornado Cash is a software program."). The government started using this same proper noun to refer to the *people* sanctioned by OFAC, not the software. Gov't Mot. 8 ("Tornado Cash is an organization."). The rest of the world agrees with amici and uses the term "Tornado Cash" to refer to the software, not the people. *E.g.*, A.R.153, 951, 1579. The government's approach is like if someone called Thomas Edison "Lightbulb." Plaintiffs stopped using the term "Tornado Cash" to avoid confusion. Plaintiffs refer to the software published at the 29 challenged addresses as the "core software tool."

*Software writers and DAO*. When referring to the two sanctioned groups of people—the software writers and DAO—the government calls them "Tornado Cash."

Plaintiffs refer to the people as "the software writers" and "the DAO." Or, when simpler, just "the sanctioned entities." The software writers are a handful of people who developed the code that was published to the challenged addresses, then abandoned control over it. The DAO is the much bigger group of "users who hold TORN, Tornado Cash's governance token." Gov't Mot. 9.

*Software/Smart contracts.* Sometimes, amici and the government refer to any rule-based computer code published at any individual address as a "smart contract." Plaintiffs just refer to it as "software."

**Procedural Background.** The government twice says that Plaintiffs changed their request for relief. Gov't Mot. 1, 24 n.9. But Plaintiffs' request hasn't changed. Plaintiffs' amended complaint and motion both seek relief as to the same 29 challenged addresses, and no others. Am.Compl.41-42, Mot. 15. They are the 29 addresses over which the sanctioned entities have no control, and which Plaintiffs can use without generating any payment to the sanctioned entities. Am.Compl.¶108 ("Plaintiffs challenge only the criminalization of transactions with the 29 addresses."); ¶18 ("The criminalization of those 29 addresses is at issue in this lawsuit."); *id.* p.39, ¶17 (requesting "order vacating and setting aside the criminalization of the Tornado Cash Tool," defined earlier as "[t]hose 29 addresses"). Plaintiffs' amended complaint even appended a table called "Challenged in this Lawsuit," listing the same 29 addresses. Am.Compl.41-42; *see also* Doc. 1 (Compl.) 35-36 (challenging same first 20 addresses out of the government's first 38). Another table, called "Not Challenged in this

4

Lawsuit," listed the remaining 62 addresses, Am.Compl.42-44. Plaintiffs' request for relief is that the Court set aside the 29 addresses listed in their amended complaint.

Three amici—representing "more than 100 companies," "users, participants, and software developers," Doc. 42-1 (Blockchain-DEF-Amicus-Br.) 1, and two venture-capital firms with large crypto portfolios, Paradigm-Amicus-Br. 1; Doc. 46-1 (Andreessen-Amicus-Br.) 1—filed briefs supporting Plaintiffs.

A group of bankers filed a brief in support of the government. Doc. 60-1 (BPI-Amicus-Br.). The bankers' brief cites only two cases, both for propositions about Fourth Amendment privacy, which is not at issue here. *See id.* at 2, 6, 8. It also cites four settlements involving other claims not present here. *Id.* at 7, 14.

## STANDARD

The government cites *Wright v. United States*, 164 F.3d 267, 268-69 (5th Cir. 1999) (per curiam), for the proposition that an agency action can be upheld if the agency gave "minimal consideration to relevant facts." *See* Gov't Mot. 14. But *Wright*—a per-curiam, out-of-circuit decision—decided only an arbitrary-and-capricious claim, not a statutory-authority claim. 164 F.3d 267. On the statutory-authority claim, any close call would go to Plaintiffs. *See infra*, I.B.

## ARGUMENT

OFAC exceeded its statutory authority by criminalizing transactions in which no foreigner has any "property interests." The government cannot reconcile its action with the definition of "property interests" that has prevailed for over 200 years: a formal

positive-law relationship. *See Shirras v. Caig*, 11 U.S. 34, 47 (1812) (Marshall, C.J.). The sanctioned entities lack any such property interests in Americans' unilateral use of the core software tool. Those uses don't generate payments to the sanctioned entities and don't give them any control over any property. OFAC also acted arbitrarily and capriciously by masking its domestic policy goals, discounting important factors, and changing its sanctions policy to target technologies rather than persons. And it violated the First Amendment by banning Americans like John Doe from contributing to their preferred political causes using "what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

## I.    OFAC exceeded its statutory authority.

The International Emergency Economic Powers Act of 1977 authorizes the President to regulate or prohibit certain actions taken with respect to foreigners' property interests. Namely, IEEPA authorizes the President to regulate or prohibit:

> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> any **property** in which any foreign country or a national thereof has any **interest**
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §1702(a)(1)(B) (breaks and emphasis added). This case focuses on the requirement that the "transaction" involve the foreigner's "property … interest." (The government doesn't appear to argue that any of the 11 verbs besides "transaction" do

any independent work here. *E.g.*, Gov't Mot. 14, 23, 34.) When an American sends his crypto asset to one of the challenged addresses, and then withdraws it at a later date, neither of the sanctioned entities have a "property interest" in that transaction. That is true under the plain-meaning interpretation, OFAC's regulatory interpretation, and the government's three favorite cases.

The government has identified three connections the sanctioned entities have to that transaction, but none of them qualify as a "property interest." First, the government says one of the sanctioned entities—the DAO—could receive an optional 0.3% payment as a result of certain transactions involving the software. Gov't Mot. 17-18; A.R.38. But all of the transactions that can possibly generate the 0.3% payment are now illegal and unchallenged, so the government's theory depends on transactions that are nonexistent. A.R.20, 32, 59 Plus, such an incidental payment wouldn't give the DAO a property interest in the underlying transactions even if it were possible to make. Second, the government says the sanctioned entities—both the software writers and the DAO—contributed their "extensive efforts" to the core software tool by writing, publishing, and promoting it. Gov't Mot. 18. But contributing one's labor to something doesn't create a property interest in it. And third, the government says one sanctioned entity—the DAO—can modify software at adjacent addresses. Gov't Mot. 9, 16. But all agree that the DAO can't modify the software at any *challenged* addresses, so this point is a non sequitur.

And when interpreting IEEPA's terms, both the rule of lenity and the major-questions doctrine govern any ambiguities. The government's deference theory mixes up legislative rules with interpretive rules. Finally, OFAC cannot be saved by granting licenses or making policy arguments.

## A. Under any interpretation of IEEPA, Plaintiffs win.

Under any interpretation of IEEPA's requirement that the prohibited "transaction" involve the foreigner's "property … interest," 50 U.S.C. §1702(a)(1)(B), Plaintiffs' transactions do not.

### 1. Plain meaning

The plain meaning of a "property interest" is a formal positive-law relationship to property. *See* Mot. 19-20 (collecting cases). "[P]roperty interests … are created by 'existing rules or understandings that stem from an independent source such as state law." *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *see also Underwriters Nat. Assur. v. N.C. Life*, 455 U.S. 691, 716 n.25 (1982) ("matter of state law'). To prove that someone has a "property interest" in something, the government therefore must point to some positive law under which the person could make a "legally cognizable" claim to the property. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005); *see Shirras*, 11 U.S. at 47 (Marshall, C.J.) (analyzing a person's "interest in … property" based on a series of technical positive-law rules). A property interest also typically includes rights like possession and control, the right to exclude, and the right of disposition. Mot. 19-

20; *see also* Anderson, *Present and Future Interests*, 19 Seattle L. Rev. 101 (1995) (diagramming 17 property interests).

The government wants this Court to reimagine the concept of a "property interest." Gov't.Mot.21. But "[w]here Congress uses terms that have accumulated settled meaning under … the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Field v. Mans*, 516 U.S. 59, 69 (1995). And the Supreme Court has already interpreted IEEPA's property-interest requirement in the traditional, positive-law sense. In *Dames & Moore v. Regan*, the Court held that damages lawsuits against foreigners didn't involve those foreigners' property interests because they were "in personam" rather than in rem. 453 U.S. 654, 675 (1981). Under technical property law rules, a damages lawsuit doesn't involve a defendant's "particular property" until "reduced to judgment [that is] executed upon." *Id.*; *accord AIG v. Islamic Republic of Iran*, 657 F.2d 430, 443 n.15 (D.C. Cir. 1981). *Dames & Moore* therefore held that the damages lawsuits against foreigners didn't involve foreigners' property interests under IEEPA. 453 U.S. at 675. Then, in *Ministry of Defense of Iran v. Elahi*, the Court reasoned that a foreigner's "property interest" in a damages award *in its favor* also did not exist until "the District Court confirmed the [arbitration] award." 556 U.S. 366, 376-77 (2009). The Court followed strict positive-law rules. *See Salazar v. Buono*, 559 U.S. 700, 712 (2010) ("[a] party that obtains a judgment in its favor acquires a 'judicially cognizable' interest").

It did not follow fuzzy notions like whether the activity stands to "benefit" a foreigner. Gov't Mot. 21.

Under this plain meaning of "property interest," the government's three theories fail to establish that the sanctioned entities have one in Plaintiffs' planned use of the core software tool.

**a.** The government says the DAO has a property interest because it "profits from" the use of the tool. Gov't Mot. 17. Specifically, the DAO "'expect[s]' to receive monetary compensation in the form of relayer-enabled transaction fees." *Id.* 23. The referenced "relayer-enabled transaction fees" are 0.3%. A.R.38. These fees didn't exist from the core software tool's publication in 2019 until "March 2022." Gov't Mot. 22; *see also* A.R.1596. And they occur only when using a subset of core software tool addresses, and only when secondary market liquidity allows the transfer. A.R.59-60.

There are two main problems with this argument. *First*, it's undisputed that using the 29 challenged addresses alone will *never* generate the 0.3% payment that the government's whole theory hangs on. All agree that generating the 0.3% payment to the DAO requires a registered relayer. A.R.32, 59. And all agree that using a registered relayer requires interacting with multiple addresses that are illegal and unchallenged. A.R.59 ("the relayer registry is the smart contract 0x58E8dCC13BE9780fC42E8723D8EaD4CF46943dF2"); A.R.20 (listing relayer-registry address—LXIV—as blocked); Am.Compl.42 (listing relayer-registry addresses—31—as "not challenged in this lawsuit"). Therefore, the only prohibited

"transactions" at issue in this lawsuit won't be able to use a registered relayer and won't be able to ever generate a payment to the DAO. After being pressed to explain how a "single transaction that would become lawful as a result of this lawsuit would result in any property going to the DAO," Mot. 23, the government offers not one. The sanctioned entities' "property interest" in Plaintiffs' transactions cannot be based on a nonexistent payment.

The government responds that the 29 challenged addresses can't be used *without* relayers because relayers are "all but essential." Gov't Mot. 10, 18, 20-21. The government knows this is false. OFAC's own record says that relayers are "optional," shows that the core software tool functioned from 2019 until March 2022 without relayers, and references *23,746* transactions using the core software tool without relayers. A.R.39, 57, 1596; *see also* Doc. 31-1 (OFAC Decl.) at 6 (up to 24,540 transactions). The challenged addresses and the unchallenged ones only "operate in concert," Gov't Mot. 21, if a user *chooses* to operate them in concert. A.R.39, 57. Plaintiffs explained in detail how they would use the core software tool without any registered relayers, and the government has found no flaws with that account. Docs. 36-2¶¶10-14, 36-3¶¶13-14, 36-4¶13-14; *see also* Paradigm-Amicus-Br. 12 ("using those relayers is not required"); Blockchain-DEF-Amicus-Br. 10 (explaining same); A.R.552-56 (explaining same).

And of course, when OFAC wraps up both foreign transactions and domestic transactions in one fell swoop, it is the Court's duty to "sever" the latter to enforce

IEEPA's terms. *See Dames & Moore*, 453 U.S. at 675; *contra* Gov't Mot. 20. If a sanction of a foreign automaker purported to include vehicles still in the factory as well as vehicles already on American roads, American drivers would have the right to have the latter part "carve[d] out," *contra* Gov't Mot. 3, to allow their "purely domestic" activity. *Wald*, 468 U.S. at 228 n.8.

 *Second*, even in an alternative world where the 0.3% payments remained possible, they would not give the DAO a "property interest" in American users' transaction. A third-party recipient lacks a property interest in a transaction unless he is an "intended beneficiary," which requires that "a *direct* and *primary* object of the contracting parties was to confer a benefit on the third party." *Bochese*, 405 F.3d at 982 (emphasis added). Otherwise, "any benefit … reaped by the third party is merely 'incidental,' and the third party has no legally enforceable right." *Id.*; *contra* Gov't Mot. 23. Even under the Supreme Court's flexible due-process jurisprudence—the broadest caselaw about property rights that Plaintiffs are aware of—a "property interest" requires "more than a unilateral expectation" of receiving payments. *Roth*, 408 U.S. at 577.

 The DAO would not be an "intended beneficiary" based on the hypothesized 0.3% fractional fee. That fee does not give rise to a property interest because it is collected "separately" by the DAO from the relayer himself, A.R.59, not from the user. *See Bochese*, 405 F.3d at 982; *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 470-76 & n.3 (2006) (sole shareholder and payee of contracting party lacks a property interest in the contract). The user does not even know if any fee will be collected because that depends

on which address he uses and external factors like market "liquidity." A.R.59-60, 1145. The DAO cannot have a "property interest" in a transaction based on the uncertain possibility of a separately-collected payment. *Roth*, 408 U.S. at 577.

**b.** The government next says that the sanctioned entities—the software writers and DAO—have a property interest because they contributed their labor to developing and promoting the core software tool. They "created," "developed," "promoted," "advertised," "set[]up," and "reward" improvements to the software. Gov't Mot. 9, 18. From these "efforts," the government makes the "logical observation" that the sanctioned entities *behaved like* someone who would "reap a positive financial result, indicative of a beneficial interest." Gov't Mot. 18 & n.5.

But contributing your labor to something and then disposing of it or making it freely available does not give you a "beneficial interest," or any other property interest, in the product or its future use. When a foreign worker helps build a car, OFAC can't prohibit an American from later driving it. *See Conrad v. Winnebago Industries, Inc.*, 2008 WL 1696950, at *7 (S.D. Ohio Apr. 9) (manufacturer has "no ownership interest" in later use). Likewise, when a foreign industry group publishes a contract template for others to use for free, OFAC can't prohibit Americans from printing and signing it. *See* Mot. 25-26; A.R.715-716 (license making core software tool freely available). The government cites no property-law cases for its "efforts" argument.

**c.** The government also says that the DAO has a property interest because it "governs" and "votes on implementing new features" to software. Mot. 9, 16. But as

the government knows, the DAO can "govern" only ancillary software at *unchallenged* addresses. It is undisputed that nobody can "modif[y]" the software at the challenged addresses. A.R.1318, 61, 557-67, 951; Andreessen-Amicus-Br. 3 ("no one will ever be able to control, alter, or remove the Smart Contracts"). Plaintiffs explained, *contra* Gov't Mot. 17 n.3, that the sanctioned entities' abandonment of any control over the core software tool meant that they could not have a property interest in it. *See* Mot. 21-22. Given the opportunity, the government hasn't pointed to one challenged address that the DAO can change. *See generally* Gov't Mot. 29. Instead, the government says only that the DAO might "deploy new smart contracts" to new addresses, which could eventually "rende[r] existing ones defunct." *Id.* But posting new alternatives can't change the current ones any more than opening a new business can change a competitor's business. A.R.548. That does not give the new business a *property interest* over the competitor.

Last, the government notes that, when Americans use the core software tool, software writers and the DAO benefit from positive externalities like increased "value of TORN" and improved "anonymity." Gov't Mot. 11. The government later says that the only "positive externalities" its statutory argument relies on are the already-addressed 0.3% relayer payments. Gov't Mot. 22. To the extent that the government relies on any other positive externalities, the possibility of benefitting from a transaction does not establish a "protect[a]ble property interest" in it. *Spence*, 873 F.2d at 258; *Domino's Pizza*, 546 U.S. at 470-76; 17A Am.Jur.2d Contracts §415.

14

Under the plain meaning of IEEPA, the sanctioned entities therefore have no "property interest" in the prohibited transactions.

## 2. Regulatory interpretations

The government argues that OFAC's regulatory interpretations, rather than the plain meaning, control. If that were true, *but see infra* I.B, none of the government's three theories meet even OFAC's own definitions.

**a.** OFAC interprets "interest" to include "an interest of any nature whatsoever, direct or indirect." Gov't Mot. 15 (quoting 31 C.F.R. §§578.309, 510.313). The government seems to think that the word "indirect" helps it. Gov't Mot. 19. But an "indirect … interest" in property is a technical term for describing an arrangement where the interest holder owns an entity, and that entity in turn owns the relevant property. *See Laredo Ridge Wind, LLC v. Nebraska Pub. Power Dist.*, 11 F.4th 645, 652 (8th Cir. 2021). Stockholders and parent companies can have "indirect ownership interest[s]" in the property of their corporations and subsidiaries, respectively. *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 349 (4th Cir. 1998); *Jemison v. IRS*, 45 F.2d 4, 5 (5th Cir. 1930). There's nothing resembling subsidiaries or stockholders here.

**b.** OFAC also interprets "property and property interest" to include, among other things, "services of any nature whatsoever, [and] contracts of any nature whatsoever." Gov't Mot. 17 (quoting 31 C.F.R. §§510.323, 578.314). But a "contract" doesn't exist without "two or more parties" making an "agreement" based on "sufficient consideration" that "creat[es] obligations" on both parties. 17A Am.Jur.2d

15

Contracts §1. Even a "unilateral contract" requires an "(1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Stand Strong USA v. Harwich Enters., LLC*, 570 F. Supp. 3d 1207, 1214-15 (S.D. Fla. 2021). The government doesn't attempt to meet those elements. It couldn't. *E.g.*, A.R.715 (making software free).

The government therefore says that because people call the software a "smart contract," it must be a legal contract. Gov't Mot. 16-17. But the term "smart contract" is a metaphor. It just means code that abides by prearranged terms, not "literal" legal contracts. Andreessen-Amicus-Br. 15-16. "[A]n aphorism often repeated is that the term 'smart contract' is a misnomer because, in many cases, a smart contract is neither smart nor a contract." *Smart Contracts and Distributed Ledger: A Legal Perspective*, ISDA 5 (2017), perma.cc/XJ2D-C4NY; *see* A.R.630 ("a so-called 'smart contract'"); A.R.1095 (defining "smart contract" as "a collection of code and data"). Although "smart contract" code can be used to *facilitate* legal contracts, that facilitation requires several additional steps not present here. *See Smart Contracts and Distributed Ledger*, *supra* 5. And if using the code did create a legal contract, it wouldn't be the *sanctioned entities'* contract. *Domino's Pizza*, 546 U.S. at 470-76.

Finally, the government says the sanctioned entities have a property interest in the "service" that their software performs. Gov't Mot. 16-18. But the sanctioned entities don't perform a service; they do nothing and the software "automatically executes." A.R.17. If they did, this argument would have no independent force because someone

16

can have a property interest in services only insofar as he is a party to a valid *contract* for services, which the sanctioned entities are not. *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir. 1987); *Buchanan v. Little Rock Sch. Dist.*, 84 F.3d 1035, 1039 (8th Cir. 1996). Plus, any property interest in a "service" refers to the *recipient's* "right to benefit of services for which one pays." *United States v. Coleman*, 590 F.2d 228, 231 (7th Cir. 1978); *accord Rivadeneira v. Univ. of S. Fla.*, 2022 WL 445661, at *14-15 (M.D. Fla. Feb. 14). A service *provider*, meanwhile, has an arguable property right in promised payment, but no such promise was made to the sanctioned entities here. *Gen. Elec. v. N.Y. DOL*, 936 F.2d 1448, 1453 (2d Cir. 1991); A.R.715.

### 3. Out-of-circuit cases

Finally, the government cites three out-of-circuit cases that took a government-friendly view of IEEPA's foreign-property-interest requirement. But not one supports the proposition that the sanctioned entities have a property interest in Plaintiffs' planned transactions using the core software tool.

- *Consarc Corp. v. Iraqi Ministry* held that Iraq had an "interes[t] in property" in $6.4 million in its own bank account. 27 F.3d 695, 702 (D.C. Cir. 1994). The plaintiff argued that, under New York law, Iraq lost its property interests in the funds because, under an ongoing "trust" arrangement, the funds automatically conveyed to the beneficiary. *Id.* at 702-03. The court concluded that the arrangement was actually for a "letter of credit," not a trust. Under "the law governing international letters of credit" the "letter of credit remains wholly executory until the beneficiary has strictly complied with its terms." *Id.* at 702. The beneficiary failed to strictly comply, so Iraq retained its executory interest. Plus, even if it were a trust,

Iraq "still held a reversionary interest in the funds" because the trust terms required the plaintiff to make a timely demand that it failed to make. *Id.*

- *Global Relief Foundation v. O'Neill* held that a foreign terrorist organization could not evade IEEPA by putting its property in a nominally American organization's name, while retaining "effectiv[e] control" over that property. 315 F.3d 748, 753 (7th Cir. 2002). The situation was analogous to if "Osama bin Laden put all of his assets into a trust" that "directed the trustee to make the funds available for purchases of weapons to be used by al Qaeda." *Id.* In fact, that's basically what was happening—including associates of al Qaeda and bin Laden himself. Brief of United States, *Glob. Relief Found. v. Snow*, 2003 WL 24246992, at *5 (N.D. Ill.).

- *Holy Land Found. for Relief v. Ashcroft* found *Global Relief*'s reasoning "unassailable" and followed it exactly as to a similar organization, this one controlled by Hamas. 333 F.3d 156, 160, 162-63 (D.C. Cir. 2003).

Here, the government makes no claim that the sanctioned entities meet any of the technical standards demanded in *Consarc*, or that users like Plaintiffs are controlled by foreign organizations like in *Global Relief* and *Holy Land*.

And although *Global Relief* and *Holy Land* go the furthest toward the government's position in this case, they didn't extend property interests beyond what could be rooted in the positive law. Those decisions were based on the foreign terrorists' demonstrated control over nominally American organizations. That reasoning has a strong positive-law pedigree, whether conceived of in terms of beneficial interests or "de facto ownership." *See United States v. Parr*, 509 F.2d 1381, 1386 (5th Cir. 1975) (plenary control of property nominally owned by someone else). And although the government points out that these cases say that "beneficial *rather than legal*

18

*interests* matter," *Glob. Relief Found.*, 315 F.3d at 753 (emphasis added), that language is unhelpful. Beneficial interests *are* legal interests. *See United States v. Mitchell*, 463 U.S. 206, 226 (1983). The courts likely meant that beneficial interests are derived from equity (as opposed to law). *See N.C. Dep't of Rev. v. Kimberley Rice Kaestner 1992 Family Trust*, 139 S. Ct. 2213, 2225 (2019). But equity is "governed by rules and precedents no less than the courts of law," *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996), and the sanctioned entities here don't have property interests under either equity or law, *supra* I.A.1.

Finally, the government cites *Regan v. Wald*, 468 U.S. 222 (1984), for the proposition that IEEPA is "broad." Gov't Mot. 19. But *Wald* referred to IEEPA as broad in ways irrelevant to this case, such as the fact that it covers even "[p]ayments for meals" *in Cuba. Wald* 468 U.S. at 233 n.16. Meanwhile, *Wald* decisively rejects the government's position here: "The grant of authorities in IEEPA," it says, "does not include the power to … regulate purely domestic transactions." *Id.* at 228 n.8. When the government says it is "incorrect" to "contend that 'IEEPA does not reach purely domestic transactions,'" Gov't Mot. 21, it shamelessly flouts *Wald*.

**B. The canons all favor Plaintiffs.**

To the extent that the Court has any doubts about IEEPA's scope, Plaintiffs receive the benefit of both the rule of lenity and the major-questions doctrine. The government, meanwhile, is not entitled to its request that OFAC interpretations carry the force of law.

**1.** "[W]hen [courts] are faced with a statute that has both criminal and noncriminal applications," the Eleventh Circuit held in *Romero v. DHS*, "the rule of lenity applies." 20 F.4th 1374, 1383 (11th Cir. 2021), *cert denied* 142 S. Ct. 2869 (2022). This case turns on 50 U.S.C. §1702(a)(1)(B). Violating that statute carries criminal penalties. *See* §1705(c) (20 years for willful violation). Therefore, lenity applies to any ambiguities in the statute.

Given the opportunity to address *Romero*, the government ignores it. Gov't Mot. 25-26. Its counterargument is a footnote from 26 years earlier in *Babbitt v. Sweet Home Chapter of Cmtys.*, 515 U.S. 687 (1995). But "*Babbitt* … did not decide whether the rule of lenity applied or analyze the challenge using the rule of lenity." *Cargill v. Garland*, 57 F.4th 447, 467-68 (5th Cir. 2023) (en banc). "*Babbitt*'s drive-by ruling … deserves little weight." *Whitman v. United States*, 574 U.S. 1003, 1003 (2014) (Scalia, J., respecting the denial of certiorari). *Romero*, a later circuit precedent that controls regardless, cites the Supreme Court's more recent lenity jurisprudence and concludes that it's "well established" that lenity applies in this context. 20 F.4th at 1383 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)).

The government also argues that it's "incorrect" to call its action a "criminalization" at all. Gov't Mot. 26. It doesn't say why. IEEPA makes it a crime, punishable by 20 years in prison, to willfully violate "any license, order, regulation, or prohibition issued under this chapter," including this one. 50 U.S.C. §1705(a), (c). The Eleventh Circuit recently affirmed a 78-month criminal sentence against a violator of a

similar IEEPA sanction. *United States v. Singer*, 963 F.3d 1144, 1150, 1167 (11th Cir. 2020). Plaintiffs' planned activities, which were previously lawful, now trigger long prison sentences. If that's not a criminalization, nothing is. Semantics aside, OFAC's action triggers lenity under *Romero*. Accordingly, any "ambiguous" terms in IEEPA must be construed "narrowly in favor of the accused." *United States v. Garcon*, 54 F.4th 1274, 1285 (11th Cir. 2022) (en banc).

**2.** The major-questions doctrine also applies because the "logic" of the government's position would allow it to take actions of vast "economic and political significance." *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006). Any agency position that implies "highly consequential power" triggers the major-questions doctrine. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Here, the logic of the government's position would allow it to criminalize: every American's use of tools, such as credit cards and bank accounts, that could allow payments to foreigners, even when those payments are independently illegal, *supra*, I.A.1.a; every American's use of anything foreigners invented, from paper to pizza to Arabic numerals; *supra*, I.A.1.b; and every use of anything foreigners contributed their labor to but no longer control, including every iPhone in any American's pocket, *supra*, I.A.1.b-c. "[H]ad Congress wished to assign th[ose] question[s] to an agency, it surely would have done so expressly." *King v. Burwell*, 576 U.S. 473, 486 (2015).

The government asks this Court to analyze only the economic implications of OFAC's isolated "designation of a single crypto mixer." Gov't Mot. 26. But the major-

questions doctrine focuses on the *implications* of the agency's interpretation. *See, e.g.*, *Alabama Ass'n of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021) ("the Government's read of §361(a) would give the CDC a breathtaking amount of authority" over *other* matters not at issue in the case, like "mandat[ing] free grocery delivery"). Plus, OFAC's action "immediately affects digital assets—alone a trillion-dollar industry." Blockchain-DEF-Amicus-Br. 18. That price-tag alone suffices. *See Alabama Realtors*, 141 S. Ct. at 2489 ($50 billion program). Amici attest that OFAC's action harms the whole industry. *E.g.*, Blockchain-DEF-Amicus-Br. 23 ("sweeping consequences [and] weaken[] the digital asset industry"). Accordingly, the government "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 142 S. Ct. at 2595 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 320, 324 (2014)). It cannot.

**3.** The government argues, to the contrary, that OFAC's regulatory interpretations provide the controlling definitions of IEEPA's property-interest requirement. Gov't Mot. 16-19. Because IEEPA "expressly authorizes" OFAC to issue "regulations prescribing definitions," it thinks OFAC's two regulatory interpretations constitute the "actual definition[s]" to be applied here with the force of law. Gov't Mot. 19; *see* 31 C.F.R. §§578.323 ("property interest"), 510.313 ("interest").

But "[i]nterpretive rules don't have the force and effect of law and are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). Notice-and-comment "legislative rules" can have the force of law, but

22

"interpretive rules" like OFAC's cannot. *Id.* at 96-97; *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).

Nor is OFAC entitled to *Chevron* deference. The government forfeited *Chevron* by not addressing its two steps. *Hollyfrontier Cheyenne Ref. v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021); Gov't Mot. 29. If the government had argued for *Chevron* deference, it would have lost. If either the rule of lenity or major-questions doctrine applies, "*Chevron* leaves the stage." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018). And the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014).

The government also forfeits *Auer* deference. That's likely because *Kisor v. Wilkie* forecloses it. *See* 139 S. Ct. 2400, 2417 (2019) (no deference to interpretation "requiring the elucidation of a simple common-law property term" because property law isn't area of agency expertise); *id.* at 2417-18 (no deference to interpretation reflecting "litigation position," rather than "fair and considered judgment"). Accordingly, if OFAC's regulations had any weight, the government's interpretations of terms like "interest" and "contract" within them would not.

## C. The government's remaining arguments fail.

Finally, the government makes a surprising admission about its view of IEEPA, reminds the Court that it has a "licensing" policy, and makes two policy arguments in favor of broadening IEEPA. These arguments don't help its statutory-authority claim.

### 1. "Every transaction"

The government says it would be "impossible" to prove that the software writers and DAO have "an interest in every transaction involving [the] software." Gov't Mot. 20, 15. Instead, the DAO "has a property interest in the software service as a whole (*not each individual use of its service*)." *Id.* at 21 (emphasis added). But of course IEEPA requires the government to show that the sanctioned entity has a property interest in "every transaction." *Id.* at 21. If the sanctioned entity lacks a property interest in any given transaction, then that's not a "transaction involving any property in which any foreign country or a national thereof has any interest," so OFAC can't prohibit it. 50 U.S.C. §1702(a)(1)(B); *see Dames & Moore*, 453 U.S. at 675 (where actions aren't "in themselves transactions involving Iranian property," they exceed "terms of the IEEPA"). That it's "impossible" to square OFAC's action with the text is an admission that the Court needs to bring it back in line.

### 2. Licenses

The government invokes its "license" system as a defense to the statutory-authority claim. *E.g.*, Gov't Mot. 24. The government's licensing policy is that someone can apply for permission to bypass its orders; but it has complete, unreviewable discretion over whether to allow them to do so. *Havana Club Holding, S.A. v. Galleon*, 961 F. Supp. 498, 503 (S.D.N.Y. 1997). Licensing is irrelevant to statutory authority. If the government has no statutory authority to criminalize Plaintiffs' planned transactions, then Plaintiffs don't need licenses. The government cites no case

explaining why its licensing policy matters to the questions presented here. *See* Gov't Mot. 14-25.

### 3. Policy

The government makes two policy arguments, one incoherent and one inappropriate.

**a.** The government says that if it loses this case, "enemy aliens' could merely transform their property interests into creative new forms to avoid sanctions." Gov't Mot. 23. The government gives no examples of what it could possibly mean by this, and Plaintiffs do not understand it. Plaintiffs' limited request for relief gives nothing to enemy aliens. It protects Americans' domestic activity while honoring OFAC's power to prohibit transactions involving *anything* belonging to *any* foreigner. *See* Mot. 26-27. This is the same line that courts have always drawn. *Dames & Moore*, 453 U.S. at 675. To Plaintiffs' knowledge, continuing to apply this line would not implicate any other OFAC actions. *See* Blockchain-DEF-Amicus-Br. 9 (explaining why other crypto sanctions comply with IEEPA); Paradigm-Amicus-Br. 11-12 (same).

**b.** Next, the government worries that if it can't prohibit purely domestic transactions like Plaintiffs', "otherwise-deterred bad actors [could] resume laundering money through [the 29 addresses] for nefarious purposes." Gov't Mot. 24. As an initial matter, the government's worries are in tension with its earlier argument that the challenged addresses alone can't even operate effectively. *See* Gov't Mot. 18. But they also show that the government's ultimate qualm is with Congress's decision to limit

IEEPA. Plaintiffs' requested relief allows OFAC to continue to prohibit all transactions by foreigners, so the only "otherwise-deterred bad actors" the government can have in mind are *Americans*. But as "[a] response to 60 years of experience" Congress deliberately withheld "authority to regulate purely domestic transactions." H.R. Rep. No. 95-459, at 3-4, 10-11 (1977); Mot. 10-11. And under our Constitution, "it is up to Congress," not bureaucrats, "to make policy judgments." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1188 (11th Cir. 1997).

## II.   OFAC's action was arbitrary and capricious.

Even had it complied with IEEPA, OFAC's action was arbitrary and capricious because its foreign-policy rationale was pretext for its domestic goals, it cites no record support that it considered any of four critical aspects of its action, and it continues to deny that it changed its policy with respect to targetting immutable technology.

**1.** OFAC acted pretextually by using foreign-sanctions justifications to outlaw a new technology in America. *Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). Its one constant star for the past year—through its August criminalization, November re-criminalization, administrative record, and this litigation—has been making sure that *Americans* cannot use this new technology with their own assets. *See U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, OFAC (Aug. 8, 2022), perma.cc/8GFV-3VMB (banning Americans from using core software tool on different legal theory, with no reference to software writers and DAO); *FAQ: Can U.S. persons engage in transactions involving identified Tornado Cash virtual currency wallet addresses*

*absent a specific license from OFAC?*, OFAC (Nov. 8, 2022), perma.cc/YX9Y-FRCM (due to ostensible benefit to software writers and DAO, "U.S. persons are prohibited from engaging in transactions involving" all 91 addresses); A.R.17, 475-76, 578 (documenting concerns with domestic uses of technology); Gov't Mot. 24 (protesting limited relief because it might free "otherwise-deterred" Americans). At the same time, OFAC lets the sanctioned foreign entities off the hook. These supposed "enemy aliens" can have American bank accounts and freely trade with Americans if they don't use the 91 addresses. *See FAQ: Who is the Tornado Cash "person" that OFAC designated?*, OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW (clarifying that all other transactions with the software writers and DAO remain legal). This "disconnect between the decision made and the explanation given" is fatal. *Commerce*, 139 S. Ct. at 2575.

    **2.** OFAC failed to consider at least four "important aspects of the problem." Mot. 32-33; *see also* Paradigm-Amicus-Br. 14; Blockchain-DEF-Am.Br.12. The government does not dispute that these aspects—reliance, due-process, lost property, and chilled protected activity—are important. It therefore must show that it considered them in the "record of the rulemaking proceedings." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43-44 (1983); *see Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000) ("[A] court can only uphold the decision of an administrative agency on those grounds 'upon which the record discloses that its action was based.'"). But the government cites nothing in the record, only information that it later posted to its website. Gov't Mot. 29-30.

**3**. OFAC changed its own policy by, for the first time, targeting technology rather than trying to "bring about a positive change in behavior." A.R.12. By prohibiting transactions with an immutable technology that cannot mend its ways, OFAC "chang[ed its] position" from its previous "ultimate goal" of reforming the sanctioned entity. *Id.*; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). If the software writers and DAO want to "change [their] behavior," A.R.12, they can't rescind the core software tool, but that was the justification for the sanction. *See* A.R.61, 557, 563-67, 951; *see also* Andreessen-Amicus-Br. 3 ("no one will ever be able to … alter, or remove the Smart Contracts"). The government points to no precedent for such an approach, so it was required to show "awareness" of its change and provide a "reasoned explanation," but failed. *Fox Television*, 556 U.S. at 515.

## III.  OFAC violated the First Amendment.

John Doe was engaged in expressive association when he used the core software tool to contribute to frontline Ukrainians. *See FEC v. Co. RFC Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends … fall[s] within the First Amendment's protection of speech and political association."); *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). The First Amendment guarantees Doe a right to "protected association" against "[g]overnment infringement" of all "forms." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021).

OFAC's action "outright ban[ned]" Doe from continuing his protected activity. *Citizens United*, 558 U.S. at 512. And it "chilled" him from being able to donate at all,

*Bonta*, 141 S. Ct. at 2382, because the core software tool was the only way he could avoid exposing himself and his donors to Russian retaliation. Doc. 36-3¶¶8-13; *see also* A.R.144, 549-50; Blockchain-DEF-Amicus-Br. 6-7 (detailing "home invasions, kidnappings, torture, and even murder" of crypto users unable to transact privately); Paradigm-Amicus-Br. 2 (similar).

The government responds that Doe has no First Amendment right to engage in protected activities on his "preferred" terms. Gov't Mot. 31. It says he should just do "bank transfers." *Id.* 32-33. But the Supreme Court said the opposite in *Meyer v. Grant*, 486 U.S. 414. "The First Amendment," it said, "protects [citizens'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 424. No matter that they "remain free to employ other means to disseminate their ideas." *Id.* When the government "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse," it violates the First Amendment. *Id.*; *see also FEC v. Massachusetts Citizens For Life*, 479 U.S. 238 (1986). Doe and his donors "select[ed] what they believe to be the most effective means" for contributing to Ukraine, so the First Amendment protects them. *Meyer*, 486 U.S. at 424. If the government were right and *Meyer* were wrong, then the First Amendment would allow the government to ban email and tell people to communicate by letter, or to ban U.S.-dollar charitable donations and tell people to donate by gold.

In response to Plaintiffs' three suggested less-restrictive means—like exempting "domestic transactions that advance protected associations," Mot. 34—the government

says those means would not "fully depriv[e]" the sanctioned entities of their "assets." Gov't Mot. 34. The government cites "no evidence at all" in support of that claim, so it can't overcome its scrutiny "burden." *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1240 (11th Cir. 2017). Even if it adds evidence, a narrow exemption for protected activities or domestic activities *would* "fully depriv[e]" the sanctioned entities of access to any assets because they would get nothing at all. Doc. 36-3¶¶10-14; *see supra*, I.A.1. Plus, OFAC has not implemented "feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993); *accord Simon Schuster v. Crime Victims Bd.*, 502 U.S. 105, 119-20 (1991). OFAC has not "fully depriv[ed]" the sanctioned entities of their "assets" at all. *Cf.* Gov't Mot. 34. Americans can still send assets to the software writers and DAO, so long as they don't use the core software tool. *FAQ: Who is the Tornado Cash "person," supra*. That defeats OFAC's scrutiny argument. *Lukumi*, 508 U.S. at 547.

Finally, the government doesn't dispute that it did "not even conside[r]" these less restrictive alternatives, so it "fails exacting scrutiny" on that basis too. *Bonta*, 141 S. Ct. at 2386, 2389.

## CONCLUSION

This Court should grant summary judgment for Plaintiffs and deny summary judgment for Defendants. It should hold unlawful and set aside the 29 challenged addresses.

Dated: Jul 21, 2023

Respectfully submitted,

*s/Cameron T. Norris*

| | |
|---|---|
| Michael A. Sasso | Jeffrey M. Harris* |
| Florida Bar No. 93814 | Cameron T. Norris* |
| masasso@sasso-law.com | Jeffrey S. Hetzel* |
| Christian Bonta | CONSOVOY MCCARTHY PLLC |
| Florida Bar No. 1010347 | 1600 Wilson Boulevard, Suite 700 |
| cbonta@sasso-law.com | Arlington, VA 22209 |
| SASSO & SASSO, P.A. | Telephone: 703.243.9423 |
| 1031 West Morse Blvd, Suite 120 | |
| Winter Park, Florida 32789 | J. Abraham Sutherland* |
| Tel.: (407) 644-7161 | 106 Connally Street |
| | Black Mountain, NC 28711 |
| | Telephone: 805.689.4577 |

*pro hac vice

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I e-filed this motion with the Court on July 21, 2023, which emailed everyone requiring notice.

*/s/Cameron T. Norris*
Counsel for Plaintiffs

**CERTIFICATES OF COMPLIANCE**

I certify that this memorandum complies with Local Rule 7.1 and 56.1, which authorize 8,000 words for opposition memorandums and 3,200 words for replies, because it contains 7,673 words, excluding the parts that may be excluded.

*/s/Cameron T. Norris*
Counsel for Plaintiffs