# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

COIN CENTER *et al.*,

   *Plaintiffs*,

v.

JANET YELLEN *et al.*,

   *Defendants*.

No. 3:22-cv-20375

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

ARGUMENT....................................................................................... 3

I.   OFAC Designated a Single Entity, Tornado Cash, Which Provides a Software Service That Is Blocked Pursuant to the Designation ........................... 3

II.  OFAC Acted Within Its Statutory Authority ................................. 5

A.   Plaintiffs Are Prohibited from Transacting with the Tornado Cash Software Regardless of the Nature of the Transaction ............................5

B.   Tornado Cash Has an Interest in Its Software Service, Which Comprises All of Its Smart Contracts ..................................................8

1.   The Court Should Adhere to the Reasonable Regulatory Definition of Property "Interest"........................................................ 8

2.   Plaintiffs' Preferred Definition of Property "Interest" Is Inapplicable and Would Undercut OFAC's Sanctions Authority .......................12

C.   The Rule of Lenity and Major Questions Doctrine Are Inapplicable ....17

III. The Designation of Tornado Cash Was Not Arbitrary and Capricious .........19

IV. Defendants Are Entitled to Summary Judgment on the First Amendment Claim ...........................................................................22

V.   The Court Should Not Grant Any of Plaintiffs' Requests for Relief.............24

CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ..............................................................................22, 23

*Barnhart v. Thomas*,
  540 U.S. 20 (2003) ........................................................................................ 7

*Bergerco Canada v. U.S. Treasury Dep't, OFAC*,
  129 F.3d 189 (D.C. Cir. 1997) ..................................................................... 9

*Bochese v. Town of Ponce Inlet*,
  405 F.3d 964 (11th Cir. 2005) ....................................................................15

*Consarc Corp. v. Iraqi Ministry*,
  27 F.3d 695 (D.C. Cir. 1994) ...................................................................9, 10

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ....................................................................................13

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ................................................................................20

*Field v. Mans*,
  516 U.S. 59 (1995) ......................................................................................12

*Fulmen Co. v. OFAC*,
  547 F. Supp. 3d 13 (D.D.C. 2020) ..............................................................10

*Global Relief Found., Inc. v. O'Neill*,
  315 F.3d 748 (7th Cir. 2002) ..................................................................10, 12

*Holy Land Found. For Relief & Dev. v. Ashcroft*,
  219 F. Supp.2 d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ...*passim*

*In re Egidi*,
  571 F.3d 1156 (11th Cir. 2009) ..................................................................12

*Meyer v. Grant*,
  486 U.S. 414 (1988) ................................................................................22, 23

*Ministry of Defense of Iran v. Elahi,*
556 U.S. 366 (2009) .................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .................................................................22

*Muscarello v. United States,*
524 U.S. 125 (1998) ................................................................18

*NFIB v. OSHA,*
142 S. Ct. 661 (2022) ..............................................................19

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ....................................................................9

*Regan v. Wald,*
468 U.S. 222 (1984) ...................................................................9

*Romero v. DHS,*
20 F.4th 1374 (11th Cir. 2021) .............................................17, 18

*West Virginia v. EPA,*
142 S. Ct. 2587 (2022) .........................................................18, 19

**Statutes**

5 U.S.C. § 553(a)(1) ....................................................................9

50 U.S.C. § 1702(a) ...................................................................19

50 U.S.C. § 1702(a)(1)(B) ...................................................*passim*

50 U.S.C. § 1704 ..............................................................8, 10, 12

**Administrative and Executive Materials**

31 C.F.R. § 510.313 .........................................................8, 11, 12

31 C.F.R. § 510.323 ...................................................................12

31 C.F.R. § 578.201(a) ............................................................5, 6

31 C.F.R. § 578.309 .........................................................8, 11, 12

31 C.F.R. § 578.314 ................................................................................12

31 C.F.R. § 578.404 ................................................................................21

31 C.F.R. § 578.802 ................................................................................ 8

Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 2, 2015) ................ 8

**Other Authorities**

Dep't of the Treasury, *The Treasury 2021 Sanctions Review* 1 (2021),
      https://perma.cc/9M85-7ZRN .........................................................21

OFAC FAQ 1078,
      https://perma.cc/5KQ5-25GE ..........................................................21

# INTRODUCTION

The Office of Foreign Assets Control (OFAC) properly designated Tornado Cash, pursuant to the International Economic Emergency Powers Act (IEEPA) and the relevant executive orders, because Tornado Cash provides a software service used by malicious cyber actors to launder hundreds of millions of dollars' worth of stolen cryptocurrency. Tornado Cash has a property interest in its software service: it benefits from every use of that service—regardless of which smart contracts are executed—because the value of TORN (its governance token) increases as the network of users grows and because it receives relayer fees remitted in the substantial majority of those transactions. Tornado Cash's software service, comprising all of its smart contracts, is therefore blocked—meaning that persons subject to U.S. jurisdiction cannot engage in "any . . . use . . . of, or dealing in, . . . or transactions involving" any of those smart contracts. 50 U.S.C. §1702(a)(1)(B). Plaintiffs ignore the clear text of IEEPA and instead insist that the statute requires that a designated entity have an enforceable interest in every blocked *transaction*. But they fail to explain how the statutory text supports their view—and for good reason: the statute does not, nor can it reasonably be interpreted to, impose any such requirement, and no court has ever suggested that it does.

Plaintiffs say that their requested relief is narrow and that OFAC should exempt from appropriate sanctions their handpicked subset of Tornado Cash smart

contracts, so that Plaintiffs can engage in purportedly "domestic" transactions for beneficent purposes. This is a distorted characterization of Plaintiffs' desired transactions (which are necessarily not "domestic" because foreign nationals have an interest in the Tornado Cash service) and of their requested relief. They ask the Court to immunize parts of the Tornado Cash software from IEEPA sanctions by pretending that those parts of the blocked property operate independently from the whole. But unblocking any subset of the Tornado Cash smart contracts would still allow anyone, whether well-intended or malicious, to engage with the money-laundering service that Tornado Cash created and from which it benefits. This would undercut the effectiveness of OFAC's response to the national-security threat that Tornado Cash presents. And this judicial relief is neither warranted nor necessary: Plaintiffs are free to apply for an OFAC license to engage in their desired transactions, but they have not done so.

Plaintiffs' arbitrary-and-capricious argument fares no better. OFAC's designation of an entity that provides a service used by malicious cyber actors is reasonable—and indeed, critical to U.S. national and economic security—and is reasonably explained in the thorough administrative record.

Nor does the designation run afoul of any First Amendment right—neither the right to association Plaintiffs asserted in their amended complaint, nor any speech

right discussed in the cases Plaintiffs cite in opposition. Simply put, there is no First Amendment right to transmit funds using a particular money-laundering service.

For all these reasons, the Court should reject Plaintiffs' meritless challenges to OFAC's designation.

## ARGUMENT

## I.    OFAC Designated a Single Entity, Tornado Cash, Which Provides a Software Service That Is Blocked Pursuant to the Designation

Plaintiffs inject unwarranted confusion into this case by misconstruing the action that OFAC took and the nature of the blocked software. To be clear, OFAC designated a single entity (Tornado Cash) that provides a single service (referred to by the same name),[1] which is properly blocked pursuant to OFAC's designation because, as described below, the entity has an interest in the software service that it provides. Plaintiffs' repeated inaccurate descriptions of this designation find no support in either fact or law.

Tornado Cash is an entity that comprises many individuals organized to function collectively for a common purpose—namely, to provide an online, for-profit money-laundering service. Tornado Cash's *organizational structure* consists

---

[1] Plaintiffs contend that referring to the entity and its software service by the same name "is like if someone called Thomas Edison 'Lightbulb.'" Pls.' Opp'n and Reply at 3, ECF No. 62. But referring to an entity and the service it provides by the same name is ubiquitous in the tech industry—for example, Google, eBay, Venmo, Facebook, and YouTube all initially did so.

of (1) its founders and other developers, who together launched the Tornado Cash service, developed new features, created its decentralized autonomous organization (DAO), and actively promoted the platform's popularity; and (2) its DAO, which is responsible for governing the platform. A.R.32. Plaintiffs misconstrue OFAC's designation of this entity, repeatedly referring to elements of its organizational structure as separate "sanctioned entities," *e.g.*, Pls.' Opp'n 3–4, 7—even as Plaintiffs elsewhere criticize OFAC for *not* simultaneously designating individual developers and DAO members, *e.g.*, *id.* at 27; *see also id.* at 2 (incorrectly stating that OFAC sanctioned "people," rather than an entity).

Plaintiffs further misapprehend the nature of the Tornado Cash service. The Tornado Cash founders created—and its developers, pursuant to the DAO's governance, have developed—a single software service. A.R.32. That software is made up of many smart contracts that work together, in various combinations, to effectuate the transactions that users initiate. A.R.43. Plaintiffs seek to exempt from sanctions 29 handpicked Tornado Cash smart contracts, but their piecemeal approach finds no support in the administrative record or elsewhere. Plaintiffs' repeated labeling of their 29 preferred smart contracts (selected based on unclear criteria) as the "core software tool," Pls.' Opp'n 3, is similarly baseless.

Nearly 84% of transactions using Tornado Cash directly result in financial benefit to the DAO through the use of relayers, A.R.57 n.113—but *all* transactions

using the Tornado Cash software benefit the entity. This is because each transaction increases the use of Tornado Cash and thus the anonymity of its users, thereby enhancing Tornado Cash's appeal and the value of TORN. A.R.16–17. It does not matter which Tornado Cash smart contracts are involved in any particular transaction; they collectively make up the money-laundering service and work together to benefit the DAO—and thus the designated entity Tornado Cash. As a result, Tornado Cash has an interest in the entire software service it provides—not just parts of it.

## II.   OFAC Acted Within Its Statutory Authority

### A. Plaintiffs Are Prohibited from Transacting with the Tornado Cash Software Regardless of the Nature of the Transaction

IEEPA authorizes the President to prohibit "any . . . transactions involving" property and "any interest" in property of persons designated under relevant executive orders and implementing regulations. 50 U.S.C. § 1702(a)(1)(B). Consistent with this authority, OFAC's implementing regulations provide that "[a]ll property and interests in property" of designated persons within U.S. jurisdiction "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." 31 C.F.R. § 578.201(a). Thus, U.S. persons are prohibited from "any" use of or dealing in such blocked property, regardless of the nature of the desired transaction. *See* 50 U.S.C. § 1702(a)(1)(B); *see Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F.Supp.2d 57, 67–68 (D.D.C. 2002) ("IEEPA authorizes the

blocking of property in which the designated [entity] has '*any* interest.' The language imposes no constraints on that term." (citation omitted)), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). As Defendants have established, Tornado Cash has an interest in its software service, composed of all of its smart contracts, including but not limited to the 29 selected by Plaintiffs. *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. at 15–19, ECF No. 57. Consequently, Plaintiffs are prohibited from engaging in *any* "transactions involving" any of the Tornado Cash smart contracts, absent a specific license from OFAC.

Plaintiffs do not squarely confront the applicable statutory and regulatory language. Instead, they repeatedly, and incorrectly, state in conclusory fashion that IEEPA requires a designated entity to have an enforceable interest in every *transaction* involving its property or interest in property for those transactions to be prohibited. *See, e.g.*, Pls.' Opp'n 7, 8, 12, 15, 24. But this conclusion cannot be squared with the text of IEEPA: when property is blocked—that is, when a designated foreign national has "*any* interest" in the property—persons subject to U.S. jurisdiction are prohibited from "*any* . . . use . . . of, or dealing in, . . . or transactions involving" that property—not a subset of transactions with the property. 50 U.S.C. §1702(a)(1)(B) (emphases added); *see* 31 C.F.R. § 578.201(a). Plaintiffs have not cited, and cannot cite, any authority that supports their novel interpretation of IEEPA.

Nor do Plaintiffs articulate any textual basis for their interpretation. Plaintiffs contend that "[i]f the sanctioned entity lacks a property interest in any given transaction," then OFAC cannot prohibit that transaction. Pls.' Opp'n 24. This is simply not what the plain language of the statute provides. IEEPA authorizes the government to prohibit "any . . . use . . . of, or dealing in . . . or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). A commonsense reading of this statutory provision clearly establishes that the limiting phrase "in which any foreign country or a national thereof has any interest" modifies only "property," not "transactions," as evidenced by the fact that it states "property in which," not "transactions in which." *Id.*; *see, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (explaining that "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows").[2] And "transactions involving" is merely the last item in a broad list of conduct that is statutorily prohibited once property has been blocked, not a prerequisite to blocking that property.

Defendants have demonstrated that (1) Tornado Cash is properly designated for providing material support for malicious cyber-enabled activities and to the

---

[2] In multiple quotations in their opposition, Plaintiffs omitted the comma following "transactions involving," further obscuring that the relative clause plainly modifies "property," and not "transactions." *See* Pls.' Opp'n 1, 24.

government of North Korea, A.R.32–60, 67–78; (2) Tornado Cash has a property interest in the smart contracts that together constitute the Tornado Cash software service, A.R.60–64; and (3) a foreign government and foreign nationals—namely, North Korea, foreign founders, and foreign TORN holders—have an interest in the smart contracts Plaintiffs seek to employ, A.R. 64–67. IEEPA therefore prohibits Plaintiffs from engaging in "any . . . transactions involving" the Tornado Cash software (absent an OFAC license).

### B. Tornado Cash Has an Interest in Its Software Service, Which Comprises All of Its Smart Contracts

#### 1. The Court Should Adhere to the Reasonable Regulatory Definition of Property "Interest"

Plaintiffs all but ignore the statutory reference to "*any* interest," 50 U.S.C. § 1702(a)(1)(B) (emphasis added), and the applicable definition of "interest" in property found in OFAC's regulations. IEEPA expressly authorizes the President to block property in which a designee has "any interest," *id.*, and to "issue such regulations, including regulations *prescribing definitions*, as may be necessary for the exercise" of that authority, *id.* § 1704 (emphasis added). Pursuant to express delegations of that authority, *see*, *e.g.*, E.O. 13694 § 8; 31 C.F.R. §578.802, OFAC adopted a broad definition of "interest" respecting property to include "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. §§ 578.309, 510.313—which includes interests that are not legally enforceable, *contra* Pls.' Opp'n 8–9. *See Holy*

*Land Found.*, 219 F.Supp.2d at 67–68; *Regan v. Wald*, 468 U.S. 222, 224, 225–26, 233–34 (1984) (repeatedly recognizing that "any interest" should be construed broadly). As explained, the Court should assess the propriety of OFAC's action based on the broad statutory language and OFAC's reasonable definition adopted pursuant to Congress's mandate.[3]

Plaintiffs argue that Defendants "forfeited" their opportunity to ask the Court for deference to OFAC's regulatory definition of property "interest." Pls.' Opp'n 22–23. Even if it were possible to "forfeit[]" the deference an agency is due when acting on explicit statutory authority—and Plaintiffs cite no case remotely suggesting it is—Defendants did no such thing. Defendants expressly noted that "OFAC may choose and apply its own definition of property interests, *subject to deferential judicial review*." Defs.' Cross-Mot. 19 (emphasis added) (quoting *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994)). Again, Congress expressly authorized the promulgation of "regulations prescribing

---

[3] Plaintiffs assert that the Court should not afford any weight to the regulatory definition because it constitutes an "interpretive rule," as opposed to a regulation subject to notice-and-comment rulemaking. Pls.' Opp'n 22–23. Plaintiffs provide no explanation for why it constitutes an "interpretive rule"—a term whose "precise meaning is the source of much scholarly and judicial debate," as the very case that Plaintiffs cite acknowledges. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Regardless, the APA exempts OFAC's regulations from notice-and-comment rulemaking because they pertain to "a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(1); *see Bergerco Canada v. U.S. Treasury Dep't, OFAC*, 129 F.3d 189, 191 (D.C. Cir. 1997).

definitions." 50 U.S.C. § 1704. Thus, "OFAC has received the authority to administer the statute, so that [courts] must give effect to OFAC's regulations unless they contradict express statutory language or prove unreasonable." *Consarc*, 27 F.3d at 701 (citation omitted). And OFAC's expansive definition of property "interest" furthers the statute's goals and OFAC's mission of protecting national security and advancing U.S. foreign policy through comprehensive economic sanctions. *See, e.g.*, *Global Relief Found., Inc. v. O'Neill* ("*Global Relief II*"), 315 F.3d 748, 753 (7th Cir. 2002) ("[IEEPA] is designed to give the President means to control assets that could be used by enemy aliens."); *Fulmen Co. v. OFAC*, 547 F.Supp.3d 13, 24 (D.D.C. 2020) (OFAC "is tasked with protecting the national security, foreign policy, and economic interests of the United States"). The Court need only determine that the regulatory definition is reasonable given the statute's purpose, which is unquestionably the case.

Under the applicable regulatory definition, Tornado Cash undoubtedly has an interest in its software service. *See* Defs.' Cross-Mot. 15–19. Both IEEPA and the regulatory definition make clear that a sanctioned entity's interest in the property need not be a legally enforceable interest; it can be a beneficial or other interest. *See Global Relief II*, 315 F.3d at 753 ("The function of the IEEPA strongly suggests that beneficial rather than legal interests matter."); *Holy Land Found.*, 219 F.Supp.2d at 68 ("IEEPA does not limit the President's blocking authority to the existence of a

legally enforceable interest."). As previously addressed, substantial evidence demonstrates that Tornado Cash has, at minimum, a beneficial interest in its software service because Tornado Cash created the service and enabled the service to make money for Tornado Cash. Tornado Cash actively promotes its service to expand its user base and, ultimately, make more money: an increase in the number of Tornado Cash uses means a rise in the number of relayer transactions remitting fees to the Tornado Cash DAO, as well as an increase in the broad network of users, enhancing their anonymity and thus increasing the value of TORN. A.R.60–64, 550–51.

Rather than addressing the regulatory definition of property "interest" in any meaningful fashion, Plaintiffs put forth a perfunctory, single-paragraph rebuttal that the word "indirect" in the regulation does not "help[]" Defendants. Pls.' Opp'n 15. They contend that an "indirect" interest in property is an inapplicable "technical term for describing an arrangement where the interest holder owns an entity, and that entity in turn owns the relevant property." *Id.* But Plaintiffs disregard the rest of the definition: "the term interest . . . means an interest of *any nature whatsoever*, direct or indirect." 31 C.F.R. §§ 578.309, 510.313 (emphasis added). Defendants have readily demonstrated that Tornado Cash has an interest "of any nature whatsoever" in the software service composed of its smart contracts.

For the first time in their opposition and reply, Plaintiffs now suggest that the Tornado Cash software service does not satisfy the regulatory definition of "property

and property interest." *Compare* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mot.") at 1–34, ECF No. 36-1, *with* Pls.' Opp'n 15–16; *see also* Defs.' Cross-Mot. 17 n.3. The Court should disregard this argument as waived. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009). Regardless, the Tornado Cash software service is unquestionably a "property and property interest" under OFAC's regulations, which define the terms broadly to include, *inter alia*, "services of any nature whatsoever, [and] contracts of any nature whatsoever." 31 C.F.R. §§ 510.323, 578.314.

### 2. Plaintiffs' Preferred Definition of Property "Interest" Is Inapplicable and Would Undercut OFAC's Sanctions Authority

Plaintiffs ask the Court to ignore the regulatory definition of "interest" and instead apply a purportedly "plain meaning" that would require a "formal positive-law relationship to property." Pls.' Opp'n 8. Plaintiffs quote a Supreme Court case stating plainly that a court should adopt the common law meaning of a term "unless the *statute otherwise dictates*." *Id.* at 9 (emphasis added) (quoting *Field v. Mans*, 516 U.S. 59, 69 (1995)). Here, IEEPA dictates otherwise. As explained, Congress expressly authorized the President to issue "regulations prescribing definitions." 50 U.S.C. § 1704. Once delegated that authority, OFAC adopted the applicable, comprehensive definition of "interest" in property, to encompass all manner of interests, consistent with IEEPA's goal of protecting U.S. national security. 31 C.F.R. §§ 578.309, 510.313; *see, e.g.*, *Global Relief II*, 315 F.3d at 753. The Court should reject Plaintiffs' unsupported invitation to stray from IEEPA's unrestricted

reference to "any interest" and from the reasonable definition that Congress authorized OFAC to prescribe.[4]

In asserting alternative definitions, Plaintiffs urge this Court to prevent OFAC from blocking any unenforceable interest in property. But Plaintiffs' restricted view of the meaning of "interest" would insulate from sanctions reams of properly prohibited conduct—for example, voluntary provision of services to terrorist groups. Their view finds no support in sanctions law, which has long encompassed simply beneficial and other interests.

Moreover, Plaintiffs' attempt to brush aside the sanctions-related cases cited by Defendants falls flat. *See* Pls.' 17–19. Chiding the government for relying on cases from other jurisdictions—notwithstanding the relative lack of sanctions-related decisions in this Circuit—Plaintiffs argue that this case does not present comparable factual circumstances. *Id.* But the relevance of the cited cases is clear. In *Holy Land Foundation*, the D.C. Circuit (relying on the Seventh Circuit's "unassailable" reasoning in *Global Relief II*) rejected the argument that IEEPA does not reach a "beneficial interest, or an interest not defined in traditional common law

---

[4] Plaintiffs also cite *Dames & Moore v. Regan*, 453 U.S. 654 (1981), Pls.' Opp'n 9, but that case did not address the meaning of "property" or property "interest" at all. Plaintiffs' reliance on *Ministry of Defense of Iran v. Elahi*, 556 U.S. 366 (2009), is similarly misplaced, as it addressed inapposite circumstances involving an interest contingent on court authorization, and it did not discuss any definition of the term property "interest."

terms." 333 F.3d at 163. The D.C. Circuit went on to explain that IEEPA "imposes no limit on the scope of the [term] interest"; the "interest need not be a legally protected one in order to be caught within the net of § 1702." *Id.* at 162–63. Plaintiffs' attempt to separate equitable, legal, and beneficial interests misses the point—IEEPA authorizes the government to prohibit transactions involving "*any* interest." 50 U.S.C. § 1702(a)(1)(b) (emphasis added).

Reprising their efforts to carve up OFAC's sanctions, Plaintiffs contend that the "connections" Defendants identified between Tornado Cash and its software service do not establish that Tornado Cash has an interest in Plaintiffs' desired *transactions* involving their handpicked 29 smart contracts. Pls.' Opp'n 7. But, again, IEEPA merely requires OFAC to establish that a foreign national (here, Tornado Cash founders and TORN holders, among others) has an interest in the blocked *property*, not individual transactions. *Supra* at 7. Tornado Cash has a property interest in its smart contracts, all of which make up the blocked software service; any interest in particular *transactions* is irrelevant. For the same reason, for example, U.S. persons are prohibited from transferring funds to each other through banks blocked under IEEPA—even where those banks charge no transaction fees and would not earn a penny from those transactions.

**a.** Putting aside their flawed IEEPA analysis, Plaintiffs' argument also fails on the face of the administrative record. Plaintiffs' assertion that using the identified

29 smart contracts alone will never generate relayer fees for the DAO is inapposite. Pls.' Opp'n 10–11. In reality, the record establishes that Tornado Cash has a property interest in its software service as a whole, consisting of all of its smart contracts, which operate collectively and in various combinations. *See, e.g.*, A.R.60–62. First, Plaintiffs identify no record support for the dubious contrary notion that their selected 29 smart contracts can be executed in isolation. Second, even if Plaintiffs were to engage in transactions using only those 29 smart contracts, Tornado Cash still benefits from *all* uses of the software service—not only through relayer fees remitted to the DAO for relayer-enabled transactions but *also* through the increased value of TORN resulting from larger numbers of Tornado Cash users. *See* A.R.32, 39, 56, 62.

Moreover, Plaintiffs' suggestion that relayers are incidental third parties to the Tornado Cash service is misguided—as is their reliance on *Bochese v. Town of Ponce Inlet*, 405 F.3d 964 (11th Cir. 2005), and its interpretation of Florida property law. *See* Pls.' Opp'n 12. In *Bochese*, the Eleventh Circuit concluded that "third party beneficiaries recognized as incidental beneficiaries" of a Florida contract do not "have a right to sue for enforcement of the contract." 405 F.3d at 981 (quotation marks omitted). That decision has no relevance here. Tornado Cash users pay a fee to the relayer, who, in turn, remits a fee to the DAO for the privilege of engaging in Tornado Cash's intentional business model of relayer-enabled transactions. A.R.56–

57. There is nothing incidental or unintended about this. Nor is the 0.3% relayer fee to the DAO insignificant, *contra* Pls.' Opp'n 10–12; that amount multiplied by nearly 84% of all Tornado Cash transactions is hardly inconsequential.[5]

**b.**   Plaintiffs argue that "contributing your labor to something and then disposing of it" does not confer "a 'beneficial interest,'" Pls.' Opp'n 13—a variation on their original contention that Tornado Cash "abandoned" any interest in its smart contracts, Pls.' Mot. 22. Plaintiffs' logic fails from the start. Tornado Cash has disposed of nothing. And it has benefitted from the increase in TORN's value since it established the DAO—and, since at least March 2022, Tornado Cash has received a continual stream of revenue from its software in the form of TORN tokens transferred to the DAO for relayer-enabled transactions. *See* A.R.32, 39, 56, 62. Additionally, Tornado Cash has engaged in extensive efforts to develop, promote, and enhance its smart contracts—all activities indicative of its commitment to the mixing service and its ongoing beneficial interest in the smart contracts. A.R.60–62.

**c.**  Plaintiffs posit that the DAO cannot "govern" or "modify" the 29 identified smart contracts individually and, therefore, Tornado Cash could not have a property

---

[5] Plaintiffs' observation that Tornado Cash historically operated without registered relayers, Pls.' Opp'n 11, fails to refute the reality that, since March 2022, the entity has benefited from relayer fees in the substantial majority of its transactions, A.R.57 n.113. This 2022 development also shows that the Tornado Cash DAO can take account of new circumstances and make changes to the software service, including to its own benefit. *See, e.g.*, A.R. 61–62.

interest in them. Pls.' Opp'n 13–14. But, as explained, Tornado Cash has a property interest in its software service as a whole, composed of all of its smart contracts, including their selected 29. And the Tornado Cash DAO *does* govern the service by, *inter alia*, deploying new smart contracts to improve "user experience" in an effort to expand its user base to generate more money for the DAO. *See, e.g.*, A.R.61–62. This business model demonstrates that Tornado Cash has a property interest in all of its smart contracts, and Plaintiffs' preferred 29 cannot reasonably be separated from the whole.

### C. The Rule of Lenity and Major Questions Doctrine Are Inapplicable

Finally, Plaintiffs blithely contend that "[t]he canons all favor" their approach. Pls.' Opp'n 19. As explained, Plaintiffs make no affirmative textual argument in support of their misinterpretation of IEEPA that would require OFAC to show that a designated entity has a legally cognizable interest in each *transaction* with blocked property. *Supra* at 7. No canon of construction can change that—least of all the rule of lenity and major questions doctrine.

**1.** Plaintiffs argue that the rule of lenity should apply here because IEEPA "has both criminal and noncriminal applications." *Id.* at 20 (quoting *Romero v. DHS*, 20 F.4th 1374, 1383 (11th Cir. 2021)). But they do not even attempt to address the threshold requirements for a court to invoke this rule of last resort: the court "must conclude that there is a *grievous ambiguity* or uncertainty in the statute," such that

17

the court "can make *no more than a guess* as to what Congress intended." *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998) (emphases added) (quotation marks omitted). As the Eleventh Circuit explained in *Romero* (apparently Plaintiffs' preferred case), "when Congress speaks in unclear or indefinite terms about what conduct is criminal, such that the governing statute is genuinely ambiguous, [courts] construe that statute in favor of criminal defendants." 20 F.4th at 1383. Even if lenity *could* apply here, where there are no "criminal defendants," Plaintiffs identify no "genuine[]" ambiguity in IEEPA's terms. *Id.* And even if they had identified such ambiguity, Plaintiffs fail to present any textual argument for their unsupported conclusion that IEEPA requires an enforceable interest in every prohibited transaction. *Supra* at 7.

**2.** The major questions doctrine is likewise applicable only in limited circumstances not present here, especially given the national-security context of the challenged action. *See West Virginia v. EPA*, 142 S.Ct. 2587, 2609 (2022) (the doctrine is reserved for "extraordinary cases"). In advocating for its application here—and, indeed, wherever an agency action, in their view, "*implies* 'highly consequential power,'" Pls.' Opp'n 21 (emphasis added)—Plaintiffs seek a drastic expansion of the doctrine. But, pursuant to IEEPA, OFAC designated a single entity and blocked a single cryptocurrency mixer that it determined poses a threat to U.S. national security. Suggesting that this narrow action is highly "consequential,"

Plaintiffs offer a puzzling list of scenarios, contending, e.g., that OFAC would block "every American's use of anything foreigners invented." *Id.* These hyperbolic scenarios, devoid of context, have no relation to this case and no apparent grounding in the statutory authority that OFAC properly exercised here. Plaintiffs also claim, citing amici filings and facts not in the administrative record, that this designation's "price-tag" is equal to the entire "trillion-dollar [digital-asset] industry," *id.* at 22— an obviously absurd claim, when this designation affects only a *single* cryptocurrency service commonly used by malicious cyber actors to transfer illicit funds.[6] This case does not involve the type of assertion of sweeping regulatory authority to which the Supreme Court has applied the doctrine. *See, e.g.*, *NFIB v. OSHA*, 142 S.Ct. 661, 666 (2022). OFAC has "clear congressional authorization" to impose this narrow sanction, *West Virginia*, 142 S.Ct. at 2595; *see* 50 U.S.C. § 1702(a), and the major questions doctrine is inapplicable.

## III. The Designation of Tornado Cash Was Not Arbitrary and Capricious

Plaintiffs' opposition reiterates their original arbitrary-and-capricious arguments without even addressing Defendants' counterarguments. They still fall

---

[6] Elsewhere Plaintiffs describe their claims as narrow, insofar as they relate only to 29 smart contracts, Pls.' Opp'n 25; Plaintiffs cannot have it both ways. Moreover, amici are here to elucidate legal issues, not introduce facts not in the record, and the Court should disregard their dire predictions and hand-waving. *See* Defs.' Cross-Mot. 17 n.3.

far short of showing that OFAC's designation was not "reasonable and reasonably explained" under the APA's highly "deferential arbitrary-and-capricious standard." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1155 (2021).

*First*, Plaintiffs' "disconnect" between OFAC's designation and its explanation appears to be little more than a policy disagreement with OFAC's decision to designate the entity without simultaneously designating individuals who run that entity.[7] Plaintiffs further criticize OFAC for "making sure that *Americans* cannot use" Tornado Cash, Pls.' Opp'n 26—but the reach of OFAC's sanctions is a function of the statute, not OFAC's discretion: IEEPA authorizes prohibiting transactions "subject to the jurisdiction of the United States." 50 U.S.C. §1702(a)(1)(B).[8] It was plainly not arbitrary or capricious for OFAC to stay within the bounds of its statutory authority.

*Second*, Plaintiffs insist that OFAC failed to consider the reliance and due-process interests of those who receive unsolicited funds; a purported "loss of

---

[7] Certainly, if OFAC were to designate any foreign individuals under IEEPA, those individuals would be similarly unable to "freely trade with Americans." Pls.' Opp'n 27. But the designation at issue is that of the entity Tornado Cash, not of any individuals.

[8] Plaintiffs accuse OFAC of merely "documenting concerns with domestic uses" of Tornado Cash, Pls.' Opp'n 27, but record pages they cite discuss OFAC's concerns regarding "malicious actors [who] could easily launder the proceeds of cyber-enabled activities," without reference to the nationality of any such actors (or other users), A.R.17; *see* A.R.475–76, 578.

property" by those who held assets in Tornado Cash software at the time of designation; and a purported "chilling effect of sanctioning software writers." Pls.' Mot. 32–33; Pls.' Opp'n 27. Plaintiffs' speculation that OFAC did not take these aspects into consideration is both unsupported and incorrect. First, OFAC made it clear that it would take a nonenforcement posture with regard to those persons who receive unsolicited funds. *See* OFAC FAQ 1078, https://perma.cc/5KQ5-25GE. Further, OFAC's regulations *already* provided for the licensing authority that would allow those with assets held in Tornado Cash to seek a specific license to retrieve those assets. *See* 31 C.F.R. § 578.404. And, again, OFAC did not sanction software writers; it sanctioned the *entity* providing a money-laundering service.

*Third*, as explained, Defs.' Opp'n 29, OFAC's designation does not represent any change in policy. Plaintiffs continue to insist that the *only* goal of the U.S. sanctions program is to "reform[] the sanctioned entity," Pls.' Opp'n 28—but they do not (and cannot) cite anything in support of this unduly narrow construction, which ignores the government's goals of "deter[ring] or disrupt[ing] behavior that undermines U.S. national security." Dep't of the Treasury, *The Treasury 2021 Sanctions Review* 1 (2021), https://perma.cc/9M85-7ZRN. In any event, OFAC's designation of Tornado Cash is consistent with Plaintiffs' narrow understanding of OFAC's goals because it aims to "bring about a positive change in behavior,"

A.R.12—i.e., to combat the use of the Tornado Cash software for illicit purposes that threaten U.S. national and economic security.

Plaintiffs do not identify any aspects of the designation of Tornado Cash for which OFAC failed to "articulate a satisfactory explanation." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The designation thus is not arbitrary or capricious.

## IV.   Defendants Are Entitled to Summary Judgment on the First Amendment Claim

Plaintiffs continue to cherry-pick language from inapposite cases in support of their position that the First Amendment creates a right to *use a particular service* to associate with others. Pls.' Opp'n 28–30. OFAC's designation of a single money-laundering service is wholly unlike the kinds of government restrictions that the Supreme Court has found to implicate First Amendment associational rights: it does not require disclosure of any information, nor regulate charitable organizations or their members. Plaintiffs have no response to this and do not contend that OFAC's designation amounts to a "disclosure requirement," *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2383 (2021) (Roberts, C.J.), that might subject it to the exacting scrutiny they ask this Court to apply.

Abandoning their previously cited cases addressing the right to associate, Plaintiffs' opposition instead relies on *Meyer v. Grant*, 486 U.S. 414 (1988)—but that case, which addresses government restrictions on *political speech*, cannot save

22

Plaintiffs' unfounded protected-association claim. Even if Plaintiffs had advanced a protected-speech claim here,[9] OFAC's designation of Tornado Cash is unlike the state "prohibition of paid petition circulators" in *Meyer*. *Id.* at 424. That prohibition, the Court concluded, "restrict[ed] access to the most effective, fundamental, and perhaps economical avenue of political discourse." *Id.* Tornado Cash does not facilitate "political discourse" at all—and, even if it did, Plaintiffs do not (and could not) argue that the numerous lawful cryptocurrency platforms they could use to transfer money (not to mention myriad more traditional money-transfer services) would be "more burdensome avenues," *id.* (quotation marks omitted), for engaging in their desired conduct.

Even if the heightened scrutiny that applies to compelled disclosure were applicable, the government need merely show that the challenged restriction is narrowly tailored—a standard that OFAC easily meets here. *See* Defs.' Cross-Mot. 33–34. Plaintiffs appear to abandon any argument that OFAC's designation is not narrowly tailored to an important government interest. Instead, Plaintiffs focus exclusively on a least-restrictive-means test that is not relevant to exacting scrutiny. *Ams. for Prosperity Found.*, 141 S.Ct. at 2383–84 (under exacting scrutiny, the

---

[9] If Plaintiffs wish to advance a protected *speech* claim, they are free to amend their complaint. But such a claim would fare no better than the protected-association claim they chose to assert. Simply put, there exists no First Amendment speech (or association) right to "us[e]" a specific service to send funds anonymously.

challenged "disclosure requirement" must "be narrowly tailored to the government's asserted interest ... *even if it is not the least restrictive means* of achieving that end" (emphasis added)); Pls.' Opp'n 29–30. In any event, in exercising its statutory authority to impose sanctions to protect U.S. national security, OFAC could not have reasonably taken narrower action than designating Tornado Cash, the entity facilitating anonymous illicit transactions, and blocking the software service in which Tornado Cash has a demonstrated interest.

## V. The Court Should Not Grant Any of Plaintiffs' Requests for Relief

Plaintiffs assert that their request for relief has not changed, but their amended complaint seeks the Court's "declaration that the criminalization of the Tornado Cash Tool is null, void, and with no force or effect." Am. Compl., Prayer for Relief, at 39. And it does not limit the term "Tornado Cash Tool" to Plaintiffs' 29 chosen smart contracts; to the contrary, it refers to the whole Tornado Cash software service. *See, e.g.*, *id.* ¶¶ 6 ("The Tornado Cash Tool is a software program permanently stored on the Ethereum ledger[.]"), 17 (describing selected 29 smart contracts as "the core of the Tornado Cash Tool"—not the entirety of it). Now, however, Plaintiffs ask the Court to "set aside the 29 addresses listed in their amended complaint," not the entire designation of Tornado Cash. Pls.' Opp'n 5.

The Court should not accede to either Plaintiffs' initial broad request or their purportedly more limited request, for the reasons discussed above. Plaintiffs'

unfounded request for relief would have far-reaching implications: allowing all persons—domestic and foreign, well-intentioned and malfeasant—to use, unencumbered, 29 identified Tornado Cash smart contracts. This would include bad actors determined to perpetuate their nefarious activities, as agents of the North Korean Government and others have done in the recent past. Plaintiffs may request OFAC specific licenses to engage in otherwise prohibited activity, but they have been unwilling to avail themselves of this existing administrative process that could obviate the need for judicial intervention in such a technical and sensitive area at the intersection of national security, foreign policy, and administrative law. The Court should reject Plaintiffs' attempt to twist the language of IEEPA for their own desired outcome, at the cost of the national security and foreign policy of the United States.

## CONCLUSION

Summary judgment should be issued in Defendants' favor on all counts.

Dated: August 11, 2023     Respectfully submitted,

            BRIAN M. BOYNTON
            Principal Deputy Assistant Attorney
            General

            ALEXANDER K. HAAS
            Director

            DIANE KELLEHER
            Assistant Director

*/s/ Christine L. Coogle*
CHRISTINE L. COOGLE
  (D.C. Bar No. 1738913)
Trial Attorney
STEPHEN M. ELLIOTT
Senior Trial Counsel
Federal Programs Branch
Civil Division
United States Department of Justice
1100 L St. NW
Washington, D.C. 20005
202-880-0282
christine.l.coogle@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's order of August 1, 2023, I hereby certify that this brief is 5,998 words in length, including headings, footnotes, and quotations but excluding the case caption, signature block, title, tables of contents and authorities, and this certification.

*/s/ Christine L. Coogle*
Counsel for Defendants