**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

COIN CENTER; PATRICK O'SUL-
LIVAN; JOHN DOE; and DAVID
HOFFMAN,

            Plaintiffs,

      v.

JANET YELLEN, in her official ca-
pacity as Secretary of the Treasury;
DEPARTMENT OF THE TREAS-
URY; ANDREA M. GACKI, in her
official capacity as Director of the Of-
fice of Foreign Assets Control; and
OFFICE OF FOREIGN ASSETS
CONTROL,

            Defendants.

Case No.
3:22-cv-20375-TKW-ZCB

**JOINT APPENDIX VOLUME II**

# EXHIBIT 120

CYBER2-29777 - 00950

# Introduction to Tornado Cash                          ⋮

Tornado Cash is a **fully decentralized non-custodial protocol** allowing private transactions in the crypto-space.

As a decentralized protocol, Tornado.Cash smart contracts have been implemented within the Ethereum blockchain, making them immutable. They can neither be changed nor tampered with. Therefore, nobody - including the original developers - can modify or shut them down. All governance and mining smart contracts are deployed by the community in a decentralized manner.

As a non-custodial protocol, users keep custody of their cryptocurrencies while operating Tornado.Cash. This means that at each deposit, they are provided with the private key enabling the access to the deposited funds, which gives users complete control over their assets.

## How is privacy achieved?

Tornado Cash improves transaction privacy by breaking the on-chain link between source and destination addresses. It uses a smart contract that accepts ETH & other tokens deposits from one address and enables their withdrawal from a different address.

To maximize privacy, several steps are recommended, such as the use of a relayer for gas payments to withdraw funds from an address with no pre-existing balance.

More details are available in *Behind the scenes: How does Tornado.Cash work?* & Tips to remain

CYBER2-29777 - 00951

anonymous.

## Where does Tornado.cash operate?

Since its inception in 2019, Tornado Cash has been operating **on the Ethereum blockchain**. The protocol has been offering diversified fixed amount pools for six tokens (ETH, DAI, cDAI, USDC, USDT & WBTC) handled by the Ethereum blockchain.

Since June 2021, in addition to the Ethereum blockchain, Tornado Cash smart contracts **have also been deployed on other side-chains & blockchains**. These deployments enabled the tool to either support new tokens or benefit from Layer-2 advantages, such as faster and cheaper transactions.

As of today, Tornado Cash is operating on:

- **Ethereum Blockchain** : **ETH** (Ethereum), **DAI** (Dai), **cDAI** (Compound Dai), **USDC** (USD Coin), **USDT** (Tether) & **WBTC** (Wrapped Bitcoin),
- **Binance Smart Chain**: **BNB** (Binance Coin),
- **Polygon Network**: **MATIC** (Polygon),
- **Gnosis Chain (former xDAI Chain)**: **xDAI** (xDai),
- **Avalanche Mainnet**: **AVAX** (Avalanche),
- **Optimism**, as a Layer-2 for **ETH** (Ethereum),
- **Arbitrum One**, as a Layer-2 **ETH** (Ethereum).

Until December 2021, the protocol included an anonymity mining system for some of these tokens, allowing its users to earn a governance token (**TORN**). Users were able to ultimately earn TORN on the Blockchain network by depositing in the ETH, DAI, cDAI & WBTC pools.

*More information on Anonymity mining & Tornado.Cash token is available.*

**Thanks to the TORN token, Tornado Cash users can actively participate in shaping the protocol**. The community has a strong weight regarding the evolution of Tornado Cash and the improvement of its features. Indeed, protocol parameters & token distribution are completely under the community's control through this governance.

All pools mentioned above can be accessed on tornadocash.eth.link. They operate **under the principle of fixed-amount deposits & withdrawals**. It means that each token has 2 to 4 different pools, allowing transactions of only 2 to 4 different fixed amounts *(e.g. ETH has four different pools, one for each of these amounts: 0.1, 1, 10 & 100 ETH)*.

**Tornado Cash Nova**

With the **release of Tornado Cash Nova** (beta version) on December 2021, an **upgraded pool with unique new features** has been added to the protocol. Users are no longer constrained by fixed-amount transactions. With the addition of Tornado Cash Nova, they can benefit from the use of **an arbitrary amount pool & shielded transfers**.

Tornado Cash Nova operates on the Gnosis Chain (former xDai Chain) as a Layer2 to optimize speed and cost. It allows **deposits and withdrawals of completely customized amounts in ETH**. This pool also enables shielded transactions where users can **transfer the custody of their token while remaining in the pool**.

Tornado Cash Nova (beta version) can be accessed on nova.tornadocash.eth.link. You can find further informations related to the functioning of Tornado Cash Nova in the dedicated section of our docs.

---

# How does Tornado.Cash run?

Codes behind Tornado.Cash functioning - **smart contacts, circuits & toolchain** - are fully **open-**

**sourced.** Working as a DAO (Decentralized Autonomous Organization), Tornado.Cash governance and mining smart contracts are deployed by its community.

The protocol also functions with zk-SNARK, which enables zero-knowledge proofs allowing users to demonstrate possession of information without needing to reveal it. The use of this technology is based **on open-source research made by Zcash team with the help of the Ethereum community**. To set up zk-SNARK initial keys, Tornado.Cash Trusted Setup Community was launched in May 2020 & accounts for 1114 contributions. This significant number of contributors makes it impossible to compromise the protocol by faking zero-knowledge proofs.

User interface is hosted on **IPFS** (InterPlanetary File System) by the community, minimizing risks of data deletion. Indeed, the interface will work as long as at least one user is hosting it.

CYBER2-29777 - 00954

# EXHIBIT 130

CYBER2-29777 - 01030

**NISTIR 8202**

# Blockchain Technology Overview

Dylan Yaga
Peter Mell
Nik Roby
Karen Scarfone

This publication is available free of charge from:
https://doi.org/10.6028/NIST.IR.8202



National Institute of
Standards and Technology
U.S. Department of Commerce

CYBER2-29777 - 01031

NISTIR 8202

# Blockchain Technology Overview

Dylan Yaga
Peter Mell
*Computer Security Division*
*Information Technology Laboratory*

Nik Roby
*G2, Inc.*
*Annapolis Junction, MD*

Karen Scarfone
*Scarfone Cybersecurity*
*Clifton, VA*

This publication is available free of charge from:
https://doi.org/10.6028/NIST.IR.8202

October 2018



U.S. Department of Commerce
*Wilbur L. Ross, Jr., Secretary*

National Institute of Standards and Technology
*Walter Copan, NIST Director and Under Secretary of Commerce for Standards and Technology*

National Institute of Standards and Technology Internal Report 8202
66 pages (October 2018)

This publication is available free of charge from:
https://doi.org/10.6028/NIST.IR.8202

Certain commercial entities, equipment, or materials may be identified in this document in order to describe an experimental procedure or concept adequately. Such identification is not intended to imply recommendation or endorsement by NIST, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.

There may be references in this publication to other publications currently under development by NIST in accordance with its assigned statutory responsibilities. The information in this publication, including concepts and methodologies, may be used by federal agencies even before the completion of such companion publications. Thus, until each publication is completed, current requirements, guidelines, and procedures, where they exist, remain operative. For planning and transition purposes, federal agencies may wish to closely follow the development of these new publications by NIST.

Organizations are encouraged to review all draft publications during public comment periods and provide feedback to NIST. Many NIST cybersecurity publications, other than the ones noted above, are available at https://csrc.nist.gov/publications.

**Comments on this publication may be submitted to:**

National Institute of Standards and Technology
Attn: Computer Security Division, Information Technology Laboratory
100 Bureau Drive (Mail Stop 8930) Gaithersburg, MD 20899-8930
Email: nistir8202-comments@nist.gov

All comments are subject to release under the Freedom of Information Act (FOIA).

## Reports on Computer Systems Technology

The Information Technology Laboratory (ITL) at the National Institute of Standards and Technology (NIST) promotes the U.S. economy and public welfare by providing technical leadership for the Nation's measurement and standards infrastructure. ITL develops tests, test methods, reference data, proof of concept implementations, and technical analyses to advance the development and productive use of information technology. ITL's responsibilities include the development of management, administrative, technical, and physical standards and guidelines for the cost-effective security and privacy of other than national security-related information in federal information systems.

## Abstract

Blockchains are tamper evident and tamper resistant digital ledgers implemented in a distributed fashion (i.e., without a central repository) and usually without a central authority (i.e., a bank, company, or government). At their basic level, they enable a community of users to record transactions in a shared ledger within that community, such that under normal operation of the blockchain network no transaction can be changed once published. This document provides a high-level technical overview of blockchain technology. The purpose is to help readers understand how blockchain technology works.

## Keywords

blockchain; consensus model; cryptocurrency; cryptographic hash function; asymmetric-key cryptography; distributed ledger; distributed consensus algorithm; proof of work; proof of stake; round robin; proof of authority; proof of identity; proof of elapsed time; soft fork, hard fork; smart contracts; data oracle.

CYBER2-29777 - 01034

# Acknowledgments

The authors wish to thank all contributors to this publication, and their colleagues who reviewed drafts of this report and contributed technical and editorial additions. This includes NIST staff James Dray, Sandy Ressler, Rick Kuhn, Lee Badger, Eric Trapnell, Mark Trapnell, James Shook and Michael Davidson.

Additional thanks to all the people and organizations who submitted comments during the public comment period.

# Audience

This publication is designed for readers with little or no knowledge of blockchain technology who wish to understand at a high level how it works. It is not intended to be a technical guide; the discussion of the technology provides a conceptual understanding. Note that some examples, figures, and tables are simplified to fit the audience.

# Trademark Information

All registered trademarks and trademarks belong to their respective organizations.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

iii

## Executive Summary

Blockchains are tamper evident and tamper resistant digital ledgers implemented in a distributed fashion (i.e., without a central repository) and usually without a central authority (i.e., a bank, company, or government). At their basic level, they enable a community of users to record transactions in a shared ledger within that community, such that under normal operation of the blockchain network no transaction can be changed once published. In 2008, the blockchain idea was combined with several other technologies and computing concepts to create modern cryptocurrencies: electronic cash protected through cryptographic mechanisms instead of a central repository or authority. The first such blockchain based cryptocurrency was Bitcoin.

Within the Bitcoin blockchain, information representing electronic cash is attached to a digital address. Bitcoin users can digitally sign and transfer rights to that information to another user and the Bitcoin blockchain records this transfer publicly, allowing all participants of the network to independently verify the validity of the transactions. The Bitcoin blockchain is stored, maintained, and collaboratively managed by a distributed group of participants. This, along with certain cryptographic mechanisms, makes the blockchain resilient to attempts to alter the ledger later (modifying blocks or forging transactions).

Because there are countless news articles and videos describing the "magic" of blockchain technology, this paper aims to describe the method behind the magic (i.e., how blockchain technology works). Arthur C. Clarke once wrote, "Any sufficiently advanced technology is indistinguishable from magic" [1]. Clarke's statement is a perfect representation for the emerging applications of blockchain technology. There is hype around the use of blockchain technology, yet the technology is not well understood. It is not magical; it will not solve all problems. As with all new technology, there is a tendency to want to apply it to every sector in every way imaginable. To help promote correct application, this document provides information necessary to develop a high-level understanding of the technology.

Blockchain technology is the foundation of modern cryptocurrencies, so named because of the heavy usage of cryptographic functions. Users utilize public and private keys to digitally sign and securely transact within the system. For cryptocurrency based blockchain networks which utilize mining (see section 4.1), users may solve puzzles using cryptographic hash functions in hopes of being rewarded with a fixed amount of the cryptocurrency. However, blockchain technology may be more broadly applicable than cryptocurrencies. In this work, we focus on the cryptocurrency use case, since that is the primary use of the technology today; however, there is a growing interest in other sectors.

Organizations considering implementing blockchain technology need to understand fundamental aspects of the technology. For example, what happens when an organization implements a blockchain network and then decides they need to make modifications to the data stored? When using a database, modifying the actual data can be accomplished through a database query and update. Organizations must understand that while changes to the actual blockchain data may be difficult, applications using the blockchain as a data layer work around this by treating later blocks and transactions as updates or modifications to earlier blocks and transactions. This software abstraction allows for modifications to working data, while providing a full history of

CYBER2-29777 - 01036

changes. Another critical aspect of blockchain technology is how the participants agree that a transaction is valid. This is called "reaching consensus", and there are many models for doing so, each with positives and negatives for particular business cases. It is important to understand that a blockchain is just one part of a solution.

Blockchain implementations are often designed with a specific purpose or function. Example functions include cryptocurrencies, smart contracts (software deployed on the blockchain and executed by computers running that blockchain), and distributed ledger systems between businesses. There has been a constant stream of developments in the field of blockchain technology, with new platforms being announced constantly – the landscape is continuously changing.

There are two general high-level categories for blockchain approaches that have been identified: permissionless, and permissioned. In a permissionless blockchain network anyone can read and write to the blockchain without authorization. Permissioned blockchain networks limit participation to specific people or organizations and allow finer-grained controls. Knowing the differences between these two categories allows an organization to understand which subset of blockchain technologies may be applicable to its needs.

Despite the many variations of blockchain networks and the rapid development of new blockchain related technologies, most blockchain networks use common core concepts. Blockchains are a distributed ledger comprised of blocks. Each block is comprised of a block header containing metadata about the block, and block data containing a set of transactions and other related data. Every block header (except for the very first block of the blockchain) contains a cryptographic link to the previous block's header. Each transaction involves one or more blockchain network users and a recording of what happened, and it is digitally signed by the user who submitted the transaction.

Blockchain technology takes existing, proven concepts and merges them together into a single solution. This document explores the fundamentals of how these technologies work and the differences between blockchain approaches. This includes how the participants in the network come to agree on whether a transaction is valid and what happens when changes need to be made to an existing blockchain deployment. Additionally, this document explores when to consider using a blockchain network.

The use of blockchain technology is not a silver bullet, and there are issues that must be considered such as how to deal with malicious users, how controls are applied, and the limitations of the implementations. Beyond the technology issues that need to be considered, there are operational and governance issues that affect the behavior of the network. For example, in permissioned blockchain networks, described later in this document, there are design issues surrounding what entity or entities will operate and govern the network for the intended user base.

CYBER2-29777 - 01037

Blockchain technology is still new and should be investigated with the mindset of "how could blockchain technology potentially benefit us?" rather than "how can we make our problem fit into the blockchain technology paradigm?". Organizations should treat blockchain technology like they would any other technological solution at their disposal and use it in appropriate situations.

This publication is available free of charge from: http://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01038

## Table of Contents

Executive Summary ..................................................................................................... iv

1  Introduction ......................................................................................................... 1
    1.1  Background and History .............................................................................. 2
    1.2  Purpose and Scope ...................................................................................... 3
    1.3  Notes on Terms ............................................................................................ 3
    1.4  Results of the Public Comment Period ...................................................... 4
    1.5  Document Structure ..................................................................................... 4

2  Blockchain Categorization ................................................................................. 5
    2.1  Permissionless .............................................................................................. 5
    2.2  Permissioned ................................................................................................. 5

3  Blockchain Components ...................................................................................... 7
    3.1  Cryptographic Hash Functions ................................................................... 7
        3.1.1  Cryptographic Nonce ........................................................................... 9
    3.2  Transactions .................................................................................................. 9
    3.3  Asymmetric-Key Cryptography ................................................................. 11
    3.4  Addresses and Address Derivation .......................................................... 12
        3.4.1  Private Key Storage .......................................................................... 13
    3.5  Ledgers ......................................................................................................... 13
    3.6  Blocks ........................................................................................................... 15
    3.7  Chaining Blocks ........................................................................................... 17

4  Consensus Models .............................................................................................. 18
    4.1  Proof of Work Consensus Model ............................................................... 19
    4.2  Proof of Stake Consensus Model ............................................................... 21
    4.3  Round Robin Consensus Model .................................................................. 23
    4.4  Proof of Authority/Proof of Identity Consensus Model ........................... 23
    4.5  Proof of Elapsed Time Consensus Model ................................................. 23
    4.6  Consensus Comparison Matrix ................................................................... 25
    4.7  Ledger Conflicts and Resolutions .............................................................. 27

5  Forking ................................................................................................................. 29
    5.1  Soft Forks ..................................................................................................... 29
    5.2  Hard Forks .................................................................................................... 29

CYBER2-29777 - 01039

    5.3  Cryptographic Changes and Forks ...................................................... 30

**6   Smart Contracts** ......................................................................................**32**

**7   Blockchain Limitations and Misconceptions** ......................................**34**

    7.1  Immutability ........................................................................................ 34

    7.2  Users Involved in Blockchain Governance..................................... 35

    7.3  Beyond the Digital ............................................................................ 36

    7.4  Blockchain Death .............................................................................. 36

    7.5  Cybersecurity .................................................................................... 36

         7.5.1  Cyber and Network-based Attacks ..................................... 37

    7.6  Malicious Users ................................................................................ 37

    7.7  No Trust ............................................................................................. 38

    7.8  Resource Usage ............................................................................... 38

    7.9  Inadequate Block Publishing Rewards........................................... 39

    7.10 Public Key Infrastructure and Identity ........................................... 39

**8   Application Considerations** ...................................................................**41**

    8.1  Additional Blockchain Considerations........................................... 44

**9   Conclusions**...........................................................................................**46**

### List of Appendices

**Appendix A— Acronyms**.............................................................................**47**

**Appendix B— Glossary** .............................................................................**49**

**Appendix C— References** ..........................................................................**55**

CYBER2-29777 - 01040

## List of Tables and Figures

Table 1: Examples of Input Text and Corresponding SHA-256 Digest Values ............... 8

Figure 1 - Example Cryptocurrency Transaction ......................................................... 10

Figure 2 - A QR code example which has encoded the text "NISTIR 8202 - Blockchain Technology Overview QR code example" ............................................................. 12

Figure 3: Generic Chain of Blocks ............................................................................. 17

Figure 4: Ledger in Conflict ....................................................................................... 27

Figure 5: The chain with block_n(B) adds the next block, the chain with block_n(A) is now orphaned ........................................................................................................ 28

Table 2: Impact of Quantum Computing on Common Cryptographic Algorithms ......... 31

Figure 6 - DHS Science & Technology Directorate Flowchart ...................................... 42

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

ix

# 1 Introduction

Blockchains are tamper evident and tamper resistant digital ledgers implemented in a distributed fashion (i.e., without a central repository) and usually without a central authority (i.e., a bank, company or government). At their basic level, they enable a community of users to record transactions in a shared ledger within that community, such that under normal operation of the blockchain network no transaction can be changed once published. In 2008, the blockchain idea was combined with several other technologies and computing concepts to create modern cryptocurrencies: electronic cash protected through cryptographic mechanisms instead of a central repository or authority.

This technology became widely known in 2009 with the launch of the Bitcoin network, the first of many modern cryptocurrencies. In Bitcoin, and similar systems, the transfer of digital information that represents electronic cash takes place in a distributed system. Bitcoin users can digitally sign and transfer their rights to that information to another user and the Bitcoin blockchain records this transfer publicly, allowing all participants of the network to independently verify the validity of the transactions. The Bitcoin blockchain is independently maintained and managed by a distributed group of participants. This, along with cryptographic mechanisms, makes the blockchain resilient to attempts to alter the ledger later (modifying blocks or forging transactions). Blockchain technology has enabled the development of many cryptocurrency systems such as Bitcoin and Ethereum[1]. Because of this, blockchain technology is often viewed as bound to Bitcoin or possibly cryptocurrency solutions in general. However, the technology is available for a broader variety of applications and is being investigated for a variety of sectors.

The numerous components of blockchain technology along with its reliance on cryptographic primitives and distributed systems can make it challenging to understand. However, each component can be described simply and used as a building block to understand the larger complex system. Blockchains can be informally defined as:

> Blockchains are distributed digital ledgers of cryptographically signed transactions that are grouped into blocks. Each block is cryptographically linked to the previous one (making it tamper evident) after validation and undergoing a consensus decision. As new blocks are added, older blocks become more difficult to modify (creating tamper resistance). New blocks are replicated across copies of the ledger within the network, and any conflicts are resolved automatically using established rules.

---

[1] Bitcoin and Ethereum are mentioned here since they are listed as the top two cryptocurrencies on market capitalization websites

CYBER2-29777 - 01042

## 1.1   Background and History

The core ideas behind blockchain technology emerged in the late 1980s and early 1990s. In 1989, Leslie Lamport developed the Paxos protocol, and in 1990 submitted the paper *The Part-Time Parliament* [2] to ACM Transactions on Computer Systems; the paper was finally published in a 1998 issue. The paper describes a consensus model for reaching agreement on a result in a network of computers where the computers or network itself may be unreliable. In 1991, a signed chain of information was used as an electronic ledger for digitally signing documents in a way that could easily show none of the signed documents in the collection had been changed [3]. These concepts were combined and applied to electronic cash in 2008 and described in the paper, *Bitcoin: A Peer to Peer Electronic Cash System* [4], which was published pseudonymously by Satoshi Nakamoto, and then later in 2009 with the establishment of the Bitcoin cryptocurrency blockchain network. Nakamoto's paper contained the blueprint that most modern cryptocurrency schemes follow (although with variations and modifications). Bitcoin was just the first of many blockchain applications.

Many electronic cash schemes existed prior to Bitcoin (e.g., ecash and NetCash), but none of them achieved widespread use. The use of a blockchain enabled Bitcoin to be implemented in a distributed fashion such that no single user controlled the electronic cash and no single point of failure existed; this promoted its use. Its primary benefit was to enable direct transactions between users without the need for a trusted third party. It also enabled the issuance of new cryptocurrency in a defined manner to those users who manage to publish new blocks and maintain copies of the ledger; such users are called *miners* in Bitcoin. The automated payment of the miners enabled distributed administration of the system without the need to organize. By using a blockchain and consensus-based maintenance, a self-policing mechanism was created that ensured that only valid transactions and blocks were added to the blockchain.

In Bitcoin, the blockchain enabled users to be pseudonymous. This means that users are anonymous, but their account identifiers are not; additionally, all transactions are publicly visible. This has effectively enabled Bitcoin to offer pseudo-anonymity because accounts can be created without any identification or authorization process (such processes are typically required by Know-Your-Customer (KYC) laws).

Since Bitcoin was pseudonymous, it was essential to have mechanisms to create trust in an environment where users could not be easily identified. Prior to the use of blockchain technology, this trust was typically delivered through intermediaries trusted by both parties. Without trusted intermediaries, the needed trust within a blockchain network is enabled by four key characteristics of blockchain technology, described below:

- **Ledger** – the technology uses an append only ledger to provide full transactional history. Unlike traditional databases, transactions and values in a blockchain are not overridden.
- **Secure** – blockchains are cryptographically secure, ensuring that the data contained within the ledger has not been tampered with, and that the data within the ledger is attestable.
- **Shared** – the ledger is shared amongst multiple participants. This provides transparency across the node participants in the blockchain network.

2

- **Distributed** – the blockchain can be distributed. This allows for scaling the number of nodes of a blockchain network to make it more resilient to attacks by bad actors. By increasing the number of nodes, the ability for a bad actor to impact the consensus protocol used by the blockchain is reduced.

For blockchain networks that allow anyone to anonymously create accounts and participate (called permissionless blockchain networks), these capabilities deliver a level of trust amongst parties with no prior knowledge of one another; this trust can enable individuals and organizations to transact directly, which may result in transactions being delivered faster and at lower costs. For a blockchain network that more tightly controls access (called permissioned blockchain networks), where some trust may be present among users, these capabilities help to bolster that trust.

## 1.2   Purpose and Scope

This document provides a high-level technical overview of blockchain technology. It looks at different categories of implementation approaches. It discusses the components of blockchain technology and provides diagrams and examples when possible. It discusses, at a high-level, some consensus models used in blockchain networks. It also provides an overview of how blockchain technology changes (known as forking) affect the blockchain network. It provides details on how blockchain technology was extended beyond attestable transactions to include attestable application processes known as smart contracts. It also touches on some of the limitations and misconceptions surrounding the technology. Finally, this document presents several areas that organizations should consider when investigating blockchain technology. It is intended to help readers to understand the technologies which comprise blockchain networks.

## 1.3   Notes on Terms

The terminology for blockchain technology varies from one implementation to the next – to talk about the technology, generic terms will be used. Throughout this document the following terms will be used:

- *Blockchain* – the actual ledger
- *Blockchain technology* – a term to describe the technology in the most generic form
- *Blockchain network* – the network in which a blockchain is being used
- *Blockchain implementation* – a specific blockchain
- *Blockchain network user* – a person, organization, entity, business, government, etc. which is utilizing the blockchain network
- *Node* – an individual system within a blockchain network
  - *Full node* – a node that stores the entire blockchain, ensures transactions are valid
    - *Publishing node* – a full node that also publishes new blocks
  - *Lightweight node* – a node that does not store or maintain a copy of the blockchain and must pass their transactions to full nodes

CYBER2-29777 - 01044

## 1.4    Results of the Public Comment Period

This document has seen substantial revision in response to the public comments received. Part of the revising process was to tighten the scope, and to provide a more foundational document as an introduction to the technology. Please note that several sections present in the draft (7.1.2 - Permissioned Use Cases, 7.2.2 - Permissionless Use Cases, and 8 - Blockchain Platforms) are not present in the published version. These topics were made explicitly out of scope for this document because the rapidly changing landscape and areas of interest around this technology, as well as the ever-increasing number of platforms, would make these sections out of place in such a foundational document. The topics in these sections are still being considered for future works.

Additionally, section 8.1.2 – Bitcoin Cash contained an erroneous and unverified statement which was not identified and removed during initial editing of the draft. Since this section has been removed, this issue is now addressed.

## 1.5    Document Structure

The rest of this document is organized as follows:

- **Section 2** discusses the high-level categorization of blockchain technology: permissionless and permissioned.
- **Section 3** defines the high-level components of a blockchain network architecture, including hashes, transactions, ledgers, blocks, and blockchains.
- **Section 4** discusses several consensus models employed by blockchain technology.
- **Section 5** introduces the concept of forking.
- **Section 6** discusses smart contracts.
- **Section 7** discusses several limitations as well as misconceptions surrounding blockchain technology.
- **Section 8** discusses various application considerations, as well as provides additional considerations from government, academia, and technology enthusiasts.
- **Section 9** is the conclusion.
- **Appendix A** provides a list of acronyms and abbreviations used in the document.
- **Appendix B** contains a glossary for selected terms defined in the document.
- **Appendix C** lists the references used throughout the document.

4

## 2   Blockchain Categorization

Blockchain networks can be categorized based on their permission model, which determines who can maintain them (e.g., publish blocks). If anyone can publish a new block, it is *permissionless*. If only particular users can publish blocks, it is *permissioned*. In simple terms, a permissioned blockchain network is like a corporate intranet that is controlled, while a permissionless blockchain network is like the public internet, where anyone can participate. Permissioned blockchain networks are often deployed for a group of organizations and individuals, typically referred to as a consortium. This distinction is necessary to understand as it impacts some of the blockchain components discussed later in this document.

### 2.1   Permissionless

Permissionless blockchain networks are decentralized ledger platforms open to anyone publishing blocks, without needing permission from any authority. Permissionless blockchain platforms are often open source software, freely available to anyone who wishes to download them. Since anyone has the right to publish blocks, this results in the property that anyone can read the blockchain as well as issue transactions on the blockchain (through including those transactions within published blocks). Any blockchain network user within a permissionless blockchain network can read and write to the ledger. Since permissionless blockchain networks are open to all to participate, malicious users may attempt to publish blocks in a way that subverts the system (discussed in detail later). To prevent this, permissionless blockchain networks often utilize a multiparty agreement or 'consensus' system (see Section 4) that requires users to expend or maintain resources when attempting to publish blocks. This prevents malicious users from easily subverting the system. Examples of such consensus models include proof of work (see Section 4.1) and proof of stake (see Section 4.2) methods. The consensus systems in permissionless blockchain networks usually promote non-malicious behavior through rewarding the publishers of protocol-conforming blocks with a native cryptocurrency.

### 2.2   Permissioned

Permissioned blockchain networks are ones where users publishing blocks must be authorized by some authority (be it centralized or decentralized). Since only authorized users are maintaining the blockchain, it is possible to restrict read access and to restrict who can issue transactions. Permissioned blockchain networks may thus allow anyone to read the blockchain or they may restrict read access to authorized individuals. They also may allow anyone to submit transactions to be included in the blockchain or, again, they may restrict this access only to authorized individuals. Permissioned blockchain networks may be instantiated and maintained using open source or closed source software.

Permissioned blockchain networks can have the same traceability of digital assets as they pass through the blockchain, as well as the same distributed, resilient, and redundant data storage system as a permissionless blockchain networks. They also use consensus models for publishing blocks, but these methods often do not require the expense or maintenance of resources (as is the case with current permissionless blockchain networks). This is because the establishment of one's identity is required to participate as a member of the permissioned blockchain network; those maintaining the blockchain have a level of trust with each other, since they were all

CYBER2-29777 - 01046

authorized to publish blocks and since their authorization can be revoked if they misbehave. Consensus models in permissioned blockchain networks are then usually faster and less computationally expensive.

Permissioned blockchain networks may also be used by organizations that need to more tightly control and protect their blockchain. However, if a single entity controls who can publish blocks, the users of the blockchain will need to have trust in that entity. Permissioned blockchain networks may also be used by organizations that wish to work together but may not fully trust one another. They can establish a permissioned blockchain network and invite business partners to record their transactions on a shared distributed ledger. These organizations can determine the consensus model to be used, based on how much they trust one another. Beyond trust, permissioned blockchain networks provide transparency and insight that may help better inform business decisions and hold misbehaving parties accountable. This can explicitly include auditing and oversight entities making audits a constant occurrence versus a periodic event.

Some permissioned blockchain networks support the ability to selectively reveal transaction information based on a blockchain network users identity or credentials. With this feature, some degree of privacy in transactions may be obtained. For example, it could be that the blockchain records that a transaction between two blockchain network users took place, but the actual contents of transactions is only accessible to the involved parties.

Some permissioned blockchain networks require all users to be authorized to send and receive transactions (they are not anonymous, or even pseudo-anonymous). In such systems parties work together to achieve a shared business process with natural disincentives to commit fraud or otherwise behave as a bad actor (since they can be identified). If bad behavior were to occur, it is well known where the organizations are incorporated, what legal remedies are available and how to pursue those remedies in the relevant judicial system.

CYBER2-29777 - 01047

## 3    Blockchain Components

Blockchain technology can seem complex; however, it can be simplified by examining each component individually. At a high level, blockchain technology utilizes well-known computer science mechanisms and cryptographic primitives (cryptographic hash functions, digital signatures, asymmetric-key cryptography) mixed with record keeping concepts (such as append only ledgers). This section discusses each individual main component: cryptographic hash functions, transactions, asymmetric-key cryptography, addresses, ledgers, blocks, and how blocks are chained together.

### 3.1    Cryptographic Hash Functions

An important component of blockchain technology is the use of cryptographic hash functions for many operations. *Hashing* is a method of applying a cryptographic hash function to data, which calculates a relatively unique output (called a *message digest*, or just *digest*) for an input of nearly any size (e.g., a file, text, or image). It allows individuals to independently take input data, hash that data, and derive the same result – proving that there was no change in the data. Even the smallest change to the input (e.g., changing a single bit) will result in a completely different output digest. Table 1 shows simple examples of this.

Cryptographic hash functions have these important security properties:

1. They are *preimage resistant.* This means that they are one-way; it is computationally infeasible to compute the correct input value given some output value (e.g., given a digest, find $x$ such that hash($x$) = digest).
2. They are *second preimage resistant.* This means one cannot find an input that hashes to a specific output. More specifically, cryptographic hash functions are designed so that given a specific input, it is computationally infeasible to find a second input which produces the same output (e.g., given $x$, find $y$ such that hash($x$) = hash($y$)). The only approach available is to exhaustively search the input space, but this is computationally infeasible to do with any chance of success.
3. They are *collision resistant.* This means that one cannot find two inputs that hash to the same output. More specifically, it is computationally infeasible to find any two inputs that produce the same digest (e.g., find an $x$ and $y$ which hash($x$) = hash($y$)).

A specific cryptographic hash function used in many blockchain implementations is the Secure Hash Algorithm (SHA) with an output size of 256 bits (SHA-256). Many computers support this algorithm in hardware, making it fast to compute. SHA-256 has an output of 32 bytes (1 byte = 8 bits, 32 bytes = 256 bits), generally displayed as a 64-character hexadecimal string (see Table 1 below).

This means that there are $2^{256} \approx 10^{77}$, or
115,792,089,237,316,195,423,570,985,008,687,907,853,269,984,665,640,564,039,457,584,007,913,129,639,936 possible digest values. The algorithm for SHA-256, as well as others, is specified in Federal Information Processing Standard (FIPS) 180-4 [5]. The NIST Secure Hashing website [6] contains FIPS specifications for all NIST-approved hashing algorithms.

7

**Table 1: Examples of Input Text and Corresponding SHA-256 Digest Values**

| Input Text | SHA-256 Digest Value |
| --- | --- |
| 1 | 0x6b86b273ff34fce19d6b804eff5a3f5747ada4eaa22f1d49c01e52ddb7875b4b |
| 2 | 0xd4735e3a265e16eee03f59718b9b5d03019c07d8b6c51f90da3a666eec13ab35 |
| Hello, World! | 0xdffd6021bb2bd5b0af676290809ec3a53191dd81c7f70a4b28688a362182986f |

Since there are an infinite number of possible input values and a finite number of possible output digest values, it is possible but highly unlikely to have a collision where hash($x$) = hash($y$) (i.e., the hash of two different inputs produces the same digest). SHA-256 is said to be collision resistant, since to find a collision in SHA-256, one would have to execute the algorithm, on average, about $2^{128}$ times (which is 340 undecillions, or more precisely 340,282,366,920,938,463,463,374,607,431,768,211,456; roughly $3.402 \times 10^{38}$).

To put this into perspective, the hash rate (hashes per second) of the entire Bitcoin network in 2015 was 300 quadrillion hashes per second (300,000,000,000,000,000/s) [7]. At that rate, it would take the entire Bitcoin network roughly 35,942,991,748,521 (roughly $3.6 \times 10^{13}$) years[2] to manufacture a collision (note that the universe is estimated to be $1.37 \times 10^{10}$ years old)[3]. Even if any such input $x$ and $y$ that produce the same digest, it would be also very unlikely for both inputs to be valid in the context of the blockchain network (i.e., $x$ and $y$ are both valid transactions).

Within a blockchain network, cryptographic hash functions are used for many tasks, such as:

- Address derivation – discussed in section 3.4.
- Creating unique identifiers.
- Securing the block data – a publishing node will hash the block data, creating a digest that will be stored within the block header.
- Securing the block header – a publishing node will hash the block header. If the blockchain network utilizes a proof of work consensus model (see Section 4.1), the publishing node will need to hash the block header with different nonce values (see Section 3.1.1) until the puzzle requirements have been fulfilled. The current block header's hash digest will be included within the next block's header, where it will secure the current block header data.

Because the block header includes a hash representation of the block data, the block data itself is

---

[2] Calculation: $2^{128}$/((((300000000000000000×60) (hash per second -> minute)
   ×60) (minute -> hour)
   ×24) (hour -> day)
   ×365.25) (day -> year) = 35942991748521.0602689869326175805734546775842 69188193 years
   https://www.wolframalpha.com/input/?i=2%5E128%2F(300000000000000000+*+60+*+60+*+24+*+365.25)

[3] As estimated by measurements made by the Wilkinson Microwave Anisotropy Probe
   https://map.gsfc.nasa.gov/universe/uni_age.html

CYBER2-29777 - 01049

also secured when the block header digest is stored in the next block.

There are many families of cryptographic hash functions utilized in blockchain technology (SHA-256 is not the only one), such as Keccak (which was selected by NIST as the winner of a competition to create the SHA-3 hashing standard), as well as RIPEMD-160.[8]

### 3.1.1 Cryptographic Nonce

A cryptographic nonce is an arbitrary number that is only used once. A cryptographic nonce can be combined with data to produce different hash digests per nonce:

$$hash\ (data + nonce) = digest$$

Only changing the nonce value provides a mechanism for obtaining different digest values while keeping the same data. This technique is utilized in the proof of work consensus model (see Section 4.1).

### 3.2 Transactions

A *transaction* represents an interaction between parties. With cryptocurrencies, for example, a transaction represents a transfer of the cryptocurrency between blockchain network users. For business-to-business scenarios, a transaction could be a way of recording activities occurring on digital or physical assets. Figure 1 shows a notional example of a cryptocurrency transaction. Each block in a blockchain can contain zero or more transactions. For some blockchain implementations, a constant supply of new blocks (even with zero transactions) is critical to maintain the security of the blockchain network; by having a constant supply of new blocks being published, it prevents malicious users from ever "catching up" and manufacturing a longer, altered blockchain (see Section 4.7).

The data which comprises a transaction can be different for every blockchain implementation, however the mechanism for transacting is largely the same. A blockchain network user sends information to the blockchain network. The information sent may include the sender's address (or another relevant identifier), sender's public key, a digital signature, transaction inputs and transaction outputs.

A single cryptocurrency transaction typically requires at least the following information, but can contain more:

- **Inputs** – The inputs are usually a list of the digital assets to be transferred. A transaction will reference the source of the digital asset (providing provenance) – either the previous transaction where it was given to the sender, or for the case of new digital assets, the origin event. Since the input to the transaction is a reference to past events, the digital assets do not change. In the case of cryptocurrencies this means that value cannot be added or removed from existing digital assets. Instead, a single digital asset can be split into multiple new digital assets (each with lesser value) or multiple digital assets can be combined to form fewer new digital assets (with a correspondingly greater value). The splitting or joining of assets will be specified within the transaction output.

CYBER2-29777 - 01050

The sender must also provide proof that they have access to the referenced inputs, generally by digitally signing the transaction – proving access to the private key.

- **Outputs** – The outputs are usually the accounts that will be the recipients of the digital assets along with how much digital asset they will receive. Each output specifies the number of digital assets to be transferred to the new owner(s), the identifier of the new owner(s), and a set of conditions the new owners must meet to spend that value. If the digital assets provided are more than required, the extra funds must be explicitly sent back to the sender (this is a mechanism to "make change").



**Figure 1 - Example Cryptocurrency Transaction**

While primarily used to transfer digital assets, transactions can be more generally used to transfer data. In a simple case, someone may simply want to permanently and publicly post data on the blockchain. In the case of smart contract systems, transactions can be used to send data, process that data, and store some result on the blockchain. For example, a transaction can be used to change an attribute of a digitized asset such as the location of a shipment within a blockchain technology-based supply chain system.

Regardless of how the data is formed and transacted, determining the validity and authenticity of a transaction is important. The validity of a transaction ensures that the transaction meets the protocol requirements and any formalized data formats or smart contract requirements specific to the blockchain implementation. The authenticity of a transaction is also important, as it determines that the sender of digital assets had access to those digital assets. Transactions are typically digitally signed by the sender's associated private key (asymmetric-key cryptography is briefly discussed in Section 3.3) and can be verified at any time using the associated public key.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01051

## 3.3   Asymmetric-Key Cryptography

Blockchain technology uses asymmetric-key cryptography[4] (also referred to as public key cryptography). Asymmetric-key cryptography uses a pair of keys: a public key and a private key that are mathematically related to each other. The public key is made public without reducing the security of the process, but the private key must remain secret if the data is to retain its cryptographic protection. Even though there is a relationship between the two keys, the private key cannot efficiently be determined based on knowledge of the public key. One can encrypt with a private key and then decrypt with the public key. Alternately, one can encrypt with a public key and then decrypt with a private key.

Asymmetric-key cryptography enables a trust relationship between users who do not know or trust one another, by providing a mechanism to verify the integrity and authenticity of transactions while at the same time allowing transactions to remain public. To do this, the transactions are 'digitally signed'. This means that a private key is used to encrypt a transaction such that anyone with the public key can decrypt it. Since the public key is freely available, encrypting the transaction with the private key proves that the signer of the transaction has access to the private key. Alternately, one can encrypt data with a user's public key such that only users with access to the private key can decrypt it. A drawback is that asymmetric-key cryptography is often slow to compute.

This contrasts with symmetric-key cryptography in which a single secret key is used to both encrypt and decrypt. With symmetric-key cryptography users must already have a trust relationship established with one another to exchange the pre-shared key. In a symmetric system, any encrypted data that can be decrypted with the pre-shared key confirms it was sent by another user with access to the pre-shared key; no user without access to the pre-shared key will be able to view the decrypted data. Compared to asymmetric-key cryptography, symmetric-key cryptography is very fast to compute. Because of this, when one claims to be encrypting something using asymmetric-key cryptography, oftentimes the data is encrypted with symmetric-key cryptography and then the symmetric-key is encrypted using asymmetric-key cryptography. This 'trick' can greatly speed up asymmetric-key cryptography.

Here is a summary of the use of asymmetric-key cryptography in many blockchain networks:

- Private keys are used to digitally sign transactions.
- Public keys are used to derive addresses.
- Public keys are used to verify signatures generated with private keys.
- Asymmetric-key cryptography provides the ability to verify that the user transferring value to another user is in possession of the private key capable of signing the transaction.

---

[4] FIPS Publication 186-4, Digital Signature Standard [9] specifies a common algorithm for digital signing used in blockchain technologies: Elliptic Curve Digital Signature Algorithm (ECDSA).

CYBER2-29777 - 01052

Some permissioned blockchain networks can leverage a business's existing public key infrastructure for asymmetric-key cryptography to provide user credentials – rather than having each blockchain network user manage their own asymmetric-keys. This is done by utilizing existing directory services and using that information within the blockchain network. Blockchain networks which utilize an existing directory service can access it via existing protocols, such as the Lightweight Directory Access Protocol (LDAP) [10], and utilize the information from the directory natively, or import it into an internal certificate authority within the blockchain network.

## 3.4   Addresses and Address Derivation

Some blockchain networks make use of an *address*, which is a short, alphanumeric string of characters derived from the blockchain network user's public key using a cryptographic hash function, along with some additional data (e.g., version number, checksums). Most blockchain implementations make use of addresses as the "to" and "from" endpoints in a transaction. Addresses are shorter than the public keys and are not secret. One method to generate an address is to create a public key, applying a cryptographic hash function to it, and converting the hash to text:

$$\text{public key} \rightarrow \text{cryptographic hash function} \rightarrow \text{address}$$

Each blockchain implementation may implement a different method to derive an address. For permissionless blockchain networks, which allow anonymous account creation, a blockchain network user can generate as many asymmetric-key pairs, and therefore addresses as desired, allowing for a varying degree of pseudo-anonymity. Addresses may act as the public-facing identifier in a blockchain network for a user, and oftentimes an address will be converted into a QR code (Quick Response Code, a 2-dimensional bar code which can contain arbitrary data) for easier use with mobile devices.



**Figure 2 - A QR code example which has encoded the text "NISTIR 8202 - Blockchain Technology Overview QR code example"**

CYBER2-29777 - 01053

Blockchain network users may not be the only source of addresses within blockchain networks. It is necessary to provide a method of accessing a smart contract once it has been deployed within a blockchain network. For Ethereum, smart contracts are accessible via a special address called a contract account. This account address is created when a smart contract is deployed (the address for a contract account is deterministically computed from the smart contract creator's address [11]). This contract account allows for the contract to be executed whenever it receives a transaction, as well as create additional smart contracts in turn.

### 3.4.1 Private Key Storage

With some blockchain networks (especially with permissionless blockchain networks), users must manage and securely store their own private keys. Instead of recording them manually, they often use software to securely store them. This software is often referred to as a *wallet*. The wallet can store private keys, public keys, and associated addresses. It may also perform other functions, such as calculating the total number of digital assets a user may have.

If a user loses a private key, then any digital asset associated with that key is lost, because it is computationally infeasible to regenerate the same private key. If a private key is stolen, the attacker will have full access to all digital assets controlled by that private key. The security of private keys is so important that many users use special secure hardware to store them; alternatively, users may take advantage of an emerging industry of private key escrow services. These key escrow services can also satisfy KYC laws in addition to storing private keys as users must provide proof of their identity when creating an account.

Private key storage is an extremely important aspect of blockchain technology. When it is reported in the news that "Cryptocurrency XYZ was stolen from…", it almost certainly means some private keys were found and used to sign a transaction sending the money to a new account, not that the blockchain network itself was compromised. Note that because blockchain data cannot generally be changed, once a criminal steals a private key and publicly transfers the associated funds to another account, that transaction generally cannot be undone.

### 3.5 Ledgers

A *ledger* is a collection of transactions. Throughout history, pen and paper ledgers have been used to keep track of the exchange of goods and services. In modern times, ledgers have been stored digitally, often in large databases owned and operated by a centralized trusted third party (i.e., the owner of the ledger) on behalf of a community of users. These ledgers with centralized ownership can be implemented in a centralized or distributed fashion (i.e., just one server or a coordinating cluster of servers).

There is growing interest in exploring having distributed ownership of the ledger. Blockchain technology enables such an approach using both distributed ownership as well as a distributed physical architecture. The distributed physical architecture of blockchain networks often involve a much larger set of computers than is typical for centrally managed distributed physical architecture. The growing interest in distributed ownership of ledgers is due to possible trust, security, and reliability concerns related to ledgers with centralized ownership:

CYBER2-29777 - 01054

- Centrally owned ledgers may be lost or destroyed; a user must trust that the owner is properly backing up the system.

  o A blockchain network is distributed by design, creating many backup copies all updating and syncing to the same ledger data between peers. A key benefit to blockchain technology is that every user can maintain their own copy of the ledger. Whenever new full nodes join the blockchain network, they reach out to discover other full nodes and request a full copy of the blockchain network's ledger, making loss or destruction of the ledger difficult.
  Note – certain blockchain implementations provide the capability to support concepts such as private transactions or private channels. Private transactions facilitate the delivery of information only to those nodes participating in a transaction and not the entire network.

- Centrally owned ledgers may be on a homogeneous network, where all software, hardware and network infrastructure may be the same. Because of this characteristic, the overall system resiliency may be reduced since an attack on one part of the network will work on everywhere.

  o A blockchain network is a heterogeneous network, where the software, hardware and network infrastructure are all different. Because of the many differences between nodes on the blockchain network, an attack on one node is not guaranteed to work on other nodes.

- Centrally owned ledgers may be located entirely in specific geographic locations (e.g., all in one country). If network outages were to occur in that location, the ledger and services which depend on it may not be available.

  o A blockchain network can be comprised of geographically diverse nodes which may be found around the world. Because of this, and the blockchain network working in a peer-to-peer fashion, it is resilient to the loss of any node, or even an entire region of nodes.

- The transactions on a centrally owned ledger are not made transparently and may not be valid; a user must trust that the owner is validating each received transaction.

  o A blockchain network must check that all transactions are valid; if a malicious node was transmitting invalid transactions, others would detect and ignore them, preventing the invalid transactions from propagating throughout the blockchain network.

- The transaction list on a centrally owned ledger may not be complete; a user must trust that the owner is including all valid transactions that have been received.

  o A blockchain network holds all accepted transactions within its distributed ledger. To build a new block, a reference must be made to a previous block – therefore building on top of it. If a publishing node did not include a reference to the latest block, other nodes would reject it.

- The transaction data on a centrally owned ledger may have been altered; a user must trust that the owner is not altering past transactions.

CYBER2-29777 - 01055

o   A blockchain network utilizes cryptographic mechanisms such as digital signatures and cryptographic hash functions to provide tamper evident and tamper resistant ledgers.

- The centrally owned system may be insecure; a user must trust that the associated computer systems and networks are receiving critical security patches and have implemented best practices for security. The system may be breached and have had personal information stolen because of insecurities.

  o   A blockchain network, due to the distributed nature, provides no centralized point of attack. Generally, information on a blockchain network is publicly viewable, and offers nothing to steal. To attack blockchain network users, an attacker would need to individually target them. Targeting the blockchain itself would be met with the resistance of the honest nodes present in the system. If an individual node was not patched, it would only affect that node – not the system overall.

## 3.6   Blocks

Blockchain network users submit candidate transactions to the blockchain network via software (desktop applications, smartphone applications, digital wallets, web services, etc.). The software sends these transactions to a node or nodes within the blockchain network. The chosen nodes may be non-publishing full nodes as well as publishing nodes. The submitted transactions are then propagated to the other nodes in the network, but this by itself does not place the transaction in the blockchain. For many blockchain implementations, once a pending transaction has been distributed to nodes, it must then wait in a queue until it is added to the blockchain by a publishing node.

Transactions are added to the blockchain when a publishing node publishes a block. A *block* contains a block header and block data. The block header contains metadata for this block. The block data contains a list of validated and authentic transactions which have been submitted to the blockchain network. Validity and authenticity is ensured by checking that the transaction is correctly formatted and that the providers of digital assets in each transaction (listed in the transaction's 'input' values) have each cryptographically signed the transaction. This verifies that the providers of digital assets for a transaction had access to the private key which could sign over the available digital assets. The other full nodes will check the validity and authenticity of all transactions in a published block and will not accept a block if it contains invalid transactions.

It should be noted that every blockchain implementation can define its own data fields; however, many blockchain implementations utilize data fields like the following:

- Block Header

  o   The block number, also known as block height in some blockchain networks.

  o   The previous block header's hash value.

  o   A hash representation of the block data (different methods can be used to accomplish this, such as a generating a Merkle tree (defined in Appendix B), and storing the root hash, or by utilizing a hash of all the combined block data).

  o   A timestamp.

15

- o The size of the block.
- o The nonce value. For blockchain networks which utilize mining, this is a number which is manipulated by the publishing node to solve the hash puzzle (see Section 4.1 for details). Other blockchain networks may or may not include it or use it for another purpose other than solving a hash puzzle.

- Block Data
  - o A list of transactions and ledger events included within the block.
  - o Other data may be present.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01057

NISTIR 8202

## 3.7   Chaining Blocks

Blocks are chained together through each block containing the hash digest of the previous block's header, thus forming the *blockchain*. If a previously published block were changed, it would have a different hash. This in turn would cause all subsequent blocks to also have different hashes since they include the hash of the previous block. This makes it possible to easily detect and reject altered blocks. Figure 3 shows a generic chain of blocks.



**Figure 3: Generic Chain of Blocks**

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01058

## 4    Consensus Models

A key aspect of blockchain technology is determining which user publishes the next block. This is solved through implementing one of many possible consensus models. For permissionless blockchain networks there are generally many publishing nodes competing at the same time to publish the next block. They usually do this to win cryptocurrency and/or transaction fees. They are generally mutually distrusting users that may only know each other by their public addresses. Each publishing node is likely motivated by a desire for financial gain, not the well-being of the other publishing nodes or even the network itself.

In such a situation, why would a user propagate a block that another user is attempting to publish? Also, who resolves conflicts when multiple nodes publish a block at approximately the same time? To make this work, blockchain technologies use *consensus models* to enable a group of mutually distrusting users to work together.

When a user joins a blockchain network, they agree to the initial state of the system. This is recorded in the only pre-configured block, the *genesis block*. Every blockchain network has a published genesis block and every block must be added to the blockchain after it, based on the agreed-upon consensus model. Regardless of the model, however, each block must be valid and thus can be validated independently by each blockchain network user. By combining the initial state and the ability to verify every block since then, users can independently agree on the current state of the blockchain. Note that if there were ever two valid chains presented to a full node, the default mechanism in most blockchain networks is that the 'longer' chain is viewed as the correct one and will be adopted; this is because it has had the most amount of work put into it. This happens frequently with some consensus models and will be discussed in detail.

The following properties are then in place:

- The initial state of the system is agreed upon (e.g., the genesis block).
- Users agree to the consensus model by which blocks are added to the system.
- Every block is linked to the previous block by including the previous block header's hash digest (except for the first 'genesis' block, which has no previous block and for which the hash of the previous block header is usually set to all zeros).
- Users can verify every block independently.

In practice, software handles everything and the users do not need to be aware of these details.

A key feature of blockchain technology is that there is no need to have a trusted third party provide the state of the system—every user within the system can verify the system's integrity. To add a new block to the blockchain, all nodes must come to a common agreement over time; however, some temporary disagreement is permitted. For permissionless blockchain networks, the consensus model must work even in the presence of possibly malicious users since these users might attempt to disrupt or take over the blockchain. Note that for permissioned blockchain networks legal remedies may be used if a user acts maliciously.

CYBER2-29777 - 01059

In some blockchain networks, such as permissioned, there may exist some level of trust between publishing nodes. In this case, there may not be the need for a resource intensive (computation time, investment, etc.) consensus model to determine which participant adds the next block to the chain. Generally, as the level of trust increases, the need for resource usage as a measure of generating trust decreases. For some permissioned blockchain implementations, the view of consensus extends beyond ensuring validity and authenticity of the blocks but encompasses the entire systems of checks and validations from the proposal of a transaction, to its final inclusion on a block.

In the following sections, several consensus models as well as the most common conflict resolution approach are discussed.

### 4.1   Proof of Work Consensus Model

In the proof of work (PoW) model, a user publishes the next block by being the first to solve a computationally intensive puzzle. The solution to this puzzle is the "proof" they have performed work. The puzzle is designed such that solving the puzzle is difficult but checking that a solution is valid is easy. This enables all other full nodes to easily validate any proposed next blocks, and any proposed block that did not satisfy the puzzle would be rejected.

A common puzzle method is to require that the hash digest of a block header be less than a target value. Publishing nodes make many small changes to their block header (e.g., changing the nonce) trying to find a hash digest that meets the requirement. For each attempt, the publishing node must compute the hash for the entire block header. Hashing the block header many times becomes a computationally intensive process. The target value may be modified over time to adjust the difficulty (up or down) to influence how often blocks are being published.

For example, Bitcoin, which uses the proof of work model, adjusts the puzzle difficulty every 2016 blocks to influence the block publication rate to be around once every ten minutes. The adjustment is made to the difficulty level of the puzzle, and essentially either increases or decreases the number of leading zeros required. By increasing the number of leading zeros, it increases the difficulty of the puzzle, because any solution must be less than the difficulty level – meaning there are fewer possible solutions. By decreasing the number of leading zeros, it decreases the difficulty level, because there are more possible solutions. This adjustment is to maintain the computational difficulty of the puzzle, and therefore maintain the core security mechanism of the Bitcoin network. Available computing power increases over time, as does the number of publishing nodes, so the puzzle difficulty is generally increasing.

Adjustments to the difficulty target aim to ensure that no entity can take over block production, but as a result the puzzle solving computations require significant resource consumption. Due to the significant resource consumption of some proof of work blockchain networks, there is a move to add publishing nodes to areas where there is a surplus supply of cheap electricity.

An important aspect of this model is that the work put into a puzzle does not influence one's likelihood of solving the current or future puzzles because the puzzles are independent. This means that when a user receives a completed and valid block from another user, they are

incentivized to discard their current work and to start building off the newly received block instead because they know the other publishing nodes will be building off it.

As an example, consider a puzzle where, using the SHA-256 algorithm, a computer must find a hash value meeting the following target criteria (known as the difficulty level):

```
SHA256("blockchain" + Nonce) = Hash Digest starting with "000000"
```

In this example, the text string "blockchain" is appended with a nonce value and then the hash digest is calculated. The nonce values used will be numeric values only. This is a relatively easy puzzle to solve and some sample output follows:

```
SHA256("blockchain0") =
0xbd4824d8ee63fc82392a6441444166d22ed84eaa6dab11d4923075975acab938
(not solved)

SHA256("blockchain1") =
0xdb0b9c1cb5e9c680dfff7482f1a8efad0e786f41b6b89a758fb26d9e223e0a10
(not solved)

...

SHA256("blockchain10730895") =
0x000000ca1415e0bec568f6f605fcc83d18cac7a4e6c219a957c10c6879d67587
(solved)
```

To solve this puzzle, it took 10,730,896 guesses (completed in 54 seconds on relatively old hardware, starting at 0 and testing one value at a time).

In this example, each additional "leading zero" value increases the difficulty. By increasing the target by one additional leading zero ("0000000"), the same hardware took 934,224,175 guesses to solve the puzzle (completed in 1 hour, 18 minutes, 12 seconds):

```
SHA256("blockchain934224174") =
0x0000000e2ae7e4240df80692b7e586ea7a977eacbd031819d0e603257edb3a81
```

There is currently no known shortcut to this process; publishing nodes must expend computation effort, time, and resources to find the correct nonce value for the target. Often the publishing nodes attempt to solve this computationally difficult puzzle to claim a reward of some sort (usually in the form of a cryptocurrency offered by the blockchain network). The prospect of being rewarded for extending and maintaining the blockchain is referred to as a reward system or incentive model.

Once a publishing node has performed this work, they send their block with a valid nonce to full nodes in the blockchain network. The recipient full nodes verify that the new block fulfills the puzzle requirement, then add the block to their copy of the blockchain and resend the block to their peer nodes. In this manner, the new block gets quickly distributed throughout the network of participating nodes. Verification of the nonce is easy since only a single hash needs to be done to check to see if it solves the puzzle.

For many proof of work based blockchain networks, publishing nodes tend to organize

CYBER2-29777 - 01061

themselves into "pools" or "collectives" whereby they work together to solve puzzles and split the reward. This is possible because work can be distributed between two or more nodes across a collective to share the workload and rewards. Splitting the example program into quarters, each node can take an equal amount of the nonce value range to test:

- Node 1: check nonce 0000000000 to 0536870911
- Node 2: check nonce 0536870912 to 1073741823
- Node 3: check nonce 1073741824 to 1610612735
- Node 4: check nonce 1610612736 to 2147483647

The following result was the first to be found to solve the puzzle:

```
SHA256("blockchain1700876653") =
0x00000003ba55d20c9cbd1b6fb34dd81c3553360ed918d07acf16dc9e75d7c7f1
```

This is a completely new nonce, but still one that solved the puzzle. It took 90,263,918 guesses (completed in 10 minutes, 14 seconds). Dividing up the work amongst many more machines yields much better results, as well as more consistent rewards in a proof of work model.

The use of a computationally difficult puzzle helps to combat the "Sybil Attack" – a computer security attack (not limited to blockchain networks) where an attacker can create many nodes (i.e., creating multiple identities) to gain influence and exert control. The proof of work model combats this by having the focus of network influence being the amount of computational power (hardware, which costs money) mixed with a lottery system (the most hardware increases likelihood but does not guarantee it) versus in network identities (which are generally costless to create).

## 4.2   Proof of Stake Consensus Model

The proof of stake (PoS) model is based on the idea that the more stake a user has invested into the system, the more likely they will want the system to succeed, and the less likely they will want to subvert it. Stake is often an amount of cryptocurrency that the blockchain network user has invested into the system (through various means, such as by locking it via a special transaction type, or by sending it to a specific address, or holding it within special wallet software). Once staked, the cryptocurrency is generally no longer able to be spent. Proof of stake blockchain networks use the amount of stake a user has as a determining factor for publishing new blocks. Thus, the likelihood of a blockchain network user publishing a new block is tied to the ratio of their stake to the overall blockchain network amount of staked cryptocurrency.

With this consensus model, there is no need to perform resource intensive computations (involving time, electricity, and processing power) as found in proof of work. Since this consensus model utilizes fewer resources, some blockchain networks have decided to forego a block creation reward; these systems are designed so that all the cryptocurrency is already distributed among users rather than new cryptocurrency being generated at a constant pace. In such systems, the reward for block publication is then usually the earning of user provided transaction fees.

The methods for how the blockchain network uses the stake can vary. Here we discuss four

21

approaches: random selection of staked users, multi-round voting, coin aging systems and delegate systems. Regardless of the exact approach, users with more stake are more likely to publish new blocks.

When the choice of block publisher is a random choice (sometimes referred to as *chain-based proof of stake*), the blockchain network will look at all users with stake and choose amongst them based on their ratio of stake to the overall amount of cryptocurrency staked. So, if a user had 42 % of the entire blockchain network stake they would be chosen 42 % of the time; those with 1 % would be chosen 1 % of the time.

When the choice of block publisher is a multi-round voting system (sometime referred to as *Byzantine fault tolerance proof of stake* [12]) there is added complexity. The blockchain network will select several staked users to create proposed blocks. Then all staked users will cast a vote for a proposed block. Several rounds of voting may occur before a new block is decided upon. This method allows all staked users to have a voice in the block selection process for every new block.

When the choice of block publisher is through a coin age system referred to as a *coin age proof of stake,* staked cryptocurrency has an *age* property. After a certain amount of time (such as 30 days) the staked cryptocurrency can *count* towards the owning user being selected to publish the next block. The staked cryptocurrency then has its *age* reset, and it cannot be used again until after the requisite time has passed. This method allows for users with more stake to publish more blocks, but to not dominate the system – since they have a cooldown timer attached to every cryptocurrency coin *counted* towards creating blocks. Older coins and larger groups of coins will increase the probability of being chosen to publish the next block. To prevent stakeholders from hoarding aged cryptocurrencies, there is generally a built-in maximum to the probability of winning.

When the choice of block publisher is through a delegate system, users vote for nodes to become publishing nodes – therefore creating blocks on their behalf. Blockchain network users' voting power is tied to their stake so the larger the stake, the more weight the vote has. Nodes who receive the most votes become publishing nodes and can validate and publish blocks. Blockchain network users can also vote against an established publishing node, to try to remove them from the set of publishing nodes. Voting for publishing nodes is continuous and remaining a publishing node can be quite competitive. The threat of losing publishing node status, and therefore rewards and reputation is constant so publishing nodes are incentivized to not act maliciously. Additionally, blockchain network users vote for delegates, who participate in the governance of the blockchain. Delegates will propose changes, and improvements, which will be voted on by blockchain network users.

It is worth noting that a problem known as "nothing at stake" may arise from some proof of stake algorithms. If multiple competing blockchains were to exist at some point (because of a temporary ledger conflict as discussed in Section 4.7), a staked user could act on every such competing chain – since it is essentially free to do so. The staked user may do this as a way of increasing their odds of earning a reward. This can cause multiple blockchain branches to continue to grow without being reconciled into a singular branch for extended periods of time.

CYBER2-29777 - 01063

Under proof of stake systems, the "rich" can more easily stake more of the digital assets, earning themselves more digital assets; however, to obtain the majority of digital assets within a system to "control" it is generally cost prohibitive.

## 4.3   Round Robin Consensus Model

Round Robin is a consensus model that is used by some permissioned blockchain networks. Within this model of consensus, nodes take turns in creating blocks. Round Robin Consensus has a long history grounded in distributed system architecture. To handle situations where a publishing node is not available to publish a block on its turn, these systems may include a time limit to enable available nodes to publish blocks so that unavailable nodes will not cause a halt in block publication. This model ensures no one node creates the majority of the blocks. It benefits from a straightforward approach, lacks cryptographic puzzles, and has low power requirements.

Since there is a need for trust amongst nodes, round robin does not work well in the permissionless blockchain networks used by most cryptocurrencies. This is because malicious nodes could continuously add additional nodes to increase their odds of publishing new blocks. In the worst case, they could use this to subvert the correct operation of the blockchain network.

## 4.4   Proof of Authority/Proof of Identity Consensus Model

The proof of authority (also referred to as proof of identity) consensus model relies on the partial trust of publishing nodes through their known link to real world identities. Publishing nodes must have their identities proven and verifiable within the blockchain network (e.g., identifying documents which have been verified and notarized and included on the blockchain). The idea is that the publishing node is staking its identity/reputation to publish new blocks. Blockchain network users directly affect a publishing node's reputation based on the publishing node's behavior. Publishing nodes can lose reputation by acting in a way that the blockchain network users disagree with, just as they can gain reputation by acting in a manner that the blockchain network users agree with. The lower the reputation, the less likelihood of being able to publish a block. Therefore, it is in the interest of a publishing node to maintain a high reputation. This algorithm only applies to permissioned blockchain networks with high levels of trust.

## 4.5   Proof of Elapsed Time Consensus Model

Within the proof of elapsed time (PoET) consensus model, each publishing node requests a wait time from a secure hardware time source within their computer system. The secure hardware time source will generate a random wait time and return it to the publishing node software. Publishing nodes take the random time they are given and become idle for that duration. Once a publishing node wakes up from the idle state, it creates and publishes a block to the blockchain network, alerting the other nodes of the new block; any publishing node that is still idle will stop waiting, and the entire process starts over.

This model requires ensuring that a random time was used, since if the time to wait was not selected at random a malicious publishing node would just wait the minimum amount of time by default to dominate the system. This model also requires ensuring that the publishing node waited the actual time and did not start early. These requirements are being solved by executing

CYBER2-29777 - 01064

software in a trusted execution environment found on some computer processors (such as Intel's Software Guard Extensions[5], or AMD's Platform Security Processor[6], or ARM's TrustZone[7]).

Verified and trusted software can run in these secure execution environments and cannot be altered by outside programs. A publishing node would query software running in this secure environment for a random time and then wait for that time to pass. After waiting the assigned time, the publishing node could request a signed certificate that the publishing node waited the randomly assigned time. The publishing node then publishes the certificate along with the block.

---

[5] Intel SGX - https://software.intel.com/en-us/sgx

[6] AMD Secure Technology - https://www.amd.com/en/technologies/security

[7] ARM TrustZone - https://www.arm.com/products/silicon-ip-security

CYBER2-29777 - 01065

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

## 4.6   Consensus Comparison Matrix

| Name | Goals | Advantages | Disadvantages | Domains | Implementations |
|------|-------|-----------|---------------|---------|-----------------|
| **Proof of work (PoW)** | To provide a barrier to publishing blocks in the form of a computationally difficult puzzle to solve to enable transactions between untrusted participants. | Difficult to perform denial of service by flooding network with bad blocks.<br><br>Open to anyone with hardware to solve the puzzle. | Computationally intensive (by design), power consumption, hardware arms race.<br><br>Potential for 51 % attack by obtaining enough computational power. | Permissionless cryptocurrencies | Bitcoin, Ethereum, many more |
| **Proof of stake (PoS)** | To enable a less computationally intensive barrier to publishing blocks, but still enable transactions between untrusted participants. | Less computationally intensive than PoW.<br><br>Open to anyone who wishes to stake cryptocurrencies.<br><br>Stakeholders control the system. | Stakeholders control the system.<br><br>Nothing to prevent formation of a pool of stakeholders to create a centralized power.<br><br>Potential for 51 % attack by obtaining enough financial power. | Permissionless cryptocurrencies | Ethereum Casper, Krypton |
| **Delegated PoS** | To enable a more efficient consensus model through a 'liquid democracy' where participants vote (using cryptographically signed messages) to elect and revoke the rights of delegates to validate and secure the blockchain. | Elected delegates are economically incentivized to remain honest<br><br>More computationally efficient than PoW | Less node diversity than PoW or pure PoS consensus implementations<br><br>Greater security risk for node compromise due to constrained set of operating nodes<br><br>As all delegates are 'known' there may an incentive for block producers to collude and accept bribes, compromising the security of the system | Permissionless cryptocurrencies<br><br>Permissioned Systems | Bitshares, Steem, Cardano, EOS |

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01066

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01067

| Name | Goals | Advantages | Disadvantages | Domains | Implementations |
|---|---|---|---|---|---|
| **Round Robin** | Provide a system for publishing blocks amongst approved/trusted publishing nodes | Low computational power.<br><br>Straightforward to understand. | Requires large amount of trust amongst publishing nodes. | Permissioned Systems | MultiChain |
| **Proof of Authority/Identity** | To create a centralized consensus process to minimize block creation and confirmation rate | Fast confirmation time<br><br>Allows for dynamic block production rates<br><br>Can be used in sidechains to blockchain networks which utilize another consensus model | Relies on the assumption that the current validating node has not been compromised<br><br>Leads to centralized points of failure<br><br>The reputation of a given node is subject to potential for high tail-risk as it could be compromised at any time. | Permissioned Systems, Hybrid (sidechain) Systems | Ethereum Kovan testnet, POA Chain, various permissioned systems using Parity |
| **Proof of Elapsed Time (PoET)** | To enable a more economic consensus model for blockchain networks, at the expense of deeper security guarantees associated with PoW. | Less computationally expensive than PoW | Hardware requirement to obtain time.<br><br>Assumes the hardware clock used to derive time is not compromised<br><br>Given speed-of-late latency limits, true time synchronicity is essentially impossible in distributed systems [13] | Permissioned Networks | Hyperledger Sawtooth |

### 4.7   Ledger Conflicts and Resolutions

As discussed previously, for some blockchain networks it is possible that multiple blocks will be published at approximately the same time. This can cause differing versions of a blockchain to exist at any given moment; these must be resolved quickly to have consistency in the blockchain network. In this section, we discuss how these situations are generally handled.

With any distributed network, some systems within the network will be behind on information or have alternative information. This depends on network latency between nodes and the proximity of groups of nodes. Permissionless blockchain networks are more prone to have conflicts due to their openness and number of competing publishing nodes. A major part of agreeing on the state of the blockchain network (coming to consensus) is resolving conflicting data.

For example:

- node_A creates block_n(A) with transactions #1, 2 and 3. node_A distributes it to some nodes.
- node_B creates block_n(B) with transactions #1, 2 and 4. node_B distributes it to some nodes.
- **There is a conflict.**
    - block_n will not be the same across the network.
        - block_n(A) contains transaction #3, but not transaction #4.
        - block_n(B) contains transaction #4, but not transaction #3.

Conflicts temporarily generate different versions of the blockchain, which is depicted in Figure 4. These differing versions are not "wrong"; rather, they were created with the information each node had available. The competing blocks will likely contain different transactions, so those with block_n(A) may see transfers of digital assets not present in block_n(B). If the blockchain network deals with cryptocurrency, then a situation may occur where some cryptocurrency may both be spent and unspent, depending on which version of the blockchain is being viewed.



**Figure 4: Ledger in Conflict**

Conflicts are usually quickly resolved. Most blockchain networks will wait until the next block is published and use that chain as the "official" blockchain, thus adopting the "longer blockchain". As in Figure 5, the blockchain containing block_n(B) becomes the "official" chain, as it got

the next valid block. Any transaction that was present in block_n(A), the orphaned block, but not present in the block_n(B) chain, is returned to the pending transaction pool (which is where all transactions which have not been included within a block reside). Note that this set of pending transactions is maintained locally at each node as there is no central server in the architecture.



**Figure 5: The chain with block_n(B) adds the next block, the chain with block_n(A) is now orphaned**

Due to the possibility of blocks being overwritten, a transaction is not usually accepted as confirmed until several additional blocks have been created on top of the block containing the relevant transaction. The acceptance of a block is often probabilistic rather than deterministic since blocks can be superseded. The more blocks that have been built on top of a published block, the more likely it is that the initial block will not be overwritten.

Hypothetically, a node in a proof of work blockchain network with enormous amounts of computing power could start at the genesis block and create a longer chain than the currently existing chain, thereby wiping out the entire blockchain history. This does not happen in practice due to the prohibitively large amount of resources that this would require. Also, some blockchain implementations lock specific older blocks within the blockchain software by creating checkpoints to ensure that this can never happen.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01069

## 5    Forking

Performing changes and updating technology can be difficult at the best of times. For permissionless blockchain networks which are comprised of many users, distributed around the world, and governed by the consensus of the users, it becomes extremely difficult. Changes to a blockchain network's protocol and data structures are called *forks*. They can be divided into two categories: *soft forks* and *hard forks*. For a soft fork, these changes are backwards compatible with nodes that have not been updated. For a hard fork, these changes are not backwards compatible because the nodes that have not been updated will reject the blocks following the changes. This can lead to a split in the blockchain network creating multiple versions of the same blockchain. Permissioned blockchain networks, due to the publishing nodes and users being known, can mitigate the issues of forking by requiring software updates.

Note that the term fork is also used by some blockchain networks to describe temporary ledger conflicts (e.g., two or more blocks within the blockchain network with the same block number) as described in Section 4.7. While this is a fork in the ledger, it is temporary and does not stem from a software change.

### 5.1    Soft Forks

A *soft fork* is a change to a blockchain implementation that is backwards compatible. Non-updated nodes can continue to transact with updated nodes. If no (or very few) nodes upgrade, then the updated rules will not be followed.

An example of a soft fork occurred on Bitcoin when a new rule was added to support escrow[8] and time-locked refunds. In 2014, a proposal was made to repurpose an operation code that performed no operation (OP_NOP2) to CHECKLOCKTIMEVERIFY, which allows a transaction output to be made spendable at a point in the future [14]. For nodes that implement this change, the node software will perform this new operation, but for nodes that do not support the change, the transaction is still valid, and execution will continue as if a NOP [9] had been executed.

A fictional example of a soft fork would be if a blockchain decided to reduce the size of blocks (for example from 1.0 MB to 0.5 MB). Updated nodes would adjust the block size and continue to transact as normal; non-updated nodes would see these blocks as valid – since the change made does not violate their rules (i.e., the block size is under their maximum allowed). However, if a non-updated node were to create a block with a size greater than 0.5 MB, updated nodes would reject them as invalid.

### 5.2    Hard Forks

A *hard fork* is a change to a blockchain implementation that is not backwards compatible. At a

---

[8] Funds placed into a third party to be disseminated based on conditions (via multi-signature transactions)

[9] NOP meaning No Operation

CYBER2-29777 - 01070

given point in time (usually at a specific block number), all publishing nodes will need to switch to using the updated protocol. Additionally, all nodes will need to upgrade to the new protocol so that they do not reject the newly formatted blocks. Non-updated nodes cannot continue to transact on the updated blockchain because they are programmed to reject any block that does not follow their version of the block specification.

Publishing nodes that do not update will continue to publish blocks using the old format. User nodes that have not updated will reject the newly formatted blocks and only accept blocks with the old format. This results in two versions of the blockchain existing simultaneously. Note that users on different hard fork versions cannot interact with one another. It is important to note that while most hard forks are intentional, software errors may produce unintentional hard forks.

A well-known example of a hard fork is from Ethereum. In 2016, a smart contract was constructed on Ethereum called the Decentralized Autonomous Organization (DAO). Due to flaws in how the smart contract was constructed, an attacker extracted Ether, the cryptocurrency used by Ethereum, resulting in the theft of $50 million [15]. A hard fork proposal was voted on by Ether holders, and the clear majority of users agreed to hard fork and create a new version of the blockchain, without the flaw, and that also returned the stolen funds.

With cryptocurrencies, if there is a hard fork and the blockchain splits then users will have independent currency on both forks (having double the number of coins in total). If all the activity moves to the new chain, the old one may eventually not be used since the two chains are not compatible (they will be independent currency systems). In the case of the Ethereum hard fork, the clear majority of support moved to the new fork, the old fork was renamed Ethereum Classic and continued operating.

## 5.3   Cryptographic Changes and Forks

If flaws are found in the cryptographic technologies within a blockchain network, the only solution may be to create a hard fork, depending on the significance of the flaw. For example, if a flaw was found in the underlying algorithms, there could be a fork requiring all future clients to use a stronger algorithm. Switching to a new hashing algorithm could pose a significant practical problem because it could invalidate all existing specialized mining hardware.

Hypothetically, if SHA-256 were discovered to have a flaw, blockchain networks that utilize SHA-256 would need a hard fork to migrate to a new hash algorithm. The block that switched over to the new hash algorithm would "lock" all previous blocks into SHA-256 (for verification), and all new blocks would need to utilize the new hashing algorithm. There are many cryptographic hash algorithms, and blockchain networks can make use of whichever suits their needs. For example, while Bitcoin uses SHA-256, Ethereum uses Keccak-256 [8].

One possibility for the need to change cryptographic features present in a blockchain network would be the development of a practical quantum computer system, which would be capable of greatly weakening (and in some cases, rendering useless) existing cryptographic algorithms. NIST Internal Report (NISTIR) 8105, Report on Post-Quantum Cryptography [16] provides a table describing the impact of quantum computing on common cryptographic algorithms. Table 2 replicates this table.

**Table 2: Impact of Quantum Computing on Common Cryptographic Algorithms**

| Cryptographic Algorithm | Type | Purpose | Impact from Large-Scale Quantum Computer |
|---|---|---|---|
| AES | Symmetric key | Encryption | Larger key sizes needed |
| SHA-2, SHA-3 | N/A | Hash functions | Larger output needed |
| RSA | Public key | Signatures, key establishment | No longer secure |
| ECDSA, ECDH (Elliptic Curve Cryptography) | Public key | Signatures, key exchange | No longer secure |
| DSA (Finite Field Cryptography) | Public key | Signatures, key exchange | No longer secure |

The cryptographic algorithms utilized within most blockchain technologies for asymmetric-key pairs will need to be replaced if a powerful quantum computer becomes a reality. This is because algorithms that rely on the computational complexity of integer factorization (such as RSA) or work on solving discrete logarithms (such as DSA and Diffie-Hellman) are very susceptible to being broken by quantum computing. The hashing algorithms used by blockchain networks are much less susceptible to quantum computing attacks but are still weakened.

CYBER2-29777 - 01072

## 6    Smart Contracts

The term smart contract dates to 1994, defined by Nick Szabo as "a computerized transaction protocol that executes the terms of a contract. The general objectives of smart contract design are to satisfy common contractual conditions (such as payment terms, liens, confidentiality, and even enforcement), minimize exceptions both malicious and accidental, and minimize the need for trusted intermediaries." [17].

Smart contracts extend and leverage blockchain technology. A *smart contract* is a collection of code and data (sometimes referred to as functions and state) that is deployed using cryptographically signed transactions on the blockchain network (e.g., Ethereum's smart contracts, Hyperledger Fabric's chaincode). The smart contract is executed by nodes within the blockchain network; all nodes that execute the smart contract must derive the same results from the execution, and the results of execution are recorded on the blockchain.

Blockchain network users can create transactions which send data to public functions offered by a smart contract. The smart contract executes the appropriate method with the user provided data to perform a service. The code, being on the blockchain, is also tamper evident and tamper resistant and therefore can be used (among other purposes) as a trusted third party. A smart contract can perform calculations, store information, expose properties to reflect a publicly exposed state and, if appropriate, automatically send funds to other accounts. It does not necessarily even have to perform a financial function. For example, the authors of this document have created an Ethereum smart contract that publicly generate trustworthy random numbers [18]. It is important to note that not every blockchain can run smart contracts.

The smart contract code can represent a multi-party transaction, typically in the context of a business process. In a multi-party scenario, the benefit is that this can provide attestable data and transparency that can foster trust, provide insight that can enable better business decisions, reduce costs from reconciliation that exists in traditional business to business applications, and reduce the time to complete a transaction.

Smart contracts must be deterministic, in that given an input they will always produce the same output based on that input. Additionally, all the nodes executing the smart contract must agree on the new state that is obtained after the execution. To achieve this, smart contracts cannot operate on data outside of what is directly passed into it (e.g., smart contracts cannot obtain web services data from within the smart contract – it would need to be passed in as a parameter). Any smart contract which uses data from outside the context of its own system is said to use an 'Oracle' (the oracle problem is described in section 7.3).

For many blockchain implementations, the publishing nodes execute the smart contract code simultaneously when publishing new blocks. There are some blockchain implementations in which there are publishing nodes which do not execute smart contract code, but instead validate the results of the nodes that do.  For smart contract enabled permissionless blockchain networks (such as Ethereum) the user issuing a transaction to a smart contract will have to pay for the cost of the code execution. There is a limit on how much execution time can be consumed by a call to a smart contract, based on the complexity of the code. If this limit is exceeded, execution stops,

CYBER2-29777 - 01073

and the transaction is discarded. This mechanism not only rewards the publishers for executing the smart contract code, but also prevents malicious users from deploying and then accessing smart contracts that will perform a denial of service on the publishing nodes by consuming all resources (e.g., using infinite loops).

For smart contract enabled permissioned blockchain networks, such as those utilizing Hyperledger Fabric's chaincode, there may not be a requirement for users to pay for smart contract code execution. These networks are designed around having known participants, and other methods of preventing bad behavior can be employed (e.g., revoking access).

33

CYBER2-29777 - 01074

## 7    Blockchain Limitations and Misconceptions

There is a tendency to overhype and overuse most nascent technology. Many projects will attempt to incorporate the technology, even if it is unnecessary. This stems from the technology being relatively new and not well understood, the technology being surrounded by misconceptions, and the fear of missing out. Blockchain technology has not been immune. This section highlights some of the limitations and misconceptions of blockchain technology.

### 7.1   Immutability

Most publications on blockchain technology describe blockchain ledgers as being immutable. However, this is not strictly true. They are tamper evident and tamper resistant which is a reason they are trusted for financial transactions. They cannot be considered completely immutable, because there are situations in which the blockchain can be modified. In this section we will look at different ways in which the concept of immutability for blockchain ledgers can be violated.

The chain of blocks itself cannot be considered completely immutable. For some blockchain implementations, the most recently published, or 'tail' blocks are subject to being replaced (by a longer, alternative chain with different 'tail' blocks). As noted earlier, most blockchain networks use the strategy of adopting the longest chain (the one with the most amount of work put into it) as truth when there are multiple competing chains. If two chains are competing, but each include their own unique sequence of tail blocks, whichever is longer will be adopted. However, this does not mean that the transactions within the replaced blocks are lost – rather they may have been included in a different block or returned to the pending transaction pool. This degree of weak immutability for tail blocks is why most blockchain network users wait several block creations before considering a transaction to be valid.

For permissionless blockchain networks, the adoption of a longer, alternate chain of blocks could be the result of a form of attack known as a 51 % attack [19]. For this, the attacker simply garners enough resources to outpace the block creation rate of rest of the blockchain network (holding more than 51 % of the resources applied towards producing new blocks). Depending on the size of the blockchain network, this could be a very cost prohibitive attack carried out by state level actors [20]. The cost to perform this type of attack increases the further back in the blockchain the attacker wishes to make a change. This attack is not technically difficult (e.g., it is just repeating the normal process of the blockchain implementation, but with selected transactions either included or omitted, and at a faster pace), it is just expensive.

For permissioned blockchain networks, this attack can be mitigated. There is generally an owner or consortium of blockchain network users who allow publishing nodes to join the blockchain network and remove publishing nodes from the blockchain network, which gives them a great amount of control.  There is less likely to be competing chains since the owner or consortium can force publishing nodes to collaborate fairly since non-cooperating publishing nodes can simply have their privileges removed. There are likely additional legal contracts in place for the blockchain network users which may include clauses for misconduct and the ability to take legal action. While this control is useful to prevent misconduct, it means that any number of blocks can be replaced through legitimate methods if desired by the owner or consortium.

CYBER2-29777 - 01075

## 7.2   Users Involved in Blockchain Governance

The governance of blockchain networks deals with the rules, practices and processes by which the blockchain network is directed and controlled. A common misconception is that blockchain networks are systems without control and ownership. The phrase "no one controls a blockchain!" is often exclaimed. This is not strictly true. Permissioned blockchain networks are generally setup and run by an owner or consortium, which governs the blockchain network. Permissionless blockchain networks are often governed by blockchain network users, publishing nodes, and software developers. Each group has a level of control that affects the direction of the blockchain network's advancement.

Software developers create the blockchain software that is utilized by a blockchain network. Since most blockchain technologies are open source, it is possible to inspect the source code, and compile it independently; it is even possible to create separate but compatible software as a means of bypassing pre-compiled software released by developers. However, not every user will have the ability to do this, which means that the developer of the blockchain software will play a large role in the blockchain network's governance. These developers may act in the interest of the community at large and are held accountable. For example, in 2013 Bitcoin developers released a new version of the most popular Bitcoin client which introduced a flaw and started two competing chains of blocks. The developers had to decide to either keep the new version (which had not yet been adopted by everyone) or revert to the old version [21]. Either choice would result in one chain being discarded—and some blockchain network user's transactions becoming invalid. The developers made a choice, reverted to the old version, and successfully controlled the progress of the Bitcoin blockchain.

This example was an unintentional fork; however, developers can purposely design updates to blockchain software to change the blockchain protocol or format. With enough user adoption, a successful fork can be created. Such forks of blockchain software updates are often discussed at length and coordinated with the involved users. For permissionless blockchain networks, this is usually the publishing nodes. There is often a long discussion and adoption period before an event occurs where all users must switch to the newly updated blockchain software at some chosen block to continue recording transactions on the new "main" fork.

For permissionless blockchain networks, although the developers maintain a large degree of influence, users can reject a change by the developers by refusing to install updated software. Of the blockchain network users, the publishing nodes have significant control since they create and publish new blocks. The user base usually adopts the blocks produced by the publishing nodes but is not required to do so. An interesting side effect of this is that permissionless blockchain networks are essentially ruled by the publishing nodes and may marginalize a segment of users by forcing them to adopt changes they may disagree with to stay with the main fork.

For permissioned blockchain networks, control and governance is driven by members of the associated owner or consortium. The consortium can govern who can join the network, when members are removed from the network, coding guidelines for smart contracts, etc.

In summary, the software developers, publishing nodes, and blockchain network users all play a part in the blockchain network governance.

CYBER2-29777 - 01076

## 7.3   Beyond the Digital

Blockchain networks work extremely well with the data within their own digital systems. However, when they need to interact with the real world, there are some issues (often called the Oracle Problem [22]). A blockchain network can be a place to record both human input data as well as sensor input data from the real world, but there may be no method to determine if the input data reflects real world events. A sensor could be malfunctioning and recording data that is inaccurate. Humans could record false information (intentionally or unintentionally). These issues are not specific to blockchain networks, but to digital systems overall. However, for blockchain networks that are pseudonymous, dealing with data misrepresentation outside of the digital network can be especially problematic.

For example, if a cryptocurrency transaction took place to purchase a real-world item there is no way to determine within the blockchain network whether the shipment took place, without relying on outside sensor or human input.

Many projects have attempted to address the 'Oracle problem' and create reliable mechanisms to ingest external data in a way that is both trustworthy and accurate.  For example, projects like 'Oraclize' provide mechanisms to take web API data and convert it into blockchain readable byte/opcode. Within the context of decentralized applications, these projects may be considered centralized as they provide single points of failure for attackers to compromise. As a result, projects like 'Mineable Oracle Contract' [23] have recently arisen to enable oracle ingestion in a way that is inspired by blockchain technology and built atop established consensus models and economic incentives.

## 7.4   Blockchain Death

Traditional centralized systems are created and taken down constantly, and blockchain networks will likely not be different. However, because they are decentralized, there is a chance that when a blockchain network "shuts down" it will never be fully shut down, and that there may always be some lingering blockchain nodes running.

A defunct blockchain would not be suitable for a historical record, since without many publishing nodes, a malicious user could easily overpower the few publishing nodes left and redo and replace any number of blocks.

## 7.5   Cybersecurity

The use of blockchain technology does not remove inherent cybersecurity risks that require thoughtful and proactive risk management. Many of these inherent risks involve a human element. Therefore, a robust cybersecurity program remains vital to protecting the network and participating organizations from cyber threats, particularly as hackers develop more knowledge about blockchain networks and their vulnerabilities.

Existing cybersecurity standards and guidance remain highly relevant for ensuring the security of systems that interface and/or rely on blockchain networks. Subject to certain adjustments to consider specific attributes of blockchain technology, existing standards and guidance provide a strong foundation for protecting blockchain networks from cyberattacks.

CYBER2-29777 - 01077

In addition to general principles and controls, there are specific cybersecurity standards with relevance to blockchain technology which already exist and are in wide use by many industries. For instance, the NIST Cybersecurity Framework expressly states that it is "not a one-size-fits-all approach to managing cybersecurity risk" because "organizations will continue to have unique risks—different threats, different vulnerabilities, different risk tolerances—and how they implement the practices in the [Framework] will vary." With that said, even though the Framework was not designed for blockchain technology specifically, its standards are broad enough to cover blockchain technology and to help institutions develop policies and processes that identify and control risks affecting blockchain technology.

### 7.5.1   Cyber and Network-based Attacks

Blockchain technologies are touted as being extremely secure due to the tamper evident and tamper resistant design – once a transaction is committed to the blockchain, it generally cannot be changed. However, this is only true for transactions which have been included in a published block. Transactions that have not yet been included in a published block within the blockchain are vulnerable to several types of attacks. For blockchain networks which have transactional timestamps, spoofing time or adjusting the clock of a member of an ordering service could have positive or negative effects on a transaction, making time and the communication of time an attack vector. Denial of service attacks can be conducted on the blockchain platform or on the smart contract implemented on the platform.

Blockchain networks and their applications are not immune to malicious actors who can conduct network scanning and reconnaissance to discover and exploit vulnerabilities and launch zero-day attacks. In the rush to deploy blockchain-based services, newly coded applications (like smart contracts) may contain new and known vulnerabilities and deployment weaknesses that will be discovered and then attacked through the network just like how websites or applications are attacked today.

### 7.6   Malicious Users

While a blockchain network can enforce transaction rules and specifications, it cannot enforce a user code of conduct. This is problematic in permissionless blockchain networks, since users are pseudonymous and there is not a one-to-one mapping between blockchain network user identifiers and users of the system. Permissionless blockchain networks often provide a reward (e.g., a cryptocurrency) to motivate users to act fairly; however, some may choose to act maliciously if that provides greater rewards. The largest problem for malicious users is getting enough power (be it a stake in the system, processing power, etc.) to cause damage. Once a large enough malicious collusion is created, malicious mining actions can include:

- Ignoring transactions from specific users, nodes, or even entire countries.
- Creating an altered, alternative chain in secret, then submitting it once the alternative chain is longer than the real chain. The honest nodes will switch to the chain that has the most "work" done (per the blockchain protocol). This could attack the principle of a blockchain network being tamper evident and tamper resistant [24].
- Refusing to transmit blocks to other nodes, essentially disrupting the distribution of information (this is not an issue if the blockchain network is sufficiently decentralized).

While malicious users can be annoyances and create short-term harm, blockchain networks can perform hard forks to combat them. Whether damages done (money lost) would be reversed would be up to the developers and users of the blockchain network.

In addition to there being malicious users of the network, the administrators of the infrastructure for permissioned blockchain networks may also act maliciously. For example, an infrastructure administrator may be able (depending upon the exact configuration) to take over block production, exclude certain users from performing transactions, rewrite block history, double spend coin, delete resources, or re-route or block network connections.

### 7.7  No Trust

Another common misinterpretation comes from people hearing that there is no "trusted third party" in a blockchain and assuming blockchain networks are "trustless" environments. While there is no trusted third party certifying transactions in permissionless blockchain networks (in permissioned systems it is less clear, as administrators of those systems act as an administrator of trust by granting users admission and permissions), there is still a great deal of trust needed to work within a blockchain network:

- There is trust in the cryptographic technologies utilized. For example, cryptographic algorithms or implementations can have flaws.
- There is trust in the correct and bug free operation of smart contracts, which might have unintended loopholes and flaws.
- There is trust in the developers of the software to produce software that is as bug-free as possible.
- There is trust that most users of the blockchain are not colluding in secret. If a single group or individual can control more than 50 percent of all block creation power, it is possible to subvert a permissionless blockchain network. However, generally obtaining the necessary computational power is prohibitively expensive.
- For blockchain network users not running a full node, there is trust that nodes are accepting and processing transactions fairly.

### 7.8  Resource Usage

Blockchain technology has enabled a worldwide network where every transaction is verified and the blockchain is kept in sync amongst a multitude of users. For blockchain networks utilizing proof of work, there are many publishing nodes expending large amounts of processing time and, more importantly, consuming a lot of electricity. A proof of work method is an effective solution for "hard to solve, easy to verify" proofs; however, it generally requires significant resource usage.  Because of their different applications, and trust models, many permissioned blockchain technologies do not use a resource intensive proof, but rather they utilize different mechanisms to achieve consensus.

The proof of work consensus model is designed for the case where there is little to no trust amongst users of the system. It ensures that publishing nodes cannot game the system[10] by

---

[10]   Use the rules and procedures meant to protect the system to manipulate the system for a desired result.

CYBER2-29777 - 01079

always being able to solve the puzzles and thereby control the blockchain and the transactions added to it. However, a major concern surrounding the proof of work consensus model is its use of energy in solving the puzzles.

The amount of energy used is often not trivial; for example, some estimate that currently the Bitcoin blockchain network uses around the same amount of electricity as the entire country of Ireland [25]. It has also been speculated that the Bitcoin blockchain network will consume as much electricity as the entire country of Denmark by 2020 [26][27][28]. Software and hardware will continue to improve, resulting in more efficient puzzle solving (reducing the amount of electricity utilized) [29]. However, blockchain networks are also still growing, resulting in harder puzzle difficulty.

An additional strain on resources occurs whenever a new full node is created; the node must obtain (usually through downloading) most of or all the blockchain data (Bitcoin's blockchain data is over 175 gigabytes and growing as of this writing) [30]. This process uses a lot of network bandwidth.

## 7.9   Inadequate Block Publishing Rewards

A potential limitation is the risk of inadequate rewards for publishing a block. The combination of increased competition, increased computational resources needed to have meaningful contributions to pools of publishing nodes, and highly volatile market prices in the cryptocurrency market creates the risk that the expected return for any given cryptocurrency may be less than the power costs needed to run publishing node software. Thus, the expected return for other cryptocurrencies may be more attractive.

Cryptocurrencies that are not able to consistently and adequately reward publishing nodes risk delays in publishing blocks and processing transactions. These delays could therefore reduce confidence in the cryptocurrency, reducing its market value further. It could then become increasingly less attractive for publishing nodes to contribute to that cryptocurrency's publishing efforts. Even worse, such weakened cryptocurrencies open themselves up to being attacked by nodes with large amounts of resources that may maliciously alter the blockchain or deny service to users attempting to submit transactions.

## 7.10  Public Key Infrastructure and Identity

When hearing that blockchain technology incorporates a public key infrastructure, some people immediately believe it intrinsically supports identity. This is not the case, as there may not be a one-to-one relationship of private key pairs to users (a user can have multiple private keys), nor is there a one-to-one relationship between blockchain addresses and public keys (multiple addresses can be derived from a single public key).

Digital signatures are often used to prove identity in the cybersecurity world, and this can lead to confusion about the potential application of a blockchain to identity management. A blockchain's transaction signature verification process links transactions to the owners of private keys but provides no facility for associating real-world identities with these owners. In some cases, it is possible to connect real-world identities with private keys, but these connections are made through processes outside, and not explicitly supported by, the blockchain. For example, a

law enforcement agency could request records from an exchange that would connect transactions to specific individuals. Another example is an individual posting a cryptocurrency address on their personal website or social media page for donations, this would provide a link from address to real world identity.

While it is possible to use blockchain technology in identity management frameworks that require a distributed ledger component, it is important to understand that typical blockchain implementations are not designed to serve as standalone identity management systems. There is more to having secure digital identities than simply implementing a blockchain.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01081

## 8   Application Considerations

Since blockchain technology is still new, a lot of organizations are looking at ways to incorporate it into their businesses. The fear of missing out on this technology is quite high, and most organizations approach the problem as "we want to use blockchain somewhere, where can we do that?" which leads to frustrations with the technology as it cannot be applied universally. A better approach would be to first understand blockchain technology, where it fits, and then identify systems (new and old) that may fit the blockchain paradigm.

Blockchain technology solutions may be suitable if the activities or systems require features such as:

- Many participants
- Distributed participants
- Want or need for lack of trusted third party
- Workflow is transactional in nature (e.g., transfer of digital assets/information between parties)
- A need for a globally scarce digital identifier (i.e., digital art, digital land, digital property)
- A need for a decentralized naming service or ordered registry
- A need for a cryptographically secure system of ownership
- A need to reduce or eliminate manual efforts of reconciliation and dispute resolutions
- A need to enable real time monitoring of activity between regulators and regulated entities
- A need for full provenance of digital assets and a full transactional history to be shared amongst participants

Several agencies and organizations have developed guides to help determine if a blockchain is suitable for a particular system or activity, and which kind of blockchain technology would be of most benefit. In this section, some articles and advice are highlighted from several different sectors – federal government, academia, technical publications, technology websites, and software developers.

The United States Department of Homeland Security (DHS) Science & Technology Directorate has been investigating blockchain technology and has created a flowchart to help one determine whether a blockchain may be needed for a development initiative. The flowchart is reproduced here, with permission.

CYBER2-29777 - 01082

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202



**Figure 6 - DHS Science & Technology Directorate Flowchart**

CYBER2-29777 - 01083

The American Council for Technology and Industry Advisory Council (ACT-IAC) have been developing both a blockchain technology primer and a blockchain playbook. ACT-IAC is a public/private partnership which facilitates collaboration and discussion between government and industry experts. ACT-IAC has developed a blockchain primer document [31], which aims to provide an overview of the technology. A second document, a blockchain playbook [32], provides a set of questions with weights to help organizations in their consideration of the technology.

There is no lack of whitepapers and news articles with a title like "Do you need a blockchain?" Two computer scientists at the Eidgenössische Technische Hochschule (ETH) Zürich university in Switzerland wrote a whitepaper titled "*Do you need a Blockchain?*" [33] which provides the background, properties, and a critical view on several use cases. Although not created by the authors, a website [34] has implemented the flowchart presented in the paper in an interactive form. However, examining the flowchart logic, as well as website code, most paths lead to "no" with only a few leading to "maybe." This critical view on the technology is one that most organizations should take; organizations should examine whether existing technologies can better solve their problems.

The Institute of Electrical and Electronics Engineers (IEEE) published in their *Spectrum* magazine the article "*Do you need a blockchain?*"[35]. The article emphasizes the utility a blockchain may provide (as an anti-censorship tool), but also discusses the tradeoff that must be made by moving away from a traditional system. Removal of trusted third parties means relying on multiple sources of "unaffiliated participants" acting in coordination, which depending on the type of blockchain platform, may be difficult to govern. The article also discusses that the technology is changing at a rapid pace – so it is difficult to predict where it will end up in a few years' time. The article includes a flowchart of its own to help the reader decide whether they need a blockchain. Finally, the article ends with the following statement: "But you should also consider the possibility that you don't need a blockchain at all." This is pertinent to those who may be desperately looking to include blockchain in their organization's portfolio.

Technology sites are also asking organizations to look closely at the technology and apply it only when necessary. Coindesk, a technology website specializing in cryptocurrency and blockchain news, technical matters and editorials, has written the article "*Don't use a blockchain unless you really need one*"[36]. The article gives some small examples about how most data today is owned by siloed organizations, and that as users we only supply it to them. It asks what the world would look like if users owned all their data. The article makes the point that the largest benefit of blockchain technology is its decentralization and can be summed up with the article's most critical point: "Despite some of the hype, blockchains are 'incredibly inefficient,' Ravikant said. 'It's worth paying the cost when you need the decentralization, but it's not when you don't.'"

Even software developers are urging organizations to examine the key aspects of the technology and how it could be applied to a problem. One such developer wrote on the website C# Corner the article "*Do You Need A Blockchain*" [37]. This article touches on the history of blockchain technology and brings to light a primary reason for the use of blockchain technology: "Blockchain brings trust to a transactional system."

CYBER2-29777 - 01084

By utilizing a blockchain cryptographic trust can be introduced into a previously no to low trust system. The article goes on to ask several pointed questions (and provides a flowchart) for helping to decide whether a blockchain network would be of benefit.

While several sources have been mentioned above for deciding if a blockchain would be applicable, there are many more. Most of the advice surrounding blockchain technology is: investigate it and use it if it is appropriate – not because it is new.

## 8.1   Additional Blockchain Considerations

When deciding whether to utilize a blockchain, one must take into consideration additional factors and determine if these factors limit one's ability to use a blockchain or a particular type of blockchain:

- **Data Visibility**
  - Permissioned blockchain networks may or may not reveal blockchain data publicly. The data may only be available to those within the blockchain network. Consider scenarios where data may be governed by policy or regulations (such as Personally Identifiable Information (PII) or General Data Protection Regulation (GDPR) regulations). Data such as this may or may not be appropriate to store even within a permissioned blockchain network.
  - Permissionless blockchain networks can allow anyone to inspect and contribute to the blockchain. The data is generally public. This leads to several questions that must be considered. Does the data for the application need to be available to everyone? Is there any harm to having public data?
- **Full transactional history** – Some blockchain networks provide a full public history of a digital asset – from creation, to every transaction it is included in. This feature may be beneficial for some solutions, and not beneficial for others.
- **Fake Data Input** – Since multiple users are contributing to a blockchain, some could submit false data, mimicking data from valid sources (such as sensor data). It is difficult to automate the verification of data that enters a blockchain network. Smart contract implementations may provide additional checks to help validate data where possible.
- **Tamper evident and tamper resistant data** – Many applications follow the "CRUD" (create, read, update, delete) functions for data. With a blockchain, there is only "CR" (create, read). There are methods that can be employed to "deprecate" older data if a newer version is found, but there is no removal process for the original data. By using new transactions to amend and update previous transactions, data can be updated while providing a full history. However, even if a new transaction marked an older transaction as "deleted" – the data would still be present in the blockchain data, even if it is not shown within an application processing the data.
- **Transactions Per Second** – Transaction processing speed is highly dependent on the consensus model used. Currently transactions on many permissionless blockchain networks are not executed at the same pace as other information technology solutions due to a slow publication time for blocks (usually in terms of seconds, but sometimes minutes). Thus, some slowdown in blockchain dependent applications may occur while

CYBER2-29777 - 01085

waiting for data to be posted. One must ask if their application can handle relatively slow transaction processing?

- **Compliance** – The use of blockchain technology does not exclude a system from following any applicable laws and regulations. For example, there are many compliance considerations with regards to legislation and policies tied to PII or GDPR that identify that certain information should not be placed on the blockchain. In addition, certain countries may limit the type of data that can be transferred across its geographic boundary. In other instances, certain legislation may dictate that the "first write" of financial transactions must be written to a node which is present within their borders. In any of these cases, a public, permissionless chain may be less appropriate, with a permissioned or hybrid approach required to satisfy regulatory needs.

  An additional example of laws and regulations are for any blockchain network which manages federal records. Federal records are subject to many laws and regulations.[11] Federal agencies themselves must follow specific federal guidelines when utilizing blockchain technology.[12]

- **Permissions** – For permissioned blockchain networks, there are considerations around the permissions themselves
    - Granularity – do the permissions within the system allow for enough granularity for specific roles that users may need (in a manner like Role-Based Access Control methods) to perform actions within the system
        - Permissioned blockchain networks allow for more traditional roles such as administrator, user, validator, auditor, etc.
    - Administration – who can administer permissions? Once permissions are administered to a user, can they easily be revoked?

- **Node Diversity** – A blockchain network is only as strong as the aggregate of all the existing nodes participating in the network.  If all the nodes share similar hardware, software, geographic location, and messaging schema then there exists a certain amount of risk associated with the possibility of undiscovered security vulnerabilities.  This risk is mitigated through the decentralization of the network of heterogeneous devices, which may be defined as "the non-shared characteristics between any one node and the generalized set"

---

[11] Such as found in the National Archives and Records Administration handbook https://www.archives.gov/records-mgmt/handbook/records-mgmt-language.html

[12] Such as found in the National Archives and Administration policy guide https://www.archives.gov/records-mgmt/policy/universalrequirements

CYBER2-29777 - 01086

## 9   Conclusions

Blockchain technology is a new tool with potential applications for organizations, enabling secure transactions without the need for a central authority. Starting in 2009[13], with Bitcoin leveraging blockchain technology, there has been an increasing number of blockchain technology-based solutions.

The first applications were electronic cash systems with the distribution of a global ledger containing all transactions. These transactions are secured with cryptographic hashes, and transactions are signed and verified using asymmetric-key pairs. The transaction history efficiently and securely records a chain of events in a way that any attempt to edit or change a past transaction will also require a recalculation of all subsequent blocks of transactions.

The use of blockchain technology is still in its early stages, but it is built on widely understood and sound cryptographic principles. Currently, there is a lot of hype around the technology, and many proposed uses for it. Moving forward, it is likely that the hype will die down, and blockchain technology will become just another tool that can be used.

As detailed throughout this publication, a blockchain relies on existing network, cryptographic, and recordkeeping technologies but uses them in a new manner. It will be important that organizations are able to look at the technologies and both the advantages and disadvantages of using them. Once a blockchain is implemented and widely adopted, it may become difficult to change it. Once data is recorded in a blockchain, that data is usually there forever, even when there is a mistake. Applications that utilize the blockchain as a data layer work around the fact that the actual blockchain data cannot be altered by making later blocks and transactions act as updates or modifications to earlier blocks and transactions. This software abstraction allows for modifications to working data, while providing a full history of changes. For some organizations these are desirable features. For others, these may be deal breakers preventing the adoption of blockchain technology.

Blockchain technology is still new and organizations should treat blockchain technology like they would any other technological solution at their disposal--use it only in appropriate situations.

---

[13] Although the whitepaper *Bitcoin: A Peer-to-Peer Electronic Cash System* was published in 2008, the actual Bitcoin network would not launch until 2009.

CYBER2-29777 - 01087

## Appendix A—Acronyms

Selected acronyms and abbreviations used in this paper are defined below.

| | |
|---|---|
| ACM | Association for Computing Machinery |
| ACT-IAC | American Council for Technology and Industry Advisory Council |
| ASIC | Application-Specific Integrated Circuit |
| BCH | Bitcoin Cash |
| BFT | Byzantine Fault Tolerant |
| BTC | Bitcoin |
| CPU | Central Processing Unit |
| CR | Create, Read |
| CRUD | Create, Read, Update, Delete |
| DAG | Directed Acyclic Graph |
| DAO | Decentralized Autonomous Organization |
| DHS | Department of Homeland Security |
| DID | Decentralized Identifier |
| DSA | Digital Signature Algorithm |
| ECDSA | Elliptic Curve Digital Signature Algorithm |
| ETC | Ethereum Classic |
| ETH | Ethereum |
| EVM | Ethereum Virtual Machine |
| FIPS | Federal Information Processing Standard |
| FOIA | Freedom of Information Act |
| GDPR | General Data Protection Regulation |
| GPU | Graphics Processing Unit |
| I2P | Invisible Internet Project |

CYBER2-29777 - 01088

| IEEE | Institute of Electrical and Electronics Engineers |
| IoT | Internet of Things |
| IR | Internal Report |
| ITL | Information Technology Laboratory |
| KYC | Know Your Customer |
| LDAP | Lightweight Directory Access Protocol |
| NARA | National Archives and Records Administration |
| NIST | National Institute of Standards and Technology |
| NISTIR | National Institute of Standards and Technology Internal Report |
| MB | Megabyte |
| PII | Personally Identifiable Information |
| PoET | Proof of Elapsed Time |
| PoS | Proof of Stake |
| PoW | Proof of Work |
| QR | Quick Response |
| RIPEMD | RACE Integrity Primitives Evaluation Message Digest |
| RSA | Rivest-Shamir-Adleman |
| SegWit | Segregated Witness |
| SHA | Secure Hash Algorithm |
| XRP | Ripple |

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01089

## Appendix B—Glossary

Selected terms used in this paper are defined below.

| | |
|---|---|
| Address | A short, alphanumeric string derived from a user's public key using a hash function, with additional data to detect errors. Addresses are used to send and receive digital assets. |
| Assets | Anything that can be transferred. |
| Asymmetric-key cryptography | A cryptographic system where users have a private key that is kept secret and used to generate a public key (which is freely provided to others). Users can digitally sign data with their private key and the resulting signature can be verified by anyone using the corresponding public key. |
| | Also known as Public-key cryptography. |
| Block | A data structure containing a block header and block data. |
| Block data | The portion of a block that contains a set of validated transactions and ledger events. |
| Block header | The portion of a block that contains information about the block itself (block metadata), typically including a timestamp, a hash representation of the block data, the hash of the previous block's header, and a cryptographic nonce (if needed). |
| Block reward | A reward (typically cryptocurrency) awarded to publishing nodes for successfully adding a block to the blockchain. |
| Blockchain | Blockchains are distributed digital ledgers of cryptographically signed transactions that are grouped into blocks. Each block is cryptographically linked to the previous one (making it tamper evident) after validation and undergoing a consensus decision. As new blocks are added, older blocks become more difficult to modify (creating tamper resistance). New blocks are replicated across copies of the ledger within the network, and any conflicts are resolved automatically using established rules. |



| | |
|---|---|
| Blockchain network user | Any single person, group, business, or organization which is using or operating a blockchain node. |

CYBER2-29777 - 01090

| | |
|---|---|
| Byzantine fault tolerant proof of stake consensus model | A proof of stake consensus model where the blockchain decides the next block by allowing all staked members to "vote" on which submitted block to include next. |
| Centralized network | A network configuration where participants must communicate with a central authority to communicate with one another. Since all participants must go through a single centralized source, the loss of that source would prevent all participants from communicating.  |
| Chain-based proof of stake consensus model | A proof of stake consensus model where the blockchain network decides the next block through pseudo-random selection, based on a personal stake to overall system asset ratio. |
| Checksum | Value computed on data to detect error or manipulation. |
| Confirmed | State of a transaction or block when consensus has been reached about its status of inclusion into the blockchain. |
| Conflict | One or more participants disagree on the state of the system. |
| Conflict resolution | A predefined method for coming to a consensus on the state of the system. For example, when portions of the system participants claim there is State_A and the rest of the participants claim there is State_B, there is a conflict. The system will automatically resolve this conflict by choosing the "valid" state as being the one from whichever group adds the next block of data. Any transactions "lost" by the state not chosen are added back into the pending transaction pool.  |
| Consensus model | A process to achieve agreement within a distributed system on the valid state.

Also known as a *consensus algorithm, consensus mechanism, consensus method.* |
| Cryptocurrency | A digital asset/credit/unit within the system, which is cryptographically sent from one blockchain network user to another. In the case of cryptocurrency creation (such as the reward for mining), the publishing node includes a transaction sending the newly created cryptocurrency to one or more blockchain network users.

These assets are transferred from one user to another by using digital signatures with asymmetric-key pairs. |

CYBER2-29777 - 01091

| Cryptographic hash function | A function that maps a bit string of arbitrary length to a fixed-length bit string. Approved hash functions satisfy the following properties: |
|---|---|

1. (*Preimage resistant*) It is computationally infeasible to compute the correct input value given some output value (the hash function is 'one way').
2. (*Second preimage resistant*) One cannot find an input that hashes to a specific output.
3. (*Collision resistant*) It is computationally infeasible to find any two distinct inputs that map to the same output.

See the NIST SP 800-175B Guideline for Using Cryptographic Standards in the Federal Government: Cryptographic Mechanisms, http://dx.doi.org/10.6028/NIST.SP.800-175B.

| Cryptographic nonce | An arbitrary number that is used once. |
|---|---|
| Decentralized network | A network configuration where there are multiple authorities that serve as a centralized hub for a subsection of participants. Since some participants are behind a centralized hub, the loss of that hub will prevent those participants from communicating. |



| Digest | See hash digest |
|---|---|
| Digital asset | Any asset that is purely digital, or is a digital representation of a physical asset |
| Digital signature | A cryptographic technique that utilizes asymmetric-keys to determine authenticity (i.e., users can verify that the message was signed with a private key corresponding to the specified public key), non-repudiation (a user cannot deny having sent a message) and integrity (that the message was not altered during transmission). |
| Distributed network | A network configuration where every participant can communicate with one another without going through a centralized point. Since there are multiple pathways for communication, the loss of any participant will not prevent communication.

This is also known as a peer-to-peer network. |



CYBER2-29777 - 01092

| Double spend (problem) | Transacting with the same set of digital assets more than once. This is a problem which has plagued many digital money systems, and a problem that most blockchain networks are designed to prevent. |
|---|---|
| Double spend (attack) | An attack where a blockchain network user attempts to explicitly double spend a digital asset. |
| Fault tolerance | A property of a system that allows proper operation even if components fail. |
| Fork | A change to blockchain network's software (usually the consensus algorithm). The changes may be backwards compatible - see Soft Fork, or the changes may not be backwards compatible - see Hard Fork. |
| Full node | A blockchain node that stores the blockchain data, passes along the data to other nodes, and ensures that newly added blocks are valid and authentic. |
| Genesis block | The first block of a blockchain network; it records the initial state of the system. |
| Hard fork | A change to a blockchain implementation that is not backwards compatible. Non-updated nodes cannot continue to transact with updated nodes. |
| Hash chain | An append-only data structure where data is bundled into data blocks that include a hash of the previous data block's data within the newest data block. This data structure provides evidence of tampering because any modification to a data block will change the hash digest recorded by the following data block. |
| Hash digest | The output of a hash function (e.g., hash(data) = digest). Also known as a message digest, digest or hash value. |
| Hash rate | The number of cryptographic hash functions a processor can calculate in a given time, usually denominated as hashes per second. |
| Hash value | See Hash digest. |
| Hashing | A method of calculating a relatively unique output (called a *hash digest*) for an input of nearly any size (a file, text, image, etc.) by applying a cryptographic hash function to the input data. |
| Immutable | Data that can only be written, not modified or deleted. |
| Incentive mechanism | See Reward system |
| Ledger | A record of transactions. |
| Lightweight node | A blockchain node that does not need to store a full copy of the blockchain and often passes its data to full nodes to be processed. |

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01093

| Merkle tree | A data structure where the data is hashed and combined until there is a singular root hash that represents the entire structure. |  |
|---|---|---|

| | |
|---|---|
| Mining | The act of solving a puzzle within a proof of work consensus model. |
| Pending transaction pool | A distributed queue where candidate transactions wait until they are added to the blockchain. |
| | Also known as memory pool, or mempool. |
| Publishing node | A node that, in addition to all responsibilities required of a full node, is tasked with extending the blockchain by creating and publishing new blocks. |
| | Also known as a mining node, committing node, minting node. |
| Node | An individual system within the blockchain network. |
| Nonce | See Cryptographic Nonce |
| Orphan block | Any block that is not in the main chain after a temporary ledger conflict. |
| Permissioned | A system where every node, and every user must be granted permissions to utilize the system (generally assigned by an administrator or consortium). |
| Permissionless | A system where all users' permissions are equal and not set by any administrator or consortium. |
| Permissions | Allowable user actions (e.g., read, write, execute). |
| Proof of stake consensus model | A consensus model where the blockchain network is secured by users locking an amount of cryptocurrency into the blockchain network, a process called *staking*. Participants with more stake in the system are more likely to want it to succeed and to not be subverted, which gives them more weight during consensus. |
| Proof of work consensus model | A consensus model where a publishing node wins the right to publish the next block by expending time, energy, and computational cycles to solve a hard-to-solve, but easy-to-verify problem (e.g., finding the nonce which, when combined with the data to be added to the block, will result in a specific output pattern). |
| Public key cryptography | See Asymmetric-key cryptography. |

CYBER2-29777 - 01094

| | |
|---|---|
| Reward system | A means of providing blockchain network users an award for activities within the blockchain network (typically used as a system to reward successful publishing of blocks).<br><br>Also known as incentive system. |
| Round robin consensus model | A consensus model for permissioned blockchain networks where nodes are pseudo-randomly selected to create blocks, but a node must wait several block-creation cycles before being chosen again to add another new block. This model ensures that no one participant creates the majority of the blocks, and it benefits from a straightforward approach, lacking cryptographic puzzles, and having low power requirements. |
| Smart contract | A collection of code and data (sometimes referred to as functions and state) that is deployed using cryptographically signed transactions on the blockchain network. The smart contract is executed by nodes within the blockchain network; all nodes must derive the same results for the execution, and the results of execution are recorded on the blockchain. |
| Soft fork | A change to a blockchain implementation that is backwards compatible. Non-updated nodes can continue to transact with updated nodes. |
| Tamper evident | A process which makes alterations to the data easily detectable. |
| Tamper resistant | A process which makes alterations to the data difficult (hard to perform), costly (expensive to perform), or both. |
| Transaction | A recording of an event, such as the transfer of assets (digital currency, units of inventory, etc.) between parties, or the creation of new assets. |
| Transaction fee | An amount of cryptocurrency charged to process a blockchain transaction. Given to publishing nodes to include the transaction within a block. |
| Turing complete | A system (computer system, programming language, etc.) that can be used for any algorithm, regardless of complexity, to find a solution. |
| Wallet | Software used to store and manage asymmetric-keys and addresses used for transactions. |

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01095

## Appendix C—References

[1]     Clarke, A.C., "Hazards of Prophecy: The Failure of Imagination," from *Profiles of the Future: An Inquiry into the Limits of the Possible*, 1962.

[2]     Lamport, Leslie. "The Part-Time Parliament." *ACM Transactions on Computer Systems*, vol. 16, no. 2, Jan. 1998, pp. 133–169., https://dl.acm.org/citation.cfm?doid=279227.279229.

[3]     Narayanan, A., Bonneau, J., Felten, E., Miller, A., and Goldfede, S., *Bitcoin and Cryptocurrency Technologies: A Comprehensive Introduction*, Princeton University Press, 2016.

[4]     Nakamoto, S., "Bitcoin: A Peer-to-Peer Electronic Cash System," 2008. https://bitcoin.org/bitcoin.pdf

[5]     National Institute of Standards and Technology, *Secure Hash Standard (SHS)*, Federal Information Processing Standards (FIPS) Publication 180-4, August 2015. https://doi.org/10.6028/NIST.FIPS.180-4

[6]     National Institute of Standards and Technology (NIST), Secure Hashing website, https://csrc.nist.gov/projects/hash-functions

[7]     "Hash per Second." *Bitcoin Wiki*, http://en.bitcoin.it/wiki/Hash_per_second.

[8]     National Institute of Standards and Technology, *SHA-3 Standard: Permutation-Based Hash and Extendable-Output Functions*, Federal Information Processing Standards (FIPS) Publication 202, August 2015. https://doi.org/10.6028/NIST.FIPS.202

[9]     National Institute of Standards and Technology (NIST), *Digital Signature Standard*, Federal Information Processing Standards (FIPS) Publication 186-4, July 2013. https://doi.org/10.6028/NIST.FIPS.186-4

[10]    "LDAP.com." *LDAP.com*, https://www.ldap.com.

[11]    "How Is the Address of an Ethereum Contract Computed?" *Ethereum Stack Exchange*, 29 Jan. 2016, 22:14, https://ethereum.stackexchange.com/questions/760/how-is-the-address-of-an-ethereum-contract-computed.

[12]    Bahsoun, J.P., Guerraoui, R., and Shoker, A., "Making BFT Protocols Really Adaptive," *2015 IEEE International Parallel and Distributed Processing Symposium*, Hyderabad, India, pp. 904-913, 2015. https://doi.org/10.1109/IPDPS.2015.21

[13]    Lamport, L. "Time, Clocks, and the Ordering of Events in a Distributed System." Communications of the ACM, vol. 21, no. 7, January 1978, pp. 558–565., doi:10.1145/359545.359563. https://amturing.acm.org/p558-lamport.pdf.

[14]    Todd, P. Bitcoin Improvement Protocol (BIP) 65, "OP_CHECKLOCKTIMEVERIFY," October 1, 2014. https://github.com/bitcoin/bips/blob/master/bip-0065.mediawiki

CYBER2-29777 - 01096

[15]    Wong, J. and Kar, I., "Everything you need to know about the Ethereum 'hard fork,'" *Quartz Media*, July 18, 2016. https://qz.com/730004/everything-you-need-to-know-about-the-ethereum-hard-fork/

[16]    Chen, L., Jordan, S., Liu, Y.-K., Moody, D., Peralta, R., Perlner, R., and Smith-Tone, D., *Report on Post-Quantum Cryptography*, National Institute of Standards and Technology Internal Report (NISTIR) 8105, April 2016. https://doi.org/10.6028/NIST.IR.8105

[17]    Szabo, N. "Smart Contracts," 1994. http://www.fon.hum.uva.nl/rob/Courses/InformationInSpeech/CDROM/Literature/LOTwinterschool2006/szabo.best.vwh.net/smart.contracts.html

[18]    Mell, P., Kelsey, J., and Shook, J., "Cryptocurrency Smart Contracts for Distributed Consensus of Public Randomness." October 7, 2017. https://doi.org/10.1007/978-3-319-69084-1_31

[19]    "Majority Attack." *Bitcoin Wiki*, https://en.bitcoin.it/wiki/Majority_attack.

[20]    Greenspan, G. "The Blockchain Immutability Myth." CoinDesk, May 9, 2017, https://www.coindesk.com/blockchain-immutability-myth/.

[21]    Narayanan, A., "Analyzing the 2013 Bitcoin fork: centralized decision-making saved the day," MultiChain, July 28, 2015. https://freedom-to-tinker.com/2015/07/28/analyzing-the-2013-bitcoin-fork-centralized-decision-making-saved-the-day

[22]    Buck, J. "Blockchain Oracles, Explained." Cointelegraph, October 18, 2017, https://cointelegraph.com/explained/blockchain-oracles-explained

[23]    https://medium.com/@kleffew/truthpoint-angelhacks-dc-submission-5569252d795a

[24]    Greenspan, G., "The Blockchain Immutability Myth," MultiChain, May 4, 2017. https://www.multichain.com/blog/2017/05/blockchain-immutability-myth/

[25]    de Vries, A. "Bitcoin's Growing Energy Problem." *Joule*, vol. 2, no. 5, 16 May 2018, pp. 801–805., https://doi.org/10.1016/j.joule.2018.04.016.

[26]    Deetman, S., "Bitcoin Could Consume as Much Electricity as Denmark by 2020," *Motherboard*, March 29, 2016. https://motherboard.vice.com/en_us/article/bitcoin-could-consume-as-much-electricity-as-denmark-by-2020

[27]    Hern, A., "Bitcoin mining consumes more electricity a year than Ireland," *The Guardian*, November 27, 2017. https://www.theguardian.com/technology/2017/nov/27/bitcoin-mining-consumes-electricity-ireland

[28]    Power Compare, https://powercompare.co.uk/bitcoin/

[29]    Loh, T. "Bitcoin's Power Needs May Be Overblown." *Bloomberg.com*, Bloomberg, January 16, 2018, https://www.bloomberg.com/news/articles/2018-01-16/bitcoin-s-power-needs-may-be-overblown-recalling-pot-growing.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

56

[30]     "Blockchain Size." Blockchain.com, www.blockchain.com/charts/blocks-size.
         Accessed July 19, 2018.

[31]     "ACT-IAC White Paper: Enabling Blockchain Innovation in the U.S. Federal
         Government." ACT-IAC, February 27, 2018, https://www.actiac.org/act-iac-
         white-paper-enabling-blockchain-innovation-us-federal-government.

[32]     "ACT-IAC White Paper: Blockchain Playbook for the U.S. Federal Government."
         ACT-IAC, April 23, 2018, https://www.actiac.org/act-iac-white-paper-blockchain-
         playbook-us-federal-government.

[33]     Wüst, K., Gervais, A. "Do You Need a Blockchain?" IACR ePrint Archive, 2017,
         p. 375., https://eprint.iacr.org/2017/375.pdf.

[34]     "Do You Need a Blockchain?" Do You Need a Blockchain?,
         http://doyouneedablockchain.com/.

[35]     Peck, Morgen E. "Do You Need a Blockchain?" IEEE Spectrum: Technology,
         Engineering, and Science News, IEEE Spectrum, September 29, 2017,
         https://spectrum.ieee.org/computing/networks/do-you-need-a-blockchain.

[36]     Hochstein, M. "Don't Use a Blockchain Unless You Really Need One." CoinDesk,
         CoinDesk, 16 Jan. 2018, https://www.coindesk.com/dont-use-blockchain-unless-
         really-need-one/.

[37]     Chand, M. "Do You Need A Blockchain." C# Corner, January 4, 2018,
         https://www.c-sharpcorner.com/article/do-you-need-a-blockchain2/.

This publication is available free of charge from: https://doi.org/10.6028/NIST.IR.8202

CYBER2-29777 - 01098

# EXHIBIT 139

CYBER2-29777 - 01144

# How to Become a Relayer?

⊙ **web.archive.org**/web/20220609181519/https://docs.tornado.cash/general/how-to-become-a-relayer

Following the execution of Tornado Cash 10th governance proposal, anyone can become a relayer for Tornado Cash users.

The only condition to be included on the Tornado Cash UI is to lock a min. of `300 TORN` *. To remain listed, it is needed to keep enough TORN locked (~ `40 TORN` at the moment in April 2022) to be able to pay back the transaction fee to the staking contract.

*This minimum stake can be changed by a governance vote at any time.*

Relayers form an essential & necessary part of the Tornado Cash ecosystem. Their use guarantees privacy as they solve the infamous "fee payment dilemma? : how to pay fees for token withdrawals from a pool while maintaining anonymity?

Therefore, relayers act as third parties and manage the entire withdrawal. They pay for transaction fees by deducting them directly from the transferred amount. They also charge an additional fee for their services.

Since the implementation of the Relayer Registry proposal, the protocol collects a fee directly from the relayer's staked balance through the `StakingReward` contract for each withdrawal. This fee percentage may vary from one pool to another and is also subject to change through on-chain governance.

Currently, it is fixed at `0.3%` . Some pools remain without fees, either because the instance is too small to assign a fee (0.1 ETH, 100 DAI/USDT, 1000 DAI/USDT), or because there is not enough liquidity on Uni v3 (all cDAI instances).

Anyone can become a relayer for the protocol in **6 simple steps** through a Relayer Registry User Interface (UI).

Below you will find everything your need to join our relayers' club & get listed on Tornado Cash decentralized relayer registry.

---

1. Warning: Understand & Accept Potential Risks

Before you commit to sharing part of your journey with Tornado Cash users as a relayer, you need to understand & accept all potential risks of being a relayer for the protocol.

---

How a Relayer is chosen by user interface

The formula for designating a relayer is as follows:

CYBER2-29777 - 01145

The list of all registered relayers is retrieved from the Relayer Registry smart contract.

For each relayer, calculate a score based on its staked TORN and its fee. The higher the stake, the higher the score is; the higher the fee, the lower the score is. For Ethereum mainnet, the formula used to calculate the score is `stake * [1 - 25*(fee-0.33)^2]`; for sidechains, the formula is `stake * [1 - 11.89*(fee-0.01)^2]`.

Then randomly pick a relayer, weighted by its calculated score.

---

## 2. Set up Relayer

The first concrete step is to run the Tornado Cash Relayer software for Ethereum Mainnet on your computer. All steps are outlined in the protocol's github. To complete this task successfully, you will have to carefully follow these instructions.

GitHub – tornadocash/tornado-relayer: Relayer for Tornado cash.

GitHub

Once completed, you will need to insert your url in the input box.



It is strongly recommended that you use your own RPC nodes. Instructions on how to run full nodes can be found here.

---

## 3. Set Up ENS Subdomain

The next steps entail:

CYBER2-29777 - 01146

Creating an ENS domain for your relayer.

Setting up its mainnet subdomain.

Adding a TXT record with the Relayer URL to the mainnet subdomain according to this specific format:

---

**Ethereum Relayers (Mandatory)**

TXT record

mainnet-tornado.xxx.eth

goerli-tornado.xxx.eth

---

**Sidechains Relayers (Optional)**

You also have the option to add subdomains with their corresponding TXT records to support chains other than Ethereum. Sidechains relayers use a different version of the Relayer software. The complete requirements with instructions are found here.
TXT record

bsc-tornado.xxx.eth

gnosis-tornado.xxx.eth

polygon-tornado.xxx.eth

optimism-tornado.xxx.eth

arbitrum-tornado.xxx.eth

avalanche-tornado.xxx.eth

---

**Nova Relayer (Optional)**

Tornado Cash Nova uses its own version of the software. If you wish to become a relayer for Tornado Cash Nova, you will find instructions to follow here.
TXT record

gnosis-nova.xxx.eth

CYBER2-29777 - 01147

# Set Up ENS Subdomain

ENS domain

◆ Mainnet                    Success ✓

✦ BSC                        Success ✓

◎ Gnosis                     Success ✓

⬡ Polygon                    Success ✓

▲ Avalanche                  Success ✓

OP Optimism                  Success ✓

⬡ Arbitrum                   Success ✓

Gö Goerli                    Success ✓



## 4. Set Up Workers

Workers are the addresses that will allow your relayer to send ZK-proofs to users. By default, the first worker is the ENS domain owner's address.

To ensure an extra level of security, we advise you to set up more than one worker.

Only the mainnet requires you to register workers. All other networks do not require the use of registered workers.



## 5. Stake

With the implementation of a decentralized relayer registry, a staking condition has been introduced as a requirement to become listed on Tornado Cash UI. Keep in mind **staking TORN is now necessary to be added to the recommended list of relayers.**

The minimum staked amount is currently set by Tornado Cash governance at `300 TORN`. This threshold can be changed by Tornado Cash governance at any time.

When a relayer is used in the Tornado Cash pool, a small amount of TORN is automatically collected from this staked balance by the `StakingReward` contract. This element is essential to keep in mind as relayers will need to keep enough TORN locked (~ `40 TORN` at the moment in April 2022) to be able to pay back the transaction fee to the staking contract.

The collected fees are subsequently distributed among DAO members with locked TORN tokens. TORN are usually locked to participate in on-chain governance (submitting & voting on proposals). You can find more information both on this forum post & in the Staking TORN documentation page.
Your staked TORN amount is not claimable, and it is non-refundable.



## 6. Summary: Final Verification & Registration

Last but not least, we advise you to **double-check all information** displayed in the Summary before registering.



*Welcome to the relayer team! Thanks to you, privacy can be better respected* 

*Written by **@bt11ba** & **@ayefda***

# EXHIBIT 157

CYBER2-29777 - 01312

Decentralized autonomous organizations (DAOs) | ethereum.org





🔍   ☰

CYBER2-29777 - 01313





# Decentralized autonomous organizations (DAOs)

- Member-owned communities without centralized leadership.
- A safe way to collaborate with internet strangers.

Decentralized autonomous organizations (DAOs) | ethereum.org

CYBER2-29777 - 01314

- lace to commit funds to a specific cause.

**On this page**                                                                 ›

≡   Ethereum use cases

DAOs are an effective and safe way to work with like-minded folks around the globe.

Think of them like an internet-native business that's collectively owned and managed by its members. They have built-in treasuries that no one has the authority to access without the approval of the group. Decisions are governed by proposals and voting to ensure everyone in the organization has a voice.

There's no CEO who can authorize spending based on their own whims and no chance of a dodgy CFO manipulating the books. Everything is out in the open and the rules around spending are baked into the DAO via its code.

# Why do we need DAOs?

Starting an organization with someone that involves funding and money requires a lot of trust in the people you're working with. But it's hard to trust someone you've only ever interacted with on the internet. With DAOs you don't need to trust anyone else in the group, just the DAO's code, which is 100% transparent and verifiable by anyone.

This opens up so many new opportunities for global collaboration and coordination

p so many new opportunities for global collaboration and coordination.

## A comparison

### DAO

Usually flat, and fully democratized.

Voting required by members for any changes to be implemented.

Votes tallied, and outcome implemented automatically without trusted intermediary.

Services offered are handled automatically in a decentralized manner (for example distribution of philanthropic funds).

All activity is transparent and fully public.

### A traditional organization

Usually hierarchical.

Depending on structure, changes can be demanded from a sole party, or voting may be offered.

If voting allowed, votes are tallied internally, and outcome of voting must be handled manually.

Requires human handling, or centrally controlled automation, prone to manipulation.

Activity is typically private, and limited to the public.

## DAO examples

To help this make more sense, here's a few examples of how you could use a DAO:

- A charity – you can accept membership and donations from anyone in the world and the group can decide how they want to spend donations.

- A freelancer network – you could create a network of contractors who pool their funds for office spaces and software

CYBER2-29777 - 01315

subscriptions.

- Ventures and grants – you could create a venture fund that pools investment capital and votes on ventures to back. Repaid money could later be redistributed amongst DAO-members.

# DAO membership

There are different models for DAO membership. Membership can determine how voting works and other key parts of the DAO.

## Token-based membership

Usually fully permissionless, depending on the token used. Mostly these governance tokens can be traded permissionlessly on a decentralized exchange. Others must be earned through providing liquidity or some other 'proof-of-work'. Either way, simply holding the token grants access to voting.

*Typically used to govern broad decentralized protocols and/or tokens themselves.*

**A famous example**

MakerDAO ↗ – MakerDAO's token MKR is widely available on decentralized exchanges. So anyone can buy into having voting power on the Maker protocol's future.

## Share-based membership

CYBER2-29777 - 01316

CYBER2-29777 - 01317

Share-based DAOs are more permissioned, but still quite open. Any prospective members can submit a proposal to join the DAO, usually offering a tribute of some value in the form of tokens or work. Shares represent direct voting power and ownership. Members can exit at any time with their proportionate share of the treasury.

*Typically used for more closer-knit, human-centric organizations like charities, worker collectives, and investment clubs. Can also govern protocols and tokens as well.*

### A famous example

MolochDAO ↗ – MolochDAO is focused on funding Ethereum projects. They require a proposal for membership so the group can assess whether you have the necessary expertise and capital to make informed judgments about potential grantees. You can't just buy access to the DAO on the open market.

# How do DAOs work?

The backbone of a DAO is its smart contract. The contract defines the rules of the organization and holds the group's treasury. Once the contract is live on Ethereum, no one can change the rules except by a vote. If anyone tries to do something that's not covered by the rules and logic in the code, it will fail. And because the treasury is defined by the smart contract too that means no one can spend the money without the group's approval either. This means that DAOs don't need a central authority. Instead, the group makes decisions collectively, and payments are automatically authorized when votes pass.

This is possible because smart contracts are tamper-proof once they go live on Ethereum. You can't just edit the code (the DAOs rules) without people noticing because everything is public

Decentralized autonomous organizations (DAOs) | ethereum.org

out people noticing because everything is public.

 More on smart contracts                                    →

## Ethereum and DAOs

Ethereum is the perfect foundation for DAOs for a number of reasons:

- Ethereum's own consensus is distributed and established enough for organizations to trust the network.

- Smart contract code can't be modified once live, even by its owners. This allows the DAO to run by the rules it was programmed with.

- Smart contracts can send/receive funds. Without this you'd need a trusted intermediary to manage group funds.

- The Ethereum community has proven to be more collaborative than competitive, allowing for best practices and support systems to emerge quickly.

## Join / start a DAO

### Join a DAO

- Ethereum community DAOs

- DAOHaus's list of DAOs ↗


CYBER2-29777 - 01318



Decentralized autonomous organizations (DAOs) | ethereum.org

## Start a DAO

- [Summon a DAO with DAOHaus ↗](#)
- [Create an Aragon-powered DAO ↗](#)
- [Start a colony ↗](#)
- [Build a DAO with DAOstack ↗](#)

# Further reading

## DAO Articles

- [What's a DAO? ↗](#) – [Aragon ↗](#)
- [House of DAOs ↗](#) – [Metagame ↗](#)
- [What is a DAO and what is it for? ↗](#) – [DAOhaus ↗](#)
- [How to Start a DAO-Powered Digital Community ↗](#) – [DAOhaus ↗](#)
- [What is a DAO? ↗](#) – [Coinmarketcap ↗](#)

## Videos

- [What is a DAO in crypto? ↗](#)

CYBER2-29777 - 01319

CYBER2-29777 - 01320

Website last updated: April 25, 2022

   

**Use Ethereum**

Ethereum wallets

Get ETH

Decentralized applications (dapps)

Layer 2

Run a node

Stablecoins

Stake ETH

**Learn**

What is Ethereum?

What is ether (ETH)?

Community guides and resources

History of Ethereum

Ethereum Whitepaper

Ethereum upgrades

Ethereum security and scam prevention

Ethereum glossary

Ethereum governance

Blockchain bridges

Ethereum energy consumption

What is Web3?

Ethereum Improvement Proposals

CYBER2-29777 - 01321

## Developers

Get started

Documentation

Tutorials

Learn by coding

Set up local environment

## Ecosystem

Community hub

Ethereum Foundation

Ethereum Foundation Blog ↗

Ecosystem Support Program ↗

Ecosystem Grant Programs

Ethereum brand assets

Devcon ↗

## Enterprise

Mainnet Ethereum

Private Ethereum

Enterprise

## About ethereum.org

About us

Jobs

Contributing

Language support

Privacy policy

Terms of use

Decentralized autonomous organizations (DAOs) | ethereum.org

Cookie policy

Contact ↗

CYBER2-29777 - 01322

# EXHIBIT 175

CYBER2-29777 - 01577

The Wayback Machine - https://web.archive.org/web/20220527111152/https://immune...



### Immunefi

## Tornado Cash

**Submit a Bug**

**Live since**

**KYC required**

**Maximum bounty**

Tornado Cash Bug Bounties | Immunefi

# Program Overview

Tornado Cash is a fully decentralized non-custodial protocol allowing private transactions in the crypto-space. Tornado Cash improves transaction privacy by breaking the on-chain link between source and destination addresses. It uses a smart contract that accepts ETH & other token deposits from one address and enables their withdrawal from a different address.

As a non-custodial protocol, users keep custody of their cryptocurrencies while operating Tornado Cash. At each deposit, users are provided with the private key enabling the access to the deposited funds, which gives users complete control over their assets.

For more information about Tornado Cash, please visit **https://tornado.cash/**.

This bug bounty program is focused on their smart contracts and is focused on preventing:

- Thefts or freezing of funds in anonymity pool
- Thefts or freezing of unclaimed yield (TORN anonymity mining)
- Theft of governance funds (Main on-chain Tornado DAO treasury only)
- On chain governance activity disruption

# Rewards by Threat Level

Rewards are distributed according to the impact of the vulnerability based on the **Immunefi Vulnerability Severity Classification System**. This is a simplified 5-level scale, with separate scales for websites/apps and smart contracts/blockchains, encompassing everything from consequence of exploitation to privilege required to likelihood of a successful exploit.

All smart contract bug reports must come with a PoC in order to be considered for a reward.

This bug bounty program has fixed rewards in **TORN**. The USD amounts reflected are only estimates. For an up-to-date price of the token, please visit **https://tornado.cash/**.

Critical smart contract vulnerabilities are further capped at 10% of economic damage, primarily taking into account the funds at risk. However, there is a minimum reward of **2 000 TORN**. Additionally, the maximum reward is capped at 32 500 TORN, even if 10% of the damage in USD equivalent is greater than the USD equivalent of 32 500 TORN.

Payouts are handled by the **Tornado Cash** team directly and are denominated in TORN. Payouts are done in **TORN.**

**Smart Contract**

( **Critical** )

Level

**Up to 32,500 TORN (~Up to USD $1,300,000)**

Payout

CYBER2-29777 - 01580

**PoC Required**

**High**

Level

**1,625 TORN (~USD $65,000)**

Payout

**PoC Required**

**Medium**

Level

**525 TORN (~USD $21,000)**

Payout

**PoC Required**

CYBER2-29777 - 01581

Tornado Cash Bug Bounties | Immunefi

# Assets in scope

### https://web.archive.org/web/20220527111152/https://ether...
Target

### Smart Contract - 0.1 ETH Pool
Type

### https://web.archive.org/web/20220527111152/https://ether...
Target

### Smart Contract - 1 ETH Pool
Type

### https://web.archive.org/web/20220527111152/https://ether...
Target

### Smart Contract - 10 ETH Pool
Type

### https://web.archive.org/web/20220527111152/https://ether...
Target

CYBER2-29777 - 01582

Tornado Cash Bug Bounties | Immunefi

**Smart Contract - 100 ETH Pool**
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

**Smart Contract - 100 DAI Pool**
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

**Smart Contract - 1k DAI Pool**
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

**Smart Contract - 10k DAI Pool**
Type

CYBER2-29777 - 01583

Tornado Cash Bug Bounties | Immunefi

https://web.archive.org/web/20220527111152/https://ether...

Target

**Smart Contract -** 100k DAI Pool

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

**Smart Contract -** 5k cDAI Pool

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

**Smart Contract -** 50k cDAI Pool

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

**Smart Contract -** 500k cDAI Pool

Type

CYBER2-29777 - 01584

Tornado Cash Bug Bounties | Immunefi

https://web.archive.org/web/20220527111152/https://ether...
Target

Smart Contract - 5m cDAI Pool
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

Smart Contract - 100 USDC Pool
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

Smart Contract - 1k USDC Pool
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

Smart Contract - 100 USDT Pool
Type

CYBER2-29777 - 01585

https://web.archive.org/web/20220527111152/https://ether…

Target

Smart Contract – 1k USDT Pool

Type

https://web.archive.org/web/20220527111152/https://ether…

Target

Smart Contract – 0.1 WBTC

Type

https://web.archive.org/web/20220527111152/https://ether…

Target

Smart Contract – 1 WBTC

Type

https://web.archive.org/web/20220527111152/https://ether…

Target

**Smart Contract - 10 WBTC**
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

**Smart Contract - Torn Token**
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

**Smart Contract - Governance Proxy**
Type

https://web.archive.org/web/20220527111152/https://ether...
Target

**Smart Contract - Reward Verifier**
Type

https://web.archive.org/web/20220527111152/https://ether...

CYBER2-29777 - 01587

Tornado Cash Bug Bounties | Immunefi

Target

Smart Contract - Withdraw Verifier

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

Smart Contract - Tree Update Verifier

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

Smart Contract - Reward Swap

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

Smart Contract - TornadoCash Proxy

Type

CYBER2-29777 - 01588

11/16

Tornado Cash Bug Bounties | Immunefi

https://web.archive.org/web/20220527111152/https://ether...

Target

Smart Contract - TornadoTrees

Type

https://web.archive.org/web/20220527111152/https://ether...

Target

Smart Contract - Miner

Type

https://web.archive.org/web/20220527111152/https://githu...

Target

Smart Contract - Poseidon hasher

Type

All smart contracts of Tornado Cash can be found at
**https://github.com/tornadocash**. However, only those in the Assets in
Scope table are considered as in-scope of the bug bounty program.

Tornado Cash Bug Bounties | Immunefi

# Impacts in scope

Only the following impacts are accepted within this bug bounty program. All other impacts are not considered as in-scope, even if they affect something in the assets in scope table.

**Smart Contract**

**Theft of governance funds (Main on-chain Tornado DAO treasury only)**
Impact
<span>( Critical )</span>

**Thefts or freezing of unclaimed yield (TORN anonymity mining)**
Impact
<span>( High )</span>

# Out of Scope & Rules

The following vulnerabilities are excluded from the rewards for this bug bounty program:

- Attacks that the reporter has already exploited themselves, leading to damage
- Attacks requiring access to leaked keys/credentials

CYBER2-29777 - 01590

- Attacks requiring access to privileged addresses (governance, strategist)

## Smart Contracts and Blockchain

- Incorrect data supplied by third party oracles

    - Not to exclude oracle manipulation/flash loan attacks

- Basic economic governance attacks (e.g. 51% attack)

- Severe break of privacy due to issues with the SNARK logic/code

- Lack of liquidity

- Best practice critiques

- Sybil attacks

- Centralization risks

The following activities are prohibited by this bug bounty program:

- Any testing with mainnet or public testnet contracts; all testing should be done on private testnets

- Any testing with pricing oracles or third party smart contracts

- Attempting phishing or other social engineering attacks against our employees and/or customers

- Any testing with third party systems and applications (e.g. browser extensions) as well as websites (e.g. SSO providers, advertising networks)

- Any denial of service attacks

- Automated testing of services that generates significant amounts of traffic

- Public disclosure of an unpatched vulnerability in an embargoed bounty

Explore

Hackers

Projects

Priority One

Nexus Matching

Whitehat Scholarship

About

Rules

Press

Brand Assets

Crypto Losses Report

CYBER2-29777 - 01592

Tornado Cash Bug Bounties | immunefi

**Blog**

**Contact**

**Privacy**

**Careers**

Hackers subscribed to our newsletter are 35.8% more likely to earn a Bounty

Your email, please                                    Prove it

Twitter

Discord

Medium

Youtube

LinkedIn

Copyright © Immunefi – Crypto bug bounty platform

CYBER2-29777 - 01593

# EXHIBIT 176

CYBER2-29777 - 01594



Subscribe to news



**CRYPTO NEWS**
AUSTRALIA

| Bitcoin | Ethereum | Tether | USD Coin | BNB |
|---|---|---|---|---|
| $30,383 AUD | $2,081 AUD | $1.56 AUD | $1.57 AUD | $446 AUD |
| ▼ -0.43% | ▼ -0.21% | ▼ -0% | ▼ -0% | ▼ -0.06% |

live prices by Swyftx.com.au

# Tornado Cash Token (TORN) Surges 94% Following Bullish Protocol Updates

2022, 9:30 AM *Jody McDonald* s ago
**Jody McDonald**
Crypto News Writer

The native token for the Tornado Cash protocol (TORN), an Ethereum-based privacy protocol, has surged 94 percent following the launch of its latest network updates.

Tornado Cash is a fully decentralised privacy protocol which enables anonymous transactions on the Ethereum network. The protocol achieves anonymity primarily by breaking the on-chain link between source and destination addresses when transactions are made.

I have seen a bit of @TornadoCash hate recently. This is ridiculous. There are many reasons other than crime that a person would want privacy. Here is a short list.

— 0xcacti (@0xcacti) February 14, 2022

Top ↑

PARTNER ADVERTISEMENT



## Price Increase Follows Launch Of Relayers

The latest price action for TORN follows the adoption and implementation of the protocol's 10th on-chain governance proposal, which saw the addition of relayers to the network:

> @TornadoCash relayer registry proposal #10 is definitely bullish for $TORN holders 🚀 ☑️ With the latest governance proposal about to be validated, I'm making a point about why this is so beneficial to $TORN valuation.
> 
> — bt1lba (@bt1lba) February 16, 2022

The community voted overwhelmingly in favour of the proposal, which was accepted on February 19. Following the launch of relayers on March 2, the price of TORN spiked from around US$37 to around the $US67 mark.

## What Are Relayers?

Tornado Cash relayers are community members who process withdrawal transactions and allow users to send transactions to accounts with no ETH balance – they are considered an important part of the protocol and improve users' privacy.

Relayers are compensated for their network services with a small portion of users' deposits. Anyone can become a relayer, provided they meet the minimum balance requirement of 300 TORN and accept the terms and conditions.

## TORN Gaining Momentum

The addition of relayers to the Tornado Cash protocol is a further boost following its integration of ETH layer 2 solution Arbitrum in December 2021, which saw a dramatic decrease in gas fees and improvements in transaction times:

> 4/4 🏁 Final Score: 85% 🔥 #DeFi #ETH #MATIC #AVAX #BSC $TORNhttps://t.co/4Fs1fQ8uRK@semenov_roman @TornadoCash @bt1lba @WUTornado @rstormsf @WillMcTighe @kaili_jenner @mike_h_wu
> — DeFiSafety (@DeFiSafety) March 1, 2022

The protocol was also recently assessed by DeFi safety, which found it to be highly secure – awarding Tornado Cash an overall score of 85 percent.

Top ↑

CYBER2-29777 - 01596

DEFI     ETHEREUM (ETH)     PRIVACY     TORNADO CASH (TORN)

## Share this article

    

🐦 Join in the conversation on this article's <u>Twitter thread</u>.

Disclaimer: The content and views expressed in the articles are those of the original authors own and are not necessarily the views of Crypto News. We do actively check all our content for accuracy to help protect our readers. This article content and links to external third-parties is included for information and entertainment purposes. It is not financial advice. Please do your own research before participating.

## Related News



**DEFI**

DeFi needs appropriate regulation before moving to retail, says Fed Chair: Finance Redefined

4 hours ago by Cointelegraph



**NFTS**

Starfish Finance Proposes DeFi-NFT Convergence on Polkadot

4 hours ago by Usethebitcoin

## Trusted Partners



Buy Crypto Hardware Wallet

**swyftx**
.com.au

Buy & Sell Cryptos



Crypto Trading Education

<u>View all partners</u>

## Trending

**RIPPLE**                                                                            #1

Popular Crypto Analyst Doubles Down on Explosive $XRP Price Prediction

**BITCOIN**                                                                           #2

Markets: XRP jumps amid court ruling against SEC, Bitcoin gains, Ether sole loser in crypto top 10

**TERRA**                                                                             #3

Crypto Trader Says One Altcoin That's Exploded 120% This Month Is About To Nuke – Here's His Target

## Popular                                                                      Top ↑

**REVIEW**
The Best Crypto Exchanges for Australia

**EVENT**
Australia Crypto Convention - Gold Coast, Sep 2022

## Today's Top Gainers

| | | | |
|---|---|---|---|
|  SAFEMOON | $8.39 | ▲ 57.72% |
| LUNC | $0.00 | ▲ 6.09% |
| ONT | $224.0 | ▲ 5.91% |
| FX | $0.38 | ▲ 5.24% |
| HNT | $8.39 | ▲ 5.12% |
| TON | $2.10 | ▲ 4.72% |

**View more**        powered by *Swyftx.com.au*

## Top Daily News

| ✉ Your email address | Go |
|---|---|

## Real-Time News



🐦  **Follow** on Twitter

✈  **Join** on Telegram

G  **Subscribe** on Google News

## C AUSTRALIA

Crypto News provides you with the most relevant Bitcoin, cryptocurrency & blockchain news.

### Useful links

News Archive
Sponsored Articles
Institution Crypto Purchases
Crypto Whale Transactions

### About Us

About
Writers
Partners
Affiliates
Advertise
Contact

**Are you a journalist or an editor? Join us: editor@cryptonews.com.au**

Top ↑

CYBER2-29777 - 01598

Disclaimer: By using this website, you agree to our Terms and Conditions and Privacy Policy. Crypto News Australia is a news service that is dedicated to upholding the highest journalistic standards and adheres to its Editorial Policy. Crypto News Australia are a subsidiary of Swyftx Pty Ltd, which operates a cryptocurrency exchange in Australia and New Zealand. Any affiliations or relationships are outlined in our Partners page or Affiliates page. Our website is purely informational and provides news about cryptocurrency & blockchain. The information on Crypto News Australia should not be taken as financial advice, investment advice or a personal recommendation. Buying and trading cryptocurrencies is a high-risk activity. Please do your own due diligence before making any investment decisions. We are not accountable, directly or indirectly, for any damage or loss incurred, alleged or otherwise, in connection to the use or reliance of any content you read on this or any affiliated website.

© Crypto News Pty Ltd   2017 - 2022   ABN 88 611 395 067

Terms    Privacy policy   Refund policy   Cookies policy   Editorial policy

Trademarks

Top ↑

# EXHIBIT 179

CYBER2-29777 - 01752



U.S. Department of Justice

REPORT OF THE
ATTORNEY
GENERAL'S
**CYBER**
**DIGITAL**
TASK FORCE

# CRYPTOCURRENCY

# ENFORCEMENT
# FRAMEWORK

CYBER2-29777 - 01753

# REPORT OF THE
# ATTORNEY
# GENERAL'S
# **CYBER**
# **DIGITAL**
# TASK FORCE

CYBER2-29777 - 01754

United States Department of Justice
Office of the Deputy Attorney General
Cyber-Digital Task Force
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
https://www.justice.gov/cryptoreport

*October 2020*

\*      \*      \*

**Guidance Disclaimer:** This document does not contain any new binding legal requirements not otherwise already imposed by statute or regulation. To the extent this Enforcement Framework is viewed as a guidance document within the definition of Executive Order 13891, the contents of this document do not have the force and effect of law and are not meant to bind the public in any way. If viewed as a guidance document, this document is intended only to provide clarity to the public regarding existing requirements under the law or Department of Justice policies.

# TABLE OF CONTENTS

ATTORNEY GENERAL'S CYBER-DIGITAL TASK FORCE ......................... v

INTRODUCTION ................................................................... vii

CRYPTOCURRENCY: AN ENFORCEMENT FRAMEWORK ................... 1

PART I
THREAT OVERVIEW .......................................................... 2
    THE BASICS ................................................................. 2
    LEGITIMATE USES ........................................................ 5
    ILLICIT USES ............................................................... 5
    THE ROLE OF DARKNET MARKETS ............................... 16

PART II
LAW AND REGULATIONS ................................................. 20
    CRIMINAL CODE AUTHORITIES ................................. 20
    REGULATORY AUTHORITIES ...................................... 22
    INTERNATIONAL REGULATION ................................. 35

PART III
ONGOING CHALLENGES AND FUTURE STRATEGIES ........... 37
    BUSINESS MODELS AND ACTIVITIES THAT MAY FACILITATE
     CRIMINAL ACTIVITY ............................................... 37
    DEPARTMENT OF JUSTICE RESPONSE STRATEGIES .............. 44

CONCLUSION ................................................................. 51

CYBER2-29777 - 01756

CYBER2-29777 - 01757



## ATTORNEY GENERAL'S CYBER-DIGITAL TASK FORCE

### Task Force Members

**Sujit Raman, Chair**
Associate Deputy Attorney General
*Office of the Deputy Attorney General*

**John Brown**
Executive Assistant Director
*Federal Bureau of Investigation*

**John C. Demers**
Assistant Attorney General
*National Security Division*

**Andrew E. Lelling**
United States Attorney
*District of Massachusetts*

**Brian C. Rabbitt**
Assistant Attorney General (Acting)
*Criminal Division*

**Terry Wade**
Executive Assistant Director
*Federal Bureau of Investigation*

**Beth A. Williams**
Assistant Attorney General
*Office of Legal Policy*

---

### Task Force Contributors

Anthony M. Shults
Senior Counsel, Office of Legal Policy
*Staff Director*

Sabrina Bagdasarian
Jeff Breinholt
Thomas Burrows
Richard W. Downing

Lindsey Freeman
Christopher Hardee
Adam Hickey
Michele R. Korver
Erin Mikita

Sean Newell
C. Alden Pelker
Kimberley Raleigh
Leo Tsao

*And the Men and Women of the Federal Bureau of Investigation*

CYBER2-29777 - 01759

# Introduction

Innovation can drive a society forward. But innovation does not occur in a vacuum. Public policy can establish background conditions that help the innovative spirit thrive—or create an environment in which that spirit is inhibited, or suppressed.

Even in societies where transformative scientific and technological advancements are achievable, public policy again plays a critical mediating role. In the wrong hands, or without appropriate safeguards and oversight, these advancements can facilitate great human suffering. Just ask the political enemies of authoritarian regimes that deploy surveillance tools Orwell never could have imagined. Or, closer to home, listen to the child victims of unspeakable sexual exploitation whose images and livestreamed abuse are so easily transmitted across the internet.

Technological innovation and human flourishing are complementary concepts, but the former does not guarantee the latter. Good public policy—and the fair and equitable enforcement of such policy—can help bring the two into alignment. And even as too much regulation undoubtedly stifles innovation (and human flourishing, too), the absence of law's protections can endanger progress across both dimensions. It takes careful consideration, and a deep and ongoing immersion in the facts, to understand when, and how, law should intervene. Once law's empire has established its root in a particular domain, it requires equally careful consideration (and humility on the part of government officials) to ensure that regulation goes no further than is required—that government action, in other words, reflects enforcement only of "those wise restraints that make us free."[i]

## This Enforcement Framework

In 2018, Attorney General Jeff Sessions established a Cyber-Digital Task Force within the U.S. Department of Justice to evaluate the impact that recent advances in technology have had on law enforcement's ability to keep our citizens safe. Acknowledging the many ways in which technological advances "have enriched our lives and have driven our economy," the Attorney General also noted that "the malign use of . . . technolog[y] harms our government, victimizes consumers and businesses, and endangers public safety and national security."[ii]

The Task Force issued a comprehensive report later that year. That report identified particular threats currently confronting our society, ranging from transnational criminal enterprises' sophisticated cyber-enabled schemes, to malign foreign influence operations, to efforts to compromise our nation's critical infrastructure. The report also identified a number of emerging threats whose contours are still developing, and recommended further examination of their potential impact. Specifically, the report recommended that "the Department should continue evaluating the emerging threats posed by rapidly developing cryptocurrencies that malicious cyber actors often use."[iii] This Cryptocurrency Enforcement Framework represents the fruits of the Task Force's efforts.

CYBER2-29777 - 01760

At the outset, it bears emphasizing that distributed ledger technology, upon which all cryptocurrencies build, raises breathtaking possibilities for human flourishing. These possibilities are rightly being explored around the globe, from within academia and industry, and from within governments—including our own.

It should be no surprise, for example, that researchers within the U.S. National Institute of Standards and Technology "have been investigating blockchain technologies at multiple levels: from use cases, applications and existing services, to protocols, security guarantees, and cryptographic mechanisms."[iv] Or that the U.S. Department of Defense's recently-issued Digital Modernization Strategy specifically identifies blockchain technology as having "promise to provide increased effectiveness, efficiency, and security."[v] Or that the U.S. Food and Drug Administration recently released a detailed vision for how it plans to deploy blockchain for food safety-related purposes.[vi] Or that—in the cryptocurrency space specifically—"the Federal Reserve is active in conducting research and experimentation related to distributed ledger technologies and the potential use cases for digital currencies," including by partnering with the Massachusetts Institute of Technology to "build and test a hypothetical digital currency oriented to central bank uses."[vii] Without doubt, cryptocurrency represents a transformative way to store and exchange value.

But as the following pages make clear, despite its relatively brief existence, this technology already plays a role in many of the most significant criminal and national security threats our nation faces. As the Task Force has found, illicit uses of cryptocurrency typically fall into three categories: (1) financial transactions associated with the commission of crimes; (2) money laundering and the shielding of legitimate activity from tax, reporting, or other legal requirements; or (3) crimes, such as theft, directly implicating the cryptocurrency marketplace itself. Part I of this Enforcement Framework examines in detail each of those categories.

Our society is not powerless in the face of these threats. As Part II demonstrates, the government has legal and regulatory tools available at its disposal to confront the threats posed by cryptocurrency's illicit uses. Interagency partnership is critical for effectively leveraging those tools. The Department of Justice has built strong working relationships with its regulatory and enforcement partners in the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the U.S. Department of the Treasury (including FinCEN, OFAC, and the IRS), among others, to enforce federal law in both its civil and criminal aspects. We have actively participated in international regulatory and criminal enforcement efforts, as well.

Those efforts are paying off. The past year alone has witnessed the indictment and arrest of the alleged operator of the world's largest online child sexual exploitation market, involving an enforcement action that was coordinated with the disruption of that darknet market, the rescue of over 20 child victims, and the seizure of hundreds of thousands of dollars' worth of bitcoin; the largest-ever seizure of cryptocurrency in the terrorism context, stemming from the

CYBER2-29777 - 01761

dismantling of terrorist financing campaigns running into the millions of dollars involving Hamas's military wing, al-Qaeda, and ISIS; the first-ever imposition of economic sanctions for virtual-asset-related malicious cyber activity; and a novel (and successful) use of the federal securities laws to protect investors in the cryptocurrency space, resulting in the disgorgement of over $1.2 billion in ill-gotten gains in a single case. We expect these enforcement trends to continue.

This report concludes in Part III with a discussion of the ongoing challenges the government faces in cryptocurrency enforcement—particularly with respect to business models (employed by certain cryptocurrency exchanges, platforms, kiosks, and casinos), and to activity (like "mixing" and "tumbling," "chain hopping," and certain instances of jurisdictional arbitrage) that may facilitate criminal activity.

## The Challenges We Face

Those challenges map neatly onto the broader set of challenges that many emerging technologies present to law enforcement. Blockchain-related technologies are complex and are difficult to learn; for example, the methods for executing crimes like pump-and-dump schemes are changing, and require investigators to familiarize themselves with everything from how initial coin offerings (ICOs) are conducted to how technologically-savvy people communicate on specialized communications applications. Not only are these emerging technologies difficult to learn, but the relevant markets also rapidly evolve. The ICO boom from a few years ago has given way to the exponential growth of Decentralized Finance markets in recent

months—with all the associated complexities and difficulties for enforcers seeking to stay ahead of the curve and keep investors safe.

The global nature of the blockchain ecosystem adds a further layer of complexity. Crime has been expanding beyond national borders for years, but blockchain takes this globalization to another level. Parties conduct transactions and transfers between continents in a matter of minutes, and the digital infrastructure of the blockchain itself almost always transcends territorial boundaries. Adding to the difficulty, some of the largest cryptoasset exchanges operate outside of the United States, and many still require nothing more than an unverified email address before allowing an individual to begin trading. Finally, decentralized platforms, peer-to-peer exchangers, and anonymity-enhanced cryptocurrencies that use non-public or private blockchains all can further obscure financial transactions from legitimate scrutiny. As this Enforcement Framework makes clear, the challenges are significant. But so, too, are the resources that the U.S. Department of Justice, as well as the U.S. government as a whole, are dedicating to the effort, in collaboration with our international partners.

## The Web 3.0

Technologists often talk about the Web 3.0, the next phase of the internet's evolution. On this vision, humans will reclaim the internet, their data, and their anonymity from large outside forces, whether they be corporate firms or government entities. Cryptocurrency—a medium of exchange defined, at its core, by a sense of private, individual control, and whose underlying

CYBER2-29777 - 01762

blockchain technology already provides the backbone for applications outside the digital currency context—is central to this decentralized, anonymized, and still-being-defined notion of a future in which "a more semantically intelligent web" leverages data that "will be used by algorithms to improve user experience and make the web more personalized and familiar," and in which users will no longer have to "rely on network and cellular providers that surveil the information going through their systems."viii Ultimately, the Web 3.0 is a vision about the nature of data itself, foretelling a world in which information is diffuse and dynamic—present everywhere at once, and therefore beyond any outsider's grasp.

Only time will tell how, and in what form, the Web 3.0 finally takes shape. To its proponents, this vision marries technological innovation with human flourishing. This Enforcement Framework suggests that, however liberating the emerging glimpses of the Web 3.0 might seem to be, that vision also can pose uniquely dangerous threats to public safety. Confronting and addressing those threats is what good public policy should do—and what the crypto ecosystem itself may have to do, if its vision of the future is ever fully to take hold. Meanwhile, federal authorities will continue vigorously enforcing the law as it exists, and pursuing justice on behalf of the American people.



*– **Sujit Raman**, Chair,*
*Attorney General's Cyber-Digital Task Force*



*Deputy Attorney General Jeffrey A. Rosen announces on September 22, 2020 the results of Operation DisrupTor, the U.S. government's largest operation to date targeting criminal activity on the darknet. The operation resulted in the arrest of nearly 180 dark web drug traffickers and criminals; the seizure of approximately 500 kilograms of illegal drugs worldwide; and the seizure of millions of dollars in cash and virtual currencies.*

x

CYBER2-29777 - 01764

# CRYPTOCURRENCY:
# AN ENFORCEMENT FRAMEWORK

Innovations in technology often change the world for the better. And yet, criminals, terrorists, and rogue states can use those same innovations for their own illegitimate ends, imposing great costs on the public. Today, few technologies are more potentially transformative and disruptive—and more potentially susceptible to abuse—than cryptocurrency.

Cryptocurrency is a form of virtual asset that uses cryptography to secure financial transactions. Many of cryptocurrency's central features—including decentralized operation and control, and, in some cases, a high degree of anonymity—present new and unique challenges for public safety that must be addressed, lest the technology be used predominantly for criminal activity. Indeed, despite its relatively brief existence, cryptocurrency technology plays a role in many of the most significant criminal and national security threats that the United States faces. For example, cryptocurrency is increasingly used to buy and sell lethal drugs on the dark web (and by drug cartels seeking to launder their profits), contributing to a drug epidemic that killed over 67,000 Americans by overdose in 2018 alone.[1] Rogue states like Russia, Iran, and North Korea may turn to cryptocurrency to fund cyber-attacks, blunt the impact of U.S. and international sanctions, and decrease America's influence in the global marketplace. And, while terrorist use of cryptocurrency is still evolving, certain terrorist groups have solicited cryptocurrency donations running into the millions of dollars via online social media campaigns.

The U.S. Department of Justice is responsible for investigating and prosecuting crimes and threats to national security, including those facilitated by the use of cryptocurrency. As consumers, investors, financial institutions, elected officials, and other stakeholders consider the future path of cryptocurrency and related technologies, we are publishing this Framework to enhance understanding of the associated public safety and national security challenges that these technologies present. These challenges impact the security and legitimacy of the cryptocurrency ecosystem itself; only by identifying and responsibly addressing them can the risks of cryptocurrency be mitigated. At a minimum, this means that entities that use or are impacted by cryptocurrency must understand their legal obligations and invest in meeting them. For example, cryptocurrency exchanges—including those physically located outside the United States—must take seriously their legal and regulatory obligations, discussed in greater detail below, to protect users and to safeguard potential evidence in criminal or national security investigations. Where a breach of these obligations might rise to the level of a criminal violation, the Department will take appropriate action.

CYBER2-29777 - 01765

In the pages that follow, we:

(1) describe how cryptocurrency technology is currently used and illustrate how malicious actors have misused that technology to harm cryptocurrency users, exchanges, and investors, as well as to facilitate a broad range of crimes from child exploitation to terrorism;

(2) identify some of the key legal authorities and partnerships the Department has relied upon to combat criminal and national security threats involving cryptocurrency; and

(3) discuss approaches for addressing the growing public safety challenges related to cryptocurrency.

# I. Threat Overview

## A. The Basics

"Virtual currency" is a digital representation of value that, like traditional coin and paper currency, functions as a medium of exchange—i.e., it can be digitally traded or transferred, and can be used for payment or investment purposes. Virtual currency is a type of "virtual asset" that is separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets.[2] Moreover, unlike "traditional currency"—which is also referred to as fiat currency, real currency, or national currency—virtual currency does not have legal tender status in any particular country or for any government or other

**Figure 1: Systemic Attributes of Virtual Currency**



CYBER2-29777 - 01766

creditor.[3] Instead, the exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Virtual currency can be *convertible*, meaning it has an equivalent value in real currency or acts as a substitute for real currency, or *non-convertible*, meaning it is specific to a particular virtual domain—such as an online gaming community—and cannot be exchanged for real currency. [4]

"Cryptocurrency" refers to a specific type of virtual currency with key characteristics. The vast majority of cryptocurrencies are decentralized, as they lack a central administrator to issue currency and maintain payment ledgers—in other words, there is no central bank. Instead, cryptocurrencies rely on complex algorithms, a distributed ledger that is often referred to as the "blockchain," and a network of peer-to-peer users to maintain an accurate system of payments and receipts. As their name suggests, cryptocurrencies rely on cryptography for security. Some examples of cryptocurrencies include Bitcoin,[5] Litecoin, and Ether.

Cryptocurrency can be exchanged directly person to person; through a cryptocurrency exchange; or through other intermediaries. The storage of cryptocurrency is typically associated with an individual "wallet," which is similar to a virtual account. Wallets can interface with blockchains and generate and/or store the public keys (which are roughly akin to a bank account number) and private keys (which function like a PIN or password) that are used to send and receive cryptocurrency. Cryptocurrency wallets can be housed in a variety of forms, including on a tangible, external device ("hardware wallets"); downloaded as software ("software wallets") onto either a personal computer or server ("desktop wallets") or an application on a smartphone ("mobile wallets"); as printed public and private keys ("paper wallets"); and as an online account associated with a cryptocurrency exchange.

**Figure 2: Anatomy of a Cryptocurrency Transaction**



The distributed ledger—which, as noted above, is known as the "blockchain" for most cryptocurrencies—allows such a decentralized system to accurately track payments and to prevent double-spending and counterfeiting by cryptographically recording every transaction. When a transaction is initiated, it is shared with participants on the network associated with payment in the cryptocurrency itself—a process known as "mining."

Cryptocurrencies can vary in their degree of anonymity depending on the public or non-public nature of their associated blockchain. For instance, while Bitcoin addresses do not have names or specific customer information attached to them, Bitcoin's blockchain is

**Figure 3: Bitcoin Basics – Key Terms**



the particular cryptocurrency, whereupon special users (often called "miners") verify that the units have not already been spent, and validate the transaction by solving a complex algorithm. The transaction is then added to the blockchain, with each block consisting of a group of reported transactions in chronological order. In exchange for participating in this community validation process, miners generate and receive a public. As a result, users can query addresses to view and understand Bitcoin transactions to some extent. Other cryptocurrencies, however, use non-public or private blockchains that make it more difficult to trace or to attribute transactions. These are often referred to as "anonymity enhanced cryptocurrencies" ("AECs") or "privacy coins." Examples of AECs include Monero, Zcash, and Dash.

4

## B. Legitimate Uses

Cryptocurrency advocates maintain that a decentralized, distributed, and secure cryptocurrency holds great promise for legitimate use. Today's market includes over 2,000 cryptocurrencies, which enable users to transfer virtual currency around the globe in exchange for goods, services, and other sources of value. Proponents of cryptocurrency contend that, by eliminating the need for financial intermediaries to validate and facilitate transactions, cryptocurrency has the potential to minimize transaction costs and to reduce corruption and fraud. In addition, some users—particularly those in countries beset by rampant inflation and where access to normal foreign exchange is limited—may use virtual currency to avoid inflation in fiat currencies.

Some advocates also claim that cryptocurrency may in the future facilitate "micro-payments," providing enterprises with the opportunity to sell low-cost goods and services that may not be profitable enough with traditional credit and debit, due to higher transaction costs. Others believe that cryptocurrency can provide new access to markets, including to individuals in the developing world who are not served by banks or other financial institutions. Cryptocurrency advocates also stress that the privacy associated with cryptocurrency, though raising significant challenges for law enforcement, can have valid and beneficial uses. For example, such advocates claim that greater anonymity may reduce the risk of account or identity theft associated with the use of traditional credit systems.

On the other hand, in addition to the substantial public safety and national security concerns discussed in this Framework, critics of cryptocurrency have raised questions about its supposed benefits. For example, certain critics contend that cryptocurrency could, if widely adopted, reduce the ability of national governments to regulate their economies through monetary policy. Others have raised concerns about the security of cryptocurrency wallets and exchanges, or pointed to the high volatility in value that most virtual currencies have experienced.

Whatever the overall benefits and risks of cryptocurrency, the Department of Justice seeks to ensure that uses of cryptocurrency are functionally compatible with adherence to the law and with the protection of public safety and national security.

## C. Illicit Uses

Many crimes that involve the use of cryptocurrency—for example, buying and selling illicit drugs—are not new, but criminals increasingly are leveraging cryptocurrency's features to advance and conceal unlawful schemes. In general, the illicit use of cryptocurrency can fall into three broad categories. As explained further below, bad actors may exploit cryptocurrency to: (1) engage in financial transactions associated with the commission of crimes, such as buying and selling drugs or weapons on the dark web, leasing servers to commit cybercrimes, or soliciting funds to support terrorist activity; (2) engage in money laundering or shield otherwise legitimate activity from tax, reporting, or other legal requirements; or (3) commit crimes directly

CYBER2-29777 - 01769

**Figure 4 : Examples of Cryptocurrencies in Investigations**



implicating the cryptocurrency marketplace itself, such as stealing cryptocurrency from exchanges through hacking or using the promise of cryptocurrency to defraud unwitting investors.[6]

### 1. Using Cryptocurrency Directly to Commit Crimes or to Support Terrorism

Criminals use cryptocurrency to facilitate crimes and to avoid detection in ways that would be more difficult with fiat currency or "real money." They can avoid large cash transactions and mitigate the risk of bank accounts being traced, or of banks notifying governments of suspicious activity. Criminals have used cryptocurrency, often in large amounts and transferred across international borders, as a new means to fund criminal conduct ranging from child exploitation to terrorist fundraising. Cryptocurrency also has been used to pay for illegal drugs, firearms, and tools to commit cybercrimes, as well as to facilitate sophisticated ransomware and blackmail schemes.

*Buying and selling illegal things.* Criminals increasingly use cryptocurrency to purchase and to sell illicit items, such as drugs,[7] child sexual abuse material,[8] firearms, explosives, and toxic substances. There is also a robust market for counterfeit identification documents and for unlawfully obtained personal information, such as stolen credit card numbers. As discussed further below, purchases and sales of illegal goods and services using cryptocurrency often take place via dark web marketplaces created explicitly for the purpose of facilitating illicit transactions.[9]

*Buying and selling tools to commit crimes or to support terrorism.* Criminals and terrorists also use cryptocurrency to buy and sell "tools of the trade"—i.e., items that may or may not themselves be unlawful but are used for subsequent unlawful conduct. Such tools include raw materials to manufacture drugs or explosives, as well as cyber tools and computing capabilities (including servers and domains) to engage in cybercrime or to

CYBER2-29777 - 01770

conduct malign influence campaigns over social media. Criminals and terrorists have purchased these items and services using cryptocurrency, hoping that their activity and planning would go unnoticed.[10]

***Ransom, blackmail, and extortion.*** Increasingly, criminal extortion schemes are carried out in the digital space. Bad actors can use cryptocurrency as a payment method to facilitate ransom and blackmail without having to demand suitcases full of cash or risk bank accounts being traced. Moreover, criminals routinely infect victims' computers and servers with ransomware, which is a type of malicious software designed to encrypt or otherwise block access to valuable data until the victim agrees to provide a specified payment.[11] Criminals also demand payment after threatening to distribute confidential or embarrassing information (such as nude photos in cases of "sextortion") or engaging in "virtual kidnappings" where victims are misled into believing a loved one has been taken.

In April 2020, the Federal Bureau of Investigation ("FBI") issued an advisory about a potential increase in cryptocurrency fraud schemes due to the COVID-19 pandemic. The FBI noted that fraudsters were leveraging the fear and uncertainty caused by the pandemic to carry out scams in new ways. For example, some scammers threatened to infect victims and their families with coronavirus unless they sent payment in bitcoin. Others offered phony or defective products for sale using cryptocurrency with the promise that the products would cure or prevent the disease.[12]

***Raising funds for criminal and terrorist activity.*** Cryptocurrency technology also has created new ways for criminal enterprises and terrorist organizations to raise funds. For example, as the notorious "Welcome to Video" case reveals, bitcoin has been used to monetize the production of child exploitation material—a development rarely seen before the rise of cryptocurrency. In addition to traditional fundraising, cryptocurrency also provides bad actors and rogue nation states with the means to earn profits directly by mining virtual currency, whether through legitimate mining operations or through illicit "cryptojacking" schemes, which are described further below.[13]

There is also evidence that certain terrorist groups are raising funds using cryptocurrency. While public data on terrorist use of cryptocurrency is limited, it is clear that terrorist networks have conducted fundraising operations through Internet-based crowdsource platforms in an attempt to evade stopgaps built into the international banking system.[14] In August 2015, for example, an individual was sentenced to over 11 years in federal prison for conspiring to provide material support and resources to the Islamic State of Iraq and al-Sham ("ISIS"), including by using social media to instruct donors on how bitcoin could provide untraceable financial support to terrorist groups.[15] More recently, in August 2020, the Department of Justice announced the government's largest-ever seizure of cryptocurrency in the terrorism context, stemming from the dismantling of terrorist financing campaigns involving the al-Qassam Brigades (Hamas's military wing), al-Qaeda, and ISIS. Each of those groups had used cryptocurrency technology and social media platforms to spread their influence and raise funds for terror campaigns.[16]

7

## SamSam

In a high-profile investigation into "21st-century digital blackmail," a federal grand jury in November 2018 indicted two Iranian men for a 34-month-long international computer hacking and extortion scheme involving the deployment of the sophisticated "SamSam" ransomware.[17] According to the indictment, starting in December 2015, the defendants allegedly accessed victims' computers, installed the SamSam ransomware, and then ran the program to encrypt critical data. The defendants demanded ransom paid in bitcoin in exchange for the keys needed to decrypt the victims' data. The defendants then allegedly exchanged the bitcoin proceeds into Iranian rial using Iran-based entities. All told, the defendants are alleged to have collected over $6 million in ransom payments and to have caused over $30 million in losses to more than 200 victims, which included hospitals, municipalities, and public institutions from around the world.



Figure 5: The "SamSam" Ransomware Attack – An Example of 21st Century Digital Blackmail

8

CYBER2-29777 - 01772

## WELCOME TO VIDEO

On October 16, 2019, the Department of Justice announced the indictment and arrest of the alleged operator of Welcome to Video, a darknet child pornography website that was the world's largest online child sexual exploitation market at the time of its seizure. Welcome to Video allegedly offered child sexual exploitation photos and videos for sale using bitcoin, and relied on virtual currency accounts to fund the site and to promote further exploitation of children. The site allegedly hosted approximately eight terabytes of child sexual exploitation material—including over 250,000 unique videos—and claimed over one million downloads of exploitative material by its users. In addition to the operator, at least 337 users of the site have been arrested and charged across the United States and around the world. The globally coordinated law enforcement operation targeting Welcome to Video and its users led to the rescue of at least 23 minor victims who were actively being abused, allegedly by the site's users.[18]



**Figure 6: Welcome to Video Website after Seizure by the Government**

CYBER2-29777 - 01773

## DARKSCANDALS

A spin-off of the "Welcome to Video" investigation, the Department of Justice on March 12, 2020 announced the indictment of a Dutch national for his alleged operation of DarkScandals, a website that featured violent rape videos and depictions of child sexual abuse. According to the indictment, DarkScandals hosted over 2,000 videos and images advertised as including "real blackmail, rape and forced videos of girls all around the world."[19] Users could allegedly access the illicit content by paying cryptocurrency or by uploading new content depicting rape or other sexual abuse. The site's alleged operator was charged with distribution of child pornography; production and transportation of obscene matters for sale or distribution; engaging in the business of selling or transferring obscene matter; and money laundering. In addition, the government filed a civil forfeiture action seeking recovery of illicit funds from 303 virtual currency accounts allegedly used by customers to fund DarkScandals and to promote child exploitation.[20]



**Figure 7: The Indictment and Civil Forfeiture Papers Filed by the Government in the DarkScandals Matter**

10

## DISMANTLING OF TERRORIST FINANCING CAMPAIGNS

On August 13, 2020, the Department of Justice announced the dismantling of three terrorist financing cyber-enabled campaigns involving the al-Qassam Brigades, al-Qaeda, and ISIS. Investigation revealed that these terrorist groups used sophisticated cyber-tools to assist in financing their operations, including through online solicitation of cryptocurrency donations from supporters around the world. The government has filed three civil forfeiture complaints and a criminal complaint involving the seizure of four websites, four Facebook pages, over 300 cryptocurrency accounts, and millions of dollars.

*Al-Qassam Brigades*. According to the government's complaint, the al-Qassam Brigades posted requests for bitcoin donations on its social media page and official websites, claiming that such donations would be untraceable and used to support violent causes. The group's websites included videos on how to make anonymous donations using unique bitcoin addresses. Fortunately, IRS, HSI, and FBI personnel were able to track and seek forfeiture of the 150 cryptocurrency accounts used to launder funds to and from the al-Qassam Brigades' accounts.

*Al-Qaeda.* The government's investigation also revealed that al-Qaeda and affiliated terrorist groups operated a bitcoin money laundering network using social media platforms and encrypted messaging apps to solicit cryptocurrency donations. In some cases, the groups claimed to be acting as charities, while actually soliciting funds for violent terrorist attacks. Al-Qaeda and their affiliates used sophisticated techniques in an attempt to conceal their fundraising efforts, but law enforcement was able to identify and seek forfeiture of 155 virtual currency assets linked to the groups.

*ISIS.* Finally, the government's investigation uncovered a scheme whereby individuals associated with ISIS marketed fake personal protective equipment ("PPE")—such as N95 respirator masks—to customers across the globe in an effort to take advantage of the COVID-19 pandemic. The funds from such sales would have been used to support ISIS's operations.[21]

CYBER2-29777 - 01775

**Figure 8:** *"Donate Anonymously with Cryptocurrency"* – An al-Qaeda-Affiliated Group Seeks Anonymous Donations in Bitcoin



*The group that posted the request for donations claimed to be a Syrian charity, but allegedly sought funds to support "the mujahidin in Syria with weapons, financial aid and other projects assisting the jihad."* [32]

**Figure 9: Website Maintained by an ISIS Facilitator to Sell Fake PPE**



12

CYBER2-29777 - 01776

## 2. Using Cryptocurrency to Hide Financial Activity

In addition to being used directly in transactions to commit crime or to support terrorism, bad actors also use cryptocurrency to hide and to promote financial activities attendant to unlawful conduct.

*Money laundering.* Criminals of all types are increasingly using cryptocurrency to launder their illicit proceeds. Broadly speaking, money laundering occurs when an individual knowingly conducts a financial transaction connected to or stemming from a criminal offense in order to promote the

### BITCOIN MAVEN

In July 2018, Theresa Tetley, known by her online moniker "Bitcoin Maven," was sentenced to one year in federal prison for money laundering and for operating an unlicensed bitcoin-for-cash money-transmitting business. Through her unregistered bitcoin exchange business, Tetley facilitated money laundering by providing money-transmission services to members of the public, including at least one individual who received bitcoin from the sale of drugs on the dark web. Tetley also conducted an exchange of bitcoin for cash with an undercover agent who represented that his bitcoin were the proceeds of narcotics trafficking. In sentencing documents, the government revealed that Tetley's business "fueled a black-market financial system" that "purposely and deliberately existed outside of the regulated bank industry."[23]

offense, conceal the proceeds, or evade federal reporting requirements.[24] Such conduct can be substantially easier when the movement of funds takes place online and anonymously, involving the exchange of cryptocurrency for other forms of cryptocurrency or the conversion of cryptocurrency to fiat currency. Indeed, the explosion of online marketplaces and exchanges that use cryptocurrency may provide criminals and terrorists with new opportunities to transfer illicitly obtained money in an effort to cover their financial footprints and to enjoy the benefits of their illegitimate earnings. Transnational criminal organizations, including drug cartels, may find cryptocurrency especially useful to hide financial activities and to move vast sums of money efficiently across borders without detection.

*Operating unlicensed, unregistered, or non-compliant exchanges.* Criminals may also attempt to hide financial activity by using cryptocurrency exchanges that do not comply with internationally recognized anti-money laundering ("AML") and combating the financing of terrorism ("CFT") standards (together, "AML/CFT").[25] In general, "virtual currency exchangers" and "virtual currency exchanges" are, respectively, individuals and entities engaged in the business of exchanging virtual currency for fiat currency, other forms of virtual currency, or other types of assets—and vice versa—typically for a commission.[26]

Unlicensed or unregistered exchanges or money transmitting businesses can "provide an avenue of laundering for those who use digital currency for illicit purposes."[27] In

### BTC-e

In 2017, prosecutors in the United States announced the indictment of the virtual currency exchange "BTC-e" and of one of the exchange's principal operators. BTC-e received more than $4 billion worth of bitcoin over the course of its operation. According to the indictment, to appeal to criminals as a customer base, BTC-e did not require users to validate their identities, obscured and anonymized transactions and sources of funds, and lacked appropriate anti-money laundering processes. As a result, the exchange predictably served as a hub for international criminals seeking to hide and launder ill-gotten gains. The indictment alleges that BTC-e facilitated transactions for cybercriminals worldwide and received criminal proceeds from numerous computer intrusions and hacking incidents, ransomware scams, identity theft schemes, corrupt public officials, and narcotics distribution rings. The Department of Justice filed criminal charges, and the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") assessed a $110 million civil penalty against the exchange for willfully violating U.S. anti-money laundering laws, and a $12 million penalty against the exchange's operator personally.[28] BTC-e is only one example in a series of cases in which the Department of Justice has pursued criminal charges against cryptocurrency exchanges for operating as unlicensed money services businesses.[29]

addition, even properly registered exchanges can serve as a haven for criminal activity by operating under lax rules or by flouting AML protocols. In the normal course, registered exchanges that comply with AML standards and "know your customer" ("KYC") requirements are likely to possess relevant transactional information. However, exchanges that avoid compliance with such requirements provide criminals and terrorists with opportunities to hide their illicit financial activity from regulators and investigators. Moreover, as discussed in Part II.C below, the requirements for exchanges to register, obtain licenses, and collect information about customers and their transactions are not consistent across international jurisdictions. This inconsistency can create challenges for international law enforcement and regulatory agencies operating in this space.

*Evading taxes.* As with money laundering, the potential difficulties in tracking cryptocurrency transactions can also facilitate tax evasion. Because of these difficulties, tax cheats may believe that the Internal Revenue Service is not able to uncover or attribute their cryptocurrency transactions, and they may even use additional anonymizing features of cryptocurrencies to further obfuscate their transactions. Tax cheats may then attempt tax evasion by, among other things, not reporting capital gains from the sale or other disposition of their cryptocurrency, not reporting business income received in cryptocurrency, not reporting wages paid in cryptocurrency, or using cryptocurrency to facilitate false invoice schemes designed to fraudulently reduce business income.[30] Importantly, the tax loss from unreported capital gains can

14

CYBER2-29777 - 01778

be significant as cryptocurrencies emerge and fluctuate in the market. For example, the value of one bitcoin famously rose from around $1,000 to around $20,000 in 2017, as investors rushed to that cryptocurrency as an investment vehicle.

*Avoiding sanctions.* Finally, individuals, companies, and rogue regimes may use cryptocurrency in attempt to avoid the reach of economic sanctions imposed by the United States or other rule-of-law countries. Cryptocurrency's decentralized and peer-to-peer format may allow sanctioned entities to bypass the financial controls built into traditional financial marketplaces to enforce such sanctions. Indeed, public reports note that several nations have explored the creation and use of their own state-sponsored cryptocurrencies, which could serve as a platform to evade financial controls and oversight. As explained by the U.S. Department of the Treasury, for example, Venezuela attempted to launch a national cryptocurrency—called the "Petromoneda" or "Petro"—in the "hope that the [cryptocurrency] would allow Venezuela to circumvent U.S. financial sanctions."³¹ Other countries, including Russia and Iran, have threatened to use existing cryptocurrencies to dodge sanctions or to develop their own cryptocurrencies specifically to avoid international oversight.³²

### 3. Committing Crimes within the Cryptocurrency Marketplace Itself

In addition to offering a means to commit old crimes in new ways, cryptocurrencies and the platforms on which they operate have often themselves become the target of criminal activity. To protect future victims, as well as to safeguard the integrity of cryptocurrency technology, more must be done to promote security and combat criminal activity on digital exchanges and platforms.

*Theft and fraud.* Cryptocurrency's features, as well as the overall "opaqueness and lack of transparency in the cryptocurrency market,"³³ make it particularly attractive, adaptable, and scalable as a target for theft. Criminals—and even rogue state actors³⁴—can steal cryptocurrency by exploiting security vulnerabilities in wallets and exchanges. Thieves can hack wallets and exchanges directly; employ social engineering and other tools to obtain passwords and PINs from unsuspecting users; or, if they themselves operate exchanges, engage in insider theft. Public reports estimate that at least $1.7 billion of cryptocurrency was stolen or scammed in 2018, with over $950 million of that amount stolen from cryptocurrency exchanges. In 2019, over $4.5 billion of cryptocurrency reportedly was lost to theft or fraud, more than doubling the losses from the prior year.³⁵ This susceptibility to theft on a massive scale demonstrates that the lack of appropriate regulation and monitoring of cryptocurrency exchanges poses a threat to cryptocurrency users themselves, as well as to the general public.

In addition to digital theft, fraudsters use cryptocurrency to bilk unsuspecting investors, to promote scams, and to engage in market manipulation. For example, in July 2018, Jon E. Montroll pleaded guilty to securities fraud and to obstruction of

CYBER2-29777 - 01779

justice related to his operation of two online Bitcoin services: WeExchange Australia, Pty. Ltd., a Bitcoin depository and currency exchange service, and BitFunder.com, which facilitated the purchase and trading of virtual shares of business entities that listed shares on the platform. Montroll pleaded guilty to converting a portion of WeExchange users' bitcoin to his personal use without the users' knowledge or consent. Montroll also admitted failing to disclose a hack of the BitFunder programming code that caused the platform to credit hackers with profits they did not earn, thereby enabling the hackers to wrongfully withdraw approximately 6,000 bitcoin. The hack meant that Montroll lacked the bitcoin necessary to cover what he owed to investors. Despite this, and as a result of his omissions and misrepresentations, Montroll still raised approximately 978 bitcoin after the discovery of the hack. In addition to committing securities fraud, Montroll provided a falsified screenshot and false and misleading answers to Securities and Exchange Commission ("SEC") personnel during the course of their investigation.[36]

In another fraudulent scheme involving cryptocurrency, Joseph Kim was sentenced in November 2018 to 15 months in federal prison for misappropriating $1.1 million in bitcoin and litecoin. Kim worked as an assistant trader for a Chicago trading firm that had formed a cryptocurrency group to engage in trading of virtual currencies. Over a two-month period in 2017, Kim misappropriated at least $600,000 of his trading firm's bitcoin and litecoin cryptocurrency for his own personal benefit, and made false statements and representations to the company's management to conceal the theft. Subsequently, Kim engaged in another scheme in which he incurred $545,000 in losses by trading cryptocurrencies using funds that he solicited from friends through lies.[37]

***Cryptojacking.*** The ability to digitally mine cryptocurrency provides criminals an independent reason to hack into and co-opt computers belonging to unsuspecting individuals and organizations. The unauthorized use of someone else's computer to generate (or "mine") cryptocurrency is called "cryptojacking."[38] This is often accomplished through the use of malware or compromised websites, which cause the victim's computer to run crypto-mining code. Considering the value of cryptocurrency compared to the relative ease of secretly using a victim's computer, cryptojacking is another relatively low-risk but high-reward illegal activity made possible by cryptocurrency technology. Reports indicate that rogue states, such as North Korea, have explored using malware to mine cryptocurrency illicitly.[39]

## D. The Role of Darknet Markets

Many of the cryptocurrency-related crimes described above are made possible through the operation of online black markets on the dark web. Indeed, much of the illicit conduct involving cryptocurrency occurs via darknet websites and marketplaces that allow criminals around the world to connect in unregulated virtual bazaars with a great deal of anonymity. These illicit marketplaces offer the opportunity not only to buy and to

CYBER2-29777 - 01780

## OPERATION DISRUPTOR

In September 2020, the Department of Justice joined Europol to announce the results of Operation DisrupTor, a coordinated international effort to disrupt opioid trafficking on the dark web. The extensive operation lasted nine months and was conducted across the United States and Europe, demonstrating international law enforcement's continued partnership against the illegal sale of drugs and other illicit goods and services.

Following the Wall Street Market takedown in May 2019, U.S. and international law enforcement agencies obtained intelligence to identify dark web drug traffickers, resulting in a series of complementary, but separate, law enforcement investigations. Operation DisrupTor actions have resulted in the arrest of 179 dark web drug traffickers and fraudulent criminals who engaged in tens of thousands of sales of illicit goods and services across the United States and Europe.

This operation resulted in the seizure of over $6.5 million in both cash and virtual currencies; approximately 500 kilograms of drugs worldwide; 274 kilograms of drugs, including fentanyl, oxycodone, hydrocodone, methamphetamine, heroin, cocaine, ecstasy, MDMA, and medicine containing addictive substances in the United States; and 63 firearms.

Operation DisrupTor led to 121 arrests in the United States including two in Canada at the request of the United States, 42 in Germany, eight in the Netherlands, four in the United Kingdom, three in Austria, and one in Sweden. A number of investigations are still ongoing to identify the individuals behind dark web accounts. Operation DisrupTor illustrates the investigative power of federal and international partnerships to combat the borderless nature of online criminal activity, including activity using cryptocurrency.



## DEEPDOTWEB

In May 2019, the Department announced the indictment of the alleged owners and operators of the website known as DeepDotWeb ("DDW") on charges of money laundering conspiracy. According to the indictment, DDW served as a gateway that provided users with access to numerous darknet marketplaces offering for sale illegal narcotics (including fentanyl, heroin, and crystal meth), firearms, malicious software, hacking tools, stolen credit card information, and other contraband. The owners of DDW allegedly received payments—styled as "referral bonuses"—paid in virtual currency to a DDW-controlled bitcoin wallet from individuals who used the site to purchase illicit items. DDW's owners allegedly attempted to conceal the nature of these illegal payments, which totaled more than $15 million, by transferring the bitcoin they received to other bitcoin addresses and to bank accounts opened under the names of shell companies. During the course of the conspiracy, DDW's owners are alleged to have referred hundreds of thousands of users to darknet marketplaces, including AlphaBay, Agora Market, Abraxas Market, Dream Market, Valhalla Market, Hansa Market, TradeRoute Market, Dr. D's, Wall Street Market, and Tochka Market. In turn, these users completed hundreds of millions of dollars' worth of allegedly illicit transactions.[40]



**Figure 10: Anatomy of the DeepDotWeb Criminal Operation**

CYBER2-29777 - 01782

## DREAM MARKET



In October 2018, an administrator of the darknet marketplace Dream Market was sentenced to 20 years in federal prison for narcotics trafficking and money laundering. The defendant, Gal Vallerius, initially participated in the marketplace as a vendor, selling Oxycodone and Ritalin. He later acted as an administrator and senior moderator, supporting illicit narcotics and money laundering transactions between the site's buyers and vendors. Following the dismantling of Silk Road and AlphaBay, Dream Market had become one of the largest darknet criminal marketplaces, and all of its items and services were offered for sale in exchange for bitcoin or other peer-to-peer cryptocurrencies.

sell illegal goods and tools for committing crimes, but also to launder money and to hide ill-gotten gains. As a result, darknet markets are a natural place for cryptocurrency to be widely used and exploited.

One of the most notorious online darknet websites, which relied exclusively on bitcoin, was known as Silk Road. Prior to being dismantled by law enforcement in 2013, Silk Road served as an extensive online criminal marketplace used by thousands of drug dealers and other vendors to distribute hundreds of kilograms of illegal drugs and other unlawful goods and services to well over 100,000 buyers. Silk Road was also used to launder hundreds of millions of dollars in illicit proceeds. When the site was shut down, other cryptocurrency-reliant darknet marketplaces sprung up in its place. Working closely with its international law enforcement partners, the Department of Justice's efforts to dismantle these virtual black markets continue in earnest, including the successful disruption of the notorious AlphaBay and Hansa marketplaces in July 2017; the Wall Street Market ("WSM") and DeepDotWeb ("DDW") websites in May 2019;[41] and the coordinated takedowns of darknet markets dedicated to opioid trafficking reflected in Operation SaboTor (March 2019)[42] and Operation DisrupTor (September 2020).[43] Cryptocurrencies played a central facilitating role in each of these global criminal enterprises. For example, as the Department announced at

19

the time that indictments were returned against the alleged owners and operators of DDW, "Between in and around November 2014 and April 10, 2019, DDW received approximately 8,155 bitcoin in kickback payments from darknet marketplaces, worth approximately $8,414,173 when adjusted for the trading value of bitcoin at the time of each transaction."[44] Attesting to the complexity of these illicit cross-border payments, many of which took place entirely outside of the established international banking network, the bitcoin was transferred to DDW's bitcoin wallet, which the defendants are alleged to have controlled, in a series of "more than 40,000 deposits," and was subsequently withdrawn to various destinations (both known and unknown) around the world through over 2,700 transactions.[45]

## II.  Law and Regulations

As discussed in Part I, a wide range of criminal activity may involve or be facilitated by the use of cryptocurrency. On numerous occasions, the Department of Justice has used available legal tools to pursue successful prosecutions of such activity. This Part provides an overview of the legal authorities the Department uses to prosecute those who misuse cryptocurrency, and describes the roles and responsibilities of the Department's key government partners.

### A.  Criminal Code Authorities

As discussed above, cryptocurrency is often the preferred payment method for the distribution of contraband and of other illegal goods and services, and it can be used to collect funds from victims of traditional fraud or computer intrusions. A wide variety of federal charges can be brought to bear for such conduct, including, for example:

- **Wire fraud,** 18 U.S.C. § 1343. (For examples of cryptocurrency prosecutions involving the wire fraud statute, see the indictment of AriseBank CEO Jared Rice, Sr., discussed on pages 31-32, and the indictment of two Iranian men for deployment of SamSam ransomware, discussed on pages 8 and 26.)

- **Mail fraud,** 18 U.S.C. § 1341.

- **Securities fraud,** 15 U.S.C. §§ 78j and 78ff. (For example, see the indictment of AriseBank CEO Jared Rice, Sr., discussed on pages 31-32, and the indictment of Jon E. Montroll, discussed on pages 15-16.)

- **Access device fraud,** 18 U.S.C. § 1029. (For example, see the indictment of AlphaBay, discussed on pages 19 and 47.)

- **Identity theft and fraud,** 18 U.S.C. § 1028. (For example, see the indictment of AlphaBay, discussed on pages 19 and 47.)

- **Fraud and intrusions in connection with computers,** 18 U.S.C. § 1030. (For example, see the indictment of two Iranian men for deployment of SamSam ransomware, discussed on pages 8 and 26.)

- **Illegal sale and possession of firearms,** 18 U.S.C. § 921 *et seq*.

- **Possession and distribution of counterfeit items,** 18 U.S.C. § 2320.

CYBER2-29777 - 01784

- **Child exploitation activities,** 18 U.S.C. § 2251 *et seq.* (For example, see the indictment of Ammar Atef Alahdali, discussed on page 6, footnote 8.)

- **Possession and distribution of controlled substances,** 21 U.S.C. § 841 *et seq.* (For example, see the indictment of AlphaBay, discussed on pages 19 and 47.)

The Department also can bring to bear a wide variety of money laundering charges in cases involving misuse of cryptocurrency. Depending on the facts and circumstances, transactions involving cryptocurrency can form the basis of concealment, promotion, sting, and international money laundering violations. In addition, individuals and companies engaged in money transmission involving virtual assets, referred to below as "virtual asset service providers," may be subject to, and may fail to comply with, both federal and State registration, record keeping, and reporting requirements. Potential charges include, for example:

- **Money laundering,** 18 U.S.C. § 1956 *et seq.* (For examples of cryptocurrency prosecutions involving the federal money laundering statute, see the indictment of BTC-e and its operator, discussed on pages 14 and 46; the indictment of AlphaBay, discussed on pages 19 and 47; the indictment of a Dutch national for his operation of DarkScandals, discussed on page 10; and the indictment of two Chinese nationals, discussed on pages 27-28.)

- **Transactions involving proceeds of illegal activity,** 18 U.S.C. § 1957. (For example, see the indictment of BTC-e and its operator, discussed on pages 14 and 46.)

- **Operation of an unlicensed money transmitting business,** 18 U.S.C. § 1960 (For example, see the indictment of BTC-e and its operator, discussed on pages 14 and 46, and the indictment of two Chinese nationals, discussed on pages 27-28.)

- **Failure to comply with Bank Secrecy Act requirements,** 31 U.S.C. § 5331 *et seq.*

Virtual asset transactions may also form the basis for prosecution if, for example, they are used as a means to provide material support or resources to terrorists or foreign terrorist organizations.[46] Such transactions could also be used for payments that facilitate other crimes implicating national security, such as espionage[47] or conspiracies involving interference in the political process, in violation of various federal laws.

Finally, the Department frequently uses existing criminal authorities to seize and forfeit virtual assets and other property derived from or involved in activity of an individual or organization charged with a crime. The Department also uses available civil authorities for such seizures and forfeitures, which allow the government to "arrest" the assets themselves, even in cases where no person is charged criminally or where a defendant may not be prosecutable due to, for example, death or flight from a jurisdiction. Statutory authorities for forfeiture include:

- **Criminal forfeiture,** 18 U.S.C. § 982; 21 U.S.C. § 853. (For examples of cryptocurrency prosecutions involving the criminal forfeiture statute, see the indictment

CYBER2-29777 - 01785

of the alleged administrator of Helix, discussed on page 43, and the indictment of two Chinese nationals, discussed on pages 27-28.)

• **Civil forfeiture,** 18 U.S.C. § 981. (For example, see the verified complaints in the AlphaBay case, discussed on pages 9 and 47; the Welcome to Video case, discussed on pages 7 and 9; the DarkScandals case, discussed on page 10; the cases involving the al-Qassam Brigades, al-Qaeda, and ISIS, discussed on pages 7 and 11-12; and the cases involving hacks of virtual currency exchanges by North Korean actors, discussed on pages 27 and 28.)

### B. Regulatory Authorities

As described above, the Department of Justice has broad and diverse federal jurisdiction over criminal and other improper conduct that may involve cryptocurrency and other types of virtual assets. A number of regulatory agencies in the United States also have authority to enforce statutes and regulations that apply to various virtual-asset-related activities. The Department has worked closely and cooperatively with these agencies in identifying and proceeding against individuals who misuse cryptocurrency for illicit purposes.

Much of the regulatory activity conducted by the agencies discussed below focuses on money services businesses ("MSBs") and virtual asset service providers ("VASPs"). In general, MSBs are individuals or entities in one or more of the following capacities:

i. currency dealer or exchanger;

ii. check casher;

iii. issuer of traveler's checks, money orders, or stored value;

iv. seller or redeemer of traveler's checks, money orders, or stored value;

v. money transmitter; or

vi. the U.S. Postal Service.[48]

VASPs are individuals or entities operating as a business to conduct one or more of the following activities for or on behalf of another entity or individual:

i. exchanges between virtual assets and fiat currencies;

ii. exchanges between one or more forms of virtual assets;

iii. transfers of virtual assets;

iv. safekeeping and/or administration of virtual assets or instruments enabling control over virtual assets; or

v. participation in and provision of financial services related to an issuer's offer and/or sale of a virtual asset.[49]

In the United States, individuals and entities that offer money transmitting services involving virtual assets, such as cryptocurrency exchanges and kiosks, as well as certain issuers, exchangers, and brokers of virtual assets, are considered MSBs. Like brick-and-mortar financial institutions, MSBs are subject to AML/CFT[50] regulations as well as certain licensing and registration requirements, as discussed below.

22

**Figure 11: Depiction of the Operation of a Global Virtual Asset Network**





### 1. The Financial Crimes Enforcement Network and the Bank Secrecy Act

***Regulatory authority.*** MSBs, including cryptocurrency exchanges, function as regulated businesses subject to the federal Bank Secrecy Act ("BSA").[51] The U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") has primary responsibility for administering the BSA and for implementing its regulations.[52] Part of that responsibility includes maintaining the BSA database, which is a repository of reports about financial transactions that are potentially indicative of money laundering.[53] FinCEN serves as the Financial Intelligence Unit ("FIU") for the United States, meaning it is the central entity responsible for receiving and analyzing suspicious transaction reports and other information concerning money laundering, financing of terrorism, and related offenses.[54] FinCEN regulates individuals and entities engaged in the business of accepting and transmitting convertible virtual currency ("CVC"), which refers to "virtual currency

that either has an equivalent value as currency, or acts as a substitute for currency, and is therefore a type of 'value that substitutes for currency.'"[55]  In 2011, FinCEN issued a final rule that, among other things, defined "money transmission services" to include accepting and transmitting "currency, funds, or *other value that substitutes for currency* by any means."[56]  The phrase "other value that substitutes for currency" was intended to cover situations where a transmission includes something that the parties recognize has value that is equivalent to, or can substitute for, fiat currency.[57]  The definition of "money transmission" is technology-neutral: whatever the platform, protocol, or mechanism, the acceptance and transmission of value from one person to another, or from one location to another, is regulated under the BSA.

To provide additional clarity and to respond to questions from the private sector, FinCEN issued interpretive guidance in March 2013 and in May 2019 regarding the application of its regulations to certain transactions involving the acceptance of currency or funds and the transmission of virtual currency.[58]  The 2013 FinCEN guidance identified the participants in some virtual currency arrangements, including "exchangers," "administrators," and "users," and clarified that while exchangers and administrators generally qualify as money transmitters under the BSA, users do not.[59]  The guidance also stated that virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered MSBs to the extent they accept and transmit CVC or when they buy or sell CVC for any reason.[60]  As MSBs, such virtual currency administrators and exchangers are obliged to have AML programs, to file Suspicious Activity Reports ("SARs"), and to follow other BSA requirements.[61]

The May 2019 FinCEN guidance addressed how FinCEN regulations relating to MSBs apply to various business models involving money transmission denominated in CVC, including with reference to prior administrative rulings.[62]  Importantly, the guidance discussed the application of the BSA to foreign-located MSBs, individual peer-to-peer exchangers, wallet providers, cryptocurrency kiosk operators, CVC-to-CVC transactions, payment processors, mixers and tumblers, initial coin offerings, Internet casinos, trading platforms, decentralized exchanges and distributed applications ("DApps"), miners, software providers, and developers of such technologies.  In particular, the guidance outlined the application of FinCEN's regulations to persons who provide anonymizing services or who are engaged in activities involving anonymity-enhanced CVCs.  According to FinCEN, anonymizing service providers and some AEC issuers are money transmitters, whereas an individual or entity that merely provides anonymizing software is not.

FinCEN has stated that MSBs that conduct money transmission in CVCs must meet the same AML/CFT standards as other MSBs under the Bank Secrecy Act.  This includes registering with FinCEN, establishing an AML program reasonably designed to prevent

CYBER2-29777 - 01788

money laundering and terrorist financing, and meeting certain record keeping and reporting obligations, such as filing SARs.[63]  SARs and currency transaction reports ("CTRs") are a vital source of information that all MSBs—including VASPs, when applicable—should be generating where appropriate, and filing with FinCEN. These reports may contain leads for law enforcement and information necessary to deter, investigate, and prosecute criminal activity.

Importantly, FinCEN's requirements apply equally to domestic and foreign-located MSBs—even if the foreign-located MSB does not have a physical presence in the United States.[64] The MSB need only do business in whole or substantial part in the United States.  In addition, parties become money transmitters, and therefore MSBs, whether they exchange from fiat to convertible virtual currency or from one virtual currency to another virtual currency.[65]

***Interaction with the Department of Justice.***  FinCEN's relationship with the Department of Justice and other law enforcement agencies generally falls into two categories: crime prevention (through compliance requirements that prevent money laundering and terrorist activity) and investigatory assistance (through, for example, the provision of leads for criminal investigations generated by regulatory reporting requirements regarding suspicious activity).   In addition, FinCEN has the ability to share and to receive financial intelligence information among foreign counterparts, thus creating an important international network.  FinCEN also has civil enforcement authority through which it can impose monetary penalties to supplement, or as an alternative to, criminal prosecution in appropriate circumstances, and can take regulatory action to address money laundering and terror financing concerns raised in the virtual currency space.[66]

In just one example of successful collaboration, FinCEN, working in coordination with the United States Attorney's Office for the Northern District of California, assessed a $700,000 civil monetary penalty in 2015 against Ripple Labs Inc. and its wholly-owned subsidiary, XRP II, LLC.[67]  Ripple Labs, which is headquartered in San Francisco, facilitated transfers of virtual assets and provided virtual asset exchange transaction services.  The company also operated a virtual currency known as XRP that, in 2015, was the second-largest cryptocurrency by market capitalization after Bitcoin.  Parallel investigations by the Department of Justice and FinCEN found that Ripple Labs willfully violated several requirements of the BSA by acting as an MSB and selling XRP without registering with FinCEN and by failing to implement and maintain an adequate AML program.   Ripple Labs entered into a settlement agreement that resolved possible criminal charges and required the entity to forfeit $450,000. These funds were credited to partially satisfy the $700,000 civil money penalty.  In addition, the settlement agreement required Ripple Labs to engage in steps to ensure future compliance with AML/CFT obligations.[68]

CYBER2-29777 - 01789



**OFAC**

## 2. Office of Foreign Assets Control

*Regulatory authority.*   Virtual assets move globally, and in some instances they move to entities or jurisdictions subject to economic sanctions administered by the U.S. Department of the Treasury. The Treasury Department's Office of Foreign Assets Control ("OFAC") administers and enforces economic and trade sanctions against targeted foreign countries and regimes; terrorist groups; international narcotics traffickers; those engaged in activities related to the proliferation of weapons of mass destruction; those engaged in malicious cyber activities; and other entities that present threats to the national security, foreign policy, or economy of the United States based on U.S. foreign policy and national security goals.[69]

As a general matter, U.S. persons and persons otherwise subject to OFAC jurisdiction—including firms that facilitate or engage in online commerce or process transactions using digital currency[70]—are responsible for ensuring that they do not engage in transactions prohibited by OFAC sanctions (such as dealings with blocked persons or property) or in otherwise-prohibited trade or investment-related transactions.[71] Prohibited transactions generally also include those that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate prohibitions imposed by OFAC under various sanctions authorities.[72] In addition, persons who provide financial, material, or technological support for or to a designated person or entity, or certain malicious activities, may themselves be designated by OFAC under the relevant sanctions authority, or be criminally or civilly liable for violations of the Trading With the Enemies Act, the International Emergency Economic Powers Act, and other statutes.[73]

*Interaction with the Department of Justice.* On November 28, 2018, OFAC took its first virtual-asset-related action pursuant to the "cyber sanctions" authorized by Executive Order ("EO") 13694, as amended by EO 13757.[74] This action targeted two Iran based individuals who helped exchange bitcoin ransom payments into Iranian rial on behalf of malicious Iranian cyber actors involved with the SamSam ransomware scheme described above.[75] OFAC also identified two bitcoin addresses associated with these individuals that were connected to over 7,000 transactions worth millions of dollars.[76] By designating these malicious cyber actors, OFAC sought to "aggressively pursue Iran and other rogue regimes attempting to exploit digital currencies and weaknesses in cyber and AML/CFT safeguards," while also encouraging "virtual currency exchanges, peer-to-peer exchangers, and other providers of digital currency services [to] harden their networks against [such] illicit schemes."[77] As described above, in a related move, the Department of Justice brought criminal charges against the two Iran-based individuals related to the 34-month-long international computer hacking and extortion scheme involving the use of SamSam ransomware against numerous U.S. computer networks.[78]

CYBER2-29777 - 01790

In August 2019, OFAC designated three Chinese nationals, one Chinese drug trafficking organization, and one Chinese pharmaceutical company for their involvement with fentanyl manufacturing and trafficking pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"). OFAC identified cryptocurrency addresses associated with two drug traffickers to maximize disruption of their financial dealings.[79] OFAC closely coordinated these designations with the Department of Justice. Previously, in 2017, the Department of Justice indicted one of the Chinese nationals for his role as a manufacturer and distributor of fentanyl and other opiate substances.[80] And in August 2018, the Department of Justice charged two of the Chinese nationals with operating a conspiracy that manufactured and shipped deadly fentanyl analogues and 250 other drugs to at least 25 countries and 37 states.[81]

In September 2020, OFAC designated three Russian nationals for having acted or purported to act for or on behalf of, directly or indirectly, the Internet Research Agency ("IRA"), an entity previously designated for its involvement with election interference activities, pursuant to EO 13694, as amended by EO 13757, and EO 13848. The IRA uses cryptocurrency to fund activities in furtherance of ongoing malign influence operations around the world. OFAC identified digital currency addresses for two of these Russian nationals.[82] Concurrently, the Department of Justice filed a criminal complaint charging one of the Russian nationals for his alleged role in a conspiracy to use the stolen identities of real U.S. persons to open fraudulent accounts at banking and cryptocurrency exchanges.[83]

Earlier, on March 2, 2020, OFAC announced sanctions pursuant to EOs 13722 and 13694, as amended, against two Chinese nationals who are alleged to have laundered over $100 million worth of cryptocurrency stolen from cryptocurrency exchanges by North Korean actors. This theft is another example of North Korea's cyber heist program (see page 28), which trains actors to target and launder stolen funds—including large amounts of cryptocurrency—from financial institutions.[84] The two sanctioned individuals allegedly received the stolen cryptocurrency from accounts controlled by North Korean actors and subsequently transferred the funds among cryptocurrency addresses to obfuscate their origin. As a result of OFAC's action, "all property and interests in property of these individuals that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC."[85] On the same day that OFAC announced these sanctions, the Department of Justice announced criminal charges against the two individuals for money laundering conspiracy and for operating an unlicensed money transmitting business, as well as the seizure of the illicit funds.[86] Subsequently, on August 27, 2020, the Department filed a complaint seeking civil forfeiture of 280 additional virtual currency addresses and accounts linked to the hacks.[87] The coordinated actions by OFAC and the Department of Justice followed a comprehensive investigation led by the FBI, IRS–Criminal Investigation, and Homeland Security Investigations, further demonstrating the importance of cooperation among investigatory agencies.

CYBER2-29777 - 01791

## CASE STUDY: THE NORTH KOREAN HACKS

As discussed in the text, on the same day in March 2020 that OFAC announced sanctions, the Department of Justice announced criminal charges against two Chinese nationals for laundering over $100 million worth of cryptocurrency that the defendants allegedly obtained from North Korean actors who had hacked cryptocurrency exchanges.[88] In March and August 2020, the Department also announced complaints seeing the civil forfeiture of hundreds of virtual currency accounts associated with related North Korean hacks and subsequent money laundering conspiracies.[89] The investigations into these criminal schemes revealed highly sophisticated money-laundering techniques. For example, criminal actors allegedly laundered the funds illicitly obtained from the hacks through several intermediary addresses and other virtual currency exchanges. On several occasions, the actors allegedly used the chain-hopping technique in an attempt to obfuscate the transaction path by converting the stolen cryptocurrency into BTC, Tether, or other forms of cryptocurrency.[90] The actors also allegedly used "peel chains" to conceal their activity, whereby "a large amount of [cryptocurrency] sitting at one address is sent through a series of transactions in which a slightly smaller amount of [cryptocurrency] is transferred to a new address each time."[91]

**Figure 12: Depiction of a Simple "Peel Chain"**



*This chart depicts a hypothetical "peel chain" where a subject deposits 100 total bitcoin into an exchange. The subject forwards the bitcoin through a series of 20 "peels" in inconsistent amounts in an attempt to make the underlying transaction difficult to track. In practice, sophisticated cybercriminals often use hundreds of transactions to obscure the path of funds.[92]*

The successful investigations into the North Korean cryptocurrency hacks and subsequent money-laundering scheme—and the coordinated actions between OFAC and the Department of Justice—demonstrate the importance of interagency coordination in addressing threats within the virtual currency space.

CYBER2-29777 - 01792



### 3. Office of the Comptroller of the Currency

The Office of the Comptroller of the Currency ("OCC") is an independent branch of the U.S. Department of the Treasury that charters, regulates, and supervises national banks and federal savings associations. OCC issues rules and regulations for banks and can "impos[e] corrective measures, when necessary, on OCC-governed banks that do not comply with laws and regulations or that otherwise engage in unsafe or unsound practices."[93] On July 22, 2020, OCC published an Interpretive Letter to clarify the authority of national banks and federal savings associations to provide cryptocurrency custody services for their customers.[94] The Letter concludes that such services, which include "holding the unique cryptographic keys associated with cryptocurrency," are a permissible modern form of traditional bank activities.[95] It also stressed OCC's position that banks can provide their services to lawful cryptocurrency businesses "so long as they effectively manage the risks and comply with applicable law."[96]

Earlier in 2020, OCC entered into a cease-and-desist consent order with M.Y. Safra Bank, after alleging that the bank violated the BSA's requirements for establishing an adequate AML program and failed to

investigate suspicious transactions and to timely file SARs. Among other things, OCC's investigation revealed that the bank failed to sufficiently consider AML risks and implement appropriate risk controls when opening accounts for customers that operated virtual-currency money services businesses.[97] Pursuant to the consent order, the bank must adopt numerous improvements to its risk profile, system of internal controls, customer due diligence operation, and BSA audit program.



### 4. The Securities and Exchange Commission

*Regulatory authority.* The mission of the U.S. Securities and Exchange Commission ("SEC") is to protect investors; to maintain fair, orderly, and efficient markets; and to facilitate capital formation. Of particular relevance to the SEC's mission in the virtual currency context is the rapid growth of the "initial coin offerings" ("ICOs") market and its widespread promotion as a means for new investment opportunity, which has provided fertile ground for malicious actors to swindle investors. ICOs (which are also known as "token sales"[98]) are a means companies have used to raise capital by offering and selling digital tokens to potential investors in exchange for funding a certain project or platform. The tokens purchased by an investor in an ICO, which are distributed

CYBER2-29777 - 01793

via a blockchain network, typically do not provide traditional "shares" in the issuing company. Instead, they might purport to grant access to a good or service, to the right to a share in the relevant project's earnings, or to a potential increase in value based on the project's success.[99] Recognizing the securities law implications for technological developments like blockchain and distributed ledger technologies, digital assets (including cryptocurrency), digital asset securities, and other digital instruments, the SEC has devoted substantial resources to this area.[100]

In 2017, the SEC issued an investigative report cautioning the public that offers and sales of digital assets—including through ICOs and token sales—by "virtual" organizations may be subject to the requirements of the federal securities laws, which include registration and disclosure mandates.[101] As the SEC explained, "[w]hether or not a particular transaction involves the offer or sale of a security—regardless of the terminology or technology used—will depend on the facts and circumstances, including the economic realities of the transaction."[102] To protect investors and the public, the SEC has summarily suspended, for 10 business days, the trading of securities of more than a dozen issuers when there were concerns about the accuracy and adequacy of information in the marketplace regarding securities offered or sold through ICOs or coin- or token- related news.[103] The SEC also has warned investors about potential scams involving companies claiming to be related to, or asserting they are engaging in, ICOs.  And the SEC has filed ICO-related civil enforcement actions against individuals violating the securities laws or engaging in fraudulent schemes.[104]

On April 3, 2019, the SEC Staff released a framework for analyzing whether "a digital asset is offered or sold as an investment contract, and, therefore, is a security" under the federal securities laws.[105] The term "security" includes an "investment contract," as well as other instruments such as stocks, bonds, and transferable shares.  Under the so-called "*Howey* test," derived from the Supreme Court's seminal 1946 decision in *Securities and Exchange Commission v. W. J. Howey Co.*, an "investment contract" exists if there is an investment of money in a common enterprise with an expectation of profits derived from the efforts of others.[106] The framework is careful to note that, in the digital asset context, as with all other assets, this analysis does not depend only on the "form and terms" of the asset itself, "but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold."[107] The SEC encourages individuals and entities in the digital asset marketplace to engage proactively with SEC staff as the marketplace continues to develop.[108]

A high-profile action brought by the SEC in October 2019 highlights the need for individuals and entities in the global digital asset marketplace to ensure they are in compliance with U.S. federal securities laws. That month, the SEC sought and received a temporary restraining order against two offshore entities conducting an unregistered, ongoing digital token offering both within the United States and overseas that had raised more than $1.7 billion of investor funds.[109] According to the SEC's complaint, "Telegram Group Inc. and its wholly-owned subsidiary

CYBER2-29777 - 01794

TON Issuer Inc. began raising capital in January 2018 to finance the companies' business, including the development of their own blockchain, the 'Telegram Open Network' or 'TON Blockchain,' as well as the mobile messaging application Telegram Messenger."[110] As part of their plan to raise funds, the entities sold "approximately 2.9 billion digital tokens called 'Grams' at discounted prices to 171 initial purchasers worldwide, including more than 1 billion Grams to 39 U.S. purchasers."[111] The SEC's complaint alleged that Telegram and TON Issuer failed to register their offers and sales of the new "Grams" cryptocurrency, in violation of the registration provisions of the Securities Act of 1933.[112]

In March 2020, a federal judge granted the SEC a preliminary injunction, ruling that the agency had shown "a substantial likelihood of success in proving that the contracts and understandings at issue, including the sale of 2.9 billion Grams to 175 purchasers in exchange for $1.7 billion, are part of a larger scheme to distribute those Grams into a secondary public market, which would be supported by Telegram's ongoing efforts."[113]Accordingly, the court concluded that, on the facts before it, "the resale of Grams into the secondary public market would be an integral part of the sale of securities without a required registration statement."[114] Three months later, the court approved a settlement between the parties, whereby Telegram and its subsidiary agreed not to appeal the court's ruling and consented to the court's judgment without admitting or denying the SEC's allegations. The court ordered Telegram to disgorge $1,224,000,000 in ill-gotten gains

from the sale of Grams, with credit for the amounts paid back to initial purchasers of Grams, and also ordered Telegram to pay a civil penalty of $18,500,000.[115]

The SEC's landmark Telegram case underscores why companies and individuals working and innovating in the digital assets space should ensure—prior to offering or selling—that their activities will meet all applicable requirements under the federal securities laws.[116] Of course, in cases involving outright fraud, bad actors face not only a variety of potential civil securities law violations, but also potential criminal prosecution for fraud or theft.[117]

***Interaction with the Department of Justice.*** The SEC works closely with the Department of Justice in cases involving criminal violations of the federal securities laws, including cases related to ICOs. As just one example, on January 25, 2018, the SEC filed a civil complaint in federal court in Texas seeking to halt an allegedly fraudulent ICO by AriseBank. The same week, the FBI and the SEC coordinated the timing of a search at the temporary residence of the ICO issuer with the execution of a freeze order by a receiver in the SEC's civil action, resulting in the recovery of cryptocurrency for the victim investors.[118] Subsequently, in the Department of Justice's related criminal case, a federal grand jury in Dallas charged AriseBank CEO Jared Rice, Sr., on November 20, 2018, for defrauding investors out of $4 million worth of cryptocurrency assets. The Department's investigation revealed that Rice claimed in connection with the ICO that a cryptocurrency token called "AriseCoin"

CYBER2-29777 - 01795

could offer consumers FDIC insured accounts and traditional banking services, in addition to cryptocurrency services. These statements were false. Rice, who had converted investor funds for his own personal use, also claimed falsely that the ICO had raised $600 million in a matter of weeks.[119] On March 20, 2019, Rice pleaded guilty in the criminal proceedings to one count of securities fraud, in violation of 15 U.S.C. §§ 78j and 78ff. In the SEC's civil action, Rice and AriseBank COO Stanley Ford agreed to pay nearly $2.7 million in disgorgements, interest, and penalties, without admitting or denying the allegations. Both Rice and Ford are permanently enjoined from violating the antifraud and registration provisions of the federal securities laws, from ever serving as officers or directors of public companies, and from participating in issuances, offers, or sales of digital securities.[120]



### 5. The Commodity Futures Trading Commission

*Statutory authority.* Like the SEC, the Commodity Futures Trading Commission ("CFTC") has statutory authority with respect to certain aspects and uses of virtual assets. Under the Commodity Exchange Act ("CEA"),[121] the CFTC has oversight over derivatives contracts, including futures, options, and swaps,[122] that involve a commodity. The CEA defines "commodity" to include agricultural products, "all other goods and articles," and "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."[123] The CFTC has concluded that certain virtual currencies are "commodities" under the CEA.[124] In addition, multiple federal courts have held that virtual currencies fall within the CEA's definition of commodity.[125]

The CFTC's jurisdiction is implicated when a virtual currency is the underlying asset in a derivatives contract, or if there is fraud or manipulation involving a virtual currency traded in interstate commerce. "Beyond instances of fraud or manipulation, the CFTC generally does not oversee 'spot' or cash market exchanges and transactions involving virtual currencies which do not utilize margin, leverage, or financing."[126] The CFTC has taken action against unregistered bitcoin futures exchanges and firms illegally offering margined or financed retail virtual currency transactions;[127] enforced laws prohibiting fictitious trades on a derivatives platform[128] and laws requiring firms to implement adequate anti-money laundering procedures;[129] issued interpretative guidance concerning whether "actual delivery" has occurred in the context of retail commodity transactions in virtual currencies;[130] issued warnings about valuations and volatility in spot virtual currency markets;[131] and addressed numerous virtual currency Ponzi schemes.[132]

*Interaction with the Department of Justice.* In a case involving parallel action by the Department of Justice, the CFTC on April

CYBER2-29777 - 01796

16, 2018, filed a complaint in federal court in New York charging Blake Harrison Kantor and Nathan Mullins, as well as several entities located in the United States and abroad, with operating a fraudulent scheme covering binary options and a virtual currency known as ATM Coin.[133] The CFTC's complaint alleged that, since at least April 2014, the defendants solicited potential customers through emails, phone calls, and a website to purchase illegal off-exchange binary options. Additionally, the defendants falsely claimed that customers' accounts would generate significant profits based upon Kantor's purported profitable trading history, and allegedly misappropriated a substantial amount of the customer funds for personal use. The defendants were alleged to have sought to cover up their misappropriation by inviting customers to transfer their binary options account balances into ATM Coin. Some customers agreed to transfer their funds into ATM Coin, and at least one customer sent additional money to the defendants to purchase additional ATM Coin. The defendants then allegedly misrepresented to customers that their ATM Coin holdings were worth substantial sums of money. On October 23, 2019, a federal court entered an order finding that the defendants had committed fraud and had misappropriated client funds, and requiring them to pay a total of $4.25 million.[134] In a parallel action, the United States Attorney for the Eastern District of New York filed a criminal indictment charging Kantor with fraud, obstruction, and making false statements. He pleaded guilty to the wire fraud conspiracy and obstruction charges, and was sentenced on July 1, 2019, to 86 months' imprisonment.[135]



### 6. The IRS and Tax Enforcement

The Internal Revenue Service ("IRS") treats virtual currency as property for U.S. federal tax purposes, which means that the general tax principles that apply to property transactions also apply to virtual currency transactions.[136] Income, including capital gains, from virtual currency transactions is taxable, and virtual currency transactions themselves must be reported on a taxpayer's income tax return.[137]

In addition, wages paid in virtual currency to employees are taxable, reportable on a Form W-2, and subject to withholding and payroll taxes. Businesses that receive payments for goods or services in virtual currency are required to include such payments in their gross income. The Department of Justice's Tax Division and U.S. Attorney's Offices around the country may pursue tax related prosecutions in cases involving the failure to report income from virtual currency. The Department of Justice also works with the IRS to support its enforcement and compliance efforts relating to virtual currency, including enforcing summonses issued to taxpayers and third parties, as well as assisting in "John Doe" summons matters.[138]

(33)

On October 9, 2019, the IRS issued additional guidance and FAQs for taxpayers who engage in virtual currency transactions, in an effort to help them better understand their reporting obligations. The guidance addresses the tax treatment of "hard forks," which occur when a cryptocurrency undergoes a protocol change resulting in a new distributed ledger and a new cryptocurrency, in addition to the original distributed ledger.[139] The FAQs also address more basic questions about, for example, calculating gains or losses when selling or exchanging virtual currency for real currency or property; whether virtual currency paid by an employer for services constitutes taxable income; and maintaining records of transactions in virtual currency.[140] On December 31, 2019, the IRS issued additional FAQs for taxpayers relating to charitable donations in virtual currency.[141]

### 7. State Authorities

State attorneys general, securities regulators, and departments of financial services are responsible for protecting the investing public in their respective States by, for example, licensing securities firms and investment professionals (such as broker-dealers and investment advisers); registering certain securities offerings; reviewing financial offerings by companies; auditing sales practices and record keeping; promoting investor education; and enforcing State securities and banking laws.[142] Many State authorities are actively monitoring, supervising, or investigating virtual asset activities within their jurisdictions, particularly those involving the issuance or sale of ICOs and other investment products.

For example, on May 21, 2018, the North American Securities Administrators Association ("NASAA")[143] announced a coordinated series of enforcement actions by State and provincial securities regulators in the United States and Canada to crack down on fraudulent ICOs and cryptocurrency-related investment products, as well as on the fraudsters behind them. More than 40 jurisdictions throughout North America participated in "Operation Cryptosweep," which resulted in nearly 70 inquiries and investigations and 35 pending or completed enforcement actions related to ICOs or cryptocurrencies.[144]

The State of New York has been one of the more proactive States seeking to regulate and gather information in the virtual asset and ICO space. New York State officials are conducting a Virtual Markets Integrity Initiative, which is a fact-finding inquiry into the policies and practices of platforms used by consumers to trade cryptocurrencies.[145]As part of that initiative, on April 17, 2018, the New York Attorney General's Office sent letters to thirteen entities identified as "major virtual currency trading platforms" or "exchanges," requesting disclosures about their operations, use of bots, conflicts of interest, outages, and other issues.[146] The letters also requested information on the covered entities' operations, internal controls, and safeguards to protect customer assets as part of a broader effort to protect cryptocurrency investors and consumers.

CYBER2-29777 - 01798

## C. International Regulation

As discussed further below, the lack of consistent international regulation and enforcement of anti-money laundering and combating the financing of terrorism standards applicable to virtual asset entities represents a major challenge. There are, however, important organizations in the international regulatory space, especially the global standard-setter for AML/CFT standards—the Financial Action Task Force ("FATF").[147]



**The Financial Action Task Force.** The FATF is an intergovernmental organization that was founded in 1989 on the initiative of the G7 by the ministers of its member jurisdictions.[148] Its objectives are to set standards and to promote effective implementation of legal, regulatory, and operational measures for combating money laundering, terrorist financing, proliferation of weapons of mass destruction, and other related threats to the integrity of the international financial system. As a standard-setting and policy-making body, the FATF works to generate the technical understanding and necessary political will to bring about national legislative and regulatory reforms, which are intended to be harmonized across jurisdictions to the greatest extent possible.

The FATF reviews money laundering and terrorist financing techniques and countermeasures; provides a forum for exchange of best practices; highlights areas of common concern; and promotes and monitors the progress of its members in adopting and implementing regulatory measures globally. In collaboration with other international stakeholders, the FATF also works to identify national-level vulnerabilities as part of its peer review process with the aim of protecting the international financial system from misuse, as well as creating standards for national best practices.

***The FATF Recommendations and Virtual Asset Guidance.*** The FATF has developed a series of "Recommendations" that are recognized as the international standards for combating money laundering, terrorist financing, and the proliferation of weapons of mass destruction. FATF member countries are responsible for implementing the standards at the national level for compliance by the private sector. This provides the foundation for a coordinated international response aimed at confronting these threats to the integrity of the global financial system.

In 2014, the FATF recognized the need to bring virtual-asset-related activities within its scope, and in 2015 issued global guidance as part of a staged approach to addressing the money-laundering and terrorist-financing risks associated with virtual asset payment products and services. In July 2018, the FATF published a report at the G20 Finance Ministers and Central Bank Governors' meeting outlining the FATF's

CYBER2-29777 - 01799

commitment to addressing illicit finance threats involving virtual assets. Under the leadership of the United States, which held the FATF presidency at the time, the FATF in October 2018 updated its standards to clarify their application to virtual asset activities by amending "Recommendation 15" and adding two new glossary definitions—"virtual asset" and "virtual asset service provider." Recommendation 15, which covers new technologies, states:

> To manage and mitigate the risks emerging from virtual assets, countries should ensure that virtual asset service providers are regulated for AML/CFT purposes, and licensed or registered and subject to effective systems for monitoring and ensuring compliance with the relevant measures called for in the FATF Recommendations.[149]

On June 21, 2019, the FATF adopted and issued a revised Interpretive Note to Recommendation 15 ("INR. 15") that further clarifies and expands upon the FATF's amendments to the standards relating to virtual assets, and describes how countries and obliged entities must comply with the relevant Recommendations to prevent the misuse of virtual assets for money laundering, terrorist financing, and proliferation.[150] Along with updated and expanded guidance aimed at assisting international jurisdictions and the private sector in implementing a risk-based approach to virtual assets and VASPs, INR. 15 requires countries to ensure that VASPs assess and mitigate their money laundering and terrorist financing risks, and implement the full range of AML/CFT preventive measures under the Recommendations—just like other entities subject to AML/CFT regulation. These measures include customer due diligence, record keeping, suspicious transaction reporting, and screening of transactions for compliance with targeted financial sanctions, among others.[151]

***Interaction with the Department of Justice.*** The United States is a founding member of the FATF and, while holding the FATF presidency from July 2018 through June 2019, made it a priority to regulate VASPs for AML/CFT. The U.S. delegation to the FATF is led by the Department of the Treasury's Office of Terrorist Financing and Financial Crimes, and includes the Department of Justice as a key interagency partner. The delegation urged that all FATF Recommendations broadly apply to VASPs and virtual asset financial activities, which resulted in the successful adoption of the amendments to Recommendation 15 along with the Interpretive Note and guidance discussed above. Department of Justice attorneys provided significant contributions to the drafting and adoption process for these important changes to the FATF standards. The FATF also pursues ongoing work on trends in AML/CFT risk related to virtual assets, such as publicly identifying red flags in virtual asset financial activity, and issuing reports that provide case studies drawn from all over the FATF's global network. The Department of Justice has been an integral partner in this effort, providing analysis and case examples for the U.S. delegation.

CYBER2-29777 - 01800

## III. Ongoing Challenges and Future Strategies

Parts I and II of this Framework discussed some of the serious public safety challenges posed by the misuse of cryptocurrency, and the legal and regulatory authorities the Department of Justice and its partners have used to address those challenges. This final Part explores the obligations of certain business and other entities that are particularly susceptible to abuse in the cryptocurrency space, and describes the Department's ongoing strategies for addressing these emerging threats to the safe and effective operation of the cryptocurrency marketplace.

### A. Business Models and Activities That May Facilitate Criminal Activity

As described above, certain MSBs and other types of VASPs play a key role in the cryptocurrency ecosystem. Given their potential to facilitate criminal activity, these entities have a heightened responsibility to safeguard their platforms and businesses from exploitation by nefarious actors and to ensure that customer data is protected and secured. Moreover, the proper collection and maintenance of customer and transactional information by MSBs and other financial institutions pursuant to the BSA is crucial to the Department's ability to identify illicit actors, investigate criminal activity, and obtain evidence necessary for prosecutions. Key industry participants bearing these responsibilities include not only conventional virtual asset exchanges and brokers, but also peer-to-peer exchangers, kiosk operators,

and online casinos, as discussed further below. Unfortunately, many entities in these new and growing sectors often fail to comply, in whole or in part, with the BSA and other legal requirements, thereby threatening the Department's investigative abilities and undermining public safety.

***Cryptocurrency exchanges.*** Companies and individuals that offer cryptocurrency and other virtual asset exchange services to the public are commonly referred to as "exchanges" and "exchangers." Even exchanges that do not accept fiat currency and operate only with cryptocurrency are obliged to follow FinCEN record keeping and reporting requirements, as the applicable regulations cover transfers of value and are not specific to fiat transactions. Moreover, all entities, including foreign-located exchanges, that do business wholly or in substantial part within the United States, such as by servicing U.S. customers, must also register with FinCEN and have an agent physically present in the United States for BSA reporting and for accepting service of process.[152]

***Peer-to-peer exchangers and platforms.*** Individuals seeking to buy or sell cryptocurrency other than through registered or licensed exchanges and financial institutions frequently turn to networks of individuals commonly referred to as peer-to-peer ("P2P") exchangers or traders. As individuals who facilitate transfers of value for the public, including the buying and selling of cryptocurrency, P2P exchangers are considered MSBs and are subject to FinCEN record keeping and reporting requirements.[153] In practice, however, many

CYBER2-29777 - 01801

## Cryptocurrency Exchanges

➤ Allow users to buy and sell cryptocurrencies

➤ Serve as a conduit to the traditional financial system

➤ Can convert cryptocurrency to other virtual currencies or to fiat currency

➤ Global entities that can move money in seconds, not days

➤ In the U.S., exchanges are regulated by FinCEN as money service businesses

➤ In the international space, exchanges are subject to inconsistent regulatory regimes

P2P exchangers fail to register with FinCEN as MSBs or to comply with BSA obligations, and some even conduct transactions without requiring any form of identification from the customer.

P2P exchangers usually charge substantially higher percentage rates or fees—or use less favorable exchange rates—than registered exchanges. They often will accept a wide variety of payment methods, including payments of fiat currency in person or through the mail, deposits into bank accounts, Western Union or MoneyGram transfers, or payments in gift cards or stored value cards. P2P exchangers generally find their customers through word of mouth, open source websites such as Craigslist, or online exchange platforms.

P2P exchangers commonly use online exchange platforms or websites that allow users to trade virtual assets directly with one another and without a central operator. Nonetheless, when engaging in the transmission of virtual assets, these platforms must comply with BSA requirements. Although many P2P exchange platforms offer services similar to those offered by centralized virtual asset exchanges, P2P exchange platforms provide opportunities for cross-platform trading of cryptocurrency without the use of traditional financial institutions. Furthermore, unlike centralized virtual asset exchanges, P2P exchange platforms may operate without an intermediary that will accept and transmit virtual assets in exchange for fiat or another type of virtual asset, or that will collect customer identification information. Individual exchangers—as well as platforms and websites—that fail to collect and maintain customer or transactional data or maintain an effective AML/CFT program may be subject to civil and criminal penalties.[154]

***Cryptocurrency kiosks.*** Cryptocurrency kiosks, which are commonly referred to as "Bitcoin ATMs," are stand-alone machines that allow users to convert fiat currency to and from bitcoin and other cryptocurrencies. With these machines, cryptocurrency can be bought or sold directly using a customer's mobile device or delivered in the form of a paper wallet. Thus, cryptocurrency kiosks offer an easy-to-use physical access point for virtual asset exchange.

CYBER2-29777 - 01802

## Cryptocurrency Kiosks (aka Bitcoin ATMs)

➢ ATM-like machines that facilitate the buying, selling, and/or exchange of bitcoin or other cryptocurrencies

➢ Can be located almost anywhere, including malls, convenience stores, gas stations, and grocery stores

➢ Often charge much higher transaction fees for services than other types of cryptocurrency exchanges

➢ Capture different types of identifying information, including photographs or video

➢ Kiosk operators are considered money service businesses and are subject to anti-money laundering regulations and other legal requirements



Cryptocurrency kiosk operators are considered MSBs in the United States. Accordingly, they are subject to the BSA and must register with FinCEN and follow all applicable money transmission requirements, including collecting and maintaining KYC data on their clients,[155] reporting suspicious transactions to FinCEN, filing currency transaction reports for fiat transactions of $10,000 or more in cash, and maintaining an effective AML/CFT program. While some operators comply with these requirements, many kiosks are not BSA-compliant and fail to collect required customer and transaction information. Indeed, investigators have linked such kiosks to illicit use by drug dealers, credit card fraud schemers, prostitution rings, and unlicensed virtual asset exchangers.

***Virtual currency casinos.*** The rising popularity of virtual assets has led to the growth of virtual-currency-based "casinos" that facilitate various forms of betting denominated in bitcoin and other virtual currencies. Under current law, a casino that has gross annual gaming revenue in excess of $1 million must be duly licensed

39

## HEROCOIN

On July 22, 2020, the Department of Justice announced that a California man agreed to plead guilty to operating an illegal virtual-currency money services business called Herocoin that exchanged up to $25 million—including proceeds of criminal activity—through in-person transactions and a network of Bitcoin ATM-type kiosks. The kiosks were installed in malls, gas stations, and convenience stores throughout California, and allowed customers to exchange cash for bitcoin and vice versa.  In his plea agreement, the defendant admitted that he intentionally failed to register Herocoin with FinCEN, and failed to implement an effective anti-money laundering program; file currency transaction reports for exchanges in excess of $10,000; conduct due diligence on customers; or file suspicious activity reports.  With respect to the Bitcoin ATM network, the defendant also admitted that he failed to implement a program to obtain identifications for customers conducting multiple transactions of up to $3,000 or verify that any identification provided actually reflected the person conducting the transaction.  After pleading guilty, the defendant will face a statutory maximum sentence of 30 years in federal prison, and will forfeit cash, cryptocurrency, and 17 Bitcoin ATMs.[156]

**Figure 13: Image of Cryptocurrency Kiosks Seized in the Herocoin Case**



CYBER2-29777 - 01804

or authorized to do business as a casino in the United States by a federal, State, or tribal authority.[157] Casinos that do not meet this criterion are considered MSBs. Whether regulated as casinos or MSBs, these gambling businesses are subject to the BSA and its KYC record keeping and reporting requirements. Traditional brick-and-mortar casinos generally do not accept bitcoin or other cryptocurrencies; however, online gambling sites increasingly do accept cryptocurrencies. Online casinos that provide gambling services are also MSBs and must comply with applicable money transmission regulations. Although many do not have a known physical location, they still are required to report suspicious transactions to FinCEN if they offer services to U.S. customers.

***Anonymity enhanced cryptocurrencies.*** The acceptance of anonymity enhanced cryptocurrencies or "AECs"—such as Monero, Dash, and Zcash—by MSBs and darknet marketplaces has increased the use of this type of virtual currency. As discussed above, because AECs use non-public or private blockchains, use of these cryptocurrencies may undermine the AML/CFT controls used to detect suspicious activity by MSBs and other financial institutions, and may limit or even negate a business's ability to conduct AML/CFT checks on customer activity and to satisfy BSA requirements. Some AECs, however, offer features, such as public view keys, that potentially can facilitate the fulfillment of AML/CFT obligations, depending upon the implementation of such features.

The Department considers the use of AECs to be a high-risk activity that is indicative of possible criminal conduct.   In most circumstances, the Department does not liquidate seized or forfeited AECs, as doing so allows them to re-enter the stream of commerce for potential future criminal use. Companies that choose to offer AEC products should consider the increased risks of money laundering and financing of criminal activity, and should evaluate whether it is possible to adopt appropriate AML/CFT measures to address such risks.

AECs are often exchanged for other virtual assets like bitcoin, which may indicate a cross-virtual-asset layering technique for users attempting to conceal criminal behavior. This practice, which is commonly referred to as "chain hopping," is discussed further below.

***Mixers, tumblers, and chain hopping.*** "Mixers" and "tumblers" are entities that attempt to obfuscate the source or owner of particular units of cryptocurrency by mixing the cryptocurrency of several users prior to delivery of the units to their ultimate destination. For a fee, a customer can send cryptocurrency to a specific address that is controlled by the mixer. The mixer then commingles this cryptocurrency with funds received from other customers before sending it to the requested recipient address. Websites or companies offering mixing or tumbling services are engaged in money transmission, and therefore are MSBs subject to the BSA and other similar international regulations. In addition to facing BSA liability for failing to register, conduct AML procedures, or collect customer identification, operators of these services can be criminally liable for money laundering because these mixers and tumblers are designed specifically to

CYBER2-29777 - 01805

## Figure 14: Example of a Criminal "Mixing" Enterprise



## Figure 15: Illustration of "Chain Hopping"

CYBER2-29777 - 01806

## HELIX

On February 13, 2020, the Department of Justice announced the indictment and arrest of the alleged administrator of Helix, a darknet cryptocurrency laundering service. According to the indictment, Helix functioned as a bitcoin "mixer" or "tumbler," allowing customers to send bitcoin to designated recipients in a manner that was designed to conceal their source or owner.

The service's administrator is alleged to have advertised Helix to customers on the darknet as a way to conceal transactions from law enforcement. The indictment charges Helix with laundering over $300 million of bitcoin, which allegedly represented the proceeds of illicit narcotics sales and other criminal transactions.[158]

**Figure 16: Helix Allegedly "Tumbled" a Large Volume of Bitcoin, Charging a Fee for Each Transaction**



*Helix allegedly received more than 354,468 bitcoin between the site's launch in June 2014 and December 2017, valued at approximately $311 million in U.S. dollars at the time of the transactions.*

CYBER2-29777 - 01807

"conceal or disguise the nature, the location, the source, the ownership, or the control" of a financial transaction.[159]

Criminals also may engage in a practice known as "chain hopping," in which they move from one cryptocurrency to another, often in rapid succession. As the Department has observed, chain hopping is "frequently used by individuals who are laundering proceeds of virtual currency thefts."[160] Chain hopping is often viewed as a potential way to obfuscate the trail of virtual currency by shifting the trail of transactions from the blockchain of one virtual currency to the blockchain of another virtual currency.

***Jurisdictional arbitrage and compliance deficiencies.*** Because of the global and cross-border nature of transactions involving virtual assets, the lack of consistent AML/CFT regulation and supervision over VASPs across jurisdictions—and the complete absence of such regulation and supervision in certain parts of the world—is detrimental to the safety and stability of the international financial system.[161] This inconsistency also impedes law enforcement's ability to investigate, prosecute, and prevent criminal activity involving or facilitated by virtual assets. For example, illicit financial flows denominated in virtual assets may move to companies and exchanges in jurisdictions where authorities lack regulatory frameworks requiring the generation and retention of records necessary to support investigations.

In the United States, AML/CFT standards have been in place for MSBs engaged in virtual asset activities since 2011, and yet many VASPs still are operating in ways that do not comply with the BSA and other regulatory requirements. For example, some VASPs apply different standards to U.S. customers versus customers in other countries, while other VASPs actively apply different standards to virtual-asset-to-fiat transactions than to virtual-asset-to-virtual-asset transactions. Such behaviors are flatly inconsistent with VASPs' BSA obligations and can create significant financial intelligence gaps.

## B. Department of Justice Response Strategies

***Investigations and prosecutions generally.*** Consistent with its mission to protect public safety and national security, the Department of Justice will continue its aggressive investigation and prosecution of a wide range of malicious actors, including those who use cryptocurrencies to commit, facilitate, or conceal their crimes. For instance, the Department has prosecuted a number of individuals operating as P2P exchangers for money laundering and for violating the BSA.[162] Many of these exchangers were selling virtual assets that they obtained from their own involvement in other criminal activities, such as drug trafficking or computer hacking, or were otherwise knowingly facilitating the criminal activities of others.

As discussed above, the Department has a broad range of legal authorities for investigating and prosecuting individuals who misuse cryptocurrency for criminal purposes. To that end, the Department is committed to an appropriate all-tools approach to dealing with cryptocurrency-related crime. The Department will continue

CYBER2-29777 - 01808

to engage actively with its regulatory partners to address the misuse and abuse of cryptocurrency by malicious actors. The case examples noted throughout this Framework highlight the many successes from the Department's work with regulatory partners such as FinCEN, OFAC, the SEC, the CFTC, and the IRS. By appropriately coordinating parallel enforcement actions, the Department can maximize its impact in investigating, dismantling, and deterring criminal activity; more effectively recover funds for victims; and better safeguard the financial system and the American public.

The Department also has robust authority to prosecute VASPs and other entities and individuals that violate U.S. law even when they are not located inside the United States. Where virtual asset transactions touch financial, data storage, or other computer systems within the United States, the Department generally has jurisdiction to prosecute the actors who direct or conduct those transactions. The Department also has jurisdiction to prosecute foreign-located actors who use virtual assets to import illegal products or contraband into the United States, or use U.S.-located VASPs or financial institutions for money laundering purposes. In addition, the Department may prosecute for violations of U.S. law those foreign-located actors who provide illicit services to defraud or steal from U.S. residents. Moreover, as FinCEN has observed, the BSA applies to entities and individuals that engage in money transmission as a business and that operate wholly or substantially in part in the United States, regardless of where they are incorporated or headquartered.

Finally, it bears emphasizing that if conduct involving virtual currency were to violate the U.S. statutes regarding material support of terrorism, the U.S. government could appropriately assert jurisdiction over such offenses anywhere in the world, consistent with due process, under the principle of protective jurisdiction. That principle holds that "[f]or non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."[163]  Where a malign actor's conduct involving cryptocurrency amounts to providing material support to a designated foreign terrorist organization, that actor engages in conduct that threatens the security of the United States, and therefore subjects himself (or itself) to the jurisdiction of our Nation's courts—and to the Department's enforcement of the Nation's laws.[164]

***Promoting law enforcement awareness and expertise.*** Given the complexity of cryptocurrency technology and of the platforms on which it is used, law enforcement professionals across agencies must continually develop and maintain the base of knowledge and skills necessary to identify threats involving cryptocurrency; conduct robust and efficient investigations of those threats; and employ the many appropriate legal tools available to bring individuals and entities that abuse cryptocurrency to justice. The Department is taking the lead in this area by dedicating resources to existing initiatives and groups that encourage law enforcement awareness and expertise in the cryptocurrency space. These efforts include continuing to promote Department-wide,

CYBER2-29777 - 01809

## CASE STUDY: BTC-e

The BTC-e case, which was introduced earlier,[165] is one example of the Department of Justice's resolve to prosecute foreign-located entities and individuals in the cryptocurrency context. BTC-e operated globally as an unlicensed virtual currency exchange to launder and liquidate criminal proceeds from virtual currency to fiat currency. In doing so, it relied on the use of shell companies and affiliated entities that were similarly unregistered with FinCEN. According to its now-defunct website, BTC-e purported to be based in Eastern Europe. BTC-e's managing shell company, Canton Business Corporation, was registered in the Seychelles, and its web domains were registered to shell companies in, among other places, Singapore, the British Virgin Islands, France, and New Zealand. After a multi-year, multi-agency investigation, the Department successfully charged BTC-e and one of its principal operators with operating an unlicensed money services business, money laundering, and other related crimes.



**Figure 17: BTC-e Website after Seizure by the U.S. Government**

CYBER2-29777 - 01810

## CASE STUDY: AlphaBay

The AlphaBay case, which also was mentioned previously,[166] further demonstrates the global reach of the Department of Justice, U.S. law enforcement, and our domestic and international partners in identifying and neutralizing unlawful activities involving cryptocurrency. At the time of its takedown by law enforcement in July 2017, AlphaBay was the dark web's largest criminal marketplace, serving over 200,000 users as a conduit for everything from illegal drugs and firearms to malware and toxic chemicals. Aided by the use of cryptocurrencies like Bitcoin, Monero, and Ether, AlphaBay's operators were able to hide the location and identities of the site's administrators and users and to facilitate the laundering of hundreds of millions of dollars. Over the course of the government's investigation, law enforcement identified AlphaBay proceeds and discovered hundreds of thousands of cryptocurrency addresses associated with the site.[167] The international operation to dismantle AlphaBay was led by the United States and involved cooperation from law enforcement partners in Thailand, the Netherlands, Lithuania, Canada, the United Kingdom, and France, as well as the European law enforcement agency Europol.[168] The legal proceedings in the United States demonstrated the breadth of authorities the Department can and will bring to bear in appropriate cases.[169]



47

formalized training of investigators and prosecutors on the cryptocurrency threat and how best to address it; working with federal, State, local, and international partners to promote and coordinate the sharing of information and resources; serving as the main point of contact in cross-jurisdictional investigations; and conducting outreach to the private sector in support of public-private partnerships.

The Department also will work with law enforcement agencies to develop further strategic guidance on the use of available legal tools to investigate and prosecute cryptocurrency-related offenses, and

**Figure 18: Example of an Illicit Transaction Path Developed Through Blockchain Analysis**[170]

*This chart depicts a complex series of transactions following a theft from a virtual currency exchange ("Exchange 3"), including numerous conversions of cryptocurrency and deposits and withdrawals involving several intermediary addresses and exchanges. Successful investigations of such schemes require enhanced training and technical capabilities.*

CYBER2-29777 - 01812

## THE DIGITAL CURRENCY INITIATIVE

As announced in the July 2018 Report of the Attorney General's Cyber Digital Task Force, the Money Laundering and Asset Recovery Section ("MLARS") within the Department of Justice's Criminal Division has established a Digital Currency Initiative to focus on "providing support and guidance to investigators, prosecutors, and other government agencies on cryptocurrency prosecutions and forfeitures."[171] The Digital Currency Initiative continues to "expand and implement cryptocurrency-related training to encourage and enable more investigators, prosecutors, and Department components to pursue such cases, while developing and disseminating policy guidance on various aspects of cryptocurrency, including seizure and forfeiture."[172]

consider legislative proposals to close any existing gaps in enforcement authority.

***Fostering cooperation with State authorities.*** As discussed above, State attorneys general offices and regulatory agencies play an important role in protecting the investing public by enforcing State securities laws and licensing, registration, and auditing requirements. Coordination and de-confliction with State attorneys general offices, regulators, and prosecuting entities is crucial, and yet communication on matters involving virtual assets between federal prosecutors and State authorities currently varies by jurisdiction. United States Attorneys' Offices and Department litigating divisions should continue to develop lines of communication with State authorities handling securities and fraud investigations, prosecutions, and enforcement actions involving cryptocurrency and virtual-asset-related investment products. In addition, Department agencies should communicate and coordinate with State financial and banking authorities that regulate money transmitters operating in their respective jurisdictions to prevent conflicts and duplication of efforts in money laundering prosecutions.

***Enhancing international cooperation and promoting comprehensive and consistent international regulation.*** The inherently global nature of the virtual asset ecosystem poses significant investigative challenges for U.S. law enforcement agencies and for Department prosecutors. Effectively countering criminal activity involving virtual assets requires close international partnerships. Foreign partners assist U.S. law enforcement in, for example, conducting investigations, making arrests, and seizing criminal assets. Similarly, foreign partners may rely on the assistance of U.S. law enforcement to take action against individuals who commit crimes abroad and conceal evidence and assets—or themselves—within the United States. The Department will continue to encourage these partnerships in support of multi-jurisdictional parallel investigations and prosecutions, particularly those involving foreign-located actors, VASPs, and transnational criminal organizations.

CYBER2-29777 - 01813

## THE GDPR

In May 2018, the European Union ("EU") General Data Protection Regulation 2016/679 ("GDPR") came into effect. GDPR is a sweeping data protection and privacy law that applies to all data controllers, data processors, and data subjects within the EU's jurisdiction. Some virtual currency exchanges have attempted to withhold data requested by law enforcement agencies in the United States through criminal grand jury subpoenas by citing GDPR's broad privacy rules.

However, GDPR does not in fact bar companies subject to U.S. jurisdiction from complying with lawful requests in criminal investigations. To the contrary, GDPR explicitly permits the disclosure of data in a number of scenarios. For example, a virtual exchange that is subject to GDPR may process the requested data under GDPR Article 6(1) when "necessary for compliance with a legal obligation to which the controller is subject" or "necessary for the purposes of the legitimate interests pursued by the controller or by a third party . . . ."[173] Similarly, under Article 49.1, international transfer of data is permitted in various circumstances, including where "the transfer is necessary for important reasons of public interest" or "necessary for the purposes of compelling legitimate interests pursued by the controller."[174]

The ability of law enforcement to investigate criminal activity is plainly an important reason of public interest, placing production of records pursuant to U.S. grand jury subpoenas squarely within the "public interest" exception in Article 49.1. Moreover, the transfer of data from exchanges may constitute a "compelling legitimate interest" in that the transfer may be necessary to prevent or defend against being held in contempt of court for failure to respond to lawful process. Indeed, the European Commission itself recognized this framework in a 2017 amicus brief it filed in the U.S. Supreme Court in *United States v. Microsoft*,[175] which discussed the GDPR's rules governing the transfer of personal data to a non-EU state. In its brief, the European Commission recognized that the public interest is served by transferring data to non-EU countries to further international criminal investigations, stating: "[I]n general, [European] Union as well as Member State law recognize the importance of the fight against serious crime—and thus criminal law enforcement and international cooperation in that respect—as an objective of general interest."[176]

GDPR Articles 6 and 49.1 provide additional legal bases for processing and transfer that may be applicable in particular circumstances. For example, Article 49.1(e) establishes a derogation if "the transfer is necessary for the establishment, exercise or [defense] of legal claims."[177] This derogation may be applicable where the transfer of data from exchanges is sought pursuant to a subpoena or other compulsory order.

While the Department disagrees with the basis for such objections to lawful requests for information, some exchanges continue to cite to the GDPR while refusing to comply with standard grand jury subpoenas. The Department will continue to engage with these virtual currency exchanges to ensure compliance with lawful requests and will pursue motions to compel as needed.

CYBER2-29777 - 01814

The Department also works with its partners in the federal government to encourage their international counterparts to continue development of comprehensive and consistent international regulation of virtual assets. As discussed above, the Financial Action Task Force has adopted amendments to its Recommendation 15 that bring VASPs and virtual asset activity within the FATF's standards for AML/CFT. As implementation of these amendments expands across global jurisdictions, the Department will continue to provide policy support and subject matter expertise to the Department of the Treasury-led U.S. delegation, and to work internationally to level the legal and regulatory playing field related to virtual assets. In addition, other international organizations, including the United Nations Office on Drugs and Crime, are in the process of adopting regulatory frameworks that mirror the FATF's developing approach to virtual asset activity. We will monitor and actively contribute to those efforts, as appropriate.

Finally, the Department will continue to encourage its partners to support the adoption of consistent regulations across jurisdictions to prevent illicit actors from practicing jurisdictional arbitrage, and to ensure the collection of important evidence and seizure of illicit assets regardless of where an entity or illicit actor may be operating.

***Conducting private sector education and outreach.*** As with any specialized, technology-driven industry, effective regulation and policing of cryptocurrency activity requires close cooperation between the public and private sectors whenever possible. This approach includes direct engagement with the companies that operate in the virtual asset space; with the banks and financial institutions that may be affected by virtual asset regulation; and, importantly, with the actual community of cryptocurrency users. In conducting such outreach, the Department and its partners will continue their efforts to advance mutual goals such as safeguarding the virtual asset marketplace from theft, fraud, and hacking.

## Conclusion

As the use of cryptocurrency evolves and expands, so too will opportunities to commit crime and to do harm by exploiting cryptocurrency technology. Every day, criminals expand and perfect techniques designed to evade detection and apprehension. Ultimately, illicit uses of cryptocurrency threaten not just public safety, but national security, as well. For example, cryptocurrency can provide terrorist organizations a tool to circumvent traditional financial institutions in order to obtain, transfer, and use funds to advance their missions. Current terrorist use of cryptocurrency may represent the first raindrops of an oncoming storm of expanded use that could challenge the ability of the United States and its allies to disrupt financial resources that would enable terrorist organizations to more successfully execute their deadly missions or to expand their influence.

Likewise, cryptocurrency presents a troubling new opportunity for individuals and rogue states to avoid international sanctions and to undermine traditional financial markets,

CYBER2-29777 - 01815

thereby harming the interests of the United States and its allies.

Despite the many challenges, the Department of Justice has aggressively investigated and prosecuted a range of malign actors who have used cryptocurrencies to facilitate or to conceal their illicit activities. Similarly, the Department has brought actions against individuals and companies that have failed to meet their legal obligations to counter illicit activity. In particular cases, we have even proceeded against the illicit cryptocurrency itself, seizing those virtual assets and removing them from the stream of international commerce, irrespective of our ability to identify or to apprehend the actors who used them. This essential work will continue, as the Department seeks to ensure that uses of cryptocurrency adhere to the law and are compatible with the protection of public safety and national security.

The Department of Justice, however, cannot achieve success on its own. We recognize the importance of working with interagency and international partners to enhance an already vigorous enforcement plan, regulatory scheme, and policy framework to thwart the opportunities created by cryptocurrency for criminals, terrorists, and other bad actors. The Department is committed to strengthening its key partnerships by promoting law enforcement awareness and expertise; by fostering cooperation with State authorities; by enhancing international cooperation; by promoting comprehensive, consistent international regulation; and by conducting private sector education and outreach.

To promote public safety and protect national security, all stakeholders—from private industry to regulators, elected officials, and individual cryptocurrency users—will need to take steps to ensure cryptocurrency is not used as a platform for illegality. Indeed, for cryptocurrency to realize its truly transformative potential, it is imperative that these risks be addressed.

CYBER2-29777 - 01816

CYBER2-29777 - 01817

CYBER2-29777 - 01818

# NOTES

## Introduction

i   The original formulation of this phrase (describing the laws as "those wise restraints that make men free") was coined by Professor John MacArthur Maguire of Harvard. *See* https://asklib.law.harvard.edu/faq/115309 (last accessed Oct. 1, 2020).

ii   Jeff Sessions, Attorney General, "Memorandum for Heads of Department Components [Establishing Cyber-Digital Task Force]," Feb. 16, 2018, available at: https://www.justice.gov/opa/press-release/file/1035457/download (last accessed Oct. 1, 2020).

iii   U.S. Dep't of Justice, Report of the Attorney General's Cyber-Digital Task Force 126 (2018), available at: https://www.justice.gov/cyberreport (last accessed Oct. 1, 2020).

iv   U.S. Dep't of Commerce, Nat'l Inst. of Standards and Tech., "Blockchain," available at: https://www.nist.gov/topics/blockchain (last accessed Oct. 1, 2020).

v   U.S. Dep't of Def, "DoD Digital Modernization Strategy," at 44 (Appendix I), July 12, 2019, available at: https://media.defense.gov/2019/Jul/12/2002156622/-1/-1/1/DOD-DIGITAL-MODERNIZATION-STRATEGY-2019.PDF (last accessed Oct. 1, 2020).

vi   *See* U.S. Food and Drug Admin., "New Era of Smarter Food Safety: FDA's Blueprint for the Future," July 2020, available at: https://www.fda.gov/media/139868/download (last accessed Oct. 1, 2020).

vii   Lael Brainard, Fed. Reserve Governor, "An Update on Digital Currencies," Aug. 13, 2020, available at: https://www.federalreserve.gov/newsevents/speech/brainard20200813a.htm (last accessed Oct. 1, 2020).

viii   Binance, "The Evolution of the Internet – Web 3.0 Explained," Feb. 2020, available at: https://academy.binance.com/en/articles/the-evolution-of-the-internet-web-3-0-explained (last accessed Oct. 1, 2020).

## Cryptocurrency: An Enforcement Framework

1   Ctrs. for Disease Control & Prevention, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed Oct. 1, 2020).

2   Financial Action Task Force (FATF), The FATF Recommendations: International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation 126 (June 2019) [hereinafter FATF International Standards], available at: http://www.fatf-gafi.org/media/fatf/documents/recommendations/pdfs/FATF%20Recommendations%202012.pdf (last accessed Oct. 1, 2020).

3   Some countries, including the United States (see text accompanying *supra* note vii), are exploring the use of blockchain technology to support a national currency. Such currencies are sometimes referred to as "Central Bank Digital Currencies" or "CBDCs." *See, e.g.,* PricewaterhouseCoopers, The Rise of Central Bank Digital Currencies (CBDCs) 2 (Nov. 2019), available at: https://www.pwc.com/gx/en/financial-services/pdf/the-rise-of-central-bank-digital-currencies.pdf (last accessed Oct. 1, 2020).

CYBER2-29777 - 01819

4   U.S. Dept. of the Treasury, Fin. Crimes Enf't Network, FinCEN Guidance FIN-2013-G001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013), available at: https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf (last accessed Oct. 1, 2020). A non-convertible virtual currency may effectively become a convertible virtual currency where a robust unofficial secondary market for the currency develops and provides the opportunity to exchange the "non-convertible" currency for fiat or other virtual currency. See Financial Action Task Force (FATF), Virtual Currencies: Key Definitions and Potential AML/CFT Risks 4–5 (June 2014), available at: http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf (last accessed Oct. 1, 2020).

5   Throughout this publication, specific examples of cryptocurrency, like Bitcoin, are capitalized when referring to the protocol, and lowercase when referring to units of the cryptocurrency.

6   To the extent this Framework discusses or references criminal cases that are pending at the time of publication, it should be noted that criminal charges are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

7   For example, Christopher Bantli, a Canadian citizen, used cryptocurrency while acting as a vendor of controlled substances on the darknet website AlphaBay. In February 2019, Bantli pleaded guilty in U.S. federal court to accepting virtual currency as payment for controlled substances, including powerful fentanyl analogues and synthetic opiates. See Press Release, "Dark Web Trafficker Convicted of Drug Importation Conspiracy," U.S. Dept. of Justice (Feb. 13, 2019), available at: https://www.justice.gov/opa/pr/dark-web-trafficker-convicted-drug-importation-conspiracy (last accessed Oct. 1, 2020).

8   In October 2018, Ammar Atef Alahdali pleaded guilty to receipt of child pornography after admitting to paying cryptocurrency to become a member of a darknet website dedicated to the advertisement and distribution of such illicit material. In 2017, Alahdali used the website to download more than twenty images depicting the sexual abuse of children, including at least one video depicting sadistic sexual conduct. See Press Release, "Foreign National Pleads Guilty to Downloading Child Pornography from the Dark Web in Exchange for Cryptocurrency," U.S. Dept. of Justice (Oct. 2, 2018), available at: https://www.justice.gov/opa/pr/foreign-national-pleads-guilty-downloading-child-pornography-dark-web-exchange-cryptocurrency (last accessed Oct. 1, 2020).

9   For examples of cases where cryptocurrencies were used in the illicit sales on the dark web, see, e.g., United States v. Hagan, 766 Fed. Appx. 356 (6th Cir. 2019) (MDMA, LSD, DMT, mushrooms, and marijuana); United States v. Reuer, CR. 19-50022-JLV, 2019 WL 1012187 (D.S.D. Mar. 4, 2019) (methamphetamine, fentanyl, and heroin); State v. Sawyer, 187 A.3d 377 (Vt. 2018) (firearms); State v. A.P., 117 N.E.3d 840 (Ohio 2018) (LSD); United States v. 2013 Lamborghini Aventador, No. 1:17-cv-00967-ljo-sko, 2018 WL 3752131 (E.D. Cal. Aug. 8, 2018) (luxury vehicles); United States v. Michell, No. CR-17-01690-001-PHX-GMS, 2018 WL 2688803 (D. Ariz. June 5, 2018) (potassium cyanide and dimethyl mercury); United States v. Vallerius, No. 17-CR-20648, 2018 WL 2325729 (S.D. Fla. May 1, 2018) (narcotics); United States v. Focia, 869 F.3d 1269 (11th Cir. 2017) (firearms); United States v. Ulbricht, 858 F.3d 71 (2d Cir. 2017) (drugs, false identification documents, and computer hacking software);

CYBER2-29777 - 01820

*United States v. Colldock*, No. CR-16-1254-JAS, 2017 WL 9615895 (D. Ariz. Sept. 11, 2017) (methamphetamine and cocaine); *United States v. Levin*, 186 F. Supp. 3d 26 (D. Mass. 2016) (child pornography); *United States v. Parks*, No. S1-4:15 CR 553, 2016 WL 6775465 (E.D. Mo. Sept. 19, 2016) (human trafficking and prostitution); *United States v. 50.44 Bitcoins*, No. ELH-15-3692, 2016 WL 3049166 (D. Md. May 31, 2016) (narcotics and illicit Bitcoin-to-fiat-currency exchanges); and *United States v. Donagal*, No. 14-cr-00285-JST-1, 2014 WL 6601843 (N.D. Cal. Nov. 18, 2014) (illegally manufactured Xanax, GHB, steroids, and other drugs).

[10] *See infra* pages 7-20 (describing AlphaBay, Operation DisrupTor, terrorist financing cases, and other examples).

[11] For example, in 2017, the U.S. government formally asserted that North Korea conducted a massive ransomware attack, referred to as the WannaCry attack, which infected computers around the world. The perpetrators of the WannaCry attack demanded ransom payments from their victims in Bitcoin. *See, e.g.*, Thomas P. Bossert, *It's Official: North Korea Is Behind WannaCry*, WALL ST. J., Dec. 18, 2017, available at: https://www.wsj.com/articles/its-official-north-korea-is-behind-wannacry-1513642537 (last accessed Oct. 1, 2020).

[12] Press Release, "FBI Expects a Rise in Scams Involving Cryptocurrency Related to the COVID-19 Pandemic," FEDERAL BUREAU OF INVESTIGATION (Apr. 13, 2020), available at: https://www.fbi.gov/news/pressrel/press-releases/fbi-expects-a-rise-in-scams-involving-cryptocurrency-related-to-the-covid-19-pandemic#:~:text=FBI%20Expects%20a%20Rise%20in%20Scams%20Involving%2-0Cryptocurrency%20Related%20to,through%20the%20complex%20cryptocurrency%20ecosystem (last accessed Oct. 1, 2020).

[13] *See infra* page 16.

[14] In what was reported in January 2015 as the "first instance of an ISIS cell fundraising using Bitcoin on the dark web," the FBI shut down the online cryptocurrency account of a known ISIS fundraiser, Abu Mustafa.  Zachary K. Goldman, Ellie Maruyama, Elizabeth Rosenberg, Edoardo Saravalle, & Julia Solomon-Strauss, *Terrorist Use of Virtual Currencies: Containing the Potential Threat*, CTR. FOR A NEW AM. SEC., May 2017, at 12, available at: https://s3.amazonaws.com/files.cnas.org/documents/CNASReport-TerroristFinancing-Final.pdf?mtime=20170502033819 (last accessed Oct. 1, 2020); *see also* European Parliament Policy Department for Citizens' Rights and Constitutional Affairs, *Virtual Currencies and Terrorist Financing: Assessing Risks and Evaluating Responses*, May 2018, available at: www.europarl.europa.eu/RegData/etudes/STUD/2018/604970/IPOL_STU(2018)604970_EN.pdf (providing detailed threat assessment, describing European Union's response, and setting out policy recommendations) (last accessed Oct. 1, 2020).

[15] Press Release, "Virginia Man Sentenced to More Than 11 Years for Providing Material Support to ISIL," U.S. DEPT. OF JUSTICE (Aug. 28, 2015), available at: https://www.justice.gov/opa/pr/virginia-man-sentenced-more-11-years-providing-material-support-isil (last accessed Oct. 1, 2020).

[16] Press Release, "Global Disruption of Three Terror Finance Cyber-Enabled Campaigns," U.S. DEPT. OF JUSTICE (Aug. 13, 2020), available at: https://www.justice.gov/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns (last accessed Oct. 1, 2020).

[17] *See* Press Release, "Two Iranian Men Indicted for Deploying Ransomware to Extort Hospitals,

CYBER2-29777 - 01821

Municipalities, and Public Institutions, Causing Over $30 Million in Losses," U.S. Dept. of Justice (Nov. 28, 2018), available at: https://www.justice.gov/opa/pr/two-iranian-men-indicted-deploying-ransomware-extort-hospitals-municipalities-and-public (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[18] Press Release, "South Korean National and Hundreds of Others Charged Worldwide in the Takedown of the Largest Darknet Child Pornography Website, Which was Funded by Bitcoin," U.S. Dept. of Justice (Oct. 16, 2019), available at: https://www.justice.gov/opa/pr/south-korean-national-and-hundreds-others-charged-worldwide-takedown-largest-darknet-child (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[19] Indictment, *United States v. Mohammad*, No. 20-cr-0065, at 6 (DLF) (D.D.C. March 2020), available at: https://www.justice.gov/usao-dc/press-release/file/1257641/download (last accessed Oct. 1, 2020); *see also* Press Release, "Dutch National Charged in Takedown of Obscene Website Selling Over 2,000 'Real Rape' and Child Pornography Videos, Funded by Cryptocurrency," U.S. Dept. of Justice (Mar. 12, 2020), available at: https://www.justice.gov/usao-dc/pr/dutch-national-charged-takedown-obscene-website-selling-over-2000-real-rape-and-child (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[20] Verified Complaint for Forfeiture In Rem, *United States v. Three Hundred Three Virtual Currency Accounts et. al.*, No. 20-cv-712 (D.D.C. Mar. 12, 2020), available at: https://www.justice.gov/usao-dc/press-release/file/1257581/download (last accessed Oct. 1, 2020).

[21] Press Release, "Global Disruption of Three Terror Finance Cyber-Enabled Campaigns," *supra* note 16.

[22] Verified Complaint for Forfeiture *In Rem*, *United States v. One Hundred Fifty Five Virtual Currency Assets*, No. 20-cv-2228 (D.D.C. Aug. 13, 2020), available at: https://www.justice.gov/opa/press-release/file/1304296/download (last accessed Oct. 1, 2020).

[23] Press Release, "'Bitcoin Maven' Sentenced to One Year in Federal Prison in Bitcoin Money Laundering Case," U.S. Dept. of Justice, U.S. Att'y's Office, C.D. Cal. (July 9, 2018), available at: https://www.justice.gov/usao-cdca/pr/bitcoin-maven-sentenced-one-year-federal-prison-bitcoin-money-laundering-case (last accessed Oct. 1, 2020).

[24] The federal crime of money laundering is defined in 18 U.S.C. § 1956.

[25] AML/CFT standards are discussed further in Part II.

[26] *See* FinCEN Guidance FIN-2013-G001, *supra* note 4, at 2; *see also* Virtual Currencies: Key Definitions and Potential AML/CFT Risks, *supra* note 4, at 7.

[27] Press Release, "'Bitcoin Maven' Sentenced to One Year," *supra* note 23.

CYBER2-29777 - 01822

[28] Press Release, "Russian National And Bitcoin Exchange Charged In 21-Count Indictment For Operating Alleged International Money Laundering Scheme And Allegedly Laundering Funds From Hack Of Mt. Gox," U.S. DEPT. OF JUSTICE, U.S. ATT'Y's OFFICE, N.D. CAL. (July 26, 2017), available at: https://www.justice.gov/usao-ndca/pr/russian-national-and-bitcoin-exchange-charged-21-count-indictment-operating-alleged (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[29] For other examples of cases in which virtual currency exchanges have been charged with operating an unlicensed money transmitting business, see United States v. Murgio, 15-cr-769(AJN), 2017 WL 365496 (S.D.N.Y. Jan. 20, 2017) and United States v. Faiella, 39 F. Supp. 3d 544 (S.D.N.Y. 2014). See also United States v. Budovsky, No. 13-cr-368 (DLC), 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (noting that 18 U.S.C. § 1960, which covers operation of an unlicensed money transmitting business, encompasses businesses that transmit virtual currency).

[30] See I.R.S. Notice 2014-21, available at: https://www.irs.gov/pub/irs-drop/n-14-21.pdf (last accessed Oct. 1, 2020).

[31] Press Release, "Treasury Sanctions Russia-based Bank Attempting to Circumvent U.S. Sanctions on Venezuela," U.S. DEPT. OF THE TREASURY (Mar. 11, 2019), available at: https://home.treasury.gov/news/press-releases/sm622 (last accessed Oct. 1, 2020).

[32] See generally, e.g., Yaya J. Fanusie & Trevor Logan, Crypto Rogues: U.S. State Adversaries Seeking Blockchain Sanctions Resistance, FOUND. FOR DEF. OF DEMOCRACIES (July 2019),

available at: https://www.fdd.org/wp-content/uploads/2019/07/fdd-report-crypto-rogues.pdf (last accessed Oct. 1, 2020). While publicly available details remain scarce, reports indicate that North Korea also has been active in exploiting cryptocurrency technology in part because of "a desire to avoid crippling international sanctions." Megan McBride & Zack Gold, Cryptocurrency: Implications for Special Operations Forces at 30, CNA (Aug. 2019), available at: https://www.cna.org/CNA_files/PDF/CRM-2019-U-020186-Final.pdf (last accessed Oct. 1, 2020); see also Crypto Rogues, supra, at 8 n.4 ("North Korea is also trying to obtain cryptocurrencies to offset sanctions mostly through cyber theft.").

[33] Gertrude Chavez-Dreyfuss, Cryptocurrency Crime Losses More than Double to $4.5 Billion in 2019, Report Finds, REUTERS, Feb. 11, 2020, available at: https://www.reuters.com/article/us-crypto-currencies-crime/cryptocurrency-crime-losses-more-than-double-to-45-billion-in-2019-report-finds-idUSKBN2051VT (last accessed Oct. 1, 2020).

[34] As discussed further in the text, the Department of Justice recently brought criminal charges against two individuals accused of laundering over $100 million worth of cryptocurrency allegedly stolen by North Korean hacks of cryptocurrency exchanges. The Department also filed a civil forfeiture complaint that "publicly exposes the ongoing connections between North Korea's cyber-hacking program and a Chinese cryptocurrency money laundering network." Press Release, "United States Files Complaint to Forfeit 280 Cryptocurrency Accounts Tied to Hacks of Two Exchanges by North Korean Actors," U.S. DEPT. OF JUSTICE (August 27, 2020), available at: https://www.justice.gov/opa/pr/united-states-files-complaint-forfeit-280-cryptocurrency-accounts-tied-hacks-two-exchanges (last accessed Oct. 1, 2020). In April 2020, the U.S. Departments of State, Treasury,

CYBER2-29777 - 01823

and Homeland Security, along with the Federal Bureau of Investigation, issued an advisory on the cyber threat posed by the North Korean regime. The advisory detailed North Korea's use of state-sponsored cyber actors, including "hackers, cryptologists, and software developers," who, among other things, engage in "cyber-enabled theft targeting financial institutions and digital currency exchanges." U.S. DEPT. OF HOMELAND SEC. ET AL., DPRK CYBER THREAT ADVISORY, *Guidance on the North Korean Cyber Threat* (Apr. 15, 2020), available at: https://us-cert.cisa.gov/sites/default/files/2020-04/DPRK_Cyber_Threat_Advisory_04152020_S508C.pdf (last accessed Oct. 1, 2020).

35  Cryptocurrency Crime Losses, *supra* note 33.

36  Press Release, "Operator Of Bitcoin Investment Platform Pleads Guilty To Securities Fraud And Obstruction Of Justice," U.S. DEPT. OF JUSTICE, U.S. ATT'Y'S OFFICE, SDNY (July 23, 2018), available at: https://www.justice.gov/usao-sdny/pr/operator-bitcoin-investment-platform-pleads-guilty-securities-fraud-and-obstruction (last accessed Oct. 1, 2020).

37  Press Release, "Trader Sentenced to 15 Months in Federal Prison for Misappropriating $1.1 Million in Cryptocurrencies," U.S. DEPT. OF JUSTICE, U.S. ATT'Y'S OFFICE, N.D. ILL. (Nov. 13, 2018), available at: https://www.justice.gov/usao-ndil/pr/trader-sentenced-15-months-federal-prison-misappropriating-11-million-cryptocurrencie-0 (last accessed Oct. 1, 2020).

38  Norton, *What is Cryptojacking? How It Works and How to Help Prevent It*, https://us.norton.com/internetsecurity-malware-what-is-cryptojacking.html (last accessed Oct. 1, 2020).

39  The aforementioned April 2020 U.S. government advisory regarding North Korea's cyber-hacking program discussed the regime's potential involvement in multiple cryptojacking schemes. *See* DPRK CYBER THREAT ADVISORY, *supra* note 34 at 2. Specifically, the advisory noted "several incidents in which computers infected with cryptojacking malware sent the mined assets—much of it anonymity-enhanced digital currency (sometimes also referred to as 'privacy coins')—to servers located in [North Korea]." *Id.* (citing a report by a UN Security Council panel of experts); *see also, e.g.*, Timothy W. Martin, *New North Korea Hack: Hijacking Computers to Power Cryptocurrency Mining*, WALL ST. J., Jan. 8, 2018, available at: https://www.wsj.com/articles/in-north-korea-hackers-mine-cryptocurrency-abroad-1515420004?mod=article_inline (last accessed Oct. 1, 2020).

40  Press Release, "Administrators of DeepDotWeb Indicted for Money Laundering Conspiracy, Relating to Kickbacks for Sales of Fentanyl, Heroin and Other Illegal Goods on the Darknet," U.S. DEPT. OF JUSTICE (May 8, 2019), available at: https://www.justice.gov/opa/pr/administrators-deepdotweb-indicted-money-laundering-conspiracy-relating-kickbacks-sales (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

41  *See* Press Release, "3 Germans Who Allegedly Operated Dark Web Marketplace with Over 1 Million Users Face U.S. Narcotics and Money Laundering Charges," U.S. DEPT. OF JUSTICE, U.S. ATT'Y'S OFFICE, C.D. CAL. (May 3, 2019), available at: https://www.justice.gov/usao-cdca/pr/3-germans-who-allegedly-operated-dark-web-marketplace-over-1-million-users-face-us (last accessed Oct. 1, 2020) (describing criminal complaint against the alleged administrators of Wall Street Market (WSM), "one of the world's largest dark web marketplaces that allowed vendors to sell a wide variety of contraband,

including an array of illegal narcotics, counterfeit goods and malicious computer hacking software").

[42] Press Release, "J-CODE Announces 61 Arrests in its Second Coordinated Law Enforcement Operation Targeting Opioid Trafficking on the Darknet," FEDERAL BUREAU OF INVESTIGATION (Mar. 26, 2019), available at: https://www.fbi.gov/news/pressrel/press-releases/j-code-announces-61-arrests-in-its-second-coordinated-law-enforcement-operation-targeting-opioid-trafficking-on-the-darknet (last accessed Oct. 1, 2020).

[43] Press Release, "International Law Enforcement Operation Targeting Opioid Traffickers on the Darknet Results in over 170 Arrests Worldwide and the Seizure of Weapons, Drugs and over $6.5 Million," U.S. DEPT. OF JUSTICE (Sept. 22, 2020), available at: https://www.justice.gov/opa/pr/international-law-enforcement-operation-targeting-opioid-traffickers-darknet-results-over-170 (last accessed Oct. 1, 2020).

[44] Press Release, "Administrators of DeepDotWeb Indicted for Money Laundering Conspiracy, Relating to Kickbacks for Sales of Fentanyl, Heroin and Other Illegal Goods on the Darknet," U.S. DEPT. OF JUSTICE (May 8, 2019), available at: https://www.justice.gov/opa/pr/administrators-deepdotweb-indicted-money-laundering-conspiracy-relating-kickbacks-sales (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[45] Id.

[46] See 18 U.S.C. §§ 2339A & B.

[47] See 18 U.S.C. § 792 et seq.

[48] 31 C.F.R. § 1010.100(ff).

[49] FATF INTERNATIONAL STANDARDS, supra note 2, at 127.

[50] As noted above, "AML/CFT" refers to anti-money laundering and combating the financing of terrorism.

[51] Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1118 (1970). The BSA is the nation's first and most comprehensive federal AML/CFT statute. The Act, which is codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951–1959, and 31 U.S.C. §§ 5311–5314 and 5316–5332, has been amended at various times, including in October 2001 by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"). Title III of the USA PATRIOT Act amended the BSA to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism. Regulations implementing all aspects of the BSA appear at 31 C.F.R. Chapter X.

[52] The authority of the Secretary of the Treasury to administer the BSA and its implementing regulations has been delegated to the Director of FinCEN. Pursuant to this delegation, FinCEN, among other things, develops AML regulations and enforces compliance with the BSA and associated regulations. See Treas. Order 180-01 (July 1, 2014), available at: https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/to180-01.aspx (last accessed Oct. 1, 2020).

[53] See 31 U.S.C. § 310(c); U.S. DEPT. OF THE TREASURY, FIN. CRIMES ENF'T NETWORK, What is the BSA Data?, https://www.fincen.gov/what-bsa-data (last accessed Oct. 1, 2020).

[54] See EGMONT GRP., Financial Intelligence Units (FIUs), https://egmontgroup.org/en/content/

(61)

financial-intelligence-units-fius (last accessed Oct. 1, 2020).

[55] U.S. Dept. of the Treasury, Fin. Crimes Enf't Network, FinCEN Guidance FIN-2019-G001, Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies 7 (May 9, 2019), available at: https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf (last accessed Oct. 1, 2020).

[56] 76 Fed. Reg. 43585 (2011); *see also* 31 CFR § 1010.100(ff)(5)(A) (emphasis added).

[57] 74 Fed. Reg. 22129, 22137 (2009).

[58] Press Release, "FinCEN Issues Guidance on Virtual Currencies and Regulatory Responsibilities," U.S. Dept. of the Treasury, Fin. Crimes Enf't Network, (Mar. 18, 2013), available at: https://www.fincen.gov/news/news-releases/fincen-issues-guidance-virtual-currencies-and-regulatory-responsibilities (last accessed Oct. 1, 2020).

[59] *See* FinCEN Guidance FIN-2013-G001, *supra* note 4.

[60] *Id.*

[61] *See generally* 31 C.F.R. Part 1022 (setting out BSA requirements applicable to MSBs).

[62] *See* FinCEN Guidance FIN-2019-G001, *supra* note 55.

[63] *See id.* at 12.

[64] *Id.*; *see also* 31 CFR § 1010.100(ff).

[65] The 2013 FinCEN guidance notes that a virtual currency exchanger is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency. *See* FinCEN Guidance FIN-2013-G001, *supra* note 4, at 2. Further, as noted above, an exchanger is a money transmitter if it accepts and transmits a convertible virtual currency or buys or sells convertible virtual currency for any reason. *Id.* at 3; *see also* Kenneth A. Blanco, Director, U.S. Dept. of the Treasury, Fin. Crimes Enf't Network, Remarks at the 2018 Chicago-Kent Block (Legal) Tech Conference (Aug. 9, 2018), available at: https://www.fincen.gov/news/speeches/prepared-remarks-fincen-director-kenneth-blanco-delivered-2018-chicago-kent-block (last accessed Oct. 1, 2020).

[66] *See* 31 U.S.C. § 5321 (authorizing the imposition of civil monetary penalties for violations of the BSA); *see also* 31 C.F.R. §§ 1010.820–821.

[67] Press Release, "Ripple Labs Inc. Resolves Criminal Investigation," U.S. Dept. of Justice (May 5, 2015), available at: https://www.justice.gov/opa/pr/ripple-labs-inc-resolves-criminal-investigation (last accessed Oct. 1, 2020); Press Release, "FinCEN Fines Ripple Labs Inc. in First Civil Enforcement Action Against a Virtual Currency Exchanger," U.S. Dept. of the Treasury, Fin. Crimes Enf't Network (May 5, 2015), available at: https://www.fincen.gov/news/news-releases/fincen-fines-ripple-labs-inc-first-civil-enforcement-action-against-virtual (last accessed Oct. 1, 2020).

[68] In another example of successful coordination, the Department of Justice in 2017 filed criminal charges against MSB BTC-e and its operator (as discussed above), while FinCEN brought a parallel civil enforcement action. *See* Superseding Indictment, *United States v. BTC-e*, No. CR 16-00227 SI (N.D. Cal. Jan. 17, 2017), available at: https://www.justice.gov/usao-ndca/press-release/file/984661/download (last accessed

CYBER2-29777 - 01826

Oct. 1, 2020); *see also* Press Release, "FinCEN Fines BTC-e Virtual Currency Exchange $110 Million for Facilitating Ransomware, Dark Net Drug Sales," U.S. Dept. of the Treasury, Fin. Crimes Enf't Network (July 26, 2017), available at: https://www.fincen.gov/sites/default/files/2017-07/BTC-e%20July%2026%20Press%20Release%20FINAL1.pdf (last accessed Oct. 1, 2020).

[69] *See generally* U.S. Dep't of the Treasury, *Office of Foreign Assets Control—Sanctions Programs and Information*, https://www.treasury.gov/resource-center/sanctions/Pages/default.aspx (last accessed Oct. 1, 2020).

[70] OFAC uses the term "digital currency," which includes cryptocurrency and blockchain-based tokens.

[71] U.S. Dep't of the Treasury, *Resource Center, OFAC FAQs: Sanctions Compliance*, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx (last accessed Oct. 1, 2020).

[72] *Id.*

[73] *Id.*

[74] OFAC typically uses Executive Orders to designate persons or entities.

[75] Press Release, "Treasury Designates Iran-Based Financial Facilitators of Malicious Cyber Activity and for the First Time Identifies Associated Digital Currency Addresses," U.S. Dept. of the Treasury (Nov. 28, 2018), available at: https://home.treasury.gov/news/press-releases/sm556 (last accessed Oct. 1, 2020). For further discussion of the SamSam ransomware scheme, see *supra* page 8.

[76] Press Release, "Treasury Designates Iran-Based Financial Facilitators," *supra* note 75

("While OFAC routinely provides identifiers for designated persons, today's action marks the first time OFAC is publicly attributing digital currency addresses to designated individuals. Like traditional identifiers, these digital currency addresses should assist those in the compliance and digital currency communities in identifying transactions and funds that must be blocked and investigating any connections to these addresses.").

[77] *Id.*

[78] Press Release, "Two Iranian Men Indicted," *supra* note 17; Indictment, *United States v. Savandi et al.*, No. 18-CR-704 (BRM) (D.N.J. Nov. 26, 2018), available at: https://www.justice.gov/opa/press-release/file/1114741/download (last accessed Oct. 1, 2020).

[79] Press Release, "Treasury Targets Chinese Drug Kingpins Fueling America's Deadly Opioid Crisis," U.S. Dept. of the Treasury (Aug. 21, 2019), available at: https://home.treasury.gov/news/press-releases/sm756 (last accessed Oct. 1, 2020).

[80] Press Release, "Chinese National Indicted in Southern District of Mississippi Designated by U.S. Treasury Department as Significant Foreign Narcotics Trafficker," U.S. Dept. of Justice (Aug 22, 2019), available at: https://www.justice.gov/usao-sdms/pr/chinese-national-indicted-southern-district-mississippi-designated-us-treasury (last accessed Oct. 1, 2020).

[81] Press Release, "Two Chinese Nationals Charged with Operating Global Opioid and Drug Manufacturing Conspiracy Resulting in Deaths," U.S. Dept. of Justice (Aug 22, 2018), available at: https://www.justice.gov/opa/pr/two-chinese-nationals-charged-operating-global-opioid-and-drug-manufacturing-conspiracy (last accessed Oct. 1, 2020).

CYBER2-29777 - 01827

[82] Press Release, "Treasury Sanctions Russia-Linked Election Interference Actors," U.S. Dept. of the Treasury (Sept. 10, 2020), available at: https://home.treasury.gov/news/press-releases/sm1118 (last accessed Oct. 1, 2020).

[83] Press Release, "Russian Project Lakhta Member Charged with Wire Fraud Conspiracy," U.S. Dept. of Justice (Sept. 10, 2020), available at: https://www.justice.gov/opa/pr/russian-project-lakhta-member-charged-wire-fraud-conspiracy (last accessed Oct. 1, 2020); see also Indictment, *United States v. Netyksho et al.*, Case No. 18-cr-00215 (D.D.C. 2018), available at: https://www.justice.gov/file/1080281/download (alleging Russian intelligence officers' use of cryptocurrency to launder funds used in furtherance of U.S. election-related hacking activity) (last accessed Oct. 1, 2020).

[84] *See supra* note 32 and accompanying text.

[85] Press Release, "Treasury Sanctions Individuals Laundering Cryptocurrency for Lazarus Group," U.S. Dept. of the Treasury (Mar. 2, 2020), available at: https://home.treasury.gov/news/press-releases/sm924 (last accessed Oct. 1, 2020).

[86] Press Release, "Two Chinese Nationals Charged with Laundering Over $100 Million in Cryptocurrency From Exchange Hack," U.S. Dept. of Justice (Mar. 2, 2020), available at: https://www.justice.gov/opa/pr/two-chinese-nationals-charged-laundering-over-100-million-cryptocurrency-exchange-hack (last accessed Oct. 1, 2020); Indictment, *United States v. Yinyin*, No. 1:20-cr-00052-TJK (D.D.C. Feb. 27, 2020), available at: https://www.justice.gov/opa/press-release/file/1253486/download (last accessed Oct. 1, 2020) (charging two Chinese nationals with conspiracy to launder monetary instruments under 18 U.S.C. § 1956(h) and operating an unlicensed money transmitted business under 18 U.S.C. § 1960(a), and seeking forfeiture under 18

U.S.C. § 982(a)(1) and 21 U.S.C. § 853(p)). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[87] Press Release, "United States Files Complaint to Forfeit 280 Cryptocurrency Accounts," *supra* note 34.

[88] Press Release, "Two Chinese Nationals Charged with Laundering Over $100 Million," *supra* note 86.

[89] Press Release, "United States Files Complaint to Forfeit 280 Cryptocurrency Accounts," *supra* note 34.

[90] Verified Complaint, *United States v. 280 Virtual Currency Accounts*, Civ. No. 20-2396, at 11–12 (D.D.C. Aug. 27, 2020), available at: https://www.justice.gov/opa/press-release/file/1310421/download (last accessed Oct. 1, 2020).

[91] Verified Complaint, *United States v. 113 Virtual Currency Accounts*, Civ. No. 20-606, at 4 (D.D.C. Mar. 2, 2020), available at: https://www.justice.gov/opa/press-release/file/1253491/download (last accessed Oct. 1, 2020).

[92] *Id.* at 5.

[93] Office of the Comptroller of the Currency, *What We Do*, https://www.occ.treas.gov/about/index-about.html (last accessed Oct. 1, 2020).

[94] OCC Interpretative Letter #1170, *Authority of a National Bank to Provide Cryptocurrency Custody Services for Customers* (July 22, 2020), available at: https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2020/int1170.pdf (last accessed Oct. 1, 2020).

CYBER2-29777 - 01828

[95] *Id.* at 1.

[96] *Id.* Shortly before this Enforcement Framework was finalized for publication, OCC on September 21, 2020 published an interpretive letter clarifying national banks' and federal savings associations' authority—in certain defined circumstances—to hold "reserves" on behalf of customers who issue certain "stablecoins." ("Stablecoins" are a type of cryptocurrency designed to have a stable value as compared with other types of cryptocurrency, which frequently experience significant volatility.) OCC's Sept. 21 letter represents the latest step in the agency's broader effort to set up systems that will enable banks to adopt cryptocurrency safely. The interpretive letter is available at https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2020/int1172.pdf (last accessed Oct. 1, 2020).

[97] *See* OCC Consent Order, In re *M.Y. Safra Bank, FSB*, AA-NE-2020-5, at 3 (Jan. 30, 2020), available at: https://www.occ.gov/static/enforcement-actions/ea2020-005.pdf (last accessed Oct. 1, 2020).

[98] U.S. SEC. AND EXCH. COMM'N, RELEASE NO. 81207: REPORT OF INVESTIGATION PURSUANT TO SECTION 21(A) OF THE SECURITIES EXCHANGE ACT OF 1934: THE DAO 10 (July 25, 2017), available at: https://www.sec.gov/litigation/investreport/34-81207.pdf (last accessed Oct. 1, 2020).

[99] U.S. SEC. & EXCH. COMM'N STAFF, FRAMEWORK FOR 'INVESTMENT CONTRACT' ANALYSIS OF DIGITAL ASSETS, available at: https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last accessed Oct. 1, 2020); FINANCIAL INDUSTRY REGULATORY AUTHORITY, *Initial Coin Offerings*, https://www.finra.org/investors/learn-to-invest/types-investments/initial-coin-offerings-and-cryptocurrencies/initial-coin-offerings (last accessed Oct. 1, 2020).

[100] The Financial Industry Regulatory Authority (FINRA), which operates under the supervision of the SEC, has issued several investor alerts regarding key cryptocurrency issues, such as ICOs and cryptocurrency-related scams. *See, e.g.,* FINANCIAL INDUSTRY REGULATORY AUTHORITY, *Investor Alert, Initial Coin Offerings (ICOs)—What to Know Now and Time-Tested Tips for Investors*, https://www.finra.org/investors/alerts/icos-what-know-now (last accessed Oct. 1, 2020); FINANCIAL INDUSTRY REGULATORY AUTHORITY, *Investor Alert, Don't Fall for Cryptocurrency-Related Stock Scams*, https://www.finra.org/investors/alerts/cryptocurrency-related-stock-scams (last accessed Oct. 1, 2020).

[101] SEC RELEASE NO. 81207, *supra* note 98.

[102] *Id.* at 17–18; *see also* Jay Clayton [SEC Chairman] and Christopher Giancarlo [CFTC Chairman], *Regulators are Looking at Cryptocurrency*, WALL ST. J., Jan. 24, 2018, available at: https://www.wsj.com/articles/regulators-are-looking-at-cryptocurrency-1516836363 ("The SEC does not have direct oversight of transactions in currencies or commodities. Yet some products that are labeled cryptocurrencies have characteristics that make them securities. The offer, sale and trading of such products must be carried out in compliance with securities law.") (last accessed Oct. 1, 2020).

[103] Section 12(k)(1) of the Securities Exchange Act provides the SEC with authority "summarily to suspend trading in any security," other than certain exempted securities, "for a period not exceeding 10 business days" if doing so is, in the SEC's opinion, "in the public interest" and required for "the protection of investors." 15 U.S.C. § 78l(k)(1).

CYBER2-29777 - 01829

[104] The SEC Staff publishes a list of its digital-asset- and ICO-related enforcement actions on its website. *See* U.S. SEC. AND EXCH. COMM'N, *Cyber Enforcement Actions,* https://www.sec.gov/spotlight/cybersecurity-enforcement-actions (last accessed Oct. 1, 2020); *see also* U.S. SEC. & EXCH. COMM'N, *Spotlight on Initial Coin Offerings and Digital Assets,* https://www.investor.gov/additional-resources/spotlight/spotlight-initial-coin-offerings-and-digital-assets (collecting SEC resources on ICOs and other digital-asset-related issues) (last accessed Oct. 1, 2020).

[105] FRAMEWORK FOR 'INVESTMENT CONTRACT' ANALYSIS OF DIGITAL ASSETS, *supra* note 99.

[106] *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301 (1946).

[107] FRAMEWORK FOR 'INVESTMENT CONTRACT' ANALYSIS OF DIGITAL ASSETS, *supra* note 99.

[108] The public can engage with SEC Staff through the SEC's Strategic Hub for Innovation and Financial Technology (FinHub). U.S. SEC. AND EXCH. COMM'N, *FinHub,* www.sec.gov/finhub (last accessed Oct. 1, 2020).

[109] Press Release, "SEC Halts Alleged $1.7 Billion Unregistered Digital Token Offering," U.S. SEC. AND EXCH. COMM'N (Oct. 11, 2019), available at: https://www.sec.gov/news/press-release/2019-212 (last accessed Oct. 1, 2020).

[110] *Id.*

[111] *Id.*

[112] *Id.* In response, Telegram and TON Issuer argued that the sale of Grams to sophisticated investors were lawful private placements of securities covered by an exemption from the registration requirement, and that the anticipated resale of the Grams by those investors to a secondary public market, upon the launch of the TON Blockchain, were unrelated transactions that would not amount to the offer or sale of securities. *See SEC v. Telegram Group Inc.*, No. 19-cv-09439-PKC, 2020 WL 1430035, at *1 (S.D.N.Y. Mar. 24, 2020).

[113] *Id.*

[114] *Id.*

[115] Final Judgment, *SEC v. Telegram Group Inc.*, No. 19-cv-09439-PKC, (S.D.N.Y. June 26, 2020), Dkt. No. 242.

[116] For example, in April 2019, the SEC's Division of Corporation Finance provided a "no-action letter" in response to an inquiry from TurnKey Jet, Inc., an interstate air charter services company that proposed "to offer and sell blockchain-based digital assets in the form of 'tokenized' jet cards" without registering under the Securities Act of 1933 or the Securities Exchange Act of 1934. *See* Letter from James P. Curry to SEC Office of Chief Counsel (Apr. 2, 2019), available at: https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1-incoming.pdf (last accessed Oct. 1, 2020). The no-action letter stated that the Division of Corporation Finance would not recommend enforcement action against the company if, based on the facts presented, it offered and sold tokens without registration. *See* TurnKey Jet, Inc., SEC No-Action Letter (Apr. 3, 2019), available at: https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm (last accessed Oct. 1, 2020).

[117] For examples of prosecutions for securities and other fraud relating to ICOs, see, for example, Press Release, "Brooklyn Businessman Pleads Guilty to

CYBER2-29777 - 01830

Defrauding Investors through Two Initial Coin Offerings," U.S. Dept. of Justice, U.S. Att'y's Office, E.D.N.Y (Nov. 15, 2018) (discussing *United States v. Zaslavskiy*, No. 17 CR 647 (RJD) (E.D.N.Y. 2018)), available at: https://www.justice.gov/usao-edny/pr/brooklyn-businessman-pleads-guilty-defrauding-investors-through-two-initial-coin (last accessed Oct. 1, 2020), and Press Release, "Founders Of Cryptocurrency Company Indicted In Manhattan Federal Court With Scheme To Defraud Investors," U.S. Dept. of Justice, U.S. Att'y's Office, S.D.N.Y (May 14, 2018), (discussing *United States v. Sharma, et. al.*, No. 18 Cr. 340 (LGS) (S.D.N.Y. 2019)), available at: https://www.justice.gov/usao-sdny/pr/founders-cryptocurrency-company-indicted-manhattan-federal-court-scheme-defraud (last accessed Oct. 1, 2020).

[118] Press Release, "SEC Halts Alleged Initial Coin Offering Scam," U.S. Sec. and Exch. Comm'n (Jan. 30, 2018), available at: https://www.sec.gov/news/press-release/2018-8 (last accessed Oct. 1, 2020).

[119] Press Release, "Cryptocurrency CEO Indicted After Defrauding Investors of $4 Million," U.S. Dept. of Justice, U.S. Att'y's Office, N.D. Tex. (Nov. 28, 2018), available at: https://www.justice.gov/usao-ndtx/pr/cryptocurrency-ceo-indicted-after-defrauding-investors-4-million (last accessed Oct. 1, 2020); Indictment, *United States v. Rice*, No. 3:18-CR-587-K (N.D. Tex. Nov. 20, 2018), available at: https://www.justice.gov/usao-ndtx/press-release/file/1115456/download (last accessed Oct. 1, 2020).

[120] Press Release, "Executives Settle ICO Scam Charges," U.S. Sec. and Exch. Comm'n (Dec. 12, 2018), available at: https://www.sec.gov/news/press-release/2018-280 (last accessed Oct. 1, 2020).

[121] 7 U.S.C. § 1 *et seq.*

[122] These terms are defined in the CFTC's Glossary. *See* U.S. Commodity Futures Trading Comm'n, *CFTC Glossary*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last accessed Oct. 1, 2020).

[123] 7 U.S.C. § 1(a)(9).

[124] *See In re Kim*, CFTC No. 19-02, 2018 WL 5993718, at *3 (Oct. 29, 2018) (consent order) ("Virtual currencies such as Bitcoin and Litecoin are encompassed in the definition of 'commodity' under [the CEA]."); *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order) ("Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities."); *In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082, at *3 n.3 (Sept. 24, 2015) (consent order) ("Further, bitcoin is a commodity under Section 1a of the Act, 7 U.S.C. § 1a (2012), and is therefore subject as a commodity to applicable provisions of the [CEA] and [CFTC] Regulations.").

[125] *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a commodity. . . . They fall well-within the common definition of 'commodity' as well as the [CEA's] definition of 'commodities' as 'all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in.'"); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495–98 (D. Mass. 2018) (applying a categorical approach to interpreting "commodity" under the CEA and determining that a non-bitcoin virtual currency is a "commodity" under the Act).

[126] U.S. Commodity Futures Trading Comm'n, A CFTC Primer on Virtual Currencies 11 (Oct. 2017), available at: https://www.cftc.gov/sites/default/files/idc/groups/public/documents/file/labcftc_primercurrencies100417.pdf (last accessed Oct. 1, 2020).

CYBER2-29777 - 01831

127 *See, e.g., In re Plutus Financial Inc*, CFTC No. 20-23, 2020 WL 4043709 (July 13, 2020) (consent order); *In re BitFinex Inc.*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016) (consent order); *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) (consent order).

128 *In re TeraExchange*, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015) (consent order).

129 *CFTC v. 1Pool Ltd*, No. 1:18-cv-2243-TNM, 2019 WL 1605201 (Mar. 4, 2019).

130 Retail Commodity Transactions Involving Certain Digital Assets, 85 Fed. Reg. 37734 (June 24, 2020) (to be codified at 17 C.F.R. pt. 1).

131 Press Release, "CFTC Staff Issues Advisory for Virtual Currency Products," COMMODITY FUTURES TRADING COMM'N (May 21, 2018), available at https://www.cftc.gov/PressRoom/PressReleases/7731-18 (last accessed Oct. 1, 2020).

132 *See, e.g., CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495–98 (D. Mass. 2018).

133 Press Release, "CFTC Charges Multiple Individuals and Companies with Operating a Fraudulent Scheme Involving Binary Options and a Virtual Currency Known as ATM Coin," COMMODITY FUTURES TRADING COMM'N (Apr. 18, 2018), available at: https://www.cftc.gov/PressRoom/PressReleases/7714-18 (last accessed Oct. 1, 2020).

134 Press Release, "Federal Court Orders Defendants to Pay More than $4.25 Million for Fraud and Misappropriation," COMMODITY FUTURES TRADING COMM'N (Nov. 1, 2019), available at: https://www.cftc.gov/PressRoom/

PressReleases/8069-19 (last accessed Oct. 1, 2020).

135 *See* Indictment, *United States v. Kantor*, No. 18-CR-177 (E.D.N.Y. Apr. 10, 2018), available at: https://www.justice.gov/usao-edny/press-release/file/1053266/download (last accessed Oct. 1, 2020); Press Release, "Defendant Sentenced to 86 Months in Prison for Defrauding Investors in Binary Options and Cryptocurrency Scheme," U.S. DEPT. OF JUSTICE, U.S. ATT'Y'S OFFICE, E.D.N.Y (July 1, 2019), available at: https://www.justice.gov/usao-edny/pr/defendant-sentenced-86-months-prison-defrauding-investors-binary-options-and (last accessed Oct. 1, 2020).

136 Notice 2014-21, 2014-16 I.R.B. 938, available at: https://www.irs.gov/pub/irs-drop/n-14-21.pdf (last accessed Oct. 1, 2020).

137 Since July 2019, the IRS has sent thousands of warning letters to taxpayers "that potentially failed to report income and pay the resulting tax from virtual currency transactions or did not report their transactions properly." News Release, "IRS has Begun Sending Letters to Virtual Currency Owners Advising Them to Pay Back Taxes, File Amended Returns; Part of Agency's Larger Efforts," INTERNAL REVENUE SERV. (July 26, 2019), available at: https://www.irs.gov/newsroom/irs-has-begun-sending-letters-to-virtual-currency-owners-advising-them-to-pay-back-taxes-file-amended-returns-part-of-agencys-larger-efforts (last accessed Oct. 1, 2020).

138 "A John Doe summons is a summons that does not identify the person with respect to whose liability the summons is issued." INTERNAL REVENUE MANUAL, Part 25.5.7, *Special Procedures for John Doe Summonses*, available at: https://www.irs.gov/irm/part25/irm_25-005-007 (last accessed Oct. 1, 2020). The IRS can use John

CYBER2-29777 - 01832

Doe summonses, which require court approval, in certain circumstances "to obtain information about possible violations of internal revenue laws by individuals whose identities are unknown." Press Release, "Court Authorizes Service of John Doe Summons Seeking the Identities of U.S. Taxpayers Who Have Used Virtual Currency," U.S. DEPT. OF JUSTICE (Nov. 30, 2016), available at: https://www.justice.gov/opa/pr/court-authorizes-service-john-doe-summons-seeking-identities-us-taxpayers-who-have-used (last accessed Oct. 1, 2020).

[139] Rev. Rul. 2019-24, 2019-44 I.R.B. 1004, available at: https://www.irs.gov/pub/irs-drop/rr-19-24.pdf (last accessed Oct. 1, 2020).

[140] INTERNAL REVENUE SERV., Frequently Asked Questions on Virtual Currency Transactions, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions (last accessed Oct. 1, 2020).

[141] *Id.*

[142] N. AM. SEC. ADM'RS ASS'N, *Our Role*, http://www.nasaa.org/about-us/our-role/ (last accessed Oct. 1, 2020).

[143] NASAA, which is comprised of State and territorial securities regulators, has taken an active role in investor education and in coordinating State actions involving VASPs and ICOs. *See, e.g.*, N. AM. SEC. ADM'RS ASS'N, INFORMED INVESTOR ADVISORY: INITIAL COIN OFFERINGS (Apr. 2018), available at https://www.nasaa.org/44836/informed-investor-advisory-initial-coin-offerings/?qoid=investor-education (last accessed Oct. 1, 2020).

[144] News Release, "State and Provincial Securities Regulators Conduct Coordinated International Crypto Crackdown," N. AM. SEC. ADM'RS ASS'N (May 21, 2018), available at: http://www.nasaa.org/45121/state-and-provincial-securities-regulators-conduct-coordinated-international-crypto-crackdown-2/ (last accessed Oct. 1, 2020).

[145] *See* N.Y. STATE OFFICE OF THE ATT'Y GEN., VIRTUAL MARKETS INTEGRITY INITIATIVE REPORT (Sept. 18, 2018), available at: https://virtualmarkets.ag.ny.gov/ (last accessed Oct. 1, 2020).

[146] Press Release, "A.G. Schneiderman Launches Inquiry into Cryptocurrency 'Exchanges,'" N.Y. STATE OFFICE OF THE ATT'Y GEN. (Apr. 17 2018), available at: https://ag.ny.gov/press-release/ag-schneiderman-launches-inquiry-cryptocurrency-exchanges (last accessed Oct. 1, 2020).

[147] The FATF is also known by its French name, Groupe d'action financière (or "GAFI").

[148] FINANCIAL ACTION TASK FORCE, *What Do We Do*, http://www.fatf-gafi.org/about/whatwedo/ (last accessed Oct. 1, 2020).

[149] FATF INTERNATIONAL STANDARDS, *supra* note 2, Recommendation 15.

[150] *See id.* at 70–71.

[151] The FATF has undertaken a 12-month review and committed further to a 24-month review of countries' progress with implementing the revised requirements for VASPs. The FATF's 12-month review concluded that there has been progress in implementation of the standards, but that much more remains to be done globally by individual jurisdictions. The report further determined that, while there is no need to revise the standards, there is a need for updated guidance, which the FATF plans to release in 2021. The FATF also undertook a report on so-called "stablecoins" at the request of the G20. This report also found no need to update the FATF standards, but did identify a number of concerns that will be addressed in forthcoming guidance.

CYBER2-29777 - 01833

¹⁵² *See* 31 C.F.R. §§ 1010.100(ff), 1022.380; *see also* U.S. DEPT. OF THE TREASURY, FIN. CRIMES ENF'T NETWORK, FINCEN ADVISORY FIN-2012-A001: FOREIGN-LOCATED MONEY SERVICES BUSINESSES (Feb. 2012), available at: https://www.fincen.gov/sites/default/files/advisory/FIN-2012-A001.pdf (last accessed Oct. 1, 2020); U.S. DEPT. OF THE TREASURY, FIN. CRIMES ENF'T NETWORK, *Bank Secrecy Act Regulations; Definitions and Other Regulations Relating to Money Services Businesses*, 76 F.R. 43585 (July 21, 2011), available at http://www.gpo.gov/fdsys/pkg/FR-2011-07-21/pdf/2011-18309.pdf (last accessed Oct. 1, 2020).

¹⁵³ Many P2P exchange platforms also offer wallet and escrow services, advertising for buyers and sellers, and messaging or chat functions. Generally, platforms that offer hosted wallet services also are MSBs and must comply with the relevant regulations.

¹⁵⁴ *See* 31 U.S.C. §§ 5318 & 5322.

¹⁵⁵ *See supra* Part I at page 14 (discussing KYC requirements).

¹⁵⁶ Press Release, "O.C. Man Admits Operating Unlicensed ATM Network that Laundered Millions of Dollars of Bitcoin and Cash for Criminals' Benefit," U.S. DEPT. OF JUSTICE, U.S. ATT'Y'S OFFICE, C.D. CAL. (July 22, 2020), available at: https://www.justice.gov/usao-cdca/pr/oc-man-admits-operating-unlicensed-atm-network-laundered-millions-dollars-bitcoin-and (last accessed Oct. 1, 2020).

¹⁵⁷ 31 C.F.R. 1010.100(t)(5)(i).

¹⁵⁸ *See* Press Release, "Ohio Resident Charged with Operating Darknet-Based Bitcoin 'Mixer,' which Laundered Over $300 Million," U.S. DEPT. OF JUSTICE (Feb. 13, 2020), available at: https://

www.justice.gov/opa/pr/ohio-resident-charged-operating-darknet-based-bitcoin-mixer-which-laundered-over-300-million (last accessed Oct. 1, 2020). The charges in the indictment are merely allegations, and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

¹⁵⁹ 18 U.S.C. § 1956(a)(1)(B)(i).

¹⁶⁰ Verified Complaint, *United States v. 280 Virtual Currency Accounts*, *supra* note 90, at 11.

¹⁶¹ Last year, the Law Library of Congress published a comprehensive report on over 40 international jurisdictions' regulatory approaches to cryptoassets, focusing on those jurisdictions' financial market and investor protection laws, as well as on their application of tax and AML/CFT laws. That report confirms the vast diversity of domestic virtual currency regulation, and practice, across the globe. *See* LAW LIBRARY OF CONGRESS, *Regulatory Approaches to Cryptoassets in Selected Jurisdictions* (April 2019), available at: https://www.loc.gov/law/help/cryptoassets/cryptoasset-regulation.pdf (last accessed Oct. 1, 2020).

¹⁶² *See, e.g., United States v. Lord*, 915 F.3d 1009 (5th Cir. 2019); *United States v. Stetkiw*, No. 18-20579, 2019 WL 417404 (E.D. Mich. Feb. 1, 2019); *United States v. Tetley*, No. 17-cr-00738 (C.D. Cal. 2018); *United States v. Mansy*, No. 2:15-cr-198-GZS, 2017 WL 9672554 (D. Maine May 11, 2017); *United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919 (W.D.N.Y. Dec. 1, 2016); *United States v. Noland et al.*, 14-cr-00401-RM (D. Col. 2015); *see also* Press Release, "'Bitcoin Maven' Sentenced to One Year," *supra* note 23.

¹⁶³ *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (citing *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987)).

CYBER2-29777 - 01834

[164] For more on the concept of protective jurisdiction in the context of U.S. material support statutes, *see* John De Pue, *Extraterritorial Jurisdiction and the Material Support Statutes*, U.S. ATTY's BULLETIN, Sept. 2014, available at: https://www.justice.gov/sites/default/files/usao/legacy/2014/09/23/usab6205.pdf (last accessed Oct. 1, 2020).

[165] *See supra* Part I at page 14.

[166] *See supra* Part I at 18, 19.

[167] Verified Complaint for Forfeiture *In Rem, United States v. Cazes*, No. 1:17-at-00557, at 21 (E.D. Cal. July 19, 2017), available at: https://www.justice.gov/opa/press-release/file/982821/download (last accessed Oct. 1, 2020).

[168] Press Release, "AlphaBay, the Largest Online 'Dark Market,' Shut Down," U.S. DEPT. OF JUSTICE (July 20, 2017), available at: https://www.justice.gov/opa/pr/alphabay-largest-online-dark-market-shut-down (last accessed Oct. 1, 2020).

[169] These criminal charges included: narcotics conspiracy (21 U.S.C. §§ 846 and 841(a)(1), (b)(l)(A), (b)(l)(C), 841(h), and 843(b)); distribution of a controlled substance (21 U.S.C. §§ 841(a)(l), (b)(l)(C), & 846); conspiracy to commit identity theft and fraud (18 U.S.C. § 1028(f)); unlawful transfer of a false identification document (18 U.S.C. § 1028(a)(2), (b)(1)(A)(ii), & (f)); conspiracy to commit access device fraud (18 U.S.C. § 1029(b)(2)); trafficking in device making equipment (18 U.S.C. § 1029(a)(4), (b)(l), & (c)(l)(A)(ii)); and money laundering conspiracy (18 U.S.C. § 1956(h)). *See* Indictment, *United States v. Cazes*, Case No, 1:17-CR-00144 (E.D. Cal. June 1, 2017), available at: https://www.justice.gov/opa/press-release/file/982826/download (last accessed Oct. 1, 2020). In addition, prosecutors used various criminal forfeiture statutes (18 U.S.C. §§ 982(a)(l) and 982(a)(2)(B) and 21 U.S.C. § 853(a)). *Id.*

[170] Verified Complaint, *United States v. 280 Virtual Currency Accounts, supra* note 90, at 11.

[171] U.S. DEPT. OF JUSTICE, REPORT OF THE ATTORNEY GENERAL'S CYBER DIGITAL TASK FORCE 100–01 (July 2018), available at: https://www.justice.gov/cyberreport (last accessed Oct. 1, 2020).

[172] *Id.* at 101.

[173] Regulation 2016/679 of the European Parliament and of the Council of April 27, 2016 on the Protection of Natural Persons with regard to the Processing of Personal Data and on the Free Movement of Such Data, and Repealing Directive 95/46/EC (General Data Protection Regulation), art. 6.1(c) & (f), available at https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=celex%3A32016R0679 (last accessed Oct. 1, 2020).

[174] *Id.*, art. 49.1 & 49.1(d).

[175] Br. of the European Comm'n on Behalf of the E.U. as Amicus Curiae in Support of Neither Party, *United States v. Microsoft*, No. 17-2 (U.S. 2018), available at: https://www.supremecourt.gov/tPDF/17/17-2/23655/20171213123137791_17-2%20ac%20European%20Commission%20for%20filing.pdf (last accessed Oct. 1, 2020).

[176] *Id.* at 15.

[177] General Data Protection Regulation, art. 49.1(e), *supra* note 173

CYBER2-29777 - 01835

# EXHIBIT 184

CYBER2-29777 - 01931

# Ethereum Name Service (ENS): Everything You Need To Know

 beincrypto.com/learn/ethereum-name-service-ens/

May 12, 2022



<u>Ethereum</u> Name Service (ENS) is a naming protocol that **allows humans to use easy-to-remember domain names for their cryptocurrency addresses**. The protocol then translates it to a machine-readable address. This process has many similarities to the DNS system we use for the internet. Furthermore, it empowers users with a tool that can unify their online presence and help them step into the realm of web3.

ENS could make all the difference in how we interact in the web3 world. We explain why this might be the case in this guide.

## Ethereum wallet addresses can be inconvenient



Just like internet protocol addresses, blockchain **addresses for cryptocurrency wallets are hard to use by the average user**. Luckily, computer scientists have developed domain names by investing in the Domain Name System (DNS), which allows linking human-readable domain names to IP addresses.

Sponsored
Sponsored

**DNS matches IP addresses with human-readable DNS names**. Instead of typing 172.64.147.202 into your address box, type beincrypto.com, and you will be taken to the website.

Despite all the technological advancements in the blockchain and crypto sector, the system still uses a system similar to the old IP address setup. **To send crypto to someone else, you will need their cryptocurrency <u>wallet</u> address**, which is a long string of characters. To remember that address is highly unlikely, and it's also not advisable since blockchain transactions are irreversible. **That means that if you send funds to the wrong address, you will never not get it back.**

To better understand the difficulty of the task, here's what an Ethereum (ETH) address looks like: **0xd0eAf74B8c5bF457C7a81c3fe277aDb6Ed32DCF4**

Sponsored Sponsored

**It's a 42-character long string**, and it is commonly referred to as a public address of a cryptocurrency wallet. You can recognize Ethereum network addresses because they **always start with "<u>0x</u>"**.

The main issues with having and using a blockchain address are related to the difficulty of sharing it with others and **the high risk of mistyping a cryptocurrency wallet address** and thus losing your funds. Furthermore, it's important to acknowledge that most cryptocurrency

users are still new to the technology and are just starting to explore it. Having to deal with long strings of characters will probably put off some of them, out of the fear of making a mistake.

This is where the Ethereum Name Services (ENS) comes in.

Sponsored Sponsored

## What is the Ethereum Name Service?



The Ethereum Name Service is an open, distributed, and extensible naming system that interacts directly with the Ethereum blockchain.

Similar to the DNS role, the **ENS has the role of a domain name service that maps human-readable addresses** such as "name.eth," to a machine-readable address such as this long hexadecimal string: "0xd0eAf74B8c5bF457C7a81c3fe277aDb6Ed32DCF4."

The personalized ENS addresses allow users to manage their cryptocurrency funds and assets by simply using a human-friendly domain name. ENS domains aim to become the usernames of web3, and **it can store crypto wallets, websites, content hashes, and metadata**. Owners can connect all their crypto wallets under one single ENS domain and receive cryptocurrencies or NFTs.

Sponsored Sponsored

This means that transactions are secure and decentralized without the need for lengthy and complicated addresses. This **reduces the chance of making mistakes** when entering the address of the recipient to which funds are sent.

Although the ENS may be identical to the DNS system of the 1980s, its architecture is different.

CYBER2-29777 - 01934

The ENS is similar to the DNS in that it uses a system called domains. **The domain's creator or owner has control over the top-level domain as well as any subdomains.**

Sponsored Sponsored

Anybody can acquire ownership of domains for their own personal use. ENS supports the import of DNS names that are already owned by users for use on ENS. Due to the hierarchical nature of ENS, **anyone can create subdomains for themselves or others**. For instance, you can create "pay.name.eth" if you own "name.eth" and make any configurations you like.

ENS can be deployed on both the Ethereum main network as well as several test networks.

## The ENS team

**The initial development of the ENS was led by Alex Van de Sande and Nick Johnson** of the Ethereum Foundation in 2017. But in 2018, it separated into a different organization led by Nick Johnson.

**True Names LTD manages the development of ENS**, a Singaporean non-profit organization. The ENS team consists of experienced Solidity developers, as well as some who used to work with the Ethereum Foundation.

The project distributed ENS tokens to the users of the service in Nov. 2021 and created a decentralized autonomous organization (DAO) to manage it. True Names Limited is the legal entity that connects to the DAO. ENS token-holders can use their assets in the same way as company shareholders; they have the ability to make decisions about pricing and protocol changes, as well managing funds within the Treasury.

The addition of ENS tokens to the project's funding model allowed it to transition away from grants. The ENS tokens can be traded for U.S. Dollars and other cryptocurrencies on crypto exchanges. This provides a financial support system to the developers of the project.

## The ENS Foundation

**The ENS DAO is represented by the ENS Foundation**. The foundation is able to provide legal support for DAO participants.

The ENS Foundation, a foundation limited by guarantee, is registered in the Cayman Islands. It is a non-profit and does not pay dividends to its members or directors. One supervisor is appointed by DS Limited, a Cayman Islands company.

More details about the ENS DAO and how the ENS foundation operates can be found on the ENS documentation page.

# What makes ENS stand out?



**The ENS domain name is your IBAN equivalent**, which allows others to send cryptocurrency to your wallet. Using ENS, you can create a "nickname" for your public address. This means that instead of sharing a long string of characters with a friend, you will have a link like "Julia.eth," which is automatically connected to your public address.

**The ENS was created for Ethereum smart contracts** and is native to the Ethereum ecosystem. It doesn't have the security problems that a DNS system has. The DNS records for domain names and names are kept on a central server. They are vulnerable to hackers. There are thousands of attacks on DNSs and internet providers every year.

However, **ENS records can't be hacked or deleted** and are protected by the Ethereum Blockchain.

Moreover, by using an ENS domain, the entire interaction between users becomes more transparent and easier to follow. This gives users of the Ethereum blockchain the unique opportunity to open a wallet and stand out from the other addresses.

## How ENS fares against DNS

Both the Domain Name System (DNS) and the Ethereum Name Service (ENS) are protocols that can handle human interactions with web2 and web3. DNS converts an IP address into a human-readable string known as a URL.

CYBER2-29777 - 01936

The Ethereum Name Service (ENS) converts an Ethereum address into a human-readable string formatted as a URL. Both functions are similar to a phone book. It is possible to look up a person's name in a phone book and find the number that allows you to contact them.

Web2 can work seamlessly with the DNS as part of a network of internet protocols. Web3, the concept that describes the new, decentralized internet, is still in its infancy and faces many challenges.

ENS's primary purpose is to make web3 easier to understand and to share crypto addresses. As time passes, more blockchain protocols will support and integrate ENS as part of their web3 integration.

## Ethereum Name Service vs. Unstoppable Domains



Of course, there is another foundation that aims to simplify the way humans interact with blockchain addresses. **The main competitor of ENS is Unstoppable Domains**, which also offers transferable domains.

Both Unstoppable Domains, as well as ENS, are built on the Ethereum blockchain. They both allow users to create and register a human-readable crypto address.

There are, however, some significant differences in the philosophy behind these projects. ENS is an open protocol that is visible to the public. Developed by a non-profit organization, it focuses on community decision-making and decentralization.

**Unstoppable Domains is a business-oriented project**. Many domains are "brand protected" to stop individuals from owning specific names, words, or phrases. Some individuals have complained that they are unable to purchase domains with their names, even though the domain isn't in use.

One big difference between ENS and Unstoppable domains is the payment method. ENS domains allow purchases for a limited period of time, just like normal website domains, and you have to renew your domain each time it expires. Since you will have to use Ethereum (ETH) to pay for the ENS domain and have fees, the prices will differ depending on the moment you want to buy the domain.

However, you can secure your ENS domain for many years and only pay the gas fee once, during registration. Another interesting aspect is that anyone can extend the registration of your ENS domain, but this doesn't give ownership over your domain.

**Unstoppable Domains need to be registered only once**, and there is no expiration date for your domain. Also, they allow multiple payment options (credit/debit card, PayPal, crypto, and through the Crypto.com app).

## What makes ENS special

The ENS is built using Ethereum's smart contract and inherits all benefits of the network. This makes it more secure and private and resists censorship than the internet Domain Name Service (DNS).

The future web3 aims to be a decentralized and open infrastructure, and it only makes sense when using internet-naming infrastructure such as ENS domains. Since ENS uses the existing Ethereum ecosystem, it can easily interact with other smart contracts and applications built on Ethereum.

The main advantages of having and using an ENS domain are:

- Have multiple web services combined into one
- Unify your online presence
- Central user-owned storage identity
- ENS is a router for non-Ethereum addresses too, like BTC, LTC, etc.
- The ENS name can be linked to a contract address and trigger a function when funds are received
- The ENS domain is linkable to IPFS to actually host a censorship-resistant website behind the ENS name
- Users can have subdomains linked to different addresses for different purposes

## How the ENS works



ENS is built upon two Ethereum smart contracts. The first one is the ENS registry, which records all domains registered on ENS. It also stores three crucial pieces of information about each domain. These are the domain owner, resolver, and caching time.

The resolver is the second smart contract. It converts domain names into machine-readable addresses and vice versa. This smart contract matches each domain with the appropriate user, website, or address.

## How to get your own ENS domain



To create your web3 username, you need to have an Ethereum wallet — such as MetaMask — and visit the ENS domains web app. First, search for a domain name. After finding one, you will need to complete the registration process. This includes verifying two transactions

from your wallet and paying **the annual fee of $5/year**, if the name is longer than five characters. Once you have the domain, you can link it with your crypto wallets and websites.

You can also create multiple subdomains like email.rick.eth and website.rick.eth under the same ENS domain. Note that each modification happens directly on the Ethereum blockchain and will incur a gas fee, which may vary depending on the day and time of the day you're trying to modify your details.

**It's also worth noting that ENS domains are scarce**, and the process is very similar to how you would purchase a DNS name. Since this is still a new side of web3, some crypto enthusiasts purchase multiple ENS domains, hoping to flip them later, when more people and brands get into web3. For instance, "exchange.eth" has sold for 6,660 ETH, and "weather.eth" sold for 300 ETH.

The ENS register also supports most popular DNS names such .com, .org, .io, .app and many more.

## What is the ENS governance token?

ENS is an open-source protocol that is fully decentralized. It is community-governed by a DAO, which consists of community members that hold ENS tokens.

**The ENS DAO is completely governed and controlled by the community** using the ENS token. This token is the utility token and governance token that allows users to submit proposals and vote to shape the future direction of the protocol. Anybody can vote for proposals on the ENSDAO if they hold ENS tokens. As with any DAO, no changes in the protocol can be made without a governance vote.

### ENS tokenomics

**ENS governance token is an ERC-20 token**. The maximum supply is 100 million ENS tokens.

To distribute ENS to the community, developers allocated 25% to users who had signed up for an ENS domain before Oct. 31, 2021.



Token distribution:

- 50% Community treasury (ENS DAO)
- 25% Airdrop to .eth holders
- 25% ENS contributors

**The developers distributed the tokens to wallets that had ENS domains**. The allocations were based on the length of time an ENS domain was owned by a user.

This means that casual users were able to receive tokens worth tens of thousands of dollars in the airdrop, while domain owners who have been around for a long time received much larger allocations.

As of May 2022, **the circulating supply is at around 20.24 million** ENS. Currently, the token is trading at around $14, and the market cap is $279.6 million. According to WalletInvestor, the price of ENS might drop and reach $1.16 by the end of 2022 and $0.40 by the end of 2027.

ENS is **available on the most popular centralized cryptocurrency exchanges**, including Binance, Coinbase, Kraken, and others. It is also on DEXs such as Uniswap and SushiSwap.

## What can you do with ENS?



The main thing cryptocurrency users can use ENS for is to **replace their long addresses with human-readable domains** that will facilitate crypto operations. Humans can easily remember an ENS that is something like "name.eth," but will find it almost impossible to remember a string like "0xd0eAf74B8c5bF457C7a81c3fe277aDb6Ed32DCF4."

At the same time, this will save them time and potential mistyping when connecting to a new DApp that requires them to input their wallet's address.

ENS domains personalize details of wallets, and this will make it easier for anyone looking to transfer your funds or any other details such as your website or social media handle. This feature can limit the fraudulent attempts of others trying to impersonate you and steal funds from your friends or collaborators.

## ENS could be at the heart of web3

The ENS was created for Ethereum smart contracts and is native to the Ethereum ecosystem. This means that it inherits its security and transparency, as opposed to the DNS records that are kept on central servers that remain vulnerable to hackers.

Cryptography is complex and can discourage beginners from getting involved. **ENS eliminates this barrier to adoption** by making crypto easier and more accessible. ENS converts the machine-readable public addresses into short, memorable links, which allow

transactions and interactions with any cryptocurrency or NFT. It aims to link all wallets, websites, and subdomains under one link, making crypto more accessible and less technical.

As blockchain addresses become more accessible to new cryptocurrency users, we might see an overall increase in adoption over the long run. For global crypto adoption to be successful, ENS and other similar incentives are crucial.

## Frequently asked questions

## What is the difference between ETH and ENS?

Ethereum (ETH) is the native asset of the Ethereum blockchain. ENS is a naming protocol built on the Ethereum blockchain that maps out Ethereum crypto addresses to human-readable domains such as "name.eth."

## What is ENS crypto?

The ENS is the governance and utility token for the Ethereum Name Service (ENS) and its DAO. ENS token holders can submit proposals and vote on proposals that dictate the future of ENS.

## Where can I **buy Ethereum** Name Service (ENS)?

You can buy Ethereum Name Service (ENS) tokens on all major cryptocurrency exchanges such as Binance, Coinbase, or KuCoin. You can also find it on decentralized exchanges (DEXs) such as Uniswap and SushiSwap.

## How do ETH domains work?

You can buy ETH domains from Ethereum Name Service (ENS), and they act as a human-readable domain name for your cryptocurrency public key, aka wallet address. The ENS Resolver translates ENS names into machine-readable addresses. You can use it to receive

crypto funds and also have all your different crypto addresses stored under the same ENS domain, as well as website addresses and social media handles.

## How much does an ENS name cost?

There are three tiers for yearly reveals for ENS domains, and it depends on the length of your ENS name. Three character names cost $640/year, four-character names cost $160/year, and five character names or longer cost $5/year. However, users have to pay an Ethereum gas fee each time they renew their ENS. That's why it would be cheaper to register your ENS for a longer period of time, as you would have to pay the gas fee only once.

## When did Ethereum Name Service start?

Alex Van de Sande and Nick Johnson from the Ethereum Foundation launched Ethereum Name Service (ENS) on May 4, 2017.

## Disclaimer

All the information contained on our website is published in good faith and for general information purposes only. Any action the reader takes upon the information found on our website is strictly at their own risk. At Learn, our priority is to provide high quality information. We take our time to identify, research and create educative content that is useful to our readers. To maintain this standard and to continue creating awesome content, our partners might reward us with a commission for placements in our articles. However, these commissions don't affect our processes for creating unbiased, honest and helpful content.

Sponsored

# EXHIBIT 199

# Harvard Law School Forum on Corporate Governance

# An Introduction to Smart Contracts and Their Potential and Inherent Limitations

*Posted by Stuart D. Levi and Alex B. Lipton, Skadden, Arps, Slate, Meagher & Flom LLP, on Saturday, May 26, 2018*

**Tags:** Blockchain, Contracts, Cybersecurity, Financial technology, Legal systems, Risk, Risk management
**More from:** Alex Lipton, Stuart Levi, Skadden

> **Editor's Note:** **Stuart D. Levi** is a partner and **Alex B. Lipton** is an associate at Skadden, Arps, Slate, Meagher & Flom LLP. This post is based on their Skadden publication.

"Smart contracts" are a critical component of many platforms and applications being built using blockchain or distributed ledger technology. Below, we outline the background and functions of smart contracts, discuss whether they can be deemed enforceable legal agreements under contract law in the United States, and highlight certain legal and practical considerations that will need to be resolved before they can be broadly used in commercial contexts.

## An Introduction to Smart Contracts

### How Smart Contracts Function

"Smart contracts" is a term used to describe computer code that automatically executes all or parts of an agreement and is stored on a blockchain-based platform. As discussed further below, the code can either be the sole manifestation of the agreement between the parties or might complement a traditional text-based contract and execute certain provisions, such as transferring funds from Party A to Party B. The code itself is replicated across multiple nodes of a blockchain and, therefore, benefits from the security, permanence and immutability that a blockchain offers. That replication also means that as each new block is added to the blockchain, the code is, in effect, executed. If the parties have indicated, by initiating a transaction, that certain parameters have been met, the code will execute the step triggered by those parameters. If no such transaction has been initiated, the code will not take any steps. Most smart contracts are written in one of the programming languages directly suited for such computer programs, such as Solidity.

At present, the input parameters and the execution steps for a smart contract need to be specific and objective. In other words, if "x" occurs, then execute step "y." Therefore, the actual tasks that smart contracts are performing are fairly rudimentary, such as automatically moving an amount of cryptocurrency from one party's wallet to another when certain criteria are satisfied. As the adoption of blockchain spreads, and as more assets are tokenized or go "on chain," smart contracts will become increasingly complex and capable of handling sophisticated transactions. Indeed, developers already are stringing together multiple transaction steps to form more complex smart contracts. Nonetheless, we are, at the very least, many years away from code being able to determine more subjective legal criteria, such as whether a party satisfied a commercially reasonable efforts standard or whether an indemnifications clause should be triggered and the indemnity paid.

Before a compiled smart contract actually can be executed on certain blockchains, an additional step is required, namely, the payment of a transaction fee for the contract to be added to the chain and executed upon. In the case of the Ethereum blockchain, smart contracts are executed on the Ethereum Virtual Machine (EVM), and this payment, made through the ether cryptocurrency, is known as "gas." [1] The more complex the smart contract (based on the transaction steps to be performed), the more gas that must be paid to execute the smart contract. Thus, gas currently acts as an important gate to prevent overly complex or numerous smart contracts from overwhelming the EVM. [2]

CYBER2-29777 - 02141

Smart contracts are presently best suited to execute automatically two types of "transactions" found in many contracts: (1) ensuring the payment of funds upon certain triggering events and (2) imposing financial penalties if certain objective conditions are not satisfied. In each case, human intervention, including through a trusted escrow holder or even the judicial system, is not required once the smart contract has been deployed and is operational, thereby reducing the execution and enforcement costs of the contracting process.

As just one example, smart contracts could eliminate the so-called procure-to-pay gaps. When a product arrives and is scanned at a warehouse, a smart contract could immediately trigger requests for the required approvals and, once obtained, immediately transfer funds from the buyer to the seller. Sellers would get paid faster and no longer need to engage in dunning, and buyers would reduce their account payable costs. This could impact working capital requirements and simplify finance operations for both parties. On the enforcement side, a smart contract could be programmed to shut off access to an internet-connected asset if a payment is not received. For example, access to certain content might automatically be denied if payment was not received.

## Historical Background

The term "smart contract" was first introduced by computer scientist and cryptographer Nick Szabo some 20 years ago as a graduate student at University of Washington. According to Szabo:

> New institutions, and new ways to formalize the relationships that make up these institutions, are now made possible by the digital revolution. I call these new contracts "smart," because they are far more functional than their inanimate paper-based ancestors. No use of artificial intelligence is implied. A smart contract is a set of promises, specified in digital form, including protocols within which the parties perform on these promises. [3]

Szabo's use of quotes around the word "smart" when comparing smart contracts to paper-based contracts, and his eschewing of artificial intelligence are important. Smart contracts may be "smarter" than paper contracts because they automatically can execute certain pre-programmed steps, but they should not be seen as intelligent tools that can parse a contract's more subjective requirements. Indeed, the classic example of a smart contract offered by Szabo is a vending machine. Once a purchaser has satisfied the conditions of the "contract" (*i.e.*, inserting money into the machine) the machine automatically honors the terms of the unwritten agreement and delivers the snack.

Smart contracts today also find their origin in Ricardian Contracts, a concept published in 1996 by Ian Grigg and Gary Howland as part of their work on the Ricardo payment system to transfer assets. Grigg saw Ricardian Contracts as a bridge between text contracts and code that had the following parameters: a single document that "is a) a contract offered by an issuer to holders, b) for a valuable right held by holders, and managed by the issuer, c) easily readable by people (like a contract on paper), d) readable by programs (parsable like a database), e) digitally signed, f) carries the keys and server information, and g) allied with a unique and secure identifier." [4]

## The Interplay With Traditional Text Agreements

One of the difficulties with discussing smart contracts is that the term is used to capture two very different paradigms. The first involves smart contracts that are created and deployed without any enforceable text-based contract behind them. For example, two parties reach an oral understanding as to the business relationship they want to capture and then directly reduce that understanding into executable code. We refer to these below as "code-only smart contracts." The second paradigm involves the use of smart contracts as vehicles to effectuate certain provisions of a traditional text-based contract, in which the text itself references the use of the smart contract to effectuate certain provisions. We refer to these as "ancillary smart contracts."

## Are Smart Contracts Enforceable?

There is no federal contract law in the United States; rather, the enforceability and interpretation of contracts is determined at the state level. Thus, while certain core principles apply consistently across state lines, and there has been a drive to harmonize state laws by the National Conference of Commissioners on Uniform State Laws, any conclusions regarding smart contracts must be tempered by the reality that states may adopt different views.

CYBER2-29777 - 02142

A discussion regarding the enforceability of smart contracts must start with the fundamental distinction between an agreement and a "contract." States generally recognize that although two parties can enter into a variety of "agreements," a contract means that the agreement is legally binding and enforceable in a court of law. **[5]** In order to determine enforceability, state courts traditionally look to whether the common law requirements of offer, acceptance and consideration are satisfied. These basic requirements surely can be achieved through ancillary smart contracts. For example, an insurer might develop a flight insurance product that automatically provides the insured with a payout if a flight is delayed by more than two hours. **[6]** The key terms, such as delineating how the delay is calculated, can be set forth in a text-based contract, with the actual formation of the contract (payment of the premium) and the execution (automatic payout upon a verifiable delay) handled through an ancillary smart contract. Here, the insurer has made a definite offer for a flight insurance product that is accepted by the insured upon payment of the premium as consideration.

Although, today, certain contracts must be in writing, and additional formalities may be required such as those under the Uniform Commercial Code (UCC) and state statutes of frauds, **[7]** agreements do not always need to be in writing to be held enforceable. **[8]** Thus, many code-only smart contracts also will be enforceable under state laws governing contracts. Szabo's example of a vending machine is instructive in this regard. There, while the buyer has many implied rights, a contract was formed without any meaningful written terms other than a price display for each item. Thus, the fact that an agreement is rendered only in code, such as the case with code-only smart contracts, presents no particular barrier to contract formation outside the barriers imposed by the UCC and statutes of frauds. Indeed, a variety of laws and legal constructs have long considered the role of information technology in contract formation.

For example, the Uniform Electronic Transactions Act (UETA) which dates back to 1999 and forms the basis for state law in 47 states, provides that, with limited exceptions, electronic records, which include records created by computer programs, and electronic signatures (*i.e.*, digital signature using public key encryption technology) be given the same legal effect as their written counterparts. **[9]** UETA even goes so far as recognizing the validity of "electronic agents," which it defines as "a computer program or an electronic or other automated means used independently to initiate an action or respond to electronic records or performances in whole or in part, without review or action by an individual." **[10]** Under UETA, an electronic agent is "capable within the parameters of its programming, of initiating, responding or interacting with other parties or their electronic agents once it has been activated by a party, without further attention of that party," **[11]** arguably a prescient acknowledgment of smart contracts.

Similarly, the federal Electronic Signatures Recording Act (E-Sign Act) not only recognizes the validity of electronic signatures and electronic records in interstate commerce, but also provides that a contract or other record relating to a transaction "may not be denied legal effect, validity, or enforceability solely because its formation, creation, or delivery involved the action of one or more electronic agents so long as the action of any such electronic agent is legally attributable to the person to be bound." **[12]** The term "electronic agent" means a computer program or an electronic or other automated means used independently to initiate an action or respond to electronic records or performances in whole or in part without review or action by an individual at the time of the action or response." **[13]**

Though an understanding of the current legal framework is important to evaluating the enforceability of smart contracts today, those using smart contracts in the future may not need to rely on laws that pre-date the development of blockchain technology. Arizona and Nevada already have amended their respective state versions of UETA to explicitly incorporate blockchains and smart contracts. **[14]** The fact that these states have adopted decidedly different definitions of those critical terms suggests that as more states follow their lead, there may be increasing pressure to adopt unified definitions to reflect blockchain and smart contract developments.

## Challenges With the Widespread Adoption of Smart Contracts

Given the existing legal frameworks for recognizing electronic contracts, it is quite likely that a court today would recognize the validity of code that executes provisions of a smart contract—what we have classified as ancillary smart contracts. There is also precedent to suggest that a code-only smart contract might enjoy similar legal protection. The challenge to widespread smart contract adoption may therefore have less to do with the limits of the law than with potential clashes between how smart contract code operates and how parties transact business. We set forth below certain of these challenges:

## How Can Non-technical Parties Negotiate, Draft and Adjudicate Smart Contracts?

A key challenge in the widespread adoption of smart contracts is that parties will need to rely on a trusted, technical expert to either capture the parties' agreement in code or confirm that code written by a third party is accurate. While some analogize this to hiring a lawyer to explain "the legalese" of a traditional text-based contract, the analogy is misplaced. Non-lawyers typically can understand simple short-form agreements as well as many provisions of longer agreements, especially those setting forth business terms. But a non-programmer would be at a total loss to understand even the most basic smart contract and is therefore significantly more beholden to an expert to explain what the contract "says."

To some extent, the inability of contracting parties to understand the smart contract code will not be a hindrance to entering into ancillary code agreements. This is because for many basic functions, text templates can be created and used to indicate what parameters need to be entered and how those parameters will be executed. For example, assume a simple smart contract function that extracts a late fee from a counterparty's wallet if a defined payment is not received by a specified date. The text template could prompt the parties to enter the amount of the expected payment, the due date and the amount of the late fee. However, a party may want to confirm that the underlying code actually will perform the functions specified in the text, and that there are no additional conditions or parameters—especially where the template disclaims any liability arising from the accuracy of the underlying code. This review will require a trusted third party with programming expertise.

In cases where such templates do not exist, and new code must be developed, the parties will need to communicate the intent of their agreement to a programmer. Simply handing that programmer a copy of the legal agreement would be inefficient since it would require the programmer to try and decipher a legal document. Parties relying on ancillary smart contracts therefore may need to draft a separate "term sheet" of functionality that the smart contract should perform and that can be provided to the programmer.

The parties also may want written representations from the programmer that the code performs as contemplated. The net result is that for customized arrangements that do not rely on an existing template, the parties may need to enter into a written agreement with the smart contract programmer, not unlike the contract that parties may enter into with a provider of services for Electronic Data Interchange (EDI) transactions today.

Insurance companies could also create policies to protect contracting parties from the risk that smart contract code does not perform the functions specified in the text of an agreement. Although the parties would also want to review (or have third parties review) the code, insurance can provide additional protection given that the parties might miss errors when reviewing the code. The parties would also take some additional comfort from the fact that the insurance company likely conducted its own code audit before agreeing to insure the code.

Code-only smart contracts used for business-to-consumer transactions could pose an additional set of issues that will need to be addressed. Courts are wary of enforcing agreements where the consumer did not receive adequate notice of the terms of the agreement, **[15]** and may be hesitant to enforce a smart contract where the consumer was not also provided with an underlying text agreement that included the complete terms.

Finally, as the validity or performance of smart contracts increasingly become adjudicated, courts may need a system of court-appointed experts to help them decipher the meaning and intent of the code. Today, parties routinely use their own experts when technical issues are at the center of a dispute. While both federal courts and many state courts have the authority to appoint their own experts, they rarely exercise that authority. **[16]** That approach may need to change if the number of standard contract disputes that center on interpreting smart contract code increases.

## Smart Contracts and the Reliance on "Off-chain" Resources

Many smart contract-proposed use-cases assume that the smart contract will receive information or parameters from resources that are not on the blockchain itself—so-called off-chain resources. For example, assume a crop insurance smart contract is programmed to transfer value to an insured party if the temperature falls below 32 degrees at any point. The smart contract will need to receive that temperature data from an agreed source. This presents two issues. First,

CYBER2-29777 - 02144

smart contracts do not have the ability to pull data from off-chain resources; rather, that information needs to be "pushed" to the smart contract. Second, if the data at issue is in constant flux, and since the code is replicated across multiple nodes across the network, different nodes may be receiving different information, even just a few seconds apart. In our example, Node-1 may receive information that the temperature is 31.9 degrees, while Node-2 may receive information that the temperature is actually 32 degrees. Given that consensus is required across the nodes for a transaction to be validated, such fluctuations can cause the condition to be deemed "not satisfied."

Contracting parties will be able to solve this conundrum by using a so-called "oracle." Oracles are trusted third parties that retrieve off-chain information and then push that information to the blockchain at predetermined times. In the foregoing example, the oracle would monitor the daily temperature, determine that the freezing event has occurred and then push that information to the smart contract.

Although oracles present an elegant solution to accessing off-chain resources, this process adds another party with whom the parties would need to contract to effectuate a smart contract, thus somewhat diluting the decentralized benefits of smart contracts. It also introduces a potential "point of failure." For example, an oracle might experience a system flaw and be unable to push out the necessary information, provide erroneous data or simply go out of business. Smart contracts will need to account for these eventualities before their adoption can become more widespread.

## What is the "Final" Agreement Between the Parties?

When analyzing traditional text-based contracts, courts will examine the final, written document to which the parties have agreed in order to determine whether the parties are in compliance or breach. Courts have long emphasized that it is this final agreement that represents the mutual intent of the parties—the "meeting of the minds."

In the case of code-only smart contracts, the code that is executed—and the outcome it produces—represents the only objective evidence of the terms agreed to by the parties. In these cases, email exchanges between the parties as to what functions the smart contract "should" execute, or oral discussions to that effect, likely would yield to the definitive code lines as the determinative manifestation of the parties' intent.

With respect to ancillary smart contracts, a court likely would look at the text and code as a unified single agreement. The issue becomes complicated when the traditional text agreement and the code do not align. In the crop insurance example described above, assume the text of an agreement specifies that an insurance payout will be made if the temperature falls below 32 degrees, while the smart contract code triggers the payment if the temperature is equal to or below 32 degrees. Assuming that the text agreement does not state whether the text or code controls in the event of an inconsistency, courts will need to determine—perhaps on a case-by-case basis—whether the code should be treated as a mutually agreed amendment to the written agreement or whether the text of the agreement should prevail. In some respects, the analysis should be no different than a case where the provisions of a main agreement differ from what is reflected in an attached schedule or exhibit. The fact that here the conflict would be between text and computer code and not two text documents should not be determinative, but courts may take a different view.

One solution will be for parties to use a text based contract where the parameters that trigger the smart contract execution are not only visible in the text but actually populate the smart contract. In our example, "less than 32 degrees" would not only be seen in the text, but also would create the parameter in the smart contract itself, thereby minimizing the chances of any inconsistency.

## The Automated Nature of Smart Contracts

One of the key attributes of smart contracts is their ability to automatically and relentlessly execute transactions without the need for human intervention. However, this automation, and the fact that smart contracts cannot easily be amended or terminated unless the parties incorporate such capabilities during the creation of the smart contract, present some of the greatest challenges facing widespread adoption of smart contracts.

For example, with traditional text contracts, a party can easily excuse a breach simply by not enforcing the available penalties. If a valued customer is late with its payment one month, the vendor can make a real-time decision that

CYBER2-29777 - 02145

preserving the long-term commercial relationship is more important than any available termination right or late fee. However, if this relationship had been reduced to a smart contract, the option not to enforce the agreement on an *ad hoc* basis likely would not exist. A late payment will result in the automatic extraction of a late fee from the customer's account or the suspension of a customer's access to a software program or an internet-connected device if that is what the smart contract was programmed to do. The automated execution provided by smart contracts might therefore not align with the manner in which many businesses operate in the real world.

Similarly, in a text-based contractual relationship, a party may be willing to accept, on an *ad hoc* basis, partial performance to be deemed full performance. This might be because of an interest in preserving a long-term relationship or because a party determines that partial performance is preferable to no performance at all. Here, again, the objectivity required for smart contract code might not reflect the realities of how contracting parties interact.

## Amending and Terminating Smart Contracts

At present, there is no simple path to amend a smart contract, creating certain challenges for contracting parties. For example, in a traditional text-based contract, if the parties have mutually agreed to change the parameters of their business deal, or if there is a change in law, the parties quickly can draft an amendment to address that change, or simply alter their course of conduct. Smart contracts currently do not offer such flexibility. Indeed, given that blockchains are immutable, modifying a smart contract is far more complicated than modifying standard software code that does not reside on a blockchain. The result is that amending a smart contract may yield higher transaction costs than amending a text-based contract, and increases the margin of error that the parties will not accurately reflect the modifications they want to make.

Similar challenges exist with respect to terminating a smart contract. Assume a party discovers an error in an agreement that gives the counterparty more rights than intended, or concludes that fulfilling its stated obligations will be far more costly than it had expected. In a text-based contract, a party can engage in, or threaten, so-called "efficient breach," *i.e.*, knowingly breaching a contract and paying the resulting damages if it determines that the cost to perform is greater than the damages it would owe. Moreover, by ceasing performance, or threatening to take that step, a party may bring the counterparty back to the table to negotiate an amicable resolution. Smart contracts do not yet offer analogous self-help remedies.

Projects are currently underway to create smart contracts that are terminable at any time and more easily amended. While in some ways this is antithetical to the immutable and automated nature of smart contracts, it reflects the fact that smart contracts only will gain commercial acceptance if they reflect the business reality of how contracting parties act.

## Objectivity and the Limits of Incorporating Desired Ambiguity Into Smart Contracts

The objectivity and automation required of smart contracts can run contrary to how business parties actually negotiate agreements. During the course of negotiations, parties implicitly engage in a cost-benefit analysis, knowing that at some point there are diminishing returns in trying to think of, and address, every conceivable eventuality. These parties no longer may want to expend management time or legal fees on the negotiations, or may conclude that commencing revenue generating activity under an executed contract outweighs addressing unresolved issues. Instead, they may determine that if an unanticipated event actually occurs, they will figure out a resolution at that time. Similarly, parties may purposefully opt to leave a provision somewhat ambiguous in an agreement in order to give themselves the flexibility to argue that the provision should be interpreted in their favor. This approach to contracting is rendered more difficult with smart contracts where computer code demands an exactitude not found in the negotiation of text-based contracts. A smart contract cannot include ambiguous terms nor can certain potential scenarios be left unaddressed. As a result, parties to smart contracts may find that the transaction costs of negotiating complex smart contracts exceed that of a traditional text-based contracts.

It will take some time for those adopting smart contracts in a particular industry to determine which provisions are sufficiently objective to lend themselves to smart contract execution. As noted, to date, most smart contracts perform relatively simple tasks where the parameters of the "if/then" statements are clear. As smart contracts increase in

complexity, parties may disagree on whether a particular contractual provision can be captured through the objectivity that a smart contract demands.

## Do Smart Contracts Really Guarantee Payment?

One benefit often touted of smart contracts is that they can automate payment without the need for dunning notices or other collection expenses and without the need to go to court to obtain a judgment mandating payment. While this is indeed true for simpler use cases, it may be less accurate in complex commercial relationships. The reality is that parties are constantly moving funds throughout their organization and do not "park" total amounts that are due on a long-term contract in anticipation of future payment requirements. Similarly, a person obtaining a loan is unlikely to keep the full loan amount in a specified wallet linked to the smart contract. Rather, the borrower will put those funds to use, funding the necessary repayments on an *ad hoc* basis.

If the party owing amounts under the smart contract fails to fund the wallet on a timely basis, a smart contract looking to transfer money from that wallet upon a trigger event may find that the requisite funds are not available. Implementing another layer into the process, such as having the smart contract seek to pull funds from other wallets or having that wallet "fund itself" from other sources, would not solve the problem if those wallets or sources of funds also lack the requisite payment amounts. The parties might seek to address this issue through a text-based requirement that a wallet linked to the smart contract always have a minimum amount, but that solution simply would give the party a stronger legal argument if the dispute was adjudicated. It would not render the payment operation of the smart contract wholly automatic. Thus, although smart contracts will render payments far more efficient, they may not eliminate the need to adjudicate payment disputes.

## Risk Allocation for Attacks and Failures

Smart contracts introduce an additional risk that does not exist in most text-based contractual relationships—the possibility that the contract will be hacked or that the code or protocol simply contains an unintended programming error. Given the relative security of blockchains, these concepts are closely aligned; namely, most "hacks" associated with blockchain technology are really exploitations of an unintended coding error. As with many bugs in computer code, these errors are not glaring, but rather become obvious only once they have been exploited. For example, in 2017 an attacker was able to drain several multi-signature wallets offered by Parity of $31 million in ether. [17] Multi-signature wallets add a layer of security because they require more than one private key to access the wallet. However, in the Parity attack, the attacker was able to exploit a flaw in the Parity code by reinitializing the smart contract and making himself or herself the sole owner of the multi-signature wallets. Parties to a smart contract will need to consider how risk and liability for unintended coding errors and resulting exploitations are allocated between the parties, and possibly with any third party developers or insurers of the smart contract.

## Governing Law and Venue

One of the key promises of blockchain technology, and by extension smart contracts, is the development of robust, decentralized and global platforms. However, global adoption means that parties may be using a smart contract across far more jurisdictions than might exist in the case of text-based contracts. The party offering terms under a smart contract would therefore be best-served by specifying the governing law and venue for that smart contract. A governing law provision specifies what substantive law will apply to the interpretation of the smart contract, whereas a venue clause specifies which jurisdiction's courts will adjudicate the dispute. In cases where governing law or venue is not specified, a plaintiff may be relatively unconstrained in choosing where to file a claim or in arguing which substantive law should apply given the wide range of jurisdictions in which a smart contract might be used. Given that many early disputes concerning smart contracts will be ones of first-impression, contracting parties will want some certainty surrounding where such disputes will be adjudicated.

# Best Practices

Given that we are at the nascent stages of smart contract adoption, best practices for implementing such code is still evolving. However, the checklist below should help developers design effective smart contracts and guide companies who

CYBER2-29777 - 02147

plan to use them.

- For now, parties entering into any type of contractual arrangement would be best served using a hybrid approach that combines text and code. As noted, there are strong arguments that code-only smart contracts should be enforceable, at least under state contract law in the U.S. However, until there is greater clarity on their validity and enforceability, code-only smart contracts should be used only for simpler transactions. Parties will continue to want text-versions of agreements so they can read the agreed-upon terms, memorialize terms that smart contracts are not equipped to address and have a document they know a court will enforce.

- In a hybrid contract using text and code, the text should clearly specify the smart contract code with which it is associated, and the parties should have full visibility into the variables that are being passed to the smart contract, how they are defined and the transaction events that will trigger execution of the code.

- When relying on oracles for off-chain data, the parties should address what would happen if the oracle is unable to push out the necessary data, provides erroneous data or simply goes out of business.

- The parties should consider risk allocation in the event of a coding error.

- The text agreement accompanying the code should specify the governing law and venue, as well as the order of precedence between text and code in the event of a conflict.

- The text agreement should include a representation by each party that they have reviewed the smart contract code, and that it reflects the terms found in the text agreement. Although such a representation cannot force a party to examine the code, it will help the counterparty defend against a claim that the code was never reviewed. Parties may also choose to insure against the risk that the code contains errors. As noted, parties may need to involve third-party experts to review the code.

# Future of Smart Contracts

Today, smart contracts are a prototypical example of "Amara's Law," the concept articulated by Stanford University computer scientist Roy Amara that we tend to overestimate new technology in the short run and underestimate it in the long run. Although smart contracts will need to evolve before they are widely adopted for production use in complex commercial relationships, they have the impact to revolutionize the reward and incentive structure that shapes how parties contract in the future. To that end, and when thinking about smart contracts, it is important not to simply think how existing concepts and structures can be ported over to this new technology. Rather, the true revolution of smart contracts will come from entirely new paradigms that we have not yet envisioned.

## Endnotes

[1] *See* "What is the 'Gas' in Ethereum?" *Cryptocompare*, November 18, 2016, **available here**. **(go back)**

[2] *Id.* **(go back)**

[3] Nick Szabo, "Smart Contracts: Building Blocks for Digital Market," 1996, **available here**. **(go back)**

[4] Ian Grigg, "The Ricardian Contract," **available here**. **(go back)**

[5] *See, e.g.*, "Restatement (Second) of Contracts," Section 1, American Law Institute, 1981. In the U.S., contract law is ordinarily a function of state law. Although this article outlines general contract law principles that are common across states, we note that state law differences may impact the enforceability of smart contracts in certain states.

CYBER2-29777 - 02148

**(go back)**

**6** At least one company, AXA, currently offers such a product. **_See here_**.
**(go back)**

**7** _See, e.g._, UCC § 2-201.
**(go back)**

**8** _See, e.g., Lumhoo v. Home Depot USA, Inc._, 229 F. Supp. 2d 121, 160 (E.D.N.Y. 2002) (holding that the plaintiffs adduced sufficient evidence to support an inference that the parties formed an oral contract for payment by their employer at an overtime rate for any hours worked in excess of eight hours per day).
**(go back)**

**9** Uniform Electronic Transactions Act (Unif. Law Comm'n 1999)—New York, Illinois and Washington have state-specific laws relating to the validity of electronic transactions.
**(go back)**

**10** _Id._ § 2(6).
**(go back)**

**11** _Id._ § 2 cmt. 5.
**(go back)**

**12** 15 U.S.C. § 7001(h).
**(go back)**

**13** 15 U.S.C. § 7006(3).
**(go back)**

**14** _See_ 2017 Ariz. HB 2417 44-7061 and Nev. Rev. Stat. Ann. § 719.090.
**(go back)**

**15** _See, e.g., Nicosia v. Amazon.com, Inc._, 834 F.3d 220 (2d Cir. 2016) (reversing the district court's dismissal for failure to state a claim and holding that reasonable minds could disagree as to whether Amazon provided the consumer with reasonable notice of the mandatory arbitration provision at issue).
**(go back)**

**16** _See_ Charles Alan Wright & Arthur R. Miller, _Federal Practice and Procedure_, Section 6304 (3d ed. supp. 2011) ("In fact, the exercise of Rule 706 powers is rare under virtually any circumstances. This is, at least in part, owing to the fact that appointing an expert witness increases the burdens of the judge, increases the costs to the parties, and interferes with the adversarial control over the presentation of evidence."), and Stephanie Domitrovich, Mara L. Merino & James T. Richardson, _State Trial Judge Use of Court Appointed Experts: Survey Results and Comparisons_, 50 Jurimetrics J. 371, 373–74 (2010).
**(go back)**

**17** _See_ Haseeb Qureshi, "A Hacker Stole $31M of Ether—How it Happened, and What it Means for Ethereum," _FreeCodeCamp_, (July 20, 2017), **available here**.
**(go back)**

Both comments and trackbacks are currently closed.

CYBER2-29777 - 02149