## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**COIN CENTER**, et al.,

     **Plaintiffs**,

**v.**                                                        **Case No. 3:22cv20375-TKW-ZCB**

**JANET YELLEN**, in her Official
Capacity as Secretary of the Treasury,
**et al.**,

     **Defendants**.

_____/

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

This case is before the Court based on the parties' cross-motions for summary judgment (Docs. 36, 57). Upon due consideration of the motions, Plaintiffs' supporting memorandum (Doc. 36-1), the responses (Docs. 57, 62), the replies (Docs. 62, 66), the amicus briefs (Docs. 42-1, 45-1, 46-1, 60-1), the joint appendix of administrative record documents (Doc. 67), the classified lodging (*see* Doc. 69),[1] and Defendants' notice of supplemental authority (Doc. 70) and Plaintiffs' response (Doc. 71), the Court finds that Defendants' motion is due to be granted and Plaintiffs' motion is due to be denied.

_____

[1] The Court reviewed the classified lodging *in camera*.

**Regulatory Background**

The International Emergency Economic Powers Act (IEEPA) authorizes the President to declare national emergencies "to deal with any unusual and extraordinary [foreign] threat … to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a). Pursuant to that authority, the President declared national emergencies with respect to malicious foreign cyber-enabled activities, *see* Exec. Order No. 13694 (Apr. 1, 2015), as amended by Exec. Order No. 13757 (Dec. 28, 2016), and North Korea's pursuit of its nuclear missile program, *see* Exec. Order No. 13722 (Mar. 15, 2016).

After a national emergency is declared, the IEEPA authorizes the President to "regulate … or prohibit … any use [of], transfer [of], … dealing in, … or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. §1702(a)(1)(B). Pursuant to that authority, the President blocked all property and interests in property of any person determined by the Secretary of the Treasury to have materially assisted, sponsored, or provided financial, material, or technological support for foreign malicious cyber-enabled activities that threaten the national security, foreign policy, or economic health or financial stability of the United States, *see* Exec. Order Nos. 13694, 13757, and the North Korean government, *see* Exec. Order No. 13722.

The Secretary of the Treasury delegated the authority granted by Executive Orders 13694 and 13722 to the Director of the Office of Financial Assets Control (OFAC). *See* 31 C.F.R. §§510.802, 578.802.

On November 8, 2022,[2] OFAC designated "Tornado Cash" as a Specially Designated National or Blocked Person. *See* A.R. 1. The effect of the designation is that "unless licensed or otherwise authorized by [OFAC], (1) all real, personal, and any other property and interests in property of [Tornado Cash] … are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in, and (2) any transaction or dealing … in property or interests in property of [Tornado Cash] is prohibited." A.R. 4.

The designation described Tornado Cash as

an entity with an organizational structure that consists of: (1) its founders—Alexey Pertsev, Roman Semenov, and Roman Storm—and other associated developers, who together launched the Tornado Cash mixing service, developed new Tornado Cash mixing service features, created the Tornado Cash Decentralized Autonomous Organization (DAO), and actively promote the platform's popularity in an attempt to increase its user base; and (2) the Tornado Cash DAO, which is responsible for voting on and implementing those new features created by the developers.

A.R. 1. The designation listed 91 Internet addresses that were affiliated with Tornado Cash, including the addresses for the "smart contracts" that Plaintiffs refer

---

[2] Tornado Cash was initially designated by OFAC on August 8, 2022, but that designation was "wholly replaced" by the November 8 "redesignat[ion]." *See* A.R. 10.

to as the "core software tool" of the Tornado Cash service.[3]  A.R. 1-4.

The designation was based on a 66-page "evidentiary memorandum" that detailed how Tornado Cash worked, A.R. 33-64, and how it had been used to facilitate malicious cyber-enabled activities by laundering hundreds of millions of dollars of cryptocurrency stolen by groups sponsored by North Korea, including the Lazarus Group, A.R. 67-78.  The memorandum was supported by 229 exhibits that contained over 2,400 pages.  A.R. 79-100; *see also* Doc. 19-2 (index of the entire administrative record).

Along with the designation, OFAC published several Frequently Asked Questions (FAQs) on its website to inform the public about the scope of the designation.  *See* OFAC, *Frequently Asked Questions: Cyber-Related Sanctions*, https://perma.cc/5KQ5-25GE.[4]  For example, FAQ 1079 explained that individuals who had funds held in Tornado Cash at the time of designation may request a specific license for retrieval of the funds and that "OFAC would have a favorable licensing policy towards such applications, provided that the transaction did not involve other

---

[3]  According to Plaintiffs, the "core software tool" consists of under 500 lines of computer code that is published to 20 of the addresses listed in the designation.  *See* Doc. 36-1 at 12.  The code at each address is identical, except that each address is designed for a different amount and/or type of crypto assets.  *Id.* at 12-13.

[4]  The FAQs are not included in the administrative record, but they were specifically referenced in the press release announcing the re-designation of Tornado Cash that is included in administrative record.  *See* A.R. 12 ("For additional information and guidance regarding sanctions implications specific to Tornado Cash, please reference OFAC's **FAQs 1076-1079** and **FAQ 1095**.") (bold language is hyperlinked in original).

sanctionable conduct."  Similarly, FAQ 1078 explained that although unsolicited receipt of crypto assets from Tornado Cash (i.e., "dusting") would technically be subject to OFAC's regulations, OFAC will not prioritize enforcement against persons who receive such funds.

### Technical Background

Cryptocurrency is a virtual currency that can be used for payment or investment purposes.  A.R. 21, 1766–67.  It is traded and exchanged on a "blockchain," which is a decentralized ledger that relies on an online network of individuals to maintain the ledger's accuracy through the use of cryptographic algorithms.  A.R. 21, 875.

Cryptocurrency can take the form of virtual coins or tokens.  A.R. 22, 729–31.  Coins are the mediums of exchange on a blockchain and are akin to dollars and cents.  A.R. 22, 731.  Tokens are assets created through software developed on a blockchain that can be used for a particular purpose, but they also have value and can be bought, sold, and traded on secondary markets.  *Id.*

A governance token is a specific type of token that can represent a share of ownership or voting rights in the mixing service's decentralized autonomous organization (DAO).  *Id.*  The DAO is an entity composed of the holders of governance tokens who manage the service by voting on organizational decisions.

A.R. 24, 515.  Normally, the core developer group creates the DAO and distributes governance tokens to stakeholders.  A.R. 515.

Ethereum is a popular crytocurrency blockchain and its native coin is Ether (ETH).  A.R. 26, 818, 857–58.  An Ethereum account is a "wallet" that can hold and send ETH along the Ethereum blockchain.  A.R. 506.

When a user makes a transaction using Ethereum, the transaction is posted to a public ledger visible to anyone.  A.R. 17.  The public ledger displays the sender's wallet address, the recipient's wallet address, and the crypto asset that they exchanged.  A.R. 23.  Thus, anyone can view every Ethereum transaction ever made on the public ledger and can trace an individual's transaction history.  A.R. 549.

Tornado Cash is a cryptocurrency "mixing service" that was founded by two Russians (Alexey Pertsev and Roman Semenov), Roman Storm, and other associated developers.  A.R. 32.  Those individuals launched the service, developed new features, created the DAO, and actively promoted the platform's popularity.  *Id.*

Tornado Cash's DAO is made up of users who hold TORN, which is Tornado Cash's governance token.  A.R. 35–41.  Tornado Cash's founders also hold TORN. A.R. 32, 35-41.  The founders and DAO include foreigners.  *Id.*

TORN holders have the right to vote on any changes to the Tornado Cash software.  A.R. 35–41.  TORN holders also have an interest in the increased use and popularity of the Tornado Cash service because TORN is a virtual asset that can be

bought and sold on secondary markets and its value has the potential to increase as the popularity of the service increases.  A.R. 43–50.

The Tornado Cash service uses smart contracts—which are essentially computer software created by its developers and approved and deployed by the DAO on the Ethereum blockchain.  A.R. 51; *see also* A.R. 818, 820, 2141.  The smart contracts allow Ethereum users to deposit ETH into a "pool" where it is mixed with other users' deposits and then withdrawn at a time of the user's choosing.  A.R. 51.  The more users that have deposited ETH into the pool the more difficult it is to connect the withdrawal with a particular deposit, which thereby provides a degree of anonymity to the user's transaction that is not available on the public ledger.  A.R. 16–17.

The smart contracts that make up what Plaintiffs refer to as Tornado Cash's "core software tool" are immutable in that they cannot be changed by anyone, including the developers and the DAO.  A.R. 563-67, 951.

Tornado Cash transactions can be (and 84% are) executed with the aid of third-party "relayers."  A.R. 57 n.113.  The use of a relayer makes it even harder to identify the parties to the transaction, but transactions can be completed without a relayer.  A.R. 57, 187.

If a registered relayer is used, the depositor pays a fee to the relayer and the relayer pays a portion of that fee to members of the Tornado Cash DAO in the form

of TORN.  A.R. 57.  If a registered relayer is not used, no fee is paid to the DAO.

A.R. 56–60.

TORN had value before the option of using relayers was added to the Tornado

Cash service in March 2022, but the value of TORN increased significantly after

relayers were added.  A.R. 38-39, 1596.  TORN continued to have value after

OFAC's initial designation of Tornado Cash, albeit considerably less than it had

before the designation.  A.R. 152-53.

## Procedural Background

OFAC's designation of Tornado Cash was challenged by Plaintiffs[5] in this

case and by other plaintiffs in a case in the Western District of Texas.  The issues

raised in the two cases are similar, but not identical.

In August 2023, the judge in the Western District of Texas case granted

summary judgment in favor of the Government.  *See Van Loon v. Dep't of Treasury*,

2023 WL 5313091 (W.D. Tex. Aug. 17, 2023) (Pitman, J.), *appeal filed*, No. 23-

50669 (5th Cir. Sep. 18, 2023).  The court found that Tornado Cash is an "entity"

that may be designated under the IEEPA and Executive Orders 13694 and 13722

and that Tornado Cash has a property interest in the smart contracts listed in the

---

[5]  Plaintiffs are three individuals who use Tornado Cash for various purposes (including making donations to organizations and causes they support) and a nonprofit cryptocurrency advocacy organization that regularly receives donations from individuals through Tornado Cash.

designation.  *Id.* at *11.  The court also rejected the plaintiffs' constitutional claims under the First Amendment and Takings Clause.  *Id.* at *12.

In this case, Plaintiffs do not challenge OFAC's determination that Tornado Cash is a foreign entity that can be designated, *see* Doc. 36-1 at 34,[6] and they only challenge the designation as it relates to 29 of the 91 addresses[7] affiliated with Tornado Cash because they contend that those addresses are not property in which a foreigner has "any interest."

Plaintiffs claim that the designation of Tornado Cash's core software tool should be held unlawful and set aside under the Administrative Procedure Act (APA) because the designation (1) exceeded OFAC's statutory authority and was contrary to law, (2) was arbitrary and capricious, and (3) violated their rights of association under the First Amendment.  Defendants[8] responds that the designation of Tornado

---

[6] Several of the amici make this argument, but the Court declines to consider it because "a district court should not consider arguments raised by amici that go beyond the issues properly raised by the parties."  *Victim Rights Law Ctr. v. Rosenfelt*, 988 F.3d 556, 564 n.8 (1st Cir. 2021), *cert. denied sub nom. Found. for Individual Rights in Educ. v. Victim Rights Law Ctr.*, 142 S. Ct. 754 (2022); *see also F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 n.4 (2013) (declining to consider issues raised by amici that were not raised by the parties or addressed by the lower courts); *New Jersey v. New York*, 523 U.S. 767, 781 n.3 (1998) (same).

[7] Plaintiffs are only challenging the designation of the 20 "core software tool" addresses and 9 additional addresses "that host ancillary tools that cannot be controlled or changed by anybody."  Doc. 36-1 at 14-15.  Plaintiffs are not challenging the other 62 addresses listed in the designation.  *Id.* at 15.

[8] Defendants are Janet Yellen, in her official capacity as Secretary of the Treasury; the Department of the Treasury; Andrea Gacki, in her official capacity as Director of OFAC; and OFAC.

Cash in its entirety was within OFAC's statutory authority, was not arbitrary and capricious, and did not violate the First Amendment.

There is no dispute that Plaintiffs have standing to challenge the designation because it will prohibit them from using Tornado Cash in the future.  Thus, the case can be resolved on the merits.

There are no factual issues in dispute, so the Court need only decide based on a review of the administrative record and the parties' cross-motions for summary judgment which party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The motions were extensively[9] briefed and are ripe for rulings. No hearing is needed to rule on the motions.[10]

## Standard of Review

Under the APA, the Court has the authority to "hold unlawful and set aside" agency action that is "arbitrary [or] capricious," 5 U.S.C. §706(2)(A), "contrary to [a] constitutional right," *id.* at §706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations," *id.* at §706(2)(C).  The standard of review under the APA

---

[9]  The parties filed 180 pages of briefs, and an additional 146 pages of amicus briefs were filed.

[10]  Plaintiffs requested oral argument, *see* Doc. 36 at 2, but the Court sees no need for it based on the extensive briefing.  *See* N.D. Fla. Loc. R. 7.1(K) ("The Court may—and most often does—rule on a motion without oral argument, even if a party requests oral argument.").

is "exceedingly deferential" to the agency, *see Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996)), particularly on matters involving foreign policy, *see Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981) (explaining that "the legislative history and cases interpreting [the statute on which the IEEPA was patterned] fully sustain the broad authority of the Executive") *Zarmach Oil Services, Inc. v. U.S. Dept. of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders.")(quoting *Regan v. Wald,* 468 U.S. 222, 242 (1984)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp.2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

In determining whether agency action is arbitrary or capricious, the Court's role is to ensure that the agency's decision was rational, "not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club*, 526 F.3d at 1360 (quoting *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996)). However, the Court is not required to defer to the agency's interpretation of unambiguous statutory or regulatory language. *See Kinsor v. Wilkie*, 139 S.Ct. 2400,

2415-18 (2019); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 457 U.S. 837, 842-43 (1984).

### Analysis

The parties' filings frame three issues—(1) whether OFAC exceed its statutory authority by designating Tornado Cash's core software tool; (2) whether the designation was arbitrary or capricious; and (3) whether the designation violated the First Amendment. Each issue will be addressed in turn.

<u>Statutory Authority</u>

Plaintiffs argue that OFAC exceeded its statutory authority in designating Tornado Cash's core software tool because the tool is merely computer code that cannot be changed by anyone and in which no foreigner has a legally recognized "property interest." The Court rejects this argument because it is built on the faulty premise that the "interest" required under the IEEPA is "property interest" or "ownership interest" in the technical legal sense.

The operative language in the IEEPA is "<u>any</u> interest," not "property interest" or "ownership interest." This statutory language has been interpreted broadly by the other courts. *See Holy Land*, 219 F. Supp. 2d at 67 (explaining that the IEEPA "does not limit the President's blocking authority to the existence of a legally enforceable interest"); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 23–24 (D.D.C. 2015) ("The sweeping language of [50 U.S.C. §]1702 imposes no limit on the scope of interest

blockable under the IEEPA.") (quoting *Holy Land*, 333 F.3d at 162); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) ("The function of the IEEPA strongly suggests that beneficial rather than legal interests matter.").  And the broad interpretation of the phrase "any interest" is consistent with its plain language because the word "any" is "used to indicate one selected without restriction," Webster's Seventh Collegiate Dictionary, at 40 (1965), and the word "interest" is a general word that is "to be accorded [its] full and fair scope [and is] not to be arbitrarily limited," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012).

The regulations adopted by OFAC define the term "interest" when used with respect to property to mean "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. §§510.313, 578.309.  This definition is consistent with the broad, plain-language interpretation of the phrase "any interest" and, thus, the regulations are entitled to deference.  *See Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994) ("OFAC may choose and apply its own definition of property interest, subject to deferential judicial review."); *OKKO*, 133 F. Supp. 3d at 25 (explaining that the OFAC's interpretation of the definition of "interest" in its regulations is entitled to deference unless "OFAC's construction has departed so far from common usage as to be 'plainly wrong.'").

13

Based on OFAC's regulations, the question as to whether OFAC has exceeded its delegated authority by designating the Tornado Cash core software tool boils down to whether members of the Tornado Cash entity (i.e., its founders, developers, and DAO) have "an interest of any nature whatsoever" in that tool. On that issue, the administrative record establishes that the Tornado Cash entity has an "interest" in all of the smart contracts that make up its service (including the core software tool) because without those contracts, the service and the TORN held by the founders, developers, and DAO would not function and would be less valuable. *See, e.g.,* A.R. 60-62.

The Court did not overlook Plaintiffs' argument that the Tornado Cash entity has "abandoned" any interest it may have had in the core software tool because the "tool [is now] inalterable and irrevocable." Doc. 36-1 at 22. However, as persuasively explained in the evidentiary memorandum, TORN holders still have an indirect beneficial "interest" in the use of the core software tool and the service as a whole because that increases the value of the TORN. *See* A.R. 61 (explaining that "TORN owners and the DAO are … similar to stockholders, who have an interest in the enterprise, and may benefit from the success of TORNADO CASH [because] the more users that submit virtual currency to the smart contracts to be mixed, the larger the pool becomes, and the more effective the virtual currency may be mixed, thereby increasing the value of TORNADO CASH and of TORN tokens").

The Court also did not overlook that the core software tool does not directly generate fees for TORN holders when the tool is used without the involvement of a registered relayer.  However, the indirect interest that TORN holders (including the Tornado Cash founders, developers, and DAO) have in the increased use and popularity of the Tornado Cash service as a whole is sufficient to establish that foreigners have an "interest" in the core software tool.  Indeed, the fact that TORN had substantial value before relayers (and the fees they paid) were added to the Tornado Cash service in March 2022 suggests that the service has intrinsic value even without relayers and supports the inference that increased use of the service will increase the value of the TORN held by Tornado Cash's founders, developers, and DAO—which is an "interest" for purposes of the IEEPA.

Finally, the Court did not overlook the statement in *Regan* that "[t]he grant of authorities in IEEPA does not include the power … to regulate purely domestic transactions."  468 U.S. at 228 n.8.  However, that does not help Plaintiffs because a Tornado Cash transaction between two Americans cannot be considered a "purely domestic transaction" when the transaction provides indirect benefits to foreigners by increasing the value of the TORN held by the Tornado Cash founders, developers, and DAO.

In sum, because foreigners (e.g., Tornado Cash's founders, developers, and DAO) have a financial "interest" in the increased use and popularity of the Tornado

Cash service as a whole, OFAC did not exceed its statutory authority by designating all of the addresses affiliated with the service, including the core software tool, under the IEEPA. This conclusion is not undercut by the rule of lenity or the major questions doctrine.

The rule of lenity is a canon of statutory interpretation that requires courts to construe any ambiguity in a statute defining a crime or imposing a penalty in favor of the defendant. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 296 (2012). The rule of lenity could be implicated here because, even though this is not a criminal case, the IEEPA imposes criminal penalties, *see* 50 U.S.C. §1705(a), (c), and "when [courts] are faced with a statute that has both criminal and noncriminal applications, '[they] must interpret the statute consistently' in both contexts." *Romero v. Sec'y, U.S. Dep't of Homeland Sec.*, 20 F.4th 1374, 1383 (11th Cir. 2021), *cert. denied sub nom. Argueta Romero v. Mayorkas*, 142 S. Ct. 2869 (2022) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)). However, "[t]he rule [of lenity] 'applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" *Moskal v. United States*, 498 U.S. 103, 108 (1990); *see also Shular v. United States*, 140 S. Ct. 779, 787 (2020) (quoting *United States v. Shabani*, 513 U.S. 10, 17

(1994)).  Here, as discussed above, there is nothing ambiguous about the statutory phrase "any interest" that would justify invocation of the rule of lenity.[11]

The major questions doctrine "refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *W. Virginia v. Envtl. Prot. Agency*, 142 S. Ct. 2587, 2609 (2022).  Accordingly, "in certain extraordinary cases … [t]he agency … must point to 'clear congressional authorization' for the power it claims." *Id.* (emphasis added) (quoting *Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 324 (2014)).  This is based on the logic that "had Congress wished to assign th[ose] question[s] to an agency, it surely would have done so expressly." *King v. Burwell*, 576 U.S. 473, 486 (2015); *see also Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (explaining that this doctrine is premised on the idea that Congress usually does not "hide elephants in mouseholes").  Here, the Court sees nothing "extraordinary" about this case or the regulatory action taken by OFAC that would implicate the major questions doctrine because, unlike other recent cases in which the doctrine has been applied,[12] the designation of Tornado Cash falls squarely

---

[11] While the phrase "any interest" is a broad one, it is not ambiguous, and "[t]he rule of lenity is not used to narrow a statute that has an unambiguously broad thrust." *United States v. Litchfield*, 986 F.2d 21, 22 (2d Cir. 1993).

[12] *See, e.g.*, *NFIB v. OSHA*, 142 S.Ct. 661, 662 (2022) (involving a vaccine mandate affecting 80 million workers that was imposed by an occupational safety agency); *Ala. Ass'n of*

within the authority delegated to OFAC and is a targeted action directed at a single entity whose services have been used to launder hundreds of millions of dollars of stolen cryptocurrency for the benefit of the North Korean government.

Accordingly, for the reasons stated above, the Court finds that OFAC did not exceed its statutory authority by designating Tornado Cash.

<u>Arbitrary or Capricious</u>

Plaintiffs argue that OFAC's designation of Tornado Cash was arbitrary and capricious because (1) it did not match the OFAC's proffered foreign-affairs rationale, (2) it departed from OFAC's longstanding position of sanctioning persons who can change their behavior rather than technology that cannot, and (3) it failed to consider important aspects of the problem.  Defendants responds that OFAC's designation of Tornado Cash was not arbitrary or capricious, that it was reasonable and necessary for national security, and that it satisfies the deferential standard for judicial review under the APA.  The Court agrees with Defendants.

An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *High Point, LLLP v. Nat'l Park Serv.*,

---

*Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021) (involving a nationwide eviction moratorium imposed by a public health agency).

850 F.3d 1185, 1193–94 (11th Cir. 2017) (quoting *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009)).  Here, the Court finds that OFAC's decision to block Tornado Cash was not arbitrary or capricious for any of the reasons asserted by Plaintiffs.

*First*, there is ample evidence in the administrative record justifying OFAC's decision to designate Tornado Cash based on the Defendaants' foreign-affairs rationale.[13]  Indeed, there is no real dispute that Tornado Cash has been used to help launder hundreds of millions of dollars of stolen cryptocurrency and that some of those funds have benefitted the North Korean government and its nuclear missile program.

*Second*, OFAC's designation of Tornado Cash does not constitute a departure from the policy of United States' sanctions policy.  Indeed, the designation is consistent with that policy because it is intended "to deter or disrupt behavior that undermines U.S. national security."  Dep't of the Treasury, The Treasury 2021 Sanctions Review 1 (2021), https://perma.cc/9M85-7ZRN.

*Third*, OFAC did not fail to consider important aspects of the problem, such as reliance interests and loss of property.  Indeed, OFAC publicly stated that it would

---

[13]  The information in classified lodging provides additional detail about this issue, but it is unnecessary (and would be inappropriate) for the Court to discuss the contents of that information here because, even without that information, there is ample evidence in the administrative record to establish that Tornado Cash has been used to launder the proceeds of illicit activities that has funded the activities of the North Korean government.

not prioritize enforcement against "dusting" transactions, *see* http://perma.cc/5KQ5-25GE (FAQ 1078), and OFAC provided a licensing scheme that Plaintiffs (and others) can utilize to complete whatever transactions are necessary to recover assets that are still held in Tornado Cash pools, *id.* (FAQ 1079). These actions demonstrate that OFAC considered the relevant reliance interests and took steps to mitigate any negative consequences innocent Tornado Cash users may face as a result of the designation.

Accordingly, for the reasons stated above, the Court finds that the designation of Tornado Cash was not arbitrary or capricious.

<u>First Amendment</u>

Plaintiffs argue that OFAC's designation of Tornado Cash violated the First Amendment because it chilled Plaintiffs' protected rights of association by blocking a financial privacy tool they relied on to make donations to organizations and causes and it was not narrowly tailored to achieve its aims. Defendants responds that the First Amendment was not implicated by OFAC's designation of Tornado Cash and, and even if it was, the designation satisfies the requisite level of scrutiny.

Plaintiffs do not cite any authority supporting the existence of a First Amendment right to use a particular service or type of currency to make donations for charitable or other purposes. The freedom of association cases cited by Plaintiffs are distinguishable because those cases involve government action that compelled

private associations to disclose their major donors or members.  *See Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021); *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963).  Here, the designation of Tornado Cash did not compel private associations to disclose anything about their donors or members.

The Court did not overlook Plaintiffs' reliance on *Meyer v. Grant*, 486 U.S. 414, 424 (1988), for the proposition that the government violates the First Amendment when it "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse."  However, that case does not help Plaintiffs here for two reasons.

*First*, *Meyer* is a free speech case that dealt with the chilling consequences that a ban on paying the circulators of initiative petitions would have on disseminating "political discourse."  Here, Plaintiffs have raised a freedom of association claim, not a free speech claim.

*Second*, the designation of Tornado Cash does not preclude Plaintiffs (or anyone else) from spending money or donating money for political ends, nor does it preclude organizations from accepting anonymous donations.  The fact that Tornado Cash may be Plaintiffs' preferred way of maintaining their financial privacy does not mean that it is the only way for them to do so.  Indeed, it is noteworthy that one of the plaintiffs stated in his declaration that Tornado Cash is used "in his regular

rotation of privacy tools," Doc. 36-2 at ¶9, which implies that there are other privacy tools that are available to Plaintiffs.

Accordingly, for the reasons stated above, the Court finds that the designation of Tornado Cash did not implicate Plaintiffs' First Amendment rights.[14]

### Conclusion

In sum, for the reasons stated above, it is **ORDERED** that:

1.      Plaintiffs' motion for summary judgment (Doc. 36) is **DENIED**.

2.      Defendants' cross-motion for summary judgment (Doc. 57) is **GRANTED**.

3.      The Clerk shall enter judgment stating: "Summary judgment is entered in favor of Defendants.  All claims in Plaintiffs' amended complaint are dismissed with prejudice.  Plaintiffs shall take nothing from this action and Defendants shall go hence without delay."

4.      The Clerk shall close the case file.

**DONE and ORDERED** this 30th day of October, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

---

[14]  Based on this conclusion, the Court need not consider what level of scrutiny applies to the designation of Tornado Cash or whether the designation would withstand that level of scrutiny.